IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No: 21-MJ-296 (GMH) |
| : | |
| CHRISTOPHER WORRELL, : | |
| : | |
| Defendant. : | |

**SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
EMERGENCY MOTION FOR RECONSIDERATION**

The government respectfully submits this supplemental memorandum of law in response to this Court's minute order of April 5, 2021, directing the government to address, by April 6, 2021, the application of *United States v. Munchel*, No. 21-3010, 2021 WL 1149196 (D.C. Cir. Mar. 26, 2021) to the instant case. *See* Dkt. (Min. Order of Apr. 5, 2021) (hereinafter "Minute Order"). This case is distinguishable from that of *Munchel* in several ways that are clear from the facts that this Court outlined in its original detention order. For that reason, the government does not view *Munchel* as requiring reconsideration of that original detention order.

The Court directed the government to address eight specific elements from the *Munchel* decision, and the government responds to each point below. The Court highlighted that the D.C. Circuit, in *Munchel*:

> **"(1) examined a statutory definition before finding that 'at this stage, the evidence sufficiently demonstrates that Munchel's taser is a dangerous weapon under the statute,'" Minute Order (quoting *Munchel*, 2021 WL 1149196, at \*6 n.5).**

This part of the D.C. Circuit's discussion is relevant, as it was in *Munchel*, to whether Worrell is eligible for detention under 18 U.S.C. § 3142(f)(1)(E). *See Munchel*, 2021 WL 1149196, at \*6. The D.C. Circuit in *Munchel* examined the definition of "dangerous weapon" that appears in 40 U.S.C. § 5104(a)(2)(B), the statute under which Munchel was charged. Under

1

*Munchel*, if a defendant is charged by indictment or complaint with committing an offense that has, as an element, the possession or use of a "dangerous weapon," that is sufficient to satisfy 18 U.S.C. § 3142(f)(1)(E). *See Munchel*, 2021 WL 1149196, at *6 ("The Bail Reform Act thus explicitly authorizes detention when a defendant is charged with committing certain felonies while possessing a dangerous weapon, as is alleged in this indictment."). Here, Worrell is charged with violating 18 U.S.C. § 1752(a)(1), (a)(2), and (a)(4), all with that statute's "dangerous weapon" enhancement. That enhancement is found in 18 U.S.C. § 1752(b)(1)(A), and requires the "use[] or carr[ying]" of "a deadly or dangerous weapon," which phrase is not further defined in the statute. *Id.* Thus, Worrell, like Munchel, has been charged, after a finding of probable cause, with offenses that include, as an element, the use or carrying of a dangerous weapon. In addition, Worrell has not, to date, disputed that pepper spray gel falls within the definition of a "dangerous weapon" under Section 3142(f)(1)(E) or Section 1752(b)(1)(A).[1] As in *Munchel*, the Court should conclude that these charges and the government's proffer are sufficient to establish that Worrell's pepper spray is a dangerous weapon under Section 3142(f)(1)(E). *Munchel*, 2021 WL 1149196, at *6 n.5.

Finally, Worrell is also independently eligible for detention under 18 U.S.C.

---

[1] The government previously made an oral proffer with respect to pepper spray's effects, and has noted the statements made in a few published opinions regarding the fact that pepper spray can cause asthmatic reactions in vulnerable individuals. *See, e.g.*, *United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1999) (discussing the effects on those with an underlying condition); *United States v. Melton*, 233 F. App'x 545, 547 (6th Cir. 2007) (unpublished) ("[B]ased on the severe and probable effects that pepper spray has on the human body, the district court's determination that pepper spray constitutes a 'dangerous weapon' was not erroneous."). Although Worrell has not disputed the effects of pepper spray (or, here, pepper spray gel), the government proffers the following information as well: One of pepper spray's ingredients is Oleoresin Capsicum, an oily extract of pepper plants. Pepper spray is an inflammatory agent that inflames the mucous membranes in the eyes, throat and lungs. It causes immediate closing of the eyes, difficulty breathing, runny nose, and coughing. Pepper spray can cause a burning sensation, pain, and temporary blindness to the person sprayed with it. The product page for the brand of pepper spray gel used by Worrell states that it has the same "high performance liquid chromatography" used in the brand's other pepper spray products, which the brand claims create the "most consistently potent pepper spray in the industry." *See Which Formulation Should I Use?*, SABRE (accessed April 5, 2021), *https://www.sabrered.com/which-formulation-should-i-use*; *SABRE's Exclusive Guarantee. HPLC technology is the pepper spray industry's #1 advantage… and it's exclusive to SABRE.*, SABRE (accessed April 5, 2021), https*://www.sabrered.com/hottest-pepper-spray*.

§ 3142(f)(2)(B) because of the obstructive conduct noted by the Court in its detention order. *See* Dkt. 13, Att. At 3; Dkt. 9 at 16 (noting, in addition to the facts highlighted by the Court, that the Defendant claimed he had engaged in no wrongdoing when first interviewed by the FBI).

> **"(2) placed little weight on a defendant's mere possession, without use, of a dangerous weapon while storming the U.S. Capitol in evaluating the district court's conclusion that the defendant posed a danger to the community," Minute Order (citing *Munchel*, 2021 WL 1149196).**
>
> **"(5) emphasized that defendants 'assaulted no one on January 6 . . . did not enter the Capitol by force . . . [and] vandalized no property' as important considerations for whether defendants 'pose a threat of using force to promote [their] political ends,'" Minute Order (citing *Munchel*, 2021 WL 1149196, at \*8).**
>
> **"(7) articulated a difference between mob participants that 'assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions' and those who 'cheered on the violence or entered the Capitol after others cleared the way,'" Minute Order (citing *Munchel*, 2021 WL 1149196, at \*8).**

The government analyzes these three factors together. First, with respect to factors 2 and 5 identified above, Munchel was alleged to have carried a taser on his person onto Capitol grounds and inside the Capitol building, but was not alleged to have used the taser. *See Munchel*, 2021 WL 1149196, at \*1-2. By contrast, this Court found, and Defendant has not seriously contested, that Defendant did actually use the pepper spray gel on his person, as is shown by: the photograph of Worrell spraying that gel; the recovery of a matching canister of pepper spray gel (of the same brand) at Worrell's residence on March 12, 2021; and Worrell's girlfriend's statements to law enforcement that Worrell told her he was attempting to pepper spray someone other than law enforcement. Thus, at the very least, there is seemingly no question Worrell both used his dangerous weapon in a crowd of people and assaulted someone on Capitol grounds, unlike *Munchel*, and in a dangerous situation involving an unruly crowd.

With respect to factor 7, the government has previously recounted why it believes, based

on the photographic evidence available, that the only reasonable interpretation of Worrell's conduct is that he was attempting to spray law enforcement officers. *See* Dkt. 9 at 21. This Court found that Worrell's contention that he was spraying someone else in the crowd "strains credulity." Dkt. 13, Att., at 1. Below is a clear photograph that the government has previously submitted to this Court of Worrell spraying his pepper gel on January 6.



The following still image, taken from a video that was discovered after this Court's March 19, 2021 detention order, captures the same moment. It shows Worrell (circled in red) raising his arm in the same fashion (and surrounded by apparently the same people) as in the photograph of him discharging pepper spray:



Among other similarities, both images show the man next to Worrell with blue plaid sleeves and a tan vest and the woman above Worrell with a tan coat and red gloves.

From these images, in addition to the photographs and videos discussed in the government's original memorandum in support of detention (Dkt. 9), and the overall context of that day, it is clear to the government that Worrell's intended target was the line of law enforcement members in this image. As the *Munchel* panel noted, "those who actually assaulted police officers . . . are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." *Munchel*, 2021 WL 1149196, at

\*8.

> "(3) determined the district court did not demonstrate that it 'adequately considered, in light of all the record evidence,' whether defendants, who were a part of the mob assault on the Capitol, illegally entered the Capitol, carried weapons onto Capitol grounds, and showed no remorse for their actions, but had limited criminal history, . . . presented 'an identified and articulable threat to the community,'" Minute Order (citing *Munchel*, 2021 WL 1149196, at \*7-8).
>
> "(4) required that any 'threat be considered in context,' . . . such that the district court must consider 'the nature of the threat identified and the resources and capabilities of the defendant' to carry out that threat," Minute Order (citing *Munchel*, 2021 WL 1149196, at \*7-8).
>
> "(6) directed the district court to consider whether defendants pose such a threat outside of the specific context 'of a large group of people who had gathered at the Capitol in protest that day' on January 6th, 2021, since 'the presence of the group was critical to their ability to obstruct the vote and to cause danger to the community,' . . . and 'there was no explanation of how [defendants] would be capable of doing so now that the specific circumstances of January 6 have passed,'" Minute Order (citing *Munchel*, 2021 WL 1149196, at \*8).

The government also analyzes these factors together. This Court's detention order spells out several reasons that were not present in *Munchel* why Worrell presents an ongoing threat to the community, including potential witnesses.

First, as noted above, Worrell (but not Munchel) actually used his dangerous weapon on Capitol grounds—and, what is more, did so against law enforcement officers protecting the Capitol. Worrell's action was one of many actions taken that day that "contributed to the police's failure to keep the mob from entering [the] Capitol building." Dkt. 13, Att. at 3. As noted above, that places Worrell in a different class of dangerousness than Munchel and others who engaged in no such conduct; Worrell's willingness to engage in violence in front of so many police officers is an indication of his likely willingness to engage in violence in the future. Worrell also still had a canister of the same brand of pepper spray gel in his residence on March 12, 2021—two months later—indicating his access to the same weapon.

6

Second, Worrell's conduct on January 6, 2021 does not stand alone. *Id.* at 1. Worrell is, unlike Munchel, a self-avowed member of the Proud Boys. He previously traveled to Washington, D.C. on December 12, 2020; is captured in photographs from that day in Proud Boy gear and with other individuals in the same type of gear; and was captured in an open-source video that the government has previously described, *see* Dkt. 9 at 6, taunting and confronting a videographer on the streets of Washington, D.C. Prior to being arrested, months after January 6, 2021, Worrell was on a camping trip with other Proud Boys members (according to his girlfriend) and was wearing a Proud Boy shirt, indicating that the events of January 6, 2021, have not dampened his enthusiasm for that organization. Indeed, these facts indicate that Worrell may not view his actions on January 6, 2021, as serious offenses, and is thus more likely to engage in such violent activity again. Then, "while being arrested, [Worrell] commented to the FBI agents that he knew the name of the tipster and stated a name, as if seeking confirmation, and further, stated that if he were to find out the name of the Twitter user who exposed his identity online, the FBI 'would be coming for [him] again.'" Dkt. 13, Att. at 3. As the Court found, "[t]hese comments raise serious and troubling signals about defendant's willingness to comply with release conditions to not intimidate or threaten any prospective witness." *Id.*

Third, as the Court described at length in its order, Worrell has a criminal history that includes a prior arrest in which he is alleged to have impersonated a law enforcement officer and confronted a young woman alone in her vehicle; in his vehicle officers found weapons, tactical gear, some form of chemical spray akin to pepper spray, and *handcuffs*. *Id.* Worrell pled no contest and was subject to a form of court-ordered probation. As the Court found, that "prior intimidating conduct towards a total stranger in service of taking the law into his own hands," which was not present in Munchel's background, "is a significant backdrop to evaluating the

government's proffer as to the risk defendant poses of danger, obstruction and intimidating witnesses if released." *Id.* Munchel, by contrast, had two prior misdemeanor convictions for marijuana possession. *See Munchel*, 2021 WL 1149196, at *1.

All of these facts—his violence on January 6, his ongoing affiliation with the Proud Boys and multiple trips to Washington, D.C., his post-arrest threats, and his prior disturbing arrest—indicate that Worrell's conduct on January 6, 2021 cannot be written off as an aberration.

> **"(8) directed that '[d]etention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight,'" Minute Order (citing *Munchel*, 2021 WL 1149196, at \*7).**

This Court rested its detention order on Worrell's dangerousness, not on a finding merely that he would be unlikely to comply with conditions of release. *See* Dkt. 13 at 2 (finding "[b]y clear and clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community"). This Court did state that Worrell may not comply with the conditions of his release, but that finding was specific to Worrell's likelihood of violating "release conditions to not intimidate or threaten any prospective witness," which is a finding directly connected to Worrell's ongoing dangerousness and the likelihood that conditions could mitigate it. Dkt. 13, Att. at 3. A defendant who uses a dangerous weapon to attack law enforcement officers protecting a government facility and a democratic institutions is, of course, far less likely to respect and abide by release conditions imposed by that very same government. But this Court correctly relied on Worrell's dangerousness, not solely on his unwillingness to abide by conditions, in detaining him.

For the reasons given above, Worrell's case is distinguishable from *Munchel*, and there is no reason to reconsider his detention on the basis of that opinion.

        Respectfully submitted,

        CHANNING D. PHILLIPS
        Acting United States Attorney
        D.C. Bar No. 415793

        */s/ William Dreher*
        WILLIAM DREHER
        D.C. Bar No. 1033828
        Assistant United States Attorney (Detailed)
        700 Stewart Street, Suite 5220
        Seattle, WA 98101
        (206) 553-4579
        william.dreher@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 6, 2021, I served a copy of this pleading on defendant's counsel through the Court's electronic filing system.

*/s/ William Dreher*
William Dreher
Assistant United States Attorney