```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
    *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,            )  Criminal Action
                                     )  Case No. 21-MJ-296
vs.                                  )
                                     )
CHRISTOPHER JOHN WORRELL,            )  April 6, 2021
                                     )  2:55 p.m.
               Defendant.            )  Washington, D.C.
    *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

### TRANSCRIPT OF MOTION FOR RECONSIDERATION
### BEFORE THE HONORABLE BERYL A. HOWELL,
### UNITED STATES DISTRICT COURT CHIEF JUDGE

**APPEARANCES:**

FOR THE GOVERNMENT: WILLIAM DREHER
                    U.S. Attorney's Office
                    700 Stewart Street
                    Seattle, WA 98101
                    (206) 553-4579
                    Email: william.dreher@usdoj.gov

FOR THE DEFENDANT:  JAMES F. KELLY, PRO HAC VICE
                    Pierce Bainbridge P.C.
                    355 South Grand Avenue, 44th Floor
                    Los Angeles, CA 90071
                    (213) 262-9333
                    Email: jpierce@piercebainbridge.com

                    ROBERT LEE JENKINS, JR.
                    1010 Cameron Street
                    Alexandria, VA 22314
                    (703) 309-0899
                    Email: rjenkins@bynumandjenkinslaw.com

ALSO PRESENT:       THOMAS FISHER, Pierce Bainbridge
                    CHRISTINE SCHUCK, Pretrial Services

Court Reporter:     Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter

*This hearing was held via videoconference and telephonically*
*in compliance with the COVID-19 pandemic*
*stay-safer-at-home recommendations and is therefore subject to*
*the limitations associated with the use of technology.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Matter before the Court,

Magistrate Case No. 21-296, United States of America versus

Christopher John Worrell.

Your Honor, for the record, pretrial agent

Christine Schuck is joining us today.

Counsel, please state your names for the record,

starting with the government.

MR. DREHER:  Good afternoon, Your Honor.

William Dreher for the government.

THE COURT:  Yes.  Good afternoon, Mr. Dreher.

MR. KELLY:  Good morning.  This is James Kelly for

the defendant, Christopher Worrell.

THE COURT:  James Kelly, okay.

MR. JENKINS:  Good afternoon, Your Honor.  This is

Robert Jenkins; I am local counsel for Mr. Kelly.

THE COURT:  Okay.  And who is Thomas Fisher?

MR. FISHER:  Hello, Your Honor.  I am a law clerk

with Pierce Bainbridge for the defendant.

THE COURT:  All right.  Well you can take your

video off, I don't think you're going to be speaking; it's

just a distraction.  If you don't mind, please.

All right.  And where is Mr. Pierce, is he here?

MR. KELLY:  No.  Mr. Pierce is not attending.  I

am appearing as counsel of record for today's hearing.

1    Thank you, Your Honor.

2              THE COURT:  Okay.  All right.  And Mr. Worrell.

3              Mr. Worrell, do you agree, after consultation with

4    counsel, to participate in this hearing today for your

5    motion --

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  -- via videoconference rather than

8    being present physically in the courtroom?

9              THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  Okay.  So pending before the Court is

11   the defendant's emergency motion for reconsideration of the

12   Court's detention order that was entered on March 19th,

13   2021.

14             In connection with this hearing, I have reviewed

15   all of the submissions that have been made, the defendant's

16   motion, the exhibits attached to that motion including the

17   DVD which was marked as Exhibit D; it arrived in the

18   courthouse yesterday so I was able to watch it yesterday.

19             I have also reviewed the government's opposition

20   memos, both docketed at ECF 19, as well as ECF 24 which was

21   in response to the court order that the government address

22   the *Munchel* factors, which is the most recent D.C. Circuit

23   case on detention for defense conduct arising out of the

24   January 6th events.

25             I have also reviewed the defendant's response to

1    the Court's minute order that -- which is docketed at ECF 23

2    which -- and that was an order -- that was entered on

3    April 1 that directed defense counsel to advise the Court

4    about all of the steps that had been taken by defense

5    counsel in coordination with the defendant's doctor,

6    Dr. Bino Rucker, to ensure that the Charlotte County Jail

7    was authorized to give the defendant all of the medications

8    that he says he requires and -- particularly in light of the

9    defense -- of the government's response saying that that

10   jail has tried multiple times to reach Dr. Rucker without

11   success.  And I have to say the response I got back from

12   Mr. Pierce to that minute order at ECF 23 did not address

13   any of the questions that I posed in my minute order since I

14   am trying to make this hearing as efficient and constructive

15   as possible with all of the information in front of me.  And

16   I think that that's important, and so that's the first thing

17   that I am going to turn to Mr. Kelly or Mr. Jenkins to

18   address because the motion for reconsideration of the

19   Court's order, which was just recently entered, was

20   predicated largely on what is called the discovery of

21   evidence not previously available; and it's based on the

22   claim that the defendant had been denied medication for his

23   medical condition.

24          So, Mr. Kelly, are you prepared to address what I

25   hoped to have already at hand, the questions in my April 1

 1    minute order?  And if you want me to review those questions

 2    I will be happy to do that for you.

 3              MR. KELLY:  No, Your Honor.

 4              I think I am equipped.  I have a pretty --

 5    substantial previous experience with oncology in other types

 6    of litigation, although I am not a medical doctor; that's

 7    why we resorted to having Dr. Rucker address all of our

 8    concerns in the form of an affidavit not once but twice

 9    regarding Mr. Worrell's condition.

10              These were -- symptoms began developing since his

11    incarceration.  He had met with a nurse and a physician who

12    was available on a Monday to explain to her what his

13    conditions were, what his symptoms were.  We had consulted

14    previously with --

15              THE COURT:  I am sorry, I am going to interrupt

16    you.  When I ask a question, if you don't mind, I'd really

17    like an answer to my question.

18              MR. KELLY:  Yes.

19              THE COURT:  So the defense motion says he has been

20    denied this medication that he requires.  The Charlotte

21    County Jail says that that medication -- he has been given

22    all of the medications for which he had good prescriptions;

23    and that for this cream -- the medication that he says he

24    didn't get -- it required further authorization from

25    Dr. Rucker; and they tried multiple times to reach

1    Dr. Rucker without success.

2          So what did you-all do as defense counsel to make

3    sure that Dr. Rucker had responded to the jail's phone calls

4    to tell them whether he was authorized or not authorized to

5    get the cream?

6          MR. KELLY:  Indeed, Dr. Rucker was -- there were

7    several attempts by the jail to contact him.  They didn't

8    leave a call back number, only a general number which he did

9    return that call and did direct medical or the pharmacy; he

10   was more than prepared to authorize any prescription which

11   has been done in the meantime, in the interim period, and

12   many of that communication has taken place.  And since then

13   the compound is being developed at the Florida location for

14   administration to Dr. Rucker -- rather to Mr. Worrell from

15   Dr. Rucker; so that is in the process of being furnished to

16   him.  That was before his transfer just yesterday to jail

17   in -- Brady jail in Oklahoma, so that has further slowed

18   down the process.

19         We have taken all steps necessary and due

20   diligence to have Dr. Rucker make direct contact with the

21   jail's pharmacy which he was able to get through to them;

22   that information -- that contact information had not

23   previously been made available by the jail.

24         THE COURT:  I'm sorry.  You know what, rather than

25   spending time in making a motion, you know, asking for

1    reconsideration of something this Court just considered,

2    don't you think it might have made more good use of your

3    time to get in touch with that jail and arrange for a

4    connection between Dr. Rucker and the jail or to fax the

5    jail a prescription with Dr. Rucker's signature?

6            I mean, it just seems like this is a comedy of

7    errors that wasn't cured very promptly by defense counsel.

8            I mean, we have -- I mean, medical issues come up

9    all the time; defense counsel simply -- you know, they talk

10   to the jail, they arrange for doctor communication.

11           Okay.  So what else do you have to say about this

12   medical condition that is now going to be treated?

13           MR. KELLY:  It cannot only be treated by

14   medication which has been denied him because of the

15   transfer; that will be the furthest line down the process.

16   If he were still in Florida, he may have those medications

17   in hand by now to at least deal with the symptoms.

18           They will only deal with the symptoms of an

19   underlying disease which is cancer, non-Hodgkin's lymphoma,

20   which is potentially fatal.  And in connection with the

21   COVID environment currently in carceral facilities, we think

22   that the government would have to stipulate that it is an

23   unsafe environment with respect to these current conditions.

24   And, again, these medications are only --

25           THE COURT:  Well, you know, I read the pretrial

1    services report before.  The pretrial services report said

2    that he had this non-Hodgkin's lymphoma; he's had it for 14

3    years, he had been subject to treatment before, it raised no

4    issue about that it wasn't controlled.

5            There was zero -- zero reference to this at the

6    hearing, zero.

7            MR. KELLY:  Okay.

8            THE COURT:  So you can imagine busy judges'

9    reactions when something that is now an emergency wasn't

10   even mentioned -- wasn't even mentioned at the hearing in

11   front of me before.

12           MR. KELLY:  Because the symptoms of the disease

13   have become aggravated during the interim period, which

14   lesions and rashes are readily apparent through a standard

15   medical evaluation.  Those were not present before but now

16   they are.  These are not self-inflicted wounds.  These are

17   rather, simply, symptoms aggravated.  It's the ongoing

18   incarceration, the lack of medications, and the lack of

19   outside oncology examination and treatment for this disease.

20           THE COURT:  Well, have you -- what efforts have

21   you made to communicate to the marshal service about the

22   fact that he needs medication he developed I guess -- or

23   compounded for him and to get it to the D.C. jail upon his

24   arrival here?

25           MR. KELLY:  Yes, agreed, Your Honor.  And with due

1    diligence we immediately contacted the marshal when it

2    became apparent that he had been transferred.  But the

3    marshal's policy is not to comment on any aspect of the

4    transfer, so it was a moot question as far as medications.

5          So the fact that we're discussing this right now

6    and he is in jail in Brady is only going to be resulting in

7    further delay in him receiving those medications; and,

8    again, those are only for the symptoms, not for the

9    underlying disease.

10          MR. DREHER:  Your Honor, if I may.

11          THE COURT:  Yes, Mr. Dreher.

12          MR. DREHER:  I think I may have some information

13   that may be helpful.

14          One thing is -- I just wanted to flag that I

15   believe -- although obviously Mr. Kelly can correct me if

16   this is not correct.  I believe that defense counsel may

17   have included some portion of their narrative description of

18   what defense counsel and Dr. Rucker did in response to -- in

19   attempting to contact the jail at docket 22 which was also

20   the reply to the government's opposition.  So that document

21   has a couple of pages of narrative facts about the attempts

22   to call the jail and provide some background for the Court.

23          With respect to --

24          THE COURT:  Well, you are right, I didn't see

25   that.  That's why I usually start with talking about what I

1    have looked at to make sure I haven't missed anything.

2          MR. DREHER:  With respect to the medications, the

3    government did reach out to the marshal service yesterday

4    when it learned that Mr. Worrell was being transported to

5    Washington, D.C., which is something that the government

6    actually -- the Department of Justice had requested given

7    the COVID -- frankly given the COVID numbers and the fact

8    that Mr. Worrell is, we would say, someone who is vulnerable

9    to COVID-19, we requested his earlier transport to

10   Washington, D.C., given their superior vaccination numbers

11   and efforts.  I think there is only one COVID case out of

12   over a thousand inmates there.

13         THE COURT:  I mean, the D.C. Department of

14   Corrections has done an excellent job.  And I actually did

15   get a report, Mr. Dreher, just yesterday that there are

16   three positive cases of COVID at the D.C. jail but they are

17   all intakes.  So they have none within -- they have none

18   among the residents at D.C. jail; these are all new intakes

19   who were caught as part of their protocol on intake and

20   quarantined and treated before they're put in the general

21   population.

22         MR. DREHER:  So with respect to the medications,

23   my understanding is that -- what the marshals informed me is

24   that Mr. Worrell has two medications that he was able to

25   travel with and neither of the medications that were noted

1   by Dr. Rucker in his affidavit were among those two

2   medications, so I do not believe he currently has the

3   medications that Dr. Rucker requested from the Charlotte

4   County Jail as early as last week.  I have some information

5   from the Charlotte County Jail as to why that is, which I am

6   happy to provide to the Court.

7          THE COURT:  Yes, because that was not my

8   understanding from reading the affidavit from the Charlotte

9   County Jail health person who said that the names of these

10  prescriptions -- they were giving him two which they

11  referred -- they are not allowed to give him because they

12  needed further doctor authorizations which their effort to

13  obtain was to no avail.

14         MR. DREHER:  Exactly.  And so I think that is all

15  accurate.  I think that was the status as of Tuesday when

16  that was filed.

17         So since that time -- so he does have -- again, he

18  does have two prescriptions; he has received those.  I think

19  those were the ones that were prescribed shortly after he

20  arrived on March 12th.

21         The third prescription that was suggested was a

22  cream that has to be specially formulated, a compound; that

23  is the one that had expired.  Based on my conversations with

24  the jail staff this morning, that prescription actually

25  expired on March 5th, which was one week prior to

1    Mr. Worrell being arrested; and there was a no refill -- and

2    it had expired.

3             Now, Mr. Worrell did have that cream -- my

4    understanding is that they were informed that he had a

5    bottle of some leftover cream at his residence.  But

6    typically jail policy is they don't allow inmates to bring

7    their own medication in with them if they haven't presented

8    a valid prescription because obviously they don't know what

9    those substances are.

10            They did obviously -- as noted in the affidavit,

11   they attempted to reach Dr. Rucker.  I reached out to

12   defense counsel on Tuesday, March 30th to say it looks like

13   there is an issue about -- once I learned -- essentially

14   within an hour of learning that there was an issue with this

15   connection -- we needed to get Dr. Rucker in connection with

16   the jail.

17            On Thursday I followed up and said if you need a

18   direct line -- I have spoken with the medical staff; if you

19   need a direct line, let me know.  I think on that day they

20   were able to get a direct line with the medical staff.

21            Dr. Rucker did talk to the advanced registered

22   nurse practitioner who works in the Charlotte County Jail on

23   April 1st.  And so here is what that individual then relayed

24   to me; so there are two prescriptions that Dr. Rucker had

25   recommended for Mr. Worrell, they are -- one of them is

1   something called a sirolimus cream; and that is a compounded

2   cream.

3           Mr. Worrell had indicated to medical staff that it

4   usually takes one to two weeks after the pharmacy receives

5   the prescription for that cream for them to actually

6   compound it and make it available to him.  That is done

7   outside of the jail setting.  There is some delay even after

8   the prescription has been entered and they receive that

9   cream.

10          Unfortunately Dr. Rucker, according to the jail

11  staff, was unable to provide either the dosage level for the

12  cream or instructions for the pharmacy on how to compound

13  the cream which, again, is not, sort of, an off-the-shelf

14  prescription.  He informed the staff that he had provided

15  those instructions to Mr. Worrell's other pharmacy and that

16  he no longer has the instructions for compounding that.  So

17  he was not able to provide those instructions directly to

18  the medical staff -- so this was on Thursday.

19          Belatedly, the nurse practitioner asked for a

20  phone number to contact Dr. Rucker for medical records that

21  they could use to support the request for the prescription.

22  Dr. Rucker informed the jail -- and, again, this is the

23  government's proffer as to what it was told by Charlotte

24  County Jail staff.

25          Dr. Rucker informed the nurse practitioner that he

1   did not -- he could not provide a phone number for medical

2   staff to directly contact with him, and that he did not have

3   the ability to provide medical records because he provided

4   what he termed a "concierge" medical service where he does

5   not have staff who can field calls or provide medical

6   records.  So they requested medical records with respect to

7   these prescription and a direct phone number for follow-up

8   questions for Dr. Rucker.  While they attempted to offer

9   these prescriptions, Dr. Rucker declined to provide either

10  of those.

11          The only two other things that I will quickly

12  note, the same nurse practitioner had seen Mr. Worrell on

13  Tuesday, March 30th; that was the conversation where

14  Mr. Worrell indicated how long apparently it takes for this

15  cream sometimes to have this prescription filled.

16          The registered nurse practitioner actually

17  informed Mr. Worrell in that conversation that his

18  girlfriend could bring the cream that he had at home to the

19  jail and that then the pharmacy -- the prescription that he

20  had brought and they could either -- they could make a

21  decision about dispensing that cream to Mr. Worrell.  And

22  Mr. Worrell told medical staff that it was about an hour

23  drive from his home to the jail and that he was not going to

24  ask his girlfriend to make that drive to bring his cream.

25  That's what they relayed.

1              Another thing -- again, I think this is the last

2    point on this, and I appreciate Your Honor's patience.

3              The second prescription was for naltrexone

4    hydrochloride.  The medical staff indicated that the

5    ordinary indicated medical use for that is when it is in

6    conjunction with opiates or opioid use, and they were not

7    aware of a -- Dr. Rucker indicated that he had prescribed it

8    for off-label use for Mr. Worrell's cancer.  The medical

9    staff asked whether he had reports for the use of -- the

10   daily use of that drug typically used, again, with respect

11   to opiates to --

12             THE COURT:  And when you say -- I'm sorry to

13   interrupt you, Mr. Dreher.  But when you say it is used for

14   opioids, is it used for opioid addiction; is that what you

15   mean?

16             MR. DREHER:  That is -- yes, that is the

17   government's understanding.  It's essentially for people who

18   either -- it's not necessarily to treat anyone who had been

19   on high doses of opioids or who had high levels of

20   opiates -- taken a high level of opiates.  It's a

21   prescription that is used to basically prevent them from

22   returning to the use of opiates, so in the addiction

23   setting; but I think also there are other -- there may be

24   some other settings in which it's prescribed for that

25   purpose.

1          Again, Dr. Rucker stated, you know, I am

2    prescribing it for this off-label use to treat his cancer.

3    But, I guess, the best I can say is that medical staff

4    requests for further information, further specification, and

5    further medical records with respect to that prescription

6    were -- they were unable to get any further information; so

7    that was the purpose he was using it for.

8          At this point, what the government has done,

9    we have -- the Department of Justice -- I have actually

10   already forwarded the information from Mr. Worrell's

11   affidavit that he filed, the reply, the doctor's affidavit,

12   to both the marshal service and to the D.C. jail to make

13   sure that they are aware of Mr. Worrell's condition.  The

14   D.C. jail responded and said not necessarily yet -- at this

15   point, they obviously can't make a medical diagnosis because

16   Mr. Worrell is not here.  But, yes, they do treat

17   individuals with -- and for someone with cancer who may see

18   oncologists --

19          THE COURT:  Mr. Dreher, you are fading a little

20   bit.  Can you just repeat what you said about your

21   communications with the D.C. jail medical staff?

22          MR. DREHER:  Absolutely.

23          When I forwarded those records, they said that

24   while they can't necessarily make a medical diagnosis

25   obviously of an inmate that they have not seen, but they do

1    regularly treat or have treated individuals with cancer, and

2    that those individuals would be sent to an outside

3    oncologist in the Washington, D.C., community to see an

4    oncologist to treat for that.  They have done that in the

5    past, and it would be perfectly comfortable with doing that.

6            THE COURT:  All right.  Thank you.

7            Mr. Kelly or Mr. Jenkins.

8            MR. KELLY:  Yes.  Hi.

9            THE COURT:  You know, this is -- it doesn't -- it

10   doesn't put a judge in a good humor when an issue is raised

11   that could have been raised at the original hearing when

12   it's done on an emergency basis.  It's also not particularly

13   fruitful or helpful to, you know, try and get

14   reconsideration of a motion based on a medical circumstance

15   where not every single effort possible with the cooperation

16   of the treating physician, you know, has been at its

17   fullest.  That's -- to say the least, Dr. Rucker's

18   assistance in this matter hasn't been as fulsome as one

19   would hope whether Mr. Worrell was incarcerated or not.  And

20   this medication presumably was not so significant that he

21   kept his prescription up to date.  You know, at the time of

22   his initial detention he -- his prescription was already

23   outdated by five days.

24            So, you know, what -- is there anything else you

25   want to add to this?  It sounds like the sooner he gets to

1    D.C. the better.

2            MR. KELLY:  I would say I respectfully disagree.

3    He has cancer, Your Honor.

4            He has been living with this for some time.  And,

5    again, the naltrexone is treatment for pain management, also

6    for autoimmune disorders.  It is another -- it's another

7    treatment for opioids, but that's not the case here.

8            The bail report never made any reference

9    whatsoever that there was any opioid-type of addiction or

10   opioid abuse; this was strictly to deal with his cancer

11   management and his autoimmune.  The cream certainly helps a

12   great deal with the rashes, the boils, and the lesions that

13   he experiences, which are clearly visible upon a medical --

14   a proper medical examination.

15           This is an ongoing -- ongoing matter.  This

16   disease of cancer exposes him because of the autoimmune

17   disorder to a heightened risk of developing COVID.  We are

18   told here, as represented, that D.C. seems to be COVID-free

19   when, in fact, the ACLU has filed a major class-action

20   lawsuit against the D.C. jail and carceral systems for

21   numerous defects involving the COVID risk; that's ongoing

22   litigation.  There are some injunctive -- injunctions in

23   place but I --

24           THE COURT:  I am very familiar with that

25   litigation, and it was started at the outset of the

1    pandemic.  And most of the issues that were identified in

2    the course of that litigation have been addressed.

3              MR. KELLY:  And if I could be --

4              THE COURT:  And I get, on a daily basis, reports

5    from the Department of Corrections about the status of the

6    community transmission of the virus and the number of people

7    within -- residents of D.C. jail with COVID and what their

8    status is.

9              MR. KELLY:  Well, again, this all came up because

10   of the aggravating symptoms developing since the last

11   hearing.  Mr. Pierce apparently believed that he didn't have

12   an opportunity to really bring up the issues.

13             But all of that aside, he has cancer; he needs to

14   see an oncologist.  And he thinks that it would be the

15   safest route to have him on home detention along the usual

16   lines, as previously ordered, with the ankle bracelet and

17   supervision.  And he intends to fully and strictly comply

18   with all of the requirements of this Honorable Court if he

19   is allowed to be released on house arrest.  There is no

20   question that he needs to get an examination with his

21   oncologist.

22             THE COURT:  And when he gets to the D.C. jail that

23   will occur promptly.

24             Is there anything further that you want to add to

25   your argument?

1          MR. KELLY:  The fact that he is living with

2    cancer, I can't imagine that it would be really feasible,

3    given the continuing substandard standard of care within

4    carceral facilities, that he is necessarily going to be

5    assured a visit with an oncologist about his ongoing cancer

6    and the appropriate treatment.

7          Again, I think that there are serious doubts as to

8    whether or not he would have the appropriate treatment

9    despite all of the assurances from the government that, in

10   fact, he will; that seems to be rather incredible and in

11   doubt.

12         And that's -- like I said, given the ongoing

13   litigation nationwide involving the COVID risk to inmates,

14   it hasn't necessarily gotten much better.  But, again, you'd

15   have to see the data of D.C. in order to further consider

16   that issue involving the conditions of his confinement.  The

17   man is currently suffering.

18         We are only respectfully and with some compassion

19   requesting that he be allowed on house arrest as he does not

20   present any risk whatsoever to the community or a flight

21   risk.  And we would hope that this Honorable Court would

22   consider his conditional release on that basis of his cancer

23   and the potential, seemingly however remote, with an

24   autoimmune condition he is at serious risk, Your Honor,

25   of -- if not COVID, further aggravation of his cancer --

1    which I believe that the jail and prison system are just ill

2    equipped to be able to meet any necessary standard of care

3    for a cancer victim.

4              THE COURT:  All right.  Mr. Dreher.

5              MR. DREHER:  Your Honor, I think aside from the

6    information that the government has made, and the

7    information about the specifics regarding COVID with respect

8    to individuals and the numbers at the D.C. jail, the

9    government --

10             THE COURT:  Okay.  Mr. Dreher, I have my -- I see

11   my court reporter.  You are fading, so we can't really hear

12   you.

13             I would like everybody who is not muted to please

14   mute their phones.  I see a number of people who are not

15   muted and they should be so that we can make sure that the

16   person speaking can be heard.

17             That didn't help that much, Mr. Dreher.

18             So you have nothing to add?

19             MR. DREHER:  That's essentially right.  As to the

20   COVID numbers, Your Honor is currently aware of --

21             THE COURT:  Well, you know, the *Munchel* -- the

22   Circuit's decision in *Munchel* which involves a defendant who

23   was wearing a taser inside the Capitol, carrying around zip

24   ties looking for -- based on what they were saying, looking

25   for members of Congress or staff to tie up -- in the

1    Circuit's view, the Munchels were not -- were not dangerous.

2            You know, why -- why should this defendant who

3    never even entered the Capitol be considered dangerous?

4            I know he sprayed bear spray in the direction of a

5    police officer based on -- including based on the new

6    photographs that the government has put in today.  But, I

7    mean, the Circuit's decision in *Munchel* was quite remarkable

8    in finding that the context of -- even if the person was

9    dangerous that day because they were, sort of, part of this

10   mob doesn't mean they're going to be dangerous afterwards.

11           You know, the Circuit was -- you know, they

12   required the district court judge there -- even conceding

13   that these appellants were a danger to act against Congress

14   at the time, on January 6th, there is no explanation of how

15   the appellants are capable of doing so now that the specific

16   circumstances of January 6th have past; and that's a factor

17   the district court should consider.  Well, January 6th has

18   past.  I mean, based on this line in the D.C. Circuit's

19   decision in *Munchel* -- since January 6th has past, you know,

20   it seems like it's going to be a little hard to detain,

21   pretrial, anybody arrested in connection with the

22   January 6th events, doesn't it?

23           MR. DREHER:  Well, Your Honor, I think --

24           THE COURT:  Given the Circuit's view, it's like

25   January 6th is over.  So where is -- how is the district

1    court or the government going to show that the defendants

2    who were involved in that offense conduct on that day will

3    be capable of doing so again in the future when there is not

4    a mob that helps facilitate their actions?

5            You know, it's a pretty high standard that the

6    Circuit laid out in *Munchel*, isn't it? -- which is why I

7    asked you to address it.

8            MR. DREHER:  Thank you, Your Honor.  Yes.

9            THE COURT:  They threw out some other factors --

10   they threw out some other factors, but -- you know, wow.

11   How am I here, Mr. Dreher?

12           MR. DREHER:  So I think that --

13           THE COURT:  Are you going to be able to say that I

14   have met the Circuit's mandate which, by the way, the

15   government did not appeal, did not even seek rehearing

16   en banc.

17           The Circuit reads as follows:  Because Munchel and

18   Eisenhart did not vandalize any property or commit violence,

19   the presence of the group was critical to their ability to

20   obstruct the vote and to cause danger to the community.  And

21   without it, these two individuals seemingly would have posed

22   little threat.

23           Would this defendant, Mr. Worrell, absent a crowd

24   of Proud Boys and absent a mob, would he have posed a threat

25   in the future?  I mean -- because that's what they go on to

1    say, that -- you know, there was no explanation of how the

2    defendants in that case, *Munchel*, would be capable of doing

3    so now that the specific circumstances of January 6th have

4    past.  This, too, is a factor that the district court has to

5    consider on remand.

6              MR. DREHER:  Right.

7              THE COURT:  So if I put Mr. Worrell under house

8    arrest -- I mean, is that sort of -- you know, with location

9    monitoring, how is that -- and the January 6th events have

10   past according to the D.C. Circuit -- how is that -- how am

11   I even supposed to say that that means he will still pose a

12   danger?

13             MR. DREHER:  Well, I think there are a couple of

14   things that I would point to, Your Honor.

15             First, as Your Honor already noted, I do think

16   actually that the *Munchel* decision -- although while it has

17   some -- as you said concededly broad language in part,

18   because also --

19             THE COURT:  Well, it has language that is

20   irreconcilable within it.  It has this language, specific

21   circumstances drawn, you know, and, at the same time, they

22   say -- they also have language saying, oh, but, look, if

23   somebody is really trying to attack the police -- has taken

24   action against the police, if someone is part of -- you

25   know, in one of these gangs, you know, we might not apply

1      that to them.  So I don't know how those two are

2      reconcilable.  I guess that's the district court's

3      conundrum, interpreting what the Circuit is trying to tell

4      us to do.  But, you know, how am I supposed to reconcile

5      that here?

6              MR. DREHER:  Your Honor, I think as I said -- as

7      the Court just noted, there are -- it does seem like the

8      *Munchel* decision at least recognized that there is a

9      different category of dangerousness granted both to -- the

10     reference, for example, to police officers or based on the

11     factors that they note with respect to what the Munchels did

12     not do, and perhaps those who vandalized property or that

13     committed other acts of violence or mayhem.

14             But I think there are also factors with respect to

15     a defendant's background and then their conduct on

16     January 6th that can distinguish those defendants from the

17     defendants in the *Munchel* decision.

18             And I think it's -- so just to give some concrete

19     examples in this case, I think that the fact that

20     Mr. Munchel's criminal history was limited to his earlier

21     convictions for marijuana possession -- and his codefendant

22     had no criminal history -- can be contrasted with, for

23     example, someone who did have a prior arrest; that

24     individual's conduct, as the Court noted in the original

25     detention order -- that would be Mr. Worrell in this case,

1    his being arrested for impersonating a law enforcement

2    officer, that those kinds of -- that kind of prior conduct

3    can establish, in the government's view, a pattern of

4    conduct that makes it more likely than someone who is not

5    sort of -- is an aberration that someone was carried away by

6    the moment or something and did something that they were --

7    would not be inclined to do --

8         THE COURT:  Well, I don't know that the D.C.

9    Circuit thought that Munchel and Eisenhart were carried

10   away.  They came prepared with weapons.  They had planning.

11   They left their weapons -- most of their weapons except a

12   taser outside on the Capitol grounds.  They came prepared

13   for an assault.  And I think -- I think -- my recollection

14   is that Mr. Munchel afterwards wanted to join one of these

15   gangs.  But, nonetheless, the Circuit's view was there

16   wasn't enough evidence of dangerousness to keep them locked

17   up.  And as I said, the government lived with that and

18   released them on pretrial release, both Munchel and the

19   mother, Eisenhart.

20        MR. DREHER:  I appreciate that.  And I think that

21   the other two things that the government would --

22        THE COURT:  I mean, what district court judges

23   don't like, Mr. Dreher -- and you can pass this along to

24   Mr. Crabb and to everybody else at the U.S. Attorney's

25   Office is -- you know, if something goes to the Circuit

1    and -- you know, what does -- what we don't want after the

2    D.C. Circuit's decision in *Munchel* is to be put through

3    these paces of pretrial detention hearings and only for an

4    appeal to the Circuit which is going to say *"Munchel"*; you

5    know, pretrial release or send it back for another

6    reconsideration and the government just caves; it doesn't --

7    you know, because they know they can't meet the standard --

8    which is why I asked you to address all of those different

9    factors.  And yet there is some language in *Munchel*, you

10   know, that seems to suggest that if you actually assault

11   police officers, actually broke through windows, doors, or

12   barricades, aided, conspired, planned, and coordinated with

13   such actions -- they are in a different category of

14   dangerousness than those who cheered on the violence or

15   entered the Capitol after others cleared the way.  But

16   people who are walking around with zip ties and a taser

17   through the Senate Chamber looking for members of

18   Congress -- like a lot of us, is pretty dangerous -- and

19   then afterwards saying, gosh, maybe we should join one of

20   the gangs to keep this up.  You know, but nonetheless the

21   government didn't try and meet the standard of *Munchel*; the

22   government just folded and granted pretrial release.

23            So, you know, am I going to go through an exercise

24   here where if it is appealed to the Circuit -- and I don't

25   know -- honestly, I don't see why anybody post *Munchel*

1    doesn't appeal every pretrial detention as part of the cases

2    that I've handled from January 6th that went to the

3    Circuit -- maybe they'll clarify what they were talking

4    about in this opinion -- because one could read this

5    opinion, you would concur, that January 6th is over.

6              So, like, how are you going to show that people

7    are still dangerous?

8              MR. DREHER:  I do agree that the opinion

9    emphasizes and focuses a lot on future dangerousness.  But I

10   still think that January 6th plays a large role in the

11   Court's analysis that would be perfectly appropriate and is

12   perfectly appropriate under *Munchel*, which is the Court's

13   analysis of dangerousness.

14             But I think the Court in *Munchel* -- the panel in

15   *Munchel* spent too much time -- or at least a decent amount

16   of time in their opinion asserting that distinguishing

17   language with respect to individuals who committed these

18   other acts, that they -- that the Court's order or opinion

19   used to set off as a separate category of dangerousness.

20   So, in this case, because we have a defendant that we think

21   falls into that category, we think --

22             THE COURT:  It looks like stuck in language -- it

23   looks like stuck in language that I am finding a bit of a

24   struggle to reconcile with some of the other things that are

25   said in the opinion.  I find it a bit of a puzzle myself.

1          MR. DREHER:  I appreciate that.

2          THE COURT:  You don't?

3          MR. DREHER:  Well, I wish I had a better answer

4    for you maybe is what I can say on how to perfectly

5    reconcile those elements of the opinion beyond the

6    government's view, which is that those -- the elements

7    that -- the portions of the opinion that describe the

8    defendants who are -- that appears to have set them off as a

9    separate category, we think, are reflective really of the

10   Court's reasoning with respect to the *Munchel* opinion.

11          In other words, although the Court obviously

12   didn't say that an essential sign should be an evaluation of

13   a defendant's dangerousness, we believe that the Court's

14   opinion did not necessarily pertain to individuals like

15   Mr. Worrell or of the defendants who did engage in property

16   destruction or acts of violence.

17          And I think that one reason -- I think I mentioned

18   this briefly in response this morning.  I do think that one

19   distinguishing factor is someone who is willing to commit an

20   act of violence right in front of a line of police officers

21   or those individuals who actually directly approached the

22   police officers at the United States Capitol -- in the

23   government's view that is, sort of, the most disturbing

24   evidence that a potential defendant will ever be to

25   potential punishment for that conduct.  So we think that is

1    highly indicative of someone's future dangerousness in the

2    sense that if they're willing to do that in the open, on

3    U.S. Capitol grounds, in front of all of these officers,

4    we'd submit that that raises troubling -- is a troubling

5    indication with respect to their future conduct.

6           And the last thing I would note is that this

7    case also involves --

8           THE COURT:  Do you understand the problem with

9    that argument, Mr. Dreher, because -- let's take the

10   Munchels, for example.  I mean, all of these people who were

11   in the Capitol knew they weren't supposed to be in the

12   Capitol.  I mean, the police had been pretty clear; they

13   were not supposed to be there, so everybody there was doing

14   something they knew they should not be doing.

15          And that -- you know, the Munchels were deep

16   inside -- deep inside the Senate Chamber but, nonetheless,

17   the Circuit didn't conclude that that blatant illegality in

18   the face of a police line that had been broken with them not

19   supposed there be -- that was pretty blatant, too.  But,

20   nonetheless, the Circuit's view -- gosh, take a taser, take

21   some zip ties, walk around the Senate Chamber -- it's not a

22   sign of future dangerousness.

23          MR. DREHER:  Well, with respect, Your Honor, I

24   think that what the -- I think two things.  One is, the

25   government agrees that most of the conduct that day was

1    conduct that the defense would blatantly and -- was

2    obviously illegal, and should have been known to any

3    individual who engaged in that conduct.

4            That said, I do think -- and I think it's

5    blatantly an aspect of the *Munchel* opinion that contains

6    that other language -- there are still degrees of illegal

7    conduct and the type of dangerousness that is associated

8    with that conduct.  And here, for example, someone who

9    actually physically assaults or attempts to assault a police

10   officer --

11           THE COURT:  You would agree that *Munchel* has very

12   much narrowed what that conduct is that was applied to

13   assault offenses for any -- almost any offense conduct on

14   January 6th?

15           MR. DREHER:  I think that the government

16   would agree that for individuals that have not committed any

17   property vandalism, that didn't engage in any violent

18   conduct and that weren't part of these other, sort of,

19   larger conspiracies or networks or groups of individuals who

20   were preplanning some of the events on January 6th -- they

21   are someone who came in with the crowd into the Capitol

22   building; and unlike the fact pattern of the defendant

23   Munchel -- so they don't have anything in their background

24   necessarily that would flag a risk of dangerousness and

25   their conduct since January 6th like in this case doesn't

1    involve an implied threat to witnesses or anything like

2    that, that there is some set of defendants that would

3    probably fall within the group described in *Munchel;* and,

4    for those defendants, I agree that the Court set out a

5    standard that would -- that the government would have to use

6    evidence showing --

7            THE COURT:  Yes.  I mean *Munchel*, to my mind, uses

8    the *Chrestman* factors that I set out in my *Chrestman*

9    decision and then added on to it tests for future

10   dangerousness that are going to be pretty difficult to meet

11   absent, as you said, membership in a gang and actual almost

12   photographic videotape evidence of assaulting a police

13   officer.  Would you agree?

14           MR. DREHER:  I think I would agree that it would

15   be easier to do with those elements.  I think there may

16   be -- I think there are some other -- I think there are some

17   other classes of defendants for whom it would not be as

18   difficult to meet, for those engaged in property

19   destruction, for example, as noted in the *Munchel* opinion.

20   But I do agree with you that opinion emphasizes or adds that

21   emphasis on future dangerousness; I agree with that.

22           THE COURT:  And the line about January 6th is in

23   the past is illuminating about how the Circuit is going to

24   view these cases.

25           Are you done, Mr. Dreher?

```
 1              MR. DREHER:  Yes, Your Honor.
 2              THE COURT:  All right.  So let me go back to
 3    Mr. Kelly or Mr. Jenkins; there were a couple of questions
 4    that I just had for you.
 5              And that is, one, what am I supposed to make of
 6    this DVD you sent, Exhibit D?  I mean, I've looked at it.
 7    It's short; it clearly shows Mr. Worrell.  There is no
 8    timestamp; it looks like it's been spliced.  What's the
 9    source of it?
10              You know, why -- if it came from Mr. Worrell, why
11    wasn't it shown at the prior detention hearing?  So many
12    questions about that.  You haven't talked about it.
13              MR. KELLY:  Yes.  I think it was just to show that
14    he was -- he was in attendance, that he was law abiding.  He
15    was not disturbing the peace.  He wasn't certainly
16    interested in being disruptive --
17              THE COURT:  But what -- let me ask you, is this --
18    who is speaking?
19              MR. KELLY:  Mr. Kelly.  James Kelly.
20              THE COURT:  Mr. Kelly.  Mr. Kelly, was that the
21    entire videotape, or was it edited?
22              MR. KELLY:  That's all the videotape that we have
23    to my knowledge, Your Honor.
24              THE COURT:  Where did you get it?
25              MR. KELLY:  This was from a camera of somebody --
```

1    it wasn't a body cam of his own; I think that may have run

2    out of juice, out of battery.

3              THE COURT:  Was it from his GoPro -- was it from

4    his GoPro camera?

5              MR. KELLY:  I can't speak to that, Your Honor.

6              THE COURT:  Okay.  So that was all you were given.

7    You haven't seen the original?

8              MR. KELLY:  No, I haven't -- no, I have not seen

9    the original.  There is no reason to edit or redact or

10   withhold anything; that would be inculpatory to him because

11   he didn't do anything wrong.

12             THE COURT:  Okay.  And let me just ask you.  There

13   are pictures of people in orange hats; who are those people?

14             MR. KELLY:  Orange and black apparently seem to be

15   signatory of those who have some sort of gang affiliation.

16   I have been told and understand that this was not a Proud

17   Boys event; it was not organized by Proud Boys.  There was

18   no color, so to speak, worn by Mr. Worrell holding himself

19   out as a Proud Boy.  There were wives and family members in

20   attendance with them at this event, a couple of little old

21   ladies.

22             Certainly, nobody expected that there was going to

23   be all of this commotion that ultimately resulted and have

24   that effect.

25             THE COURT:  Well, Mr. Kelly, you can appreciate my

1    puzzlement, again, as to what is supposed to be exculpatory

2    about the video clips you've shown me because -- as short as

3    it was, if you show the defendant now hanging around with

4    all of these -- it seems to me looked -- they were wearing

5    orange hats.  I just wanted the confirmation that those were

6    huge Proud Boy groups; that's number one.

7              And then, number two, you say he wasn't doing

8    anything illegal.  He was moving police barriers closer to

9    the Capitol and that, to me, at the time -- given the fact

10   that the police were being pressed against this police line

11   by this mob, strikes me as questionable behavior and whether

12   he is fully law abiding, to move a police barrier closer to

13   the Capitol.

14             MR. KELLY:  Well, he certainly wasn't crossing in

15   that direction because he never entered the Capitol

16   building.  So it really wouldn't square with the fact that

17   he did not enter the Capitol building so it wasn't in his

18   interest to push against or move against the police line.

19   He was just merely standing there off to the side.

20             THE COURT:  But in the video clip, Mr. Kelly, you

21   show the person making the video clip moving the police

22   barrier.  I presumed that that was the defendant moving the

23   police barrier.  Is that incorrect?

24             MR. KELLY:  The defendant was not to my knowledge

25   moving the police barrier at all.  He was just a bystander

1    to this entire event -- participant if you will.

2              THE COURT:  No.  It was -- it was an aspect of the

3    video clip that looked like the person making the video was

4    moving the police barrier, and that's why I wanted to know

5    was this -- was the defendant the source of the video?  Was

6    he the person making it?  Otherwise, I am not really sure

7    what I am supposed to make of it other than there is a

8    really big crowd of Proud Boys there all wearing large hats

9    and hanging out with the defendant.

10             MR. KELLY:  Well, he was not in attendance as a

11   Proud Boy.  He was there with family members and, like I

12   said, a couple of elderly ladies that were there.  Certainly

13   they wouldn't have included more vulnerable folks to be in

14   the midst of any kind of dangerousness for some sort of

15   hostility by any means.

16             In light of the fact that Mr. Worrell has no

17   violent history, there is no predisposition for violence

18   whatsoever if he is allowed on house arrest.  He is a

19   law-abiding citizen and, certainly, a welcomed neighbor in

20   the naval community up until this point with all of the

21   media blitz gone public.

22             THE COURT:  Mr. Kelly, in all of the photographs

23   that the government has produced and video clips -- and the

24   video clip that you produced in Exhibit D, including of

25   Mr. Worrell, despite his cancer condition, he is not -- and

1    the concern that you are expressing now about transmission

2    of COVID and being exposed to COVID -- in none of those

3    pictures that I have seen is he wearing a mask.

4             MR. KELLY:  He had a gator, Your Honor.

5             THE COURT:  I'm sorry.  Say that again.

6             MR. KELLY:  He had a gator, Your Honor, around his

7    neck.  A gator, which is -- it wraps the neck, and it can be

8    lifted up over his nose and his mouth; he did wear a gator.

9             THE COURT:  Well, in the photographs that I have

10   seen, including the photograph of him squirting the bear

11   spray at the law enforcement line, is he wearing his

12   gator --

13            MR. KELLY:  It may have been --

14            THE COURT:  -- in the midst of the mob?

15            MR. KELLY:  It may have been -- it may have been

16   not at his mouth or across the lower portion of his face at

17   that point in time; I am uncertain of that.

18            But he did wear a gator to the event anticipating

19   that there could be some density of the crowd.

20            Again, I am just referring to the cancer -- that

21   the symptoms have worsened and deteriorated in a very

22   substantial way during his incarceration; and that's really

23   the basis for our emergency motion for reconsideration.

24   It's gotten much worse.

25            THE COURT:  Mr. Dreher, you have seen a lot of

1   photographs of Mr. Worrell.  Have you ever seen him with his

2   gator up or a mask?

3                MR. DREHER:  No, Your Honor.

4                THE COURT:  All right.  Mr. Kelly is there

5   anything further?

6                MR. KELLY:  We just -- simply that we are just

7   requesting the emergency consideration of this detention

8   order which we've had an ample opportunity to cover this

9   afternoon.

10                And we believe that, in the interest of

11   Mr. Worrell's safety and in light of the *Munchel* decision --

12   that this is a nonviolent offender; no previous disposition

13   for dangerousness in his home community or a flight risk;

14   that he simply be released to the house arrest subject to

15   the usual conditions.  And he will be strictly complying

16   with such an order and have an opportunity for oncology

17   treatment and care which cannot -- would never be provided

18   at the carceral facilities, detention, jail or prisons,

19   which the government submits would be a safe environment,

20   but it would be completely the opposite; that was the

21   subject of the class action in the first place --

22   particularly of a cancer patient.

23                As a matter of compassion, as justice requires, if

24   Your Honor would allow him for home detention, and he will

25   certainly be in compliance with the *Munchel* decision and the

1    reasoning in good faith.

2          Thank you, Your Honor.

3          THE COURT:  All right.  The Court is ready to rule

4    on the defendant's emergency motion for reconsideration of

5    the Court's decision that he be subject to pretrial

6    detention; and that was an order that was issued with full

7    explanation of the reasons in consideration of the

8    appropriate factors, that was a decision that was made prior

9    to the *Munchel* decision by the D.C. Circuit being issued.

10         The Court is going to deny this motion at this

11   time.  One of the bases for the motion is that there is

12   newly discovered evidence not previously available.  That

13   "newly discovered evidence," as best I can make it out, is

14   that the defendant has lack of access to a particular

15   medication, like medications for his non-Hodgkin's lymphoma.

16         It's the government's opposition and detailed

17   proffer today about conversations and medications between

18   the jail facility where the defendant was held and the

19   efforts by and to get his treating physician to step forward

20   and communicate as to the authorizations for that medication

21   is very illuminating, in terms of this doctor not being able

22   to provide records, you know, admitting he was using an off

23   usage -- off-label usage of one of the medications; didn't

24   seem particularly cooperative with the medical facility

25   where the defendant was held, you know, which is sort of

1    a -- you know, an interesting response; that he doesn't have

2    records and he can't provide the compound, and it was

3    just -- appears to have been really a lack of cooperation.

4         In addition, the defendant could have had his

5    girlfriend or partner bring the medication but he didn't

6    want to bother her with that; so it's a little bit of a

7    disconnect in the facts as the Court is seeing it, the

8    efforts made to actually get the cream to the defendant and

9    what actually occurred here.

10        In any event, the defendant is on his way to D.C.

11   jail where they can get him whatever additional medications

12   that he needs to treat his lymphoma.  If there is some other

13   issue that comes up once he gets to Washington, D.C., I am

14   sure defense counsel will bring that to the attention of

15   whoever the presiding judge is when this case is ultimately

16   formally charged with an indictment and assigned -- randomly

17   assigned to a judge who will then preside over the case.

18        I do appreciate that -- defense counsel has

19   asserted that this condition, this lymphoma condition --

20   non-Hodgkin's lymphoma that the defendant has had now for at

21   least 14 years subject to some continuing treatment might

22   make him more vulnerable to COVID.  But, frankly, I have

23   seen a lot of photographs of the defendant during the course

24   of even this detention hearing -- at this detention hearing

25   and the prior detention hearing, and I really have not seen

1    this defendant wearing a mask, wearing his -- a scarf or

2    anything in the middle of a mob; so his concern about

3    transmission of COVID given his medical condition is a

4    little bit late blooming to me.

5          With respect to the issues raised in the papers

6    and only slightly at this hearing, that there was -- that

7    the Court committed some kind of clear error in its

8    consideration of the 3142(g) factors, the defendant clearly

9    disagrees with the Court's conclusions from -- my

10   consideration of those factors that are required to be

11   considered; but there is nothing that the Court has heard

12   that persuades me that there was an error in the

13   consideration of those factors even post *Munchel*.

14         Even though *Munchel* does have some language in it

15   that is difficult to reconcile with some of the language in

16   other places in the decision, but whatever -- whatever the

17   Circuit said about January 6th has past is really going to

18   be in some ways, you know, a challenge to show future

19   dangerousness given the fact that January 6th is over and

20   past.

21         The Circuit did carve out a category of the

22   offender of January 6th events, this defendant fits squarely

23   within that statement; although the defendant who actually

24   took action to assault police officers by spraying bear

25   spray directly at a police line, and the other part -- the

1       other category that the Circuit talked about were people who

2       actually broke windows and did other things to let people

3       into the Capitol building.  And the government's theory of

4       this which appears from where this defendant was located

5       where he sprayed the bear spray, where there was a thin line

6       on -- I think it was the west plaza of the Capitol that

7       police officers -- that was actually where a major breach

8       into the Capitol occurred -- the defendant's actions in this

9       army and making the police fall back was actually quite

10      helpful to the mob in getting into the Capitol at that

11      location.

12              So, to summarize, the defendant is charged with

13      serious felonies; he included preplanning with paraphernalia

14      that he took with him to this riot, from a tactical vest,

15      radio communications, a can of pepper spray gel.  He

16      discharged the pepper spray gel at the thin line of police

17      officers at a location where the mob ultimately was able to

18      break into the Capitol.  He coordinated with others in

19      joining the Proud Boys in advance to get there.

20              His own videotape shows him with this big crowd of

21      Proud Boys with orange caps on.  And they all -- you know,

22      he assembled with the Proud Boys to walk to the Capitol to

23      stop the electoral vote count.  It is true, indeed, he did

24      not breach the interior of the Capitol building; and -- but,

25      nonetheless, the efforts that he took to threaten to injure

1    and assault police officers with pepper gel spray, to my

2    mind, meets the *Munchel* category of people for whom

3    dangerousness is a warranted finding, particularly given

4    this defendant's criminal history which I will not go into

5    having already exhausted it before; and, most disturbingly,

6    the defendant's statements at the time of his arrest, that

7    the FBI will be coming for him again if he were to find the

8    name of the Twitter user who exposed his identity online.

9         So upon consideration of the defendant's emergency

10   motion for reconsideration, and all of the other papers

11   submitted in connection with this reconsideration motion,

12   the defendant's motion is denied.

13        As before, Mr. Worrell is to be brought to this

14   district, and he is to appear before a magistrate judge

15   here.  I think I set the date of April 8, 2021, at

16   10:00 a.m. unless he is indicted before then.  If he is

17   indicted before then, he will appear in front of the

18   Article III judge to which the case is randomly assigned.

19        Is there anything further today from the

20   government, Mr. Dreher?

21        MR. DREHER:  No, Your Honor.

22        I would just note for defense counsel that D.C.

23   jail did say that they can coordinate with either the

24   government or the D.C. jail to get records to the D.C. jail

25   in advance that will expedite Mr. Worrell's preplanned

1    pharmacy record when he gets there.  So I just wanted to

2    alert defense counsel as to that fact, if that would be

3    helpful.

4         THE COURT:  Yes.  If Mr. Kelly or defense counsel

5    can get the records out of Dr. Rucker any more ably than you

6    or the jail -- the prior jail was able to.  Mr. Rucker

7    apparently has some trouble -- Dr. Rucker has some trouble

8    with his medical records.

9         MR. KELLY:  He didn't have any medical records,

10   Your Honor.  Dr. Rucker doesn't have any medical records; he

11   just simply examined Mr. Worrell at that time and at that

12   meeting.

13        Also, we would like to just have an idea of a

14   timeline in which he will be receiving those medications

15   that we have been discussing, and that's referring to the

16   sirolimus cream and the naltrexone hydrochloride which is

17   for his autoimmune deficiency.  If we can have some idea of

18   a timeline for that and, also, when he will be able to get a

19   medical oncology examination to --

20        THE COURT:  Mr. Kelly, you are going to have to

21   wait until he gets to D.C. and, hopefully, that will be

22   soon.

23        MR. KELLY:  Thank you.

24        THE COURT:  It seems like there was a lot of time

25   wasted at the last jail getting all of these things put into

1    place, but that's not going to be used for an excuse for

2    emergency motions at this point.

3            He is going to get to the D.C. jail.  The D.C.

4    jail has very adequate medical intake, and they will take

5    care of it; and you are just going to have to stay on top of

6    it, Mr. Kelly.  Perhaps there will be a more responsive

7    doctor here in D.C. who can provide both authorizations for

8    prescriptions and prescriptions that are on-label uses that

9    can actually be prescribed by legitimate doctors.

10           All right.  Is there anything further today from

11   you, Mr. Kelly?

12           MR. KELLY:  No, Your Honor.

13           I appreciate your consideration of our oral

14   argument today here.  In any event, we'll look forward to

15   his future oncology examination to be able to deal with this

16   cancer situation and with high hopes that he will not

17   contract any type of infections, including COVID-19.

18           Thank you, Your Honor.

19           THE COURT:  All right.  You are all excused.

20           (Whereupon, the proceeding concludes, 4:06 p.m.)

21                          * * * * *

22

23

24

25

**CERTIFICATE**

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.

PLEASE NOTE:  This hearing was held via videoconference and telephonically in compliance with the COVID-19 pandemic stay-safer-at-home recommendations and is therefore subject to the limitations associated with the use of technology, including but not limited to telephone signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing capabilities.

This certificate shall be considered null and void if the transcript is disassembled in any manner by any party without authorization of the signatory below.

Dated this 9th day of April, 2021.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter