IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **v.** : | |
| : | Case No: 21-MJ-292 RCL |
| : | |
| **CHRISTOPHER WORRELL,** : | |
| : | |
| **Defendant.** : | |

**OPPOSITION TO**
**DEFENDANT'S SECOND EMERGENCY MOTION FOR RECONSIDERATION**

The government respectfully opposes defendant Christopher Worrell's second emergency motion for reconsideration of Chief Judge Howell's March 19, 2021 order detaining Worrell prior to trial.

Worrell raises three arguments: that he is being denied prescription medication aimed at treating his non-Hodgkin's lymphoma; that he is not being permitted to see an outside oncologist; and that he is vulnerable to a second COVID-19 infection. The first and third arguments closely mirror those raised by Worrell in his first motion for reconsideration, which he filed on March 26, 2021. Chief Judge Howell denied that motion after an April 6, 2021 hearing. For the reasons described below, Mr. Worrell's allegations do not merit reconsideration of Chief Judge Howell's March 19 detention order any more than they did in late March when he raised similar arguments. The second argument, meanwhile, is factually incorrect.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    Dangerousness.**

The facts establishing Mr. Worrell's dangerousness, and hence the appropriateness of his detention generally, are spelled out in detail in the government's prior detention-related filings: its initial memorandum in support of detention (Dkt. 9); its memorandum in opposition to

1

Worrell's first motion for reconsideration (Dkt. 19); and the government's subsequent response to Chief Judge Howell's minute order regarding the D.C. Circuit's *Munchel* opinion (Dkt. 24). *See United States v. Munchel*, 2021 WL 1149196 (D.C. Cir. Mar. 26, 2021). The government incorporates those factual proffers by reference, but does not repeat them here. The most salient facts found by Chief Judge Howell in her March 19 detention order are as follows:

- Worrell's "participation in the mob was planned, calculated and intentional." Dkt. 13 at 5.

- Worrell, a self-avowed Proud Boy, traveled to the U.S. Capitol on January 6, 2021 with other members of the Proud Boys and armed with a tactical vest, pepper spray, and radio communications device. *Id.*

- Worrell then "discharged pepper spray gel directed at a thin police line keeping the rioters from entering the Capitol via the West Plaza." *Id.*

- Worrell's criminal history includes a 2009 arrest for impersonating a law enforcement officer, which involved "intimidating conduct towards a total stranger in service of taking the law into his own hands" and was "a significant backdrop" in evaluating Worrell's dangerousness. *Id.* at 7. In that incident, Worrell "displayed a gold colored badge" to a young female driver, then "tailed" the driver "as if attempting to pull her over"; she escaped by entering a local business's parking lot. *Id.* at 6. Worrell was arrested and found with a badge, firearms, pepper spray, knives, and handcuffs in his vehicle. *Id.* at 7.

- On the day of his arrest in this case, Worrell "refused to turn himself him, as directed by the FBI, to the nearest FBI office when he was three hours away from his home heading to a Proud Boys camping trip." *Id.* at 7.

- When Worrell was arrested, he "commented to the FBI agents that he knew the name of the tipster and stated a name, as if seeking confirmation, and further, stated that if he were to find out the name of the Twitter user who exposed his identity online, the FBI 'would be coming for [him] again,'" comments that Chief Judge Howell believed "raise serious and troubling signals about defendant's willingness to comply with release conditions to not intimidate or threaten any prospective witness." *Id.*

**II.     Worrell's Medical History**

When he was arrested, Worrell reported to the pretrial services office in the Middle District of Florida that he had been diagnosed with non-Hodgkin's lymphoma in 2007. Worrell also reported that he at one time received chemotherapy and radiation treatment for that cancer. The government is currently not aware of Worrell receiving either form of treatment recently. Worrell did not mention his underlying condition at the initial detention hearing. *See* Ex. 1 (Tr. of Apr. 6, 2021 Hr'g) at 17.

On March 26, 2021, in a filing that closely mirrors his most recent motion for reconsideration, Worrell filed what he styled an emergency motion for reconsideration of Chief Judge Howell's March 19 detention order. *See* Dkt. 16. Worrell argued that (1) his requests for two of his required medications had been denied by the Charlotte County Jail, where he was detained pending transit to D.C.; and (2) his non-Hodgkin's lymphoma made him highly vulnerable should he contract COVID-19. Dkt. 16-1. Worrell attached to that motion the same March 24, 2021 affidavit from Dr. Rucker that he has attached here. *See* Dkt. 16-4; Dkt. 47-4. Worrell sought a specially formulated prescription cream and a low-dose prescription for naltrexone.

The government then sought information from the Charlotte County Jail, which informed the government that the jail's medical staff had attempted to reach Dr. Rucker for more than two weeks by calling four different numbers. Dkt. 19-1 at 3. Dr. Rucker had not returned their calls. Upon learning that Dr. Rucker had not yet responded to the jail, the government immediately informed both defense counsel (via email) and the Court (in its opposition) that the Charlotte County Jail was waiting to hear back from Dr. Rucker regarding the prescriptions. Dkt. 19 at 2-3, 4-5. Dr. Rucker then communicated with the jail's medical staff.

At the April 6, 2021 hearing on Worrell's motion, the government proffered the following further facts:

- Worrell's compounded cream prescription had expired on March 5, 2021, one week before he was arrested on March 12, 2021. *Id.* at 11.

- Worrell had stated that he had a partial bottle of that cream at his residence. Worrell was informed by Charlotte County Jail staff that he could have his girlfriend bring that leftover cream for the jail's pharmacy to approve. He declined to do so. *Id.* at 14.

- Dr. Rucker informed the Charlotte County Jail that he "was unable to provide either the dosage level for the cream or instructions for the pharmacy on how to compound the cream," because he "no longer has the instructions for compounding that." *Id.* at 13.

- With respect to Worrell's second requested prescription, for naltrexone, medical staff informed Dr. Rucker that the ordinary medical use for that is to treat opiate withdrawal or exposure to high opioid levels. *Id.* at 15. Jail medical staff were

> unaware of a valid use of that drug to treat non-Hodgkin's lymphoma. *Id.* Dr. Rucker declined to provide justification for using naltrexone to treat lymphoma beyond stating that he was prescribing it for that "off-label" purpose. *Id.* at 16.

- Dr. Rucker informed jail staff that he had no medical staff, did not keep medical records, and that he provided a "concierge" holistic or nontraditional medical service. *Id.* at 13-14.

Defense counsel did not dispute the foregoing proffered facts during the hearing. Chief Judge Howell stated:

> [T]o say the least, Dr. Rucker's assistance in this matter hasn't been as fulsome as one would hope whether Mr. Worrell was incarcerated or not. And this medication presumably was not so significant that he kept his prescription up to date.

*Id.* at 17. Later, Chief Judge Howell stated:

> [T]he government's opposition and detailed proffer today . . . is very illuminating, in terms of this doctor not being able to provide records, . . . admitting he was using an . . . off-label usage of one of the medications; didn't seem to particularly cooperative with the medical facility where the defendant was held . . . that he doesn't have the records and he can't provide the compound, and it was just—appears to have been really a lack of cooperation. In addition, the defendant could have had his girlfriend or partner bring the medication but he didn't want to bother her with that.

*Id.* at 39-40. Chief Judge Howell denied Worrell's motion. *Id.* at 39.

Worrell was diagnosed with COVID-19 upon arrival at the D.C. Jail following a positive COVID-19 test on April 13, 2021. He is no longer exhibiting symptoms, according to the latest medical records in the government's possession. He filed the instant motion on May 11, 2021.

In response to Worrell's latest motion for reconsideration, the government obtained the following information from Unity Healthcare, the healthcare provider that the D.C. Jail contracts with to provide healthcare to inmates.

Unity staff report, with respect to Worrell's allegation that his condition is "rapidly deteriorating" and that he has developed "lymphomas on the skin of his face, neck, back, arms,

5

and legs," Dkt. 47-1 at 5, that they have not seen a significant change in Mr. Worrell's exam since his arrival. However, staff did note that, at baseline, he has significant post-radiation skin changes and abnormalities and skin findings consistent with his diagnosis of cutaneous lymphoma.

With respect to Dr. Rucker, Unity staff noted that, based on the Florida Department of Health's licensing website, he appears to be a urologist, not an oncologist. Although Dr. Rucker was now able to offer the formula for his prescribed compounded cream, Unity staff declined to authorize that prescription. According to Unity, based on their review of medical records from the oncologists Worrell had seen before Dr. Rucker, the two prescriptions were not the treatment recommended by his prior oncologists. Moreover, Unity staff could not find recommendations or guidelines for the compound cream (a topical Rapamycin cream) or for the naltrexone for the treatment of cutaneous lymphoma in the literature. The D.C. Jail's infirmary called an oncologist at Howard University to confirm there were no recommended or standard off-label uses for these two medications to treat cutaneous lymphoma. The oncologist at Howard University Hospital was not aware of any recommended treatments using those two prescriptions.

Worrell is scheduled to see an outside oncologist on May 19, 2021.

## ARGUMENT

I. **Standard of Review.**

Worrell styles his motion a "motion for reconsideration." Dkt. 47-1 at 9. In general, a court will grant a motion for reconsideration of an interlocutory order like a detention order only when the movant demonstrates: "'(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order.'" *Zeigler v. Potter*, 555

F. Supp. 2d 126, 129 (D.D.C. 2008)); *United States v. Gamble*, No. CR 19-348 (CKK), 2020 WL 588323, at *3 (D.D.C. Feb. 6, 2020) (applying this standard to detention reconsideration motion), *vacated and remanded on other grounds*, 810 F. App'x 7 (D.C. Cir. 2020); *see also* Dkt. 47-1 at 9 (agreeing with this standard of review).

The corollary of that narrow standard of review is that motions for reconsideration "cannot be used as 'an opportunity to reargue facts and theories upon which a court has already ruled, nor as a vehicle for presenting theories or arguments that could have been advanced earlier.'" *Estate of Gaither ex rel. Gaither v. District of Columbia*, 771 F. Supp. 2d 5, 10 (D.D.C. 2011) (quoting *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 14 (D.D.C. 2010))); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 48 (D.D.C. 2013) (applying similar standard in detention context).

## II.     Worrell's alleged new facts do not merit reconsideration.

Worrell rests his motion on three purported new facts.

First, Worrell contends that the D.C. Jail has failed to authorize prescriptions he has requested. Dkt. 47-1 at 5-6. Worrell is presumably referring to the same two prescriptions that were denied him in the Charlotte County Jail, each originally prescribed by Dr. Rucker: a specially compounded topical Rapamycin cream and naltrexone. The D.C. Jail has not authorized the two prescription medications that Mr. Worrell has requested for reasons similar to those given by the Charlotte County Jail. According to the D.C. Jail's staff, Dr. Rucker, who holds himself out as an oncologist, is listed as having a specialty in urology, not oncology, on the Florida Department of Health licensing website.[1] He has previously stated that he provides a "concierge" and holistic medical approach, in which he apparently does not have medical staff and does not

---

[1] *See* https://mqa-internet.doh.state.fl.us/MQASearchServices/HealthCareProviders/Details?LicInd=79441&ProCde=1501. At least one article in which presumably the same Dr. Rucker was interviewed also characterizes him as a former urologist. *See* http://health.heraldtribune.com/2016/03/23/bradenton-clinic-is-part-of-an-industry-luring-women-and-athletes/.

keep medical records—a fact defense counsel confirmed at the April 6, 2021 hearing. *See* Ex. 1 at 13-14; *id.* at 44 (defense counsel stating "Dr. Rucker doesn't have any medical records"). With respect to the naltrexone, Dr. Rucker informed the Charlotte County Jail that he was using that drug—ordinarily, the government understands, employed to treat opioid-related issues—for the "off-label" use of treating lymphoma. *Id.* at 15-16. But when asked for support for that off-label use, Dr. Rucker declined to provide any to the Charlotte County Jail. *Id.* Unity Healthcare, meanwhile, has researched whether either the Rapamycin cream or naltrexone are recommended treatments for cutaneous lymphoma in the literature, and have consulted with an outside oncologist on that question. They have been unable to find support for the use of either medication to treat Worrell's lymphomas. Finally, Worrell's prior treating oncologists had not recommended those medications, according to the records Unity reviewed. Unity has therefore concluded that the two prescriptions are inappropriate to treat Worrell's cutaneous lymphoma, and scheduled him to visit with an outside oncologist instead. Thus, two different jails' contracted healthcare providers have determined that those prescriptions either could not be provided or were medically inappropriate.

Despite the passage of nearly two months, Worrell has provided no new facts in his motion regarding either prescription—no justification for naltrexone's off-label use, no new affidavit from Dr. Rucker, no supporting affidavit from any other medical professional. He provides only the same affidavit from Dr. Rucker that he submitted in March. Indeed, Worrell has recycled the same argument (and many of the same paragraphs) he included in his initial motion for reconsideration six weeks ago. Ex. 1 at 7. Chief Judge Howell denied that motion based on, among other things, the absence of medical justification provided by Worrell or his doctor for the two medications. Thus, Worrell's first fact—to the extent it can be considered new

at all—does not merit reconsideration.

Second, Worrell contends that he "will not be able to see an oncologist soon, perhaps not even for a month." Dkt. 47-1 at 8. That is inaccurate. Worrell is scheduled to see an outside oncologist on May 19, 2021. Worrell was in isolation at the D.C. Jail for several weeks after his arrival on April 13, 2021, due to his COVID-19 diagnosis. Thus, he is scheduled to see an outside specialist within a few weeks of him being eligible to do so.

Finally, third, Worrell contends that the risk he faces from COVID-19 is somehow greater now that he has contracted and seemingly overcome the disease. But in his first motion for reconsideration, Worrell already argued that the risk of him contracting COVID-19 was a reason for him to be released, due to the health risks it posed. Dkt. 16-1 at 7-10. Chief Judge Howell denied that motion on April 6, 2021. Now that Worrell has contracted and seems to be recovering from COVID-19, the risk of reinfection is dramatically lower, as government health authorities have made clear for many months. According to the Centers for Disease Control and Prevention, "[c]ases of reinfection with COVID-19 have been reported, but remain rare,"[2] and a recent study found the rate of reinfection even for often-exposed healthcare workers was roughly eight times lower than the rate of primary infection among those without a prior infection, with a median interval between a first infection and reinfection of more than 200 days.[3] Moreover, Worrell can receive a vaccine shot while in custody when it is medically appropriate for him to do so. With increasing vaccination rates at the D.C. Jail and low COVID-19 infection rates there, Worrell's risk of COVID-19 reinfection is low, and certainly lower than his risk of primary infection when his first motion for reconsideration was denied by Chief Judge Howell.

---

[2] *See* Centers for Disease Control and Prevention, Reinfection with COVID-19 (Updated Oct. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html.
[3] *See* Centers for Disease Control and Prevention, COVID-19 Science Update (Apr. 23, 2021), https://www.cdc.gov/library/covid19/04232021_covidupdate.html#anchor_Reinfection.

Worrell's motion does not raise any new facts that merit reconsideration.

## CONCLUSION

The Court should deny Worrell's second motion for reconsideration.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793


*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov