### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **No. 21-CR-292 (RCL)** |
| | **:** | |
| **CHRISTOPHER WORRELL,** | **:** | |
| **Defendant.** | **:** | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S
### <u>MOTION FOR TRANSFER</u>

Nearly 45 years ago, the en banc D.C. Circuit rejected the core of the argument made by defendant Christopher Worrell here: that based upon "the District of Columbia's voting record in the past two presidential elections[,]" the defendants could not receive a fair trial in this District and a change of venue was required. *United States v. Haldeman*, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc). In that case, the defendants were former high-ranking members of the Nixon administration, and they were charged with crimes arising from the Watergate scandal, which "received extraordinarily heavy coverage in both national and local news media." *Id.* at 51, 59. Notwithstanding the fact "that Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party, as opposed to the Republican Party to which the defendants . . . belonged," and that roughly 80% of the voters in D.C. voted for the Democratic Party candidate when Nixon ran for president in 1968 and 1972, *id.* at 160, the court declared that, "[n]ot without reason, the relevance of this information seems to have escaped the prosecution, the defendants, their counsel, and the trial court," and that there was no legal support for the proposition "that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43.

Significantly, although 93% of the Washington, D.C. population knew about the charges against the *Haldeman* defendants and 73% of those individuals had an opinion of the defendants'

guilt or innocence, *id.* at 144, the court of appeals nonetheless held both that the district court "was correct to follow this circuit's well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 63-64. Instead, the court of appeals held that an "extensive voir dire" ultimately assured that the defendants "were tried by an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70.

The same holds true here. Worrell's pre-voir dire Motion for Transfer (Dkt. 44 and 44-1) should be denied as premature. As in *Haldeman* and other heavily publicized cases from this jurisdiction and elsewhere around the country, extensive pre-trial screening and voir dire will suffice to ensure that Worrell receives a fair trial by an unbiased jury. "And if an impartial jury actually cannot be selected, that fact should become evident at the voir dire. [Worrell] will then be entitled to any actions necessary to assure that he receives a fair trial." *Haldeman*, 559 F.2d at 63.

## BACKGROUND

Hundreds of individuals from all over the country traveled to Washington, D.C. for the events of January 6, 2021. On that date, as a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election, members of a large crowd that had gathered outside forced entry into the U.S. Capitol. Others in the crowd encouraged and assisted those acts. Scores of individuals entered the U.S. Capitol without authority to be there. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials. This event in its entirety is hereinafter referred to as the "Capitol Attack."

As relevant here, Defendant Christopher Worrell was one of the individuals who unlawfully entered the U.S. Capitol grounds on January 6, 2021. He first traveled to the District

of Columbia in December 2020, to participate in a Proud Boys rally. He then returned to the District of Columbia in early January 2021, committed federal crimes in the District of Columbia on January 6, 2021, and subsequently was indicted by a federal grand jury in the District of Columbia. The grand jury charged Worrell with: (1) Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(1), (b)(1)(A)); (2) Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(2), (b)(1)(A)); (3) Engaging in Physical Violence in a Restricted Building or Grounds Using a Deadly or Dangerous Weapon (18 U.S.C. § 1752(a)(4), (b)(1)(A)); (4) Act of Physical Violence in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(F)); (5) Civil Disorder (18 U.S.C. § 231(a)(3)); and (6) Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon (18 U.S.C. § 111(a)(1) and (b)). *See* Indictment (Dkt. 31).

National and local news stations across the United States covered the events of January 6, 2021, and the Capitol Attack. Over 400 individuals have been charged in connection with the Capitol Attack. Worrell is only one person in a sea of hundreds from all over the country who have been charged in the District of Columbia based upon their involvement in the Capitol Attack.

## ARGUMENT

According to Worrell, his trial should be transferred outside of Washington, D.C. because "[a] trial in Washington D.C. for Mr. Worrell would be by jurors who voted almost unanimously against Donald Trump, who have been barraged with propaganda about a 'white nationalist' attack, who are continuously told they were victims of an 'insurrection,' who were placed under curfew and locked down as a result, and who have been placed under seemingly endless military hold because of danger posed by 'Domestic Violent Extremists.'" Memorandum in Support of

Defendant Christopher Worrell's Motion to Transfer (Dkt. 44-1) (hereinafter "Motion") at 13. As discussed below, Worrell's Motion is premature and otherwise meritless.

The United States Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," Art. III, § 2, cl. 3, before a "jury of the State and district wherein the crime shall have been committed," Amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958); *see United States v. Levy Auto Parts*, 787 F.2d 946, 952 (4th Cir. 1986) ("Article III, § 2 of the Constitution requires that local crimes be prosecuted locally"). And they give rise to "a general presumption that a criminal prosecution should be retained in the original district." *United States v. Bowdoin,* 770 F. Supp. 2d 133, 138 (D.D.C. 2011) (Collyer, J.). If "extraordinary local prejudice will prevent a fair trial," however, a defendant may request that the case be transferred to another district under Federal Rule of Criminal Procedure 21(a). *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) ("Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."). It is the defendant's burden to establish his entitlement to a transfer of venue. *See, e.g.*, *In re United States*, 273 F.3d 380, 388 (3d Cir. 2001) ("the courts have held that the criminal defendant has the burden of making the case for transfer" under Rule 21(b)); *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979) ("It has long been recognized as a general rule that a defendant, in order to establish a deprivation of due process, must show that potential jurors were actually prejudiced by the pretrial publicity.").

## I.     Worrell's Motion Should Be Denied Without Prejudice As Premature.

Under longstanding D.C. Circuit precedent, the proper time for a court to evaluate a motion for a transfer of venue based upon prejudicial pretrial publicity is after voir dire. In the overwhelming majority of cases, thorough juror screening and extensive voir dire are sufficient to ensure that all seated jurors can be fair and impartial and to provide a criminal defendant with the fair trial to which he is entitled. *See, e.g., In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) ("[A]ny high-profile case will receive significant media attention. It is no surprise that people in general, and especially the well-informed, will be aware of it. Knowledge, however, does not equate to disqualifying prejudice. Distinguishing between the two is at the heart of the jury selection process."). As the D.C. Circuit has explained, "'[t]he ultimate question'" on a motion to transfer venue based upon prejudicial pretrial publicity "'is whether it is possible to select a fair and impartial jury, and the proper occasion for such a determination is upon the voir dire examination.' It is then, and more usually only then, that a fully adequate appraisal of the claim can be made, and it is then that it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967) (quoting *Blumenfield v. United States*, 284 F.2d 46, 51 (8th Cir. 1960)). "If an impartial jury actually cannot be selected, that fact should become evident at the voir dire. The defendant will then be entitled to any actions necessary to assure that he receives a fair trial." *Haldeman*, 559 F.2d at 63.

The en banc court in *Haldeman* followed this approach in a case involving the Watergate scandal, perhaps the most famous, heavily publicized political scandal in modern history. Notwithstanding the "extraordinarily heavy coverage in both national and local news media" that that scandal received, the court held that "the District Court was correct to follow this circuit's

well established procedure by refusing [the defendants'] pre-voir dire requests for . . . a change of venue." *Id.* at 59, 63-64.

Other courts agree that "the preferable procedure" is for a trial court to defer decision on a motion to transfer based on prejudicial pretrial publicity until after it has conducted voir dire. *United States v. Campa*, 459 F.3d 1121, 1146-47 (11th Cir. 2006) ("Indeed, we have ruled that a trial court's method of holding its decision on a Rule 21 motion for change of venue in abeyance until the conclusion of the voir dire is clearly the preferable procedure.") (quotation marks omitted); *see also United States v. Yousef*, 327 F.3d 56, 155 (2nd Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where voir dire reveals that an impartial jury cannot be impanelled would a change of venue be justified."); *United States v. Poludniak*, 657 F.2d 948, 955 (8th Cir. 1981) ("This court has repeatedly held that it is preferable to await voir dire before ruling upon motions for change of venue."); *United States v. Gullion*, 575 F.2d 26, 28 (1st Cir. 1978) ("We find that the trial judge did not abuse his discretion in denying the motion for a change of venue until he could consider the effect of any pretrial publicity at the time of conducting the voir dire of prospective jurors."); *United States v. Williams*, 523 F.2d 1203, 1209 n.10 (5th Cir. 1975) ("Holding a final decision on the motion in abeyance pending the conclusion of voir dire is clearly the preferable procedure."). As the Seventh Circuit has explained, it is "ordinarily preferable to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors, instead of in the vacuum of a hearing without reference to prospective jurors." *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986).

Worrell concedes that "[t]he D.C. Circuit has historically preferred voir dire of potential jurors as a means of dealing with pretrial publicity," and that the Supreme Court has not "bar[red]

a court from deferring the decision on a change of venue motion until voir dire[.]" Motion at 18-19. He nonetheless asserts that this Court should disregard that standard practice and grant a change of venue now, long before a trial, because "the D.C. Circuit's usual practice of deferring a motion for transfer until after voir dire is insufficient to protect Mr. Worrell, and may instead result in a false sense of security with a jury panel that is inherently incapable of unbiased adjudication." Motion at 20. Although there may exist cases in which "'adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed,'" *id.* at 20 (quoting *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)), that is a question for the Court to decide *after* it conducts voir dire, because "[t]he results of the *voir dire* itself" often "demonstrate that the community was not inflamed against the defendants," *United States v. Edmond*, 52 F.3d 1080, 1097 (D.C. Cir. 1995).

Indeed, although Worrell claims that he has been "[v]ilifi[ed] in the [m]edia," Motion at 12, it is unlikely that any significant segment of the D.C. population knows Worrell by name, much less the crimes he is accused of committing or the evidence of those crimes. *See Edmond*, 52 F.3d at 1097 ("As we have discussed, less than a third of all prospective jurors ever *had heard* of any of the defendants from the media, much less formed an opinion about their guilt."). Even if they had, "the mere fact that trial jurors have *heard of* a defendant does not give rise to the assumption that they are *prejudiced against* the defendant except in cases of extremely prejudicial pretrial publicity." *Id.* And, as the D.C. Circuit found in *Haldeman*, it is possible in this District to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial" even when an overwhelming percentage of the potential jurors have heard of the defendants and their crimes, and have formed an opinion of the defendants' guilt. 559 F.2d at 70, 144. In any event, because the question whether it is possible to select a fair and impartial jury is one that can only

be answered after a thorough voir dire, this Court should follow the D.C. Circuit's "well-established procedure" and deny Worrell's pretrial motion to transfer venue without prejudice to his ability to bring that motion again at the appropriate time.

## II.   Worrell Has Not Established Circumstances So Extreme as to Warrant a Presumption of Prejudice.

Worrell contends that this Court should not follow that standard practice of deferring a motion to transfer venue until after voir dire, because he believes his is one of the extraordinary cases in which pretrial circumstances conclusively establish that no jury can be impaneled in this District that could fairly and impartially try his case.  But as explained below, that contention flies in the face of case law denying motions to transfer in cases far more notorious than Worrell's and with more aggravated pretrial circumstances and publicity.  Worrell cannot establish that his case is one of the remarkable few that requires a transfer outside of this District.

As just noted, the Supreme Court has recognized that there may arise a "presumption of prejudice" resulting from sufficiently prejudicial pretrial publicity, but that presumption is appropriate "only [in] the extreme case." *Skilling*, 561 U.S. at 381. "[N]ews accounts of the crime" do not "alone presumptively deprive[ ] the defendant of due process." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). That is because "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require ignorance." *Skilling*, 561 U.S. at 381. *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (explaining that jurors are not required to be "totally ignorant of the facts and issues involved"; "scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case"). And "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). Consistent with these well-established principles, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history: Dzhokhar

Tsarnaev, one of the Boston Marathon bombers; Jeffrey Skilling, a longtime Enron executive; Zacharias Moussaoui, who conspired to commit the September 11 terrorist attacks; Ramzi Yousef and others who committed the 1993 World Trade Center bombing; and, in this jurisdiction, former Attorney General John Mitchell and others charged as part of the Watergate scandal. *See Skilling*, 561 U.S. at 399; *In re Tsarnaev*, 780 F.3d at 15; *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002); *Yousef*, 327 F.3d at 155; *Haldeman*, 559 F.2d at 70; *see also*, *e.g.*, *United States v. Salim*, 189 F. Supp. 2d 93, 97 (S.D.N.Y. 2002) (refusing to transfer venue from New York, even after the World Trade Center attacks, in case of defendant charged in a separate case with a global terrorist conspiracy to murder U.S. citizens, including the bombings of the U.S. embassies in Nairobi and Dar es Salaam).

In none of these cases did the courts apply a presumption of prejudice to the defendant, notwithstanding the extensive pretrial publicity of the defendants' crimes. Indeed, as discussed below, the D.C. Circuit appears to have never applied such a presumption. And the Supreme Court has done so in only three, "extreme" cases from nearly sixty years ago: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *See Skilling*, 561 U.S. at 379 (describing *Rideau*). The Court presumed prejudice because, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. In *Estes*, "extensive publicity before trial swelled into excessive exposure during preliminary court proceedings as reporters and television crews overran the courtroom and 'bombard[ed] . . . the

community with the sights and sounds of' the pretrial hearing. The media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Estes] was entitled.'" *Skilling*, 561 U.S. at 379-80 (quoting *Estes*, 381 U.S. at 536). And in *Sheppard*, "a 'carnival atmosphere' pervaded the trial": "'[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom,' thrusting jurors 'into the role of celebrities.'" *Id.* at 380 (quoting *Sheppard*, 384 U.S. at 353, 355, 358).

Notably, in *Sheppard*, the Court found that "months" of "virulent publicity about Sheppard" and his crime—including "a three-day inquest" during which "Sheppard was examined for more than five hours without counsel" that was "televised live" and "ended in a public brawl"— did not by itself deny the defendant his right to due process. 384 U.S. at 354; *see Skilling*, 561 U.S. at 380 ("Pretrial media coverage, which we characterized as 'months [of] virulent publicity about Sheppard and the murder,' did not alone deny due process"). Nor has either the Supreme Court or the D.C. Circuit presumed prejudice in any case in the 55 years since *Sheppard* was decided. To the contrary, in *Patton v. Yount*, the Supreme Court held that the trial court did not err "in finding that the jury as a whole was impartial" even where "voir dire showed that all but 2 of 163 veniremen questioned about the case had heard of it, and that, 126, or 77%, admitted they would carry an opinion into the jury box." 467 U.S. at 1029, 1032 (1984). In *Mu'Min v. Virginia*, the Court declined to presume prejudice despite "substantial" pretrial publicity that "w[as] not favorable" to the defendant. 500 U.S. 415, 429 (1991). And in *Skilling*, the Court refused to presume prejudice notwithstanding "the magnitude and negative tone of media attention directed at Enron" because of the "large, diverse pool of potential jurors" in the Houston Area; the fact that, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected

to shut from sight"; "over four years [had] elapsed between Enron's bankruptcy and Skilling's trial"; and "Skilling's jury acquitted him of nine insider-trading counts." 561 U.S. at 382-83.

Similarly, in *Haldeman*, the D.C. Circuit declined to find that the defendants' "due process rights were violated by the District Court's refusal to grant . . . a change of venue prior to attempting selection of a jury" notwithstanding the "massive," sometimes "hostile in tone and accusatory in content," pretrial publicity. 559 F.2d at 61-62. The court explained that, "unlike the situation faced by the [Supreme] Court in *Rideau*," the publicity surrounding Watergate gave the court "no reason for concluding that the population of Washington, D.C. was so aroused against [the defendants] and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated[.]" *Id*. The D.C. Circuit has similarly refused to presume prejudice in numerous other cases involving both national crimes such as Watergate and notorious local criminals such as Rayful Edmond. *See, e.g.*, *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995) (declining to presume prejudice, which "is reserved for only the most egregious cases"); *Edmond*, 52 F.3d at 1099 ("Neither the nature nor the impact of the publicity in this case presented the 'extreme circumstances' necessary to establish a presumption that a fair trial was impossible in this jurisdiction."); *United States v. Ehrlichman*, 546 F.2d 910, 916 n.8 (D.C. 1976) ("An examination of the voir dire process and its results in this case makes clear that the extreme circumstances condemned by the Supreme Court in . . . *Sheppard* . . . and *Rideau* . . . are not present here."); *United States v. Chapin*, 515 F.2d 1274, 1287 (D.C. Cir. 1975) (rejecting "the argument is that no voir dire would have been effective in rooting out the prejudices of which [the defendant] complains").

This case is nothing like the few "extreme case[s]" in which the Supreme Court has presumed prejudice based upon adverse pretrial publicity.

*First*, given the sheer number of people number involved in the Capitol Attack, it is unlikely that more than a small share of D.C. residents could identify Worrell by name, much less know the particulars of his case, the crimes with which he has been charged, or the evidence against him.  The news stories about Worrell have "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Indeed, to the government's knowledge, Worrell has made no statements to the press at all.[1]  The reporting on Worrell thus in no way resembles *Rideau*, where "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff." 373 U.S. at 725. Whereas "Rideau's dramatically staged admission of guilt . . . was likely imprinted indelibly in the mind of anyone who watched it," *Skilling*, 561 U.S. at 382-83, Worrell provides no reason to believe that, by the time his trial begins, D.C. jurors are likely to be able to remember and distinguish the reporting about him from that involving the many hundreds of other people charged as part of the Capitol Attack.  And even if they could, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require ignorance." *Id.* at 381.

Moreover, while there has been substantial publicity surrounding the Capitol Attack generally, "precedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, enabling the change to serve its purpose." *Chapin*, 515 F.2d at 1288.  Here, the first two results

---

[1] Even if he had, a defendant's voluntary and inflammatory statements to the press are utterly unlike an uncounseled confession obtained by the state (like that in *Rideau*).  A defendant should not be permitted to buy himself a transfer of venue by voluntarily talking about his case to the press.

that show up in a Google search for "Christopher Worrell" are articles from his local newspaper in Florida, the Naples Daily News,[2] and the fifth relevant result is an article in "Wink News," which describes itself as "SW Florida's News Leader."[3]   If anything, Worrell is the subject of intense local interest in his *hometown*—near the district where he wishes to be tried—not in Washington, D.C.   Publicity has largely focused on either the Capitol Attack generally or on defendants other than Worrell, and its focus has been nationwide or, with respect to Worrell, local to southern Florida, not Washington, D.C. *Id.* at 378. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 22 ("It is true that there has been ongoing media coverage of the advent of the trial and petitioner's pre-trial motions, both locally and nationally. But that would be true wherever trial is held, and the reporting has largely been factual."); *Haldeman*, 559 F.2d at 64 n.43 (noting that "a change of venue would have been of only doubtful value" where the pretrial publicity was nationwide in scope and where the crime was "simply not a local [one] of peculiar interest to the residents of the District of Columbia").

*Second*, that Worrell is but one of hundreds of individuals charged in connection with the Capitol Attack also sharply distinguishes him from those defendants—like Jeffrey Skilling, Dzhokhar Tsarnaev, Zacharias Moussaoui, or the Watergate defendants—who were charged alone or in small groups of defendants.   Some of those defendants effectively became the public face of

---

[2] *See East Naples arrest could have connection to Capitol Riots and Proud Boys. Here's what we know,* Naples Daily News (Mar. 16, 2021), https://www.naplesnews.com/story/news/2021/03/13/christopher-worrell-arrested-naples-ties-proud-boys-capitol-riot-suspected/4682025001/; *D.C. Judge orders East Naples man with Proud Boys ties to remain jailed through trial*, Naples Daily News (Mar. 20, 2021), https://www.naplesnews.com/story/news/crime/2021/03/19/capitol-riots-d-c-judge-orders-east-naples-man-proud-boys-ties-remain-jailed/4762784001/; *SWFL man accused of participating in insurrection will be held without bond*, WinkNews (Mar. 19, 2021), https://www.winknews.com/2021/03/19/swfl-man-accused-of-participating-in-insurrection-will-be-held-without-bond/.
[3] *See* https://www.winknews.com/.

heinous crimes that had received massive publicity.  By contrast, here the sheer number of defendants charged in connection with the Capitol Attack means that there is no single defendant, or even small group of defendants, who have become the public face of the entire criminal riot.  If an impartial jury can be selected for defendants who were individually well known by the jury pool at the time of their trial, then it can be selected for merely one of the hundreds of individuals responsible for the Capitol Attack.

*Third*, the size of the District's population likewise distinguishes it from those few cases in which the Supreme Court has presumed prejudice. The Census Bureau estimates the District's population to be around 705,000 people, *see* QuickFacts, District of Columbia, *available at* https://www.census.gov/quickfacts/DC, far more than the 150,000-person Louisiana parish at issue in *Rideau*, 373 U.S. at 724. Indeed, the District is more populous than Clark County was in 1988, but a four-Justice plurality nonetheless concluded in *Gentile v. State Bar of Nevada* that there was a reduced likelihood of prejudice there "[g]iven the size of the community from which any potential jury venire would be drawn[.]" 501 U.S. 1030, 1044 (1991).

*Fourth*, due to the backlog in trials for detained defendants caused by the COVID-19 pandemic, it appears unlikely that this case will be one "in which trial swiftly followed a widely reported crime[.]" *Skilling*, 561 U.S. at 383.

*Fifth*, this Court can take measures to prevent a "carnival atmosphere" from pervading Worrell's trial and denying him the "judicial serenity and calm" to which he is entitled. *See Sheppard*, 384 U.S. at 358 ("The carnival atmosphere at trial could easily have been avoided since the courtroom and courthouse premises are subject to the control of the court.").

Worrell purports to evaluate the so-called "*Skilling* factors" in an attempt to demonstrate that this Court should presume prejudice and transfer his case to Florida without even attempting

14

to choose an impartial jury here. Motion at 8-21. But two of the four "[i]mportant differences" that the Supreme Court found to "separate Skilling's prosecution from those in which [it had] presumed juror prejudice" are unknown and, indeed, currently unknowable: the time elapsed between the crime and the trial, and whether the jury's verdict indicates impartiality. *Skilling*, 561 U.S. at 381-83.  As previously discussed, Worrell's trial is unlikely to occur any time soon.  Worrell thus relies on three contentions to claim that "that detrimental pretrial publicity and community prejudice in Washington D.C. is so likely to have affected the jury pool that the venire must be presumed as tainted." Motion at 1.

*First*, Worrell complains that this District could never produce an impartial jury because "Washington D.C. is both a small and highly insular political community."[4]  Motion at 8; *see also* Motion at 8-9; *id.* at 13-18.  Worrell asserts that "more than 90%" of the residents of this District voted for the Democratic candidate in recent presidential elections.  *Id.* at 3. According to Worrell, because he supports former President Donald Trump, *id.* at 1, and because "[a] trial in Washington D.C. for Mr. Worrell would be by jurors who voted almost unanimously against Donald Trump," *id.* at 7, this Court should not even attempt to pick a fair and impartial jury in this case.

As previously discussed (at 1-2), the *en banc* D.C. Circuit rejected just such an argument in *Haldeman*, 559 F.2d at 64 n.43. There, the defendants were not just vocal supporters of President Nixon, but were former high-ranking officials in his administration. *Id.* at 51. And the defendants were not among many hundreds charged in a high-profile crime of nationwide significance, but were instead just seven, nationally known figures "charged [in] what amounted to an unprecedented scandal at the highest levels of government," *id.*, that "led to the resignation of

---

[4] The size of the District's jury pool is discussed *supra* at 14.  The government discusses here only Worrell's contention that it is a "highly insular political community."

President Nixon," *id.* at 54 n.15. If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of the president's administration, *id.* at 64 n.43, it surely has no bearing on venue here. Ultimately, the question is whether the court can select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Id.* at 70. The District's voting record cannot establish a presumption of prejudice so invidious that this Court should not even attempt to select such a jury.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals such as John Poindexter, Oliver North, Scooter Libby, and, more recently, Roger Stone, all received fair trials in this jurisdiction by unbiased juries. *See United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990); *United States v. Stone*, Cr. No. 19-0018 (ABJ), 2020 WL 1892360 (D.D.C. April 16, 2020); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007). Indeed, in *Stone*, Judge Jackson rejected an argument similar to the one Worrell makes here:

> At bottom, the defense merely posits that if you do not like Donald Trump, you must not like Roger Stone, or if you are concerned about racism on the part of some of the President's supporters, then you must be applying that label to Roger Stone because he was a supporter, too. While there is no evidence that proves this hypothesis, there is evidence that contradicts it . . . . At bottom, the motion appears to be based on the defendant's assumption that the juror must have known who he was, what his relationship with Donald Trump has been over time, and what role he played in the campaign, and that since he was so central to the election, one could not possibly view him independently from the President. . . . But there is no basis to conclude that Roger Stone was a household name in . . . Washington, D.C.

2020 WL 1892360, at *30-31. Judge Jackson went on to explain that "[t]he case law in this Circuit makes it clear that one cannot assume that people in the community—even those who follow the news—have a deep understanding of the facts of a particular case. During the prosecutions that arose out of the Watergate and Iran-Contra investigations, the Court of Appeals repeatedly

expressed its confidence that jurors with open minds could be found within the District, even though the investigations had received a great deal of public attention." *Id.* at *31. The same is true here.

In any event, there is zero support for Worrell's odd claim that this "case is factually political" and that the "majority of the Government's evidence against Mr. Worrell is his discussion of politics." *Id.* at 1. The elements of the offenses with which Worrell is charged do not relate directly to politics. As Worrell knows; the government has not referred to any political statements by Worrell in any filings to date, and the overwhelming majority of the evidence against Mr. Worrell will be the videos and photographs of him present on Capitol grounds on January 6, 2021. Equally baseless is Worrell's claim that this is a "political case before a jury that will showcase political issues debated by counsel." *Id.* at 15. Perhaps to Worrell's disappointment, government counsel will not be engaging in "debate[s]" with defense counsel over political issues at trial. A defendant cannot complain that the local jury is too partisan to hear his case when politics qua politics (rather than, e.g., as evidence of intent) will only be at issue if *he* repeatedly attempts to interject irrelevant political issues into the trial.

*Second*, Worrell contends that the pretrial publicity in his case "is more complicated, publicized, and widespread than any other criminal matter in Washington, D.C.'s history." Motion at 9. This contention is refuted above. The Capital Attack is no more notorious than Watergate or (in other districts) the Boston Marathon bombing, the 9/11 attacks, or the World Trade Center bombing. And as previously explained, the particulars of Worrell's case have been publicized in his hometown media, but hardly at all in the local Washington, D.C. media. *See supra* at 12-13. This factor cuts against presuming prejudice.

*Third*, Worrell submits the bald exaggeration that the citizens of Washington D.C. "have been placed under seemingly endless military hold because of danger posed by 'Domestic Violent Extremists.'" Motion at 7. Yet whatever curfew, road closures, and other limited restrictions were imposed in the days immediately following the Capitol Attack, many have been lifted. The few thousand National Guardsmen who have remained in D.C. may be leaving shortly. *See, e.g.*, *Guard leaders eye ends to Capitol Hill, border security mission*, Marine Corps Times (May 18, 2021), https://www.marinecorpstimes.com/news/pentagon-congress/2021/05/18/guard-leaders-eye-end-to-capitol-hill-border-security-missions/ (citing testimony from National Guard Bureau Chief Gen. Daniel Hokanson that the 2,300 troops currently at the U.S. Capitol are scheduled to end that mission May 23); *National Guard mission at Capitol slated to end May 23; fencing to remain up* Fox5 News (May 12, 2021), https://www.fox5dc.com/news/national-guard-mission-at-capitol-slated-to-end-may-23-fencing-to-remain-up-report. Much of the reporting cited by Worrell regarding the inconveniences experienced by a segment of D.C. residents appears to predate the inauguration, and those inconveniences may already have subsided. Any impact from these restrictions will have lessened further by the time of trial. In any event, the National Guard presence at the Capitol and its immediate vicinity for a few months' time does not establish that the entirety of "D.C. was a militarily occupied zone," Motion at 10, any more than the presence of federal troops at Marine Corps Base Quantico establishes that the Eastern District of Virginia is a "militarily occupied zone." Worrell, whose experience in Washington, D.C. appears to be limited to rioting with Proud Boys downtown and at the U.S. Capitol, can perhaps be forgiven for believing that every District resident lives in the shadow of the U.S. Capitol. He may not understand that hundreds of thousands of residents, from whom a jury pool could easily be drawn, live and work

miles away in residential neighborhoods that were largely unaffected by the National Guard's presence.  This factor, too, cuts against presuming prejudice.

Only a thorough voir dire can accurately evaluate whether the District's residents not only can distinguish Worrell from the thousands of other people involved in the Capitol Attack but also have formed judgments about his guilt. *See, e.g.*, *Yousef*, 327 F.3d at 155 ("the key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool"). It is thus appropriate to defer resolution of his motion until after such a voir dire.  Worrell provides no support for deviating from that well-worn route here.

### III.    Worrell's Alternative Venue Makes No Sense.

Worrell strangely insists that his trial should be moved to the Southern District of Florida. As Worrell hopefully knows, he lives in, was arrested in, had his initial appearance in, and has family in the Middle District of Florida, not the Southern District of Florida.  As far as the government knows, he has no connections to the Southern District of Florida at all.  In any event, as noted above, much of the local publicity specifically concerning Worrell's case is local to southern Florida, not D.C.  Worrell, who carries the burden of establishing that a transfer of venue is appropriate, has failed to make that showing.

### CONCLUSION

Courts routinely conclude that, despite significant negative pretrial publicity, defendants received a fair trial in the location where they committed their crimes. This was true in *Skilling*, notwithstanding "the community passion aroused by Enron's collapse and the vitriolic media treatment" aimed at Skilling. 561 U.S. at 377. This was true for Dzhokhar Tsarnaev, one of the Boston Marathon bombers, notwithstanding the fact that "the reporting of the events" in that case "st[ood] unrivaled in American legal history (at least as of today)." *United States v. Tsarnaev*, 968 F.3d 24, 42 (1st Cir. 2020); *see id.* at 56 ("[I]f pressed to decide the venue question now, two of

19

us would likely find the judge abused no discretion in finding venue proper in Boston in 2015."). It was true for Zacharias Moussaoui, who was prosecuted "in the Eastern District of Virginia, minutes by car from the Pentagon." *In re Tsarnaev*, 780 F.3d at 16; *see Moussaoui*, 43 F. App'x at 613. It was true in the World Trade Bombing case. *See Yousef*, 327 F.3d at 155. It was true in the post-Watergate prosecutions. *See Haldeman*, 559 F.2d at 70-71. And it is true here, too.

But the question whether the Court ultimately can select an impartial jury for Worrell's trial is one that the Court need not answer today. Rather, the only question before the Court at this time is whether to presume that, whatever jury it picks, and whenever it picks that jury, Worrell cannot possibly receive a fair trial in this jurisdiction. Because such a presumption has no legal or factual support in this case, and runs counter to the D.C. Circuit's "well established procedure" against answering that question before conducting voir dire, the Court should deny Worrell's Motion.

For the foregoing reasons, the government respectfully requests that Worrell's Motion to Transfer be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793


*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov

20