# Exhibit 2

```
1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2
        - - - - - - - - - - - - - - - x
3       THE UNITED STATES OF AMERICA,
                                            Criminal Action No.
4                    Plaintiff,            1:21-cr-00292-RCL-1
                                            Friday, May 14, 2021
5       vs.                                 10:06 a.m.

6       CHRISTOPHER JOHN WORRELL,

7                    Defendant.
        - - - - - - - - - - - - - - - x
8

9       _____

10                   TRANSCRIPT OF MOTION HEARING
              HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
11                    UNITED STATES DISTRICT JUDGE
        _____
12      APPEARANCES:

13      For the United States:    WILLIAM KENNELLY DREHER, ESQ.
                                  U.S. ATTORNEY'S OFFICE
14                                700 Stewart Street, Suite 5220
                                  Seattle, WA 98101
15                                (202) 553-4579
                                  william.dreher@usdoj.gov
16

17      For the Defendant:        JAMES KELLY, ESQ.
                                  PIERCE BAINBRIDGE P.C.
18                                355 S. Grand Avenue, 44th Floor
                                  Los Angeles, CA 90071
19                                918-727-4129
                                  jkelly@piercebainbridge.com
20

21      Court Reporter:           Lisa A. Moreira, RDR, CRR
                                  Official Court Reporter
22                                U.S. Courthouse, Room 6718
                                  333 Constitution Avenue, NW
23                                Washington, DC  20001
                                  202-354-3187
24

25
```

```
 1                     P R O C E E D I N G S
 2              THE COURTROOM DEPUTY:  Good morning, Judge.  We're
 3      on the record for Criminal Case 21-292, United States of
 4      America vs. Christopher John Worrell.
 5              Will counsel for the parties please identify
 6      yourselves.
 7              MR. DREHER:  Good morning, Your Honor -- I
 8      apologize.
 9              MR. KELLY:  James Kelly for Mr. Christopher
10      Worrell.
11              MR. DREHER:  Good morning, Your Honor; William
12      Dreher for the United States.
13              THE COURT:  All right.  And Mr. Worrell, can you
14      hear me okay?
15              THE DEFENDANT:  Yes, sir, I can.
16              THE COURT:  Okay.  All right.  We're here on the
17      motion to reconsider conditions.  The Court also, when it
18      received this case, was going to arraign the defendant, and
19      I don't know if the courtroom deputy is prepared for an
20      arraignment or not.  We'll do that at the end of this in any
21      event.  The Court was notified at the time that it set for
22      the arraignment that Mr. Worrell, in the meantime, had
23      contracted COVID and could not be transported to the room to
24      conduct the arraignment so the arraignment was postponed
25      until now.
```

1          I read last night, in light of the emergency

2     motion, the transcript of the hearing before Chief Judge

3     Howell on April the 6th, and I take it that the purpose of

4     this motion is in light of the Court of Appeals saying that

5     the Court could reconsider the detention question in light

6     of new information, and I'm to determine if there's new

7     information that should lead to reconsideration.

8          So what I looked at so far in terms of new

9     information that has come to light is that, first, it is new

10    that the defendant contracted COVID but is allegedly

11    recovering and, second, that the defendant still has not

12    been seen by an oncologist but is scheduled for next

13    Wednesday, May 19th, for consult with an oncologist so the

14    jail has delayed giving him the second medication.

15          The first medication, as far as I can tell there

16    was never a prescription provided by the prescribing doctor

17    with the ingredients so it could not have been given in any

18    event.  The second prescription, I take it they had the

19    dosage and everything, but it was an off-label use, and I

20    take it from the opposition, from the government, that the

21    medical authorities at the jail thought that they should

22    have an oncologist review it before they filled that

23    prescription at the jail, and that that's where we are, that

24    it was going to be determined by an oncologist.

25          So I think that's where we are.  So I don't know

1   what new information there is for the Court to consider

2   before the May 19th review by the oncologist and my hearing

3   the results of that review, but I'm willing to hear whatever

4   the petitioner's counsel wants to say today.

5         I did wonder, in terms of if I ruled today, that

6   you certainly would have the right to have that reviewed by

7   the Court of Appeals, but the last time you took an

8   emergency appeal the Court of Appeals set a three-week

9   briefing schedule so you won't be very far along in terms

10  of -- I think May 20th is going to be a more realistic date

11  to rule after we see what the oncologist does and make sure

12  we get a determination out of the oncologist that will get

13  you somewhere on the road to a decision.  But I'll leave

14  that to you.

15        So with those comments, I'll hear from you,

16  Mr. Kelly.  I did read the full transcript last night so I

17  know what was going on before.  Tell me what's new.

18              MR. KELLY:  Thank you, Your Honor.

19              What's new?  Well, the cancer has been ongoing.

20              THE COURT:  Right.

21              MR. KELLY:  A lack of medication, a lack of

22  treatment.  It seems the government has imposed the blame

23  game, so to speak, on the fact that Dr. Rucker, back at

24  Charlotte, when this all started in his initial detention,

25  implored Naltrexone and this medicated cream, which is used

1    for the skin lesions, which is ongoing; and it has been

2    pronounced as significant by the D.J. Jail medical

3    authorities, that the skin rashes, the lesions, are ongoing

4    and visible, and that's a manifestation of his Non-

5    Hodgkin's lymphoma.

6          Yes, we've been trying to get this medication ever

7    since Florida, and then he was -- just before that

8    medication was to be dispensed to him properly by authority

9    of Dr. Rucker and in agreement with the Florida jail

10   facility, he then was carted halfway across the country to

11   Oklahoma, to a small little Grady County Jail which had a

12   bad reputation for COVID transmission, and then eventually

13   to Virginia -- we tried to catch up there and get his

14   medications dispensed -- and then he was in D.C., and before

15   we knew it he had COVID.

16         The whole point of this from the very beginning

17   had been to avoid the risk factor, which the government has

18   always discounted as very, very low risk.  We were always

19   told it was very low risk.  Even Judge Howell in the last

20   hearing on the motion for consideration prior to his COVID

21   diagnosis said, "It's low risk.  Don't worry about it."

22         Nevertheless --

23         THE COURT:  I think in D.C. it was because we've

24   had pretty good luck, but the transport is clearly -- and

25   he's shown it is -- a problem because the Marshals have this

1    central transport they do in Oklahoma or some place, and

2    it's a problem.

3              MR. KELLY:  Well, yes, and the ACLU has brought up

4    the problem with the D.J. Jail.  That was the subject of a

5    major class action which is nationwide being given global

6    publicity surrounding the issues of COVID and other matters

7    of overcrowding in that particular widely publicized case

8    involving D.J. Jail.

9              So as we sit here today, it appears that the COVID

10   has largely subsided.  As is known, the risk of

11   recontracting COVID is still present and a potential danger

12   to an autoimmune-compromised person like Mr. Worrell.

13             At the very outset, Your Honor, it was said, "Oh,

14   this is just an alarmist.  This is just an overreaction."

15   Well, eventually he did contract COVID, to his detriment,

16   and that could be life-threatening to a cancer patient with

17   the comorbid conditions that Mr. Worrell has, and all that

18   was disregarded previously.

19             When we brought that up on appeal in light of the

20   COVID, the Court declined to address that until we brought

21   it before you, Your Honor, and now that it seems that the

22   COVID has potentially resolved, still we have the lack of

23   treatment from the oncology.

24             This next week's appointment was only brought up

25   at the very last moment, at the 11th hour, after we filed

 1    this second motion for reconsideration.  So its timing is

 2    very telling, I think, in these type of proceedings here.

 3    The government's trying to catch up to where we've been all

 4    along, which is trying to protect our client's health and

 5    well-being.  And we do take, in light of his cancer and in

 6    light of the COVID, that this dangerousness factor of the

 7    four factors that are considered in the Bail Reform Act is

 8    vastly mitigated, and even if the jail should present him

 9    for appointment next Wednesday, the 19th, regardless, we

10    believe that an independent medical exam -- which is only

11    fair -- an independent medical exam in his home community is

12    ultimately our approach here today because that is for

13    conditional release.

14          He's not a danger.  He's not a threat to his

15    community.  He's a law-abiding citizen otherwise outside of

16    the particular incident that occurred on January 6th.

17          What seems to be the ideology, the doctrine,

18    behind the DOJ is to push this against hundreds of people

19    now, and Mr. Worrell is just petitioning again for this

20    Court to respectfully reconsider his detention at the D.C.

21    Jail where he is potentially at ongoing risk of

22    recontracting COVID.  The science is still evolving as

23    we're beginning to understand more about COVID-19, the

24    SARS virus, and in light of that, we would just push that he

25    have an independent medical exam with another oncologist.

1     Dr. Rucker was deemed to be a urologist, not an oncologist.

2          Regardless, there is a Dr. Freeman, who has known

3     Mr. Worrell for over 15 years and is well aware of his

4     medical history, radiology, oncology, board-certified in the

5     state of Florida, who is more than happy to meet with Chris,

6     and that would be an independent medical exam.

7          We're just a bit distrustful of the jail system,

8     and for good reason.  We've been told before that he was at

9     very low risk of COVID.  He contracted COVID.  Now this exam

10    on next week's schedule is only because we pushed a second

11    time here for reconsideration to bring before the District

12    Court of Washington, D.C., the matter of his health crisis.

13    And this is an ongoing health crisis to Mr. Worrell, and

14    we're just seeking relief on that basis.

15         And let me see.  In addition to that, I would note

16    that not only the treatment has been inadequate and

17    dangerous and life-threatening, that this is counter to

18    Section 504 of the Rehabilitation Act of 1973 and Title 2

19    the Americans with Disabilities Act.

20         You know, before his unnecessary pretrial

21    incarceration, which was really tantamount to punishment

22    for -- given everything that he's been through, this is

23    clearly punishment.  I think it was recited on the floor of

24    Congress just a day or two ago by the honorable congressman

25    from Arizona that Mr. Christopher Worrell is being subject

1    to a form of torture during the course of this

2    incarceration.  This is all in the report and has been

3    broadcast on NPR, National Public Radio.  Now this case has

4    become not just nationwide by global in light of all of

5    this.

6              Mr. Worrell's white blood count is shown by the

7    D.C. Jail records to be somewhere off the charts, running

8    very high, which is very disturbing and concerning.  That

9    could mean more than a few things here, and that's why we

10   think a qualified oncologist in the state of Florida, just

11   as Dr. Freeman, is most qualified and most competent, I

12   think, to render an opinion on this matter rather than the

13   self-serving type of statements that have been made on the

14   part of the government and now this 11th hour appointment on

15   Wednesday of next week with an oncologist.

16             Again, it seems to be the determined effort of the

17   government to keep Mr. Worrell incarcerated when he does not

18   present a threat to anyone.  All he wants to do is be home

19   with his family safely and be treating his cancer

20   appropriately.

21             Again, they have cited previously that, well, he

22   seemed to flout and disregard his own health conditions

23   involving COVID or even his existing cancer because he

24   wasn't wearing a mask, because he was there.  Certainly we

25   would concede that he was just in the wrong place at the

1    wrong time, and unfortunately things -- as everyone knows,

2    things escalated during the course of the January 6th

3    events.

4           But Mr. Worrell otherwise is a law-abiding

5    citizen.  He's a cancer patient.  He's suffering

6    intolerably, and this is now becoming a matter of

7    widespread knowledge and publicity nationwide, globally.

8    Mr. Worrell is, as in the words of a U.S. Congressman from

9    Arizona, being tortured while in custody.  And hardly an

10   appointment with one oncologist provided by the jail, the

11   penal system, will necessarily obviate or mitigate the risk

12   that Mr. Worrell has toward his suffering in light of his

13   cancer symptoms that he's incurring, this high white blood

14   count, which is off the charts, and with the poor history

15   that the penal system has shown him to date.  Therefore, we

16   would respectfully request Mr. Worrell's immediate release

17   conditionally.

18          And he will be certainly in strict compliance --

19   we can assure that -- if the Court should deem him

20   eligible to release him to home detention, usual conditions,

21   and allowing him regular visits with his oncologist,

22   Dr. Freeman, Dr. Rucker, the urologist in this particular

23   matter.  He has a higher degree of sensitivity in line with

24   a professional medical practice that hasn't been shown him

25   in the penal system from Florida to Oklahoma to Virginia to

1    Washington, D.C.

2         Therefore, I would also like to allow Mr. Worrell

3    an opportunity to speak on his own behalf or to answer any

4    questions from this Honorable Court that you may have,

5    whether at this time or perhaps after the government has had

6    an opportunity to respond to my opening statement.

7         Thank you very much, Your Honor.

8         THE COURT:  I'll hear from the government first,

9    and then I'll hear from Mr. Worrell.

10        MR. DREHER:  Thank you, Your Honor.

11        First, I just wanted to clarify one factual aspect

12   that you have discussed in your opening discussion of the

13   facts that you had reviewed in this case.  Just to be clear,

14   my understanding is that when Dr. Rucker contacted the

15   Charlotte County Jail back in late March he was unable to

16   provide the formula for the first prescription.

17        THE COURT:  Right.

18        MR. DREHER:  I think that now he is able to or has

19   at least said that he is able to to the D.C. Jail.

20        THE COURT:  Has he?

21        MR. DREHER:  I don't know if he has, but what the

22   D.C. Jail medical staff told me is they didn't ask him for

23   the precise formula because he described --

24        THE COURT:  The defendant did not file anything

25   with me, so I don't know that -- I mean, I would have

1    assumed -- all they filed was a previous affidavit from him

2    that didn't have it, so I don't have anything in the record

3    that shows that he's ever provided it.

4              MR. DREHER:  I think that's accurate, Your Honor,

5    and I'm just -- because that information came to me, I just

6    wanted to relay it to Your Honor.

7              THE COURT:  I appreciate it because it does make a

8    difference to me, the fact that they can't give him a

9    prescription that they don't even have, which is what I

10   looked at it as.

11             MR. DREHER:  Yes.  Thank you, Your Honor.

12             With respect to the -- sort of the course of this

13   or the procedural history of these various motions, what I

14   would say is that it's not that the government is attempting

15   to provide explanations or excuses for not providing some of

16   this treatment, but rather trying to explain simply to the

17   Court why there has been -- what the cause of the delay

18   has been, and certainly at the Charlotte County Jail

19   there were numerous efforts over multiple weeks to reach

20   Dr. Rucker.  Only after the government responded to an

21   emergency motion that was filed with an affidavit from

22   Dr. Rucker did Dr. Rucker call the medical jail staff back

23   and have the conversation with him that was discussed at

24   length in the April 6th hearing.

25             Now, at the D.C. Jail I think that there has been

1     better communication between Dr. Rucker, who did -- it

2     sounds like did -- was in touch with the D.C. Jail, but

3     there is this still remaining issue, which is that both

4     jails' independent medical contractors -- you know, these

5     are contractors who work with the jails to provide

6     healthcare services.  And each of them have independently

7     concluded that these two prescriptions, at least in the

8     medical literature, do not seem to be indicated for the type

9     of cutaneous lymphoma that Mr. Worrell suffers from.

10             They reviewed the medical records from

11    Mr. Worrell's prior oncologists and did not find either

12    prescription recommended by either doctor.  They consulted

13    with an outside oncologist at Howard University Hospital.

14    That oncologist had never heard of an indication for either

15    of these types of drugs to be used to treat cutaneous

16    lymphoma in that off-label way, and they therefore decided

17    to refer him to this outside oncologist.  I don't know

18    exactly when that referral initially took place.  All I know

19    is from the medical records it appears there was some

20    discussion referring to an outside oncologist in mid-April.

21             So I don't think this was necessarily an 11th hour

22    thing or something that was scheduled only in response to

23    this motion.  I think it's possible that it was scheduled

24    and that the information was just not relayed to Mr. Worrell

25    that it was scheduled.

1          THE COURT:  Explain to me, though, why the jail

2     medical authorities should second-guess any prescription.

3     Why don't they just carry out a prescription?

4          MR. DREHER:  So I think that there are two issues,

5     Your Honor.

6          First is there are -- the jail has to make sure

7     that any medication -- you know, one of the medication's I

8     think on-label use has to do with opioid withdrawal.

9          THE COURT:  Right.

10          MR. DREHER:  So the jail has to make sure, of

11     course, that any medications or compounds that are coming

12     into the jail are both safe for individuals to use, because

13     they obviously owe a duty of care to their inmates who are

14     under their care, especially pretrial detainees, but that

15     they're also the compounds that they represent them to be,

16     right?  So that is why generally jails can't allow sort of

17     leftover bottles or compounds --

18          THE COURT:  I understand that, but if they've

19     authenticated that it's properly prescribed by a physician,

20     why do they go beyond that?

21          MR. DREHER:  I think that it is when they deem it

22     could potentially be detrimental to the health of the

23     inmates.  So I think if they thought that it, you know,

24     would have no effect or would potentially be beneficial, I

25     assume that they would not have concluded not to dispense

1    those medications, but that they need the medical

2    justification for it to be a standard prescription for that

3    type of -- for that type of cancer or disease.

4              I think the second thing that has --

5              THE COURT:  If the doctor who prescribed it

6    thought so, why would they second-guess that?

7              MR. DREHER:  So I think in this case the second

8    thing that has somewhat stymied these efforts is that it is

9    a little bit unclear what Dr. Rucker's practice is, and so

10   the jail would like Mr. Worrell to see a board-certified

11   oncologist.  Dr. Rucker does state in his affidavit that

12   he's a former cancer surgeon, but our understanding or the

13   jail's understanding is that he's a urologist, not an

14   oncologist, and that he currently practices a form of

15   holistic medicine with no medical records, and I think that

16   the jail is, therefore, wary of automatically dispensing

17   medication that had only ever been prescribed by that

18   doctor, Dr. Rucker, and not by Mr. Worrell's previous

19   oncologist when the oncologist that they spoke with had

20   never heard of a designated treatment of those or designated

21   use of those two medications to treat lymphoma.

22             THE COURT:  But Mr. Worrell is seen by a

23   practicing physician in Florida.

24             MR. DREHER:  Dr. Rucker?

25             THE COURT:  Dr. Rucker, yes.

1          MR. DREHER:  I believe that he is.  I believe that

2     he is, Your Honor.

3          THE COURT:  Okay.

4          Well, I -- so your position is wait and see what

5     the oncologist says.  The oncologist could say it would be

6     harmful.

7          MR. DREHER:  Well, I think the oncologist --

8          THE COURT:  If the oncologist said it's not

9     beneficial, that you could refuse to fill those

10    prescriptions?  I'm not sure what it is we're waiting for

11    then.

12         MR. DREHER:  Well, I think the oncologists could

13    say that there were different medications that would be more

14    beneficial at treating these symptoms that Mr. Worrell has

15    described, and that, for example, there may be interactions

16    between those medications that the oncologist would

17    prescribe and these other medications.  But I admit it is

18    possible that or it is certainly possible -- I just don't

19    know medically whether this is accurate or not -- that those

20    two prescriptions could be given in conjunction with what

21    the oncologist prescribes next week, if anything, to treat

22    that skin condition.

23         So although I'm relaying the jail's staff's

24    concerns about prescribing those medications, I also

25    understand the Court's concern about if an individual or an

1    inmate wants to take the prescriptions, that he has

2    essentially in some ways assumed the risk of receiving those

3    prescriptions.  I understand the Court's impulse to allow

4    the individual to have the prescriptions, if that's what

5    they're seeking.

6             THE COURT:  Okay.  Go ahead with whatever else you

7    want to say.

8             MR. DREHER:  Beyond that, Your Honor, I was just

9    going to point out what I think the Court is already well

10   aware of, which is, with respect to the risk of COVID

11   reinfection the government does think that risk is low.

12            I do appreciate that both Chief Judge Howell

13   and the government previously represented that the risk

14   of COVID infection at the D.C. Jail would be low.  I think

15   it was accurate at the time it was made.  It is true that

16   the transport process is not the same, but there are

17   currently --

18            THE COURT:  Did he test positive when he arrived

19   at the jail; do you know?

20            MR. DREHER:  Yes, on the first day that he came

21   in.

22            THE COURT:  It wasn't there that he got it.

23            MR. DREHER:  Exactly.  I think currently there are

24   zero cases among the 1,400 inmates, and there are obviously

25   increasing vaccination rates there, so I think the risk of

1    reinfection once he enters the or now that he's entered the

2    general population is much lower, and he obviously does have

3    some residual protection from having unfortunately

4    contracted COVID-19 during the transport process.

5            So we think that that -- the third aspect with

6    respect at the present time to risk of reinfection, if

7    anything, is sort of -- as a matter of medical certainty has

8    to be a lower risk now than when Chief Judge Howell

9    entertained a similar argument a few weeks ago.

10           THE COURT:  Okay.

11           All right.  Mr. Worrell, whatever you'd like to

12   say I'm certainly interested in hearing.

13           THE DEFENDANT:  Good morning, Your Honor.

14           THE COURT:  Good morning.

15           THE DEFENDANT:  I came here with some pretty

16   sizeable information to my situation here.  And that is, the

17   normal meds, Rituxan, that would normally treat lymphoma,

18   because I've been subjected to them over 15 years, I am

19   highly allergic to those drugs.  So this is why we've kind

20   of gone to other options, and we're still in the middle at

21   this time to figure out some things, stem cell treatments,

22   et cetera.  So the last time I had my Rituxan treatment, my

23   body broke down in hives from the top of my head to the

24   bottom of my feet, and I was nearly hospitalized.  So this

25   is why we have some nontraditional medicine going on.  And I

1    also need more diagnoses and prognoses by doctors that know

2    my case heavily.

3           I'd also like to go on the record and say

4    Dr. Mitchell here and Dr. Crenshaw last week, during my

5    medical visit -- and this can be backed up by Corporal

6    Hayes, who is my escort officer -- they told me to my face

7    that my doctor's not qualified and that they will not give

8    me any meds he's prescribed to me.  That is on record.

9           And I find it hard to believe that a general

10   practitioner can overrule a specialist like an oncologist,

11   which Dr. Rucker is a urologist.  He's also a urologist

12   oncologist.  I've read his stuff and dealt with him for a

13   while now.

14          Now I'm also in the middle of trying to get with

15   Dr. Freeman with my situation when I was incarcerated

16   because she knows my 15-year history.  But the lesions on my

17   face -- and I don't know if you can see them -- the thrush

18   is gone through my face, and now it's extended to parts of

19   my body I've never had it before.  The fact that they want

20   to send me to an independent oncologist for another opinion

21   is valid, but it sets me back because now this oncologist

22   has to review 15 years of my situation and try to make a

23   determination based on what he has in front of him instead

24   of what is known.  This thing could take weeks, if not

25   months, from my life here.

1       I'm begging the Court.  I need this treatment.

2   I'm only 50 years old.  I'm not trying to bypass what I'm

3   due to answer to.  I just need the treatment by people that

4   know me.  This is not only trying medically, but it's also

5   mentally trying, and this is all key to my health.

6       I'm not trying to not answer to any charges that

7   the government wants me to answer to.  I'm just asking for

8   fair treatment.

9       Judge Howell promised me in Oklahoma that if we

10  transferred my records ahead of time there would be an

11  oncologist visit almost waiting for me.  Well, here I am 34

12  days in, no oncologist; so the promise made by Chief Justice

13  Howell and the government and the doctors have not been met.

14      I am severely behind in diagnosis at this point.

15  Who knows even if the meds Dr. Rucker has prescribed to me

16  are even appropriate at this point.  None of these doctors

17  can say so without having me -- I need multiple clinical

18  tests.  I need bone marrow biopsies, skin biopsies, more

19  extensive blood tests.  I'm unfortunately all too familiar

20  with all of this.  I'm almost as qualified as some of these

21  doctors in my situation because I have extensively been

22  involved in it.

23      I feel my medical health is in jeopardy this

24  morning.  My high white blood cell count hasn't happened to

25  me in 14 years, and I feel it's been because I've been

1        (indiscernible).

2                I have a 16-year-old son, too.  I'd like to see

3        him grow up to be a young man and not have to bury his

4        father before his time.

5                I'd ask for the Court's -- I'm pleading to the

6        Court.  I need these treatments, whatever they may be.  I

7        will honor all conditions you give me.  I have proof of that

8        in a previous case that I was adjudicated with.

9        Adjudication was (indiscernible).  I was actually released

10       from probation early because I was that honorable.

11               My integrity is all I have, sir, and I will

12       respect anything you say, but I desperately need your help

13       here.  This is an extremely trying time for me and my

14       family.  I don't know what else I can say to you, sir.

15               THE COURT:  Okay.  Thank you, Mr. Worrell.

16               Let me ask the government a little more about what

17       the oncologist here is going to do.  Will he have access to

18       the prior oncology records?  Have they obtained those?

19               MR. DREHER:  They have obtained them from -- or at

20       least from some.  The medical records indicated they've been

21       in touch with a Dr. Grossman's office, a Dr. Newman,

22       obviously with Dr. Rucker.  I believe -- I believe -- I'm

23       not sure whether that's the same office that Dr. Freeman

24       practices with.  But they have reviewed his prior oncology

25       records, and my understanding is that those were sent to the

1    oncologist in advance so the oncologist would have that

2    medical history and would have reviewed that medical history

3    by the time of the appointment.

4            THE COURT:  Okay.  So the oncologist here would

5    not just have to rely on his own medical history.

6            MR. DREHER:  As he self-reports it?  That's right,

7    which I do appreciate -- and I do appreciate that it's

8    difficult for a patient to, you know, keep in their head

9    while in custody their entire medical history, which is why

10   getting access to the medical records is important.

11           THE COURT:  All right.

12           All right.  Mr. Kelly, before we go to the

13   arraignment, let me see if you have anything you want to add

14   to this now.

15           MR. KELLY:  Yes, I think that Mr. Worrell was very

16   well-spoken about the circumstances.  This is definitely an

17   emotionally trying time for him.  Again, all of this seems

18   to be tantamount to punishment, unconstitutional, rather

19   than just mere detention.  He's a man who has been

20   long-suffering since he has been taken into custody.

21           And I should note that Dr. Rucker, they did sort

22   out some of the communication problems.  The jail didn't

23   leave a call number for Dr. Rucker to get in touch with

24   them.  He was very diligent.  He provided a very full and

25   complete affidavit at that time.

1          THE COURT:  This is in Florida?

2          MR. KELLY:  Yes, back in Florida.  So it was all

3     understood by all parties that the medications at that time

4     were to be dispensed, and then all of a sudden in the middle

5     of the night federal marshals show up, and they take him

6     out, and they send him out to Grady, Oklahoma.  Very

7     alarming, very disturbing, particularly when we found out

8     that COVID was rampant at Grady County.  And, again, it was

9     another hot spot for COVID.

10          Jails and prisons obviously have been under the

11     gun by federal public defenders, ACLU, for all of this

12     intensive lock-up, overcrowding problems.  I know.  I come

13     from Oklahoma.  I was at the Attorney General's office.  We

14     dealt with this in the federal court system all of the time,

15     civil right, federal habeas corpus.  I've worked hundreds of

16     these cases, and I've seen it all before, and we're seeing

17     it again individually with respect to Mr. Worrell here now.

18          Over two decades later nothing has changed.  We

19     doubt anything is going to change.  We have a feeling this

20     oncologist is with the penal system, is an outside

21     contractor, and will very unlikely be independent

22     necessarily as would a practitioner in the field,

23     particularly in the home community of Mr. Worrell where I

24     think that he's going to be receiving all the proper medical

25     care that he deserves.  He's not going to get it while in

1    detention in incarcerable facilities.  This is a well-known

2    fact.  I've seen this for decades now, and it pains me to

3    see it happening to Mr. Worrell, who is a good man.

4            He's a family man, law-abiding.  He's a credit to

5    his community.  He just wants to be home with his own

6    oncologist and doctors who can properly administer treatment

7    and care for him, appropriate medications, because I have a

8    feeling we're going to be talking about this all over again

9    some time next week or at some point in time in the future

10   about the failure on the part of the facilities to deliver

11   proper treatment and care and medications to Mr. Worrell.  I

12   should hope that we don't have another deja vu of that

13   again.

14           I have nothing further at this time.

15           THE COURT:  The clerk will go ahead and arraign

16   the defendant while we're here.

17           THE COURTROOM DEPUTY:  Yes, Your Honor.

18           We'll let the record reflect that the defendant

19   has received either a copy of or has spoken to his counsel

20   about the six-count indictment that has been issued, and the

21   defendant has been -- sorry -- charged with six counts.

22           The first count is 18 USC Subsection 1752(a)(1)

23   and (b)(1)(A), entering and remaining in a restricted

24   building or grounds with a deadly or dangerous weapon.

25           Count 2, 18 USC 1752(a)(2) and (b)(1)(A),

1    disorderly and disruptive conduct in a restricted building

2    or ground with a dangerous or deadly weapon.

3              Count 3, 18 USC 1752(a)(4) and (b)(1)(A), engaging

4    in physical violence in a restricted building or grounds

5    using a deadly and dangerous weapon.

6              Count 4, which is 40 USC 5104(e)(2)(F), act of

7    physical violence in the Capitol grounds or building.

8              Count 5, which is 18 USC Section 231(a)(3), civil

9    disorder.

10             And the final count, Count 6, which is 18 USC

11   111(a)(1) and (b), assaulting, resisting or impeding certain

12   officers using a dangerous weapon.

13             How does the defendant wish to plea, and does he

14   waive the formal reading of the indictment?

15             MR. KELLY:  I can respond, Your Honor.  Not guilty

16   on all counts, Your Honor.

17             THE COURT:  And waives formal reading?

18             MR. KELLY:  Yes.

19             THE COURT:  Okay.  Thank you.

20             All right.  Anything further from the government

21   before we recess?

22             MR. DREHER:  No, Your Honor.  I think the

23   government would just note that it does appreciate the risk

24   of COVID and the risk of Mr. Worrell's underlying condition,

25   and so I just want to put that on the record.  The

1    government does appreciate that he is at higher risk, not

2    just of COVID but because of his underlying condition.  And

3    obviously the Department of Justice is sort of an

4    intermediary here between Mr. Worrell's medical physicians

5    and the physicians working at the jail staff; and,

6    therefore, I'm relaying what has been conveyed to us, but I

7    did want to make that clear, that we do understand the

8    nature of the risk, and we take it seriously.

9              THE COURT:  Okay.

10             All right.  I'll issue an order as promptly as I

11   can.  I'll be in recess.  Thank you very much, Counsel.

12                  (Whereupon the hearing was

13                   concluded at 10:43 a.m.)

1

## CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, LISA A. MOREIRA, RDR, CRR, do hereby

4     certify that the above and foregoing constitutes a true and

5     accurate transcript of my stenographic notes and is a full,

6     true and complete transcript of the proceedings to the best

7     of my ability.

8        **NOTE:**  This hearing was held during the COVID-19

9     pandemic stay-at-home restrictions and is subject to the

10    technological limitations of court reporting remotely.

11                   Dated this 20th day of May, 2021.

12

13

                              /s/Lisa A. Moreira, RDR, CRR
14                            Official Court Reporter
                              United States Courthouse
15                            Room 6718
                              333 Constitution Avenue, NW
16                            Washington, DC 20001

17

18

19

20

21

22

23

24

25