## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITES STATES OF AMERICA,

v.

CHRISTOPHER WORRELL,

*Defendant.*

**Case No. 1:21-cr-00292-RCL**

**\* REDACTED\***

### MEMORANDUM OPINION

After defendant Christopher Worrell was arrested on charges stemming from his participation in the January 6, 2021 breach of the United States Capitol, Chief Judge Howell issued an order detaining him pending trial. ECF No. 13. Defendant moved for emergency reconsideration of that order on the basis of, among other things, the government's treatment of his non-Hodgkin's lymphoma and his risk of contracting a severe COVID-19 infection. *See* ECF No. 16-1. Chief Judge Howell denied that motion, and the Circuit affirmed. *United States v. Worrell*, No. 21-3020, 2021 WL 2010795 (D.C. Cir. May 5, 2021). The case was later transferred to the undersigned. Defendant then filed the present motion—his second emergency motion for reconsideration—again arguing that inadequate medical treatment for his lymphoma and the risk posed to him by COVID-19 are reasons to reconsider the previous detention order. ECF No. 47-1. After the government filed an opposition, ECF No. 49, the Court held a hearing on the motion at which the defendant testified. Min. Entry 5/4/2021. In response to this Court's Order, the government provided supplemental briefing, ECF No. 60, to which defendant replied, ECF No. 64.

Upon consideration of the parties' filings, ECF Nos. 47, 49, 60, 64, the arguments set forth at the hearing, and the underlying record, the Court finds that there are no previously unknown

facts having a "material bearing" on the issue whether there are conditions of release that will reasonably assure the safety of others and the community. *See* 18 U.S.C. § 3142(f)(2). Nor has defendant met his burden to show that there is a "compelling reason" for release under 18 U.S.C. § 3142(i). Thus, for the reasons explained below, the Court will **DENY** defendant's emergency motion for reconsideration, ECF No. 47.

## I.   BACKGROUND

### A.  Factual Allegations

The government has proffered the following evidence in its filings opposing defendant's motion for pretrial release and defendant's motions for reconsideration of the order detaining him pending trial. *See* ECF Nos. 9, 19, 49, 60.

At approximately 1:00 P.M. on January 6, 2021, a joint session of Congress convened to certify the Electoral College vote count for the 2020 Presidential Election. ECF No. 9 at 6. As elected members of the U.S. Senate and House of Representatives met in separate chambers inside the U.S. Capitol building, a large crowd gathered outside. *Id.* at 7. U.S. Capitol Police Officers, as well as temporary and permanent security barriers, stood between the crowd and the Capitol. *Id.*

Capitol Police were unable to maintain these barriers. *Id.* Between 1:00 and 2:00 P.M., individuals from the crowd overwhelmed police barriers and barricades around the outside perimeter of the U.S. Capitol grounds. *Id.* at 10. As the riotous crowd surged to the steps of the Capitol building, a single line of law enforcement attempted to hold back the crowd from the entrances to the building's interior. *Id.* Over the next half hour, members of the crowd exchanged blows with, threw objects at, and pepper sprayed the officers attempting to hold back the crowd. *Id.* Others grabbed and carried away law enforcement barriers—exposing the officers to the crowd. *Id.*

2

At this precarious moment, defendant positioned himself next to a wooden stairway on the side of the Capitol plaza, unclipped a canister of pepper-spray gel from his tactical vest, and discharged a stream of pepper-spray gel toward the law enforcement officers positioned at the base of the steps. *Id.* at 10–11. The moment was captured by a photographer and submitted in the government's filings. *Id.*

Around 2:00 P.M., the mob forced its way past officers and into the Capitol building. *Id.* As they did so, they broke windows and assaulted members of the Capitol Police. *Id.* When the mob broke into the building, Congressional members and then-Vice President Pence were forced to evacuate. *Id.*

Although defendant was not one of the rioters who breached the Capitol building, defendant was part of the mob that, during the time officers struggled to keep the crowd from advancing between 1:00 and 2:00 P.M., engaged in attacks on the Capitol Police. *Id.*

Defendant is an avowed member of the Proud Boys organization. *Id.* at 3–4. He was arrested wearing a shirt with the words "Proud Boys" emblazoned on it, and law enforcement located in his house numerous shirts, patches, and challenge coins featuring the Proud Boys colors, logos, insignia, or specific Proud Boys chapters. *Id.* at 4. The government also proffered pictures and videos showing defendant wearing Proud Boys apparel or colors. *Id.*

According to defendant's live-in girlfriend, on January 6, 2021, she and defendant traveled to Washington D.C. with other Proud Boys in vans paid for by another individual. *Id.* at 8. They stayed in hotel rooms paid for by another individual. *Id.* Defendant and other Proud Boys used radio-communication devices on January 6, and he marched to the Capitol wearing tactical gear, prepared for confrontation. *Id.*

**B. Defendant's Conduct After the Capitol Riot and Subsequent Arrest**

On January 18, 2021 the FBI conducted a voluntary interview with defendant.  ECF No. 9 at 12.  A tip notified the FBI that defendant had posted a video on his Facebook page showing him at the Capitol issuing commands to other rioters.  *Id.* at 12.[1]  In his interview, defendant admitted that he was at the Capitol, but denied any wrongdoing and specifically denied entering the Capitol building.  *Id.*

On March 12, 2021, the FBI went to defendant's residence to arrest him incident to the execution of a search warrant.  *Id.* at 13.  But defendant was away camping.  *Id.*  Over the phone, an FBI agent instructed defendant to turn himself in to the nearest FBI field office in Sarasota, Florida.  *Id.*  Defendant refused and stated that he would turn himself in at his residence, which was several hours away.  *Id.*  For public-safety reasons, the FBI declined to force defendant to turn himself in at Sarasota.  *Id.*

While defendant was being arrested at his residence, he told law enforcement that he knew who alerted the FBI to his activities, offering a particular individual's name.  *Id.*  He also mentioned that he was upset at a particular Twitter user who had exposed his identity online.  *Id.*  Defendant said something to the effect of, if he ever found that person, the FBI would "be coming for [him] again."  *Id.*

In its most recent filing, the government proffered several more of defendant's statements from his Facebook page.  For example, on January 18, 2021 (the day defendant was interviewed by the FBI) he told one Facebook user:

> **Worrell**: Got a visit from FBI an hour ago
> …
> **Worrell**: I just put a troll post out Believe I know who ratted

---

[1] The government explains that it has thus far been unable to obtain this video.

> **User**: Feds have been going over every vid with a fine tooth comb
> though. They may have just ID'd you from public vids
> **Worrell**: ████████████████████ . . . . We shall see
> Got a plan
> **User**: Forget him for now, he's irrelevant. ...
> **Worrell**: I am 99.9 I know who called.

ECF No. 60-2 at 12. In a public post that same day, he wrote, "SO WHOMEVER [sic] CALLED

THE 'FEDS' ON ME REST ASSURED I KNOW WHO YOU ARE AND WE WILL BE

DISCUSSING THIS SOON!! The best part is you have NOTHING accept [sic] empty

accusations!! You are the piece of shit I knew you were!!" *Id.* He then responded to several

comments concerning this person, noting in one, "It's a simple case of a butt hurt pu\*\*y ass bitch

that thought they could F\*\*k with someone with some dumb bullshit!! They are about to get

educated in 'real life.'" *Id.*

### C.  Procedural History

#### 1.  Chief Judge Howell's Order Of Detention

On March 19, Chief Judge Howell issued an order detaining defendant pending trial. ECF

No. 13. Chief Judge Howell first found that the government could seek pretrial detention because

defendant's charged conduct involved a felony and the use of a dangerous weapon. ECF No. 27

at 62, *see* 18 U.S.C. § 3142(f)(1)(E). Chief Judge Howell then found that each of the factors in 18

U.S.C. § 3142(g) supported defendant's detention. She concluded that clear and convincing

evidence demonstrated that no condition or combination of conditions of release would reasonably

assure the safety of others and the community. ECF No. 13 at 2. Her analysis is briefly

summarized in the following discussion.

First, Chief Judge Howell found that the nature and circumstances of the offense weighed

"heavily" in favor of detention. *Id.* at 5. Defendant was charged with four felonies stemming from

the Capitol Riot, in which his participation was "planned, calculated, and intentional." *Id.*

Defendant assembled with other Proud Boys and was equipped with a tactical vest, pepper spray, and a radio-communications device. *Id.* And at the Capitol, "[d]efendant discharged pepper spray gel directed at a thin police line keeping the rioters from entering the Capitol via the West Plaza." *Id.* Second, the weight of the evidence—which includes photos and videos clips of defendant at the Capitol—weighed strongly in favor detention. *Id.* at 6. Third, defendant's history and characteristics also weighed in favor of detention. *Id.* at 6–7. Here, defendant was previously arrested for impersonating a police officer, which involved "intimidating conduct towards a total stranger in service of taking the law into his own hands." *Id.* at 7. Defendant's initial refusal to turn himself in, and his statements during his arrest concerning others who exposed or reported him to the FBI, also "raise[d] serious and troubling signals about defendant's willingness . . . to not intimidate or threaten any potential witnesses." *Id.* at 7. Finally, all of these circumstances "taken together amplify concern that defendant will not adhere to a court order and that no condition or conditions will assure the safety of the community, potential witnesses, and, in particular, those who aided the government in identifying defendant, if he were to be released." *Id.* at 8.

### 2.  Defendant's First Emergency Motion For Reconsideration

On March 26, 2021, defendant filed his first emergency motion for reconsideration, arguing that he had not received adequate medical care for his non-Hodgkin's lymphoma and that his underlying conditions placed him at risk of contracting a severe COVID-19 infection. ECF No. 16-1 at 8.[2] On the issue of medical care specifically, he argued that his requests for two prescribed

---

[2] Defendant also reargued that the four factors in § 3142(g) did not support his detention in light of the Circuit's decision in *United States v. Munchel,* 991 F.3d 1273 (D.C. Cir. 2021). ECF No. 16-1 at 8–12. As reflected by the transcript, Chief Judge Howell rejected those arguments. ECF No. 41 at 41 ("[T]he defendant clearly disagrees with the Court's conclusions from—my consideration of those factors that are required to be considered; but there is nothing that the Court has heard that persuades me that there was an error in the consideration of those factors even post *Munchel.*").

cancer medications had been denied and that he had been deprived of an opportunity to be seen by his physician, Dr. Bino Rucker. *See* ECF No. 16-1 at 3.

The government opposed these claims and made detailed proffers in its opposition and at a hearing on the emergency motion on April 9, 2021. Regarding defendant's requests for medication, the government explained that defendant's prescription for one medication—a topical compound cream—expired prior to his arrest. ECF No. 29 at 11. As of April 1, 2021, Dr. Rucker "was unable to provide the dosage level for the cream or instructions for the pharmacy on how to compound the cream," *id.* at 12, and he could not provide medical records related to the prescription, *id.* at 14. Dr. Rucker explained that he could not do so because he has no medical staff, keeps no medical records, and that he provides a "concierge" holistic or nontraditional medical service. *Id.* at 13–14. Additionally, defendant refused permission from the Charlotte County Jail's staff to have his girlfriend transport his leftover cream from home. ECF No. 29 at 14. Chief Judge Howell found that defendant's issues with obtaining the cream appeared to stem from his own "lack of cooperation," and that defendant's characterization of medical need was belied by his refusal to ask his girlfriend to bring the remaining cream and his failure to keep his prescription up to date. *Id.* at 40; *see id.* at 17.

As to the second prescription for naltrexone hydrochloride, the government explained that the medical staff at the Charlotte County Jail were unaware of any use for naltrexone as a cancer treatment. *Id.* at 15. Dr. Rucker contended that he prescribed it for "off-label use." *Id.* at 16. But here too, the medical staff at the jail were unable to obtain any additional medical records with respect to that prescription because Dr. Rucker did not keep them. *Id.* Defense counsel nevertheless argued that naltrexone was necessary for "pain management." *Id.* at 18.

Chief Judge Howell rejected defendant's arguments. She first noted that, "to say the least, Dr. Rucker's assistance in this matter hasn't been as fulsome as one would hope whether Mr. Worrell was incarcerated or not. And this medication presumably was not so significant that he kept his prescription up to date." *Id.* at 17. Chief Judge Howell also found:

> [T]he government's opposition and detailed proffer [] about conversations and medications between the jail facility where the defendant was held and the efforts by and to get his treating physician to step forward and communicate as to the authorizations for that medication is very illuminating, in terms of this doctor not being able to provide records . . . admitting he was using an . . . off-label usage of one of the medications; didn't seem particularly cooperative with the medical facility where the defendant was held . . . that he doesn't have the records and he can't provide the compound, and it was just—appears to have been really a lack of cooperation. In addition, the defendant could have had his girlfriend or partner bring the medication but he didn't want to bother her with that.

*Id.* at 39–40. In any event, Chief Judge Howell concluded that defendant would be able to receive any necessary medication and care when he arrived at the D.C. Jail. *Id.* at 19, 41, 45 ("The D.C. Jail has very adequate medical intake.").

The Circuit affirmed Chief Judge Howell's ruling. *Worrell*, 2021 WL 2010795, at *1. The Circuit first concluded that defendant did not adequately preserve his challenge to Chief Judge Howell's finding that the pepper-spray gel he used was a dangerous weapon. *Id.* Nor could defendant show that the Chief Judge's conclusion was plain error. *Id.* Next, the Circuit affirmed the Chief Judge's dangerousness determination, which was not clearly erroneous. *Id.* Defendant "'actually assaulted police officers' with pepper spray gel." *Id.* (quoting *Munchel*, 991 F.3d at 1284). And the dangerousness determination was "further buttressed" by defendant's "threats against others—including potential witnesses," and his "membership in and alleged coordination with the Proud Boys, some of whose members have been indicted for conspiring to attack

8

Congress." *Id.* While defendant's appeal was pending, and prior to his arrival at the D.C. Jail, he contracted COVID-19. *Id.* at 2. To the extent that defendant argued that his COVID-19 diagnosis warranted pretrial release, the Circuit instructed this Court to consider that argument in the first instance on remand. *Id.*

### 3. The Filing Under Review: Defendant's Second Emergency Motion For Reconsideration

On May 11, defendant filed the present motion for reconsideration. ECF No. 47. By the time he filed the motion, he had recovered from COVID-19. But he describes his experience with COVID-19 as "severe" and alleges that it caused him intense "psychological and emotional distress." ECF No. 47-1 at 7. He argues that he has been denied access to medical treatment and his prescribed cancer medications (the cream and naltrexone), and that he remains at risk of severe reinfection from COVID-19. *Id.* at 4, 6–7. In support, he provides affidavits from Dr. Rucker, who states that he is the "treating oncologist" for defendant. ECF No. 47-4 at 1.[3] Dr. Rucker's submissions note that while he has not seen defendant since *before* his arrest on March 12, 2021, ECF No. 64-1 at 2, it is his opinion that both prescriptions are medically necessary, that defendant is at increased risk of recontracting COVID-19, and that defendant should be released from detention because confinement aggravates defendant's non-Hodgkin's lymphoma, *id.* at 2–3; ECF No. 47-4 at 1–2.

The government opposes the motion for reconsideration. ECF No. 49. In its opposition, factual proffers in the hearing on this motion, and its supplemental brief and exhibits filed in

---

[3] Notably, counsel chose to attach to the present motion the same March 24 "affidavit" from Dr. Rucker included in the initial emergency motion for reconsideration. *See* ECF No. 47-4. It is not clear that this filing is indeed an affidavit because it does not state that it is under penalty of perjury. *See* 28 U.S.C. § 1746. In any event, the affidavit provides no information about defendant's risks of reinfection after recovery from the disease. *See id.* Only after the government filed its opposition and a supplemental brief did defendant provide an updated affidavit for Dr. Rucker. ECF No. 64-1. It is not clear why this affidavit was not submitted with the defendant's motion in the first instance. *See infra* n.7.

response to this Court's Order, ECF No. 50, the government has provided extensive information about defendant's medical history and care while in custody. The Court has reviewed these submissions in full, and it briefly summarizes the information here.

Defendant was diagnosed with COVID-19 upon his arrival at the D.C. Jail, but he is no longer exhibiting symptoms or testing positive. ECF No. 49 at 5. Unity Healthcare (the D.C. Jail's contracted healthcare provider) disputed defendant's allegation that his lymphoma condition is "rapidly deteriorating" and reported no significant change in defendant's examination since his arrival at the D.C. Jail. *Id.* at 5–6. Six days after his arrival, he was scheduled for an appointment with an oncologist. ECF No. 60-3 at 4. Defendant's medical records show that in August 2020, his treating oncologist at the Moffitt Cancer Center (i.e., not Dr. Rucker) recommended an alternative chemotherapy regimen as a substitute for the drug rituximab (to which defendant had an allergic reaction), as well as a repeat PET scan and bone-marrow biopsy. ECF No. 60-2 at 2; ECF No. 60-3 at 58. Defendant declined this treatment plan, did not follow up with the oncologist, and apparently did not see any oncologist between August 2020 and his arrest. *See, e.g.*, ECF No. 60-3 at 58. In February 2021, he visited Dr. Rucker—a urologist who practices alternative medicine for cancer patients—on a single occasion and received prescriptions for the two medications that he seeks in his motion for reconsideration. *Id.* While at the D.C. Jail, he has met with multiple doctors in the chronic-care facility. *Id.* at 47–48. They determined that his requested medications are outside the standard of care, have questionable support in the scientific literature, and that his condition would be best managed by an oncologist, not a urologist. *Id.* So they declined to prescribe the defendant's requested medications. *Id.*

On May 19, 2021, defendant visited Dr. ████ Ali, an oncologist at Howard University

Hospital. ECF No. 60-4.[4] Dr. Ali reported with respect to defendant:

> Cutaneous B cell lymphoma: . . . He needs Dermatology evaluation
> for a repeat skin Biopsy to assess the sample with molecular studies,
> PET scan for interim staging. He will need to be treated given
> symptoms—pruritis, [treatment] likely will be
> Gazyva/Bendamustine he will need bone biopsy and port placed. He
> understood and agreed with the plan, followed by maintenance.
> [History of] Head and neck ca, currently on remission, no sign or
> symptoms suggestive of recurrence. RTC after skin Biopsy and PET
> scan.

*Id.* at 5. The report also notes that defendant had "no lymphadenopathy" and "no skin lesions,"

although defendant had reported skin lesions. *Id.* at 3–4. This discrepancy is not addressed

explicitly in the report. *Id.* Dr. Ali did not prescribe defendant's requested medications. A follow-

up appointment was scheduled with the chronic-care clinic at the D.C. Jail, and the D.C. Jail

medical staff have received written referrals for the recommended procedures. *See* ECF No. 60-3

at 4.

The government also provided evidence disputing defendant's characterization of his

COVID-19 infection as severe and detailing defendant's treatment for, among other things,

COVID-19, a cyst he had on his back, and a broken hand. *See, e.g.*, ECF No. 60-3 at 6–7, 17–18,

21, 101, 104, 108–14.

Defendant replied to the government's supplement. ECF No. 64. In his reply, defendant

criticizes the government's characterization of Dr. Rucker and his medical care. ECF No. 64 at 1.

---

[4] Defense counsel asserts that the government failed to "even name the Howard oncologists, the
Government [employees], or Unity employees who apparently dispute Dr. Rucker's prescriptions." ECF
No. 64 at 3. That is false. Defendant's treating oncologist—Dr. ████ Ali—has his name appear in the
government's exhibits. *See* ECF No. 60-4. (Defense counsel acknowledges Dr. Ali's identity on the next
page of the same filing.) The names of the two physicians at the chronic-care facility are also specifically
mentioned in the government's filings. ECF No. 60-3 at 48–49 (Doctors ████ Mitchell and ████
Crenshaw).

He also argues that the government has been deliberately indifferent to his medical needs and has violated his due process rights. *See id.* at 11.

On June 1, 2021, defendant then filed a "supplement" to his reply alleging that he suffered a period of unconsciousness and fell to the floor on May 30, 2021. ECF No. 66 at 1. He states that he was put on a stretcher and brought to the medical unit. *Id.* He remembers being asked questions, but cannot remember them or how he answered. *Id.* He now represents that he "has a large hematoma from where he landed on his head." *Id.* And he states that "to the best of his memory, he was given two over the counter painkillers and sent back to his cell," rather than taken to the hospital. *Id.* He claims that D.C. Jail personnel did not examine him further or provide him with a CT scan. *Id.* And he argues, in addition to his earlier criticisms of his medical care, that this incident alone constitutes "deliberate indifference." *Id.*

Defendant's motion is now ripe for consideration.

## II.   LEGAL STANDARDS

### A. Pretrial Detention Under the Bail Reform Act

The Bail Reform Act, 18 U.S.C. § 3141 *et seq.*, authorizes the detention of a defendant awaiting trial on a federal offense only under certain, limited circumstances. 18 U.S.C. § 3142(f). First, the government may seek a defendant's pretrial detention if the charged offenses fall into any of five enumerated categories. § 3142(f)(l). Those categories include:

12

(A) a crime of violence,[5] a violation of section 1591, or an offense listed in section 2332b(g)(5)(B)[6] for which a maximum term of imprisonment of 10 years or more is prescribed,

(B) an offense for which the maximum sentence is life imprisonment or death,

(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act . . . the Controlled Substances Import and Export Act . . . or [46 U.S.C. § 705],

(D) any felony if [the person charged] has been convicted of two or more offenses described in [§§ 3142(f)(l)(A)–(C)] if a circumstance giving rise to federal jurisdiction had existed, or a combination of such offenses, or

(E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device . . . or any other dangerous weapon[.]

§ 3142(f)(l)(A)–(E).

Second, the government may also seek detention—or the court *sua sponte* may hold a detention hearing to determine whether pretrial detention is appropriate—when the case involves "a serious risk" that the defendant will flee or "will attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." § 3142(f)(2).

If the Bail Reform Act authorizes pretrial detention, the judicial officer must hold a hearing to determine whether there are conditions of release that would reasonably assure the appearance

---

[5] The Bail Reform Act defines "crime of violence" as (A) "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another," (B) "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," or (C) "any felony under chapter 77, 109A, 110, or 117." 18 U.S.C. § 3156(a)(4).
[6] Section 2332b(g)(5)(B) lists offenses that become a "federal crime of terrorism" when the offense is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(B).

of the defendant as required and the safety of any other person and the community. § 3142(f). If the judicial officer finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the judicial officer "*shall* order" the person detained pending trial. § 3142(e)(l) (emphasis added). A finding that no condition or combination of conditions would reasonably assure the safety of any other person and the community must be supported by clear and convincing evidence. § 3142(f). And a finding that no conditions would reasonably assure the defendant's appearance as required must be supported by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

Under some circumstances that are not present here, the Bail Reform Act may establish a rebuttable presumption of detention. *See* § 3142(e). But where, as here, the presumption is not implicated, the court instead must consider the following factors to determine whether there are conditions that would reasonably assure the defendant's appearance and the public's safety:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device
>
> (2) the weight of the evidence against the person
>
> (3) the history and characteristics of the person, including—
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings
> >
> > (B) whether, at the time of the current offense of arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and

> (4) the nature and seriousness of the danger to any person or the
> community that would be posed by the person's release.

§ 3142(g).

## B. Reopening a Detention Hearing Under Section 3142(f)(2)

Important here, § 3142(f)(2) provides that a hearing "may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." § 3142(f)(2). The statute does not define the term "material bearing," so the Court looks to the ordinary meaning of those words. Here, there may be some surface ambiguity about the phrase's precise connotation. One possible view is that it refers to information that merely relates in some way to a detention determination. But another view is that it refers specifically to information that, if true, would affect the validity or propriety of detention itself. *See Material*, Black's Law Dictionary (10th ed. 2014) (listing definitions for "material" as either "having some logical connection with the consequential facts" or, alternatively, "of such a nature that knowledge of the item would affect a person's decision-making; significant, essential"). If the phrase means the former, then defendants may reopen detention hearings by introducing new information merely with some sort of connection to their detention. But if it means the latter, the defendant must introduce new information that's not only logically *connected* to detention, but that might also significantly *affect* the decision whether to detain the defendant.

The problem with the former, "mere logical connection" view is that it necessarily treats some of the statutory language as surplusage. *Cf. Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995) ("[A]ll words in a statute are to be assigned meaning[.]"). If Congress wanted to convey

that defendants could reopen detention hearings with information merely related or connected to detention, it could have simply used the word "bearing," since "bearing" already connotes a connection or relationship. *See Webster's New International Dictionary* 192 (3d ed. 1965) (likening the term "bearing" to a "relation" or "connection"). Instead, Congress went further. It stipulated that the new information must have not only a "bearing" on—that is, a logical connection to—detention, but that it must have a "*material* bearing" on detention. § 3142(f). So "material" here must mean something more than a mere "logical connection," since "bearing" already conveys precisely the same semantic content. In other words, it must refer to materiality in its second sense—the sort of information essential to, or capable of significantly affecting, the detention decision. Only this latter reading gives full effect to both words in the term "material bearing." Thus, in addition to "bearing" on—having a logical relation to—detention, the sort of new information capable of reopening a detention hearing must also "bear" *materially*—it must relate in some *significant* or *essential* way to the decision whether to detain. *See, e.g., United States v. Cisneros*, 328 F.3d 610, 614 (10th Cir. 2003) ("[R]econsideration is permissible under this section only when there is new information that would materially influence the judgment about whether there are conditions of release which will reasonably assure that the defendant will not flee and will not harm any other person or the community.").

### C. Temporary Release Under Section 3142(i)

In addition to permitting the reopening of a detention hearing under § 3142(f)(2), the Bail Reform Act also allows defendants ordered detained to move for temporary release under 18 U.S.C. § 3142(i). Section 3142 provides that after a judicial officer enters an order of detention, the officer "may by subsequent order, permit the temporary release of the [defendant], in the custody of a United States marshal or another appropriate person, to the extent that the judicial

officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  Section 3142(i) "provides a distinct mechanism for temporarily releasing a detained defendant, in a manner that has nothing to do with a revisiting of the initial detention determination." *United States v. Lee*, No. 19-cr-298, 2020 WL 1541049, at *3 (D.D.C. Mar. 30, 2020).  A defendant moving under § 3142(i) bears the burden of showing that he is entitled to relief. *United States v. Riggins*, 456 F. Supp. 3d 138, 149 (D.D.C. 2020).

Before the COVID-19 pandemic, few courts had considered what amounts to "another compelling reason" necessitating release, as motions brought under § 3142(i) typically sought temporary release for the defendant's preparation of his defense. *See, e.g., United States v. Lee*, 451 F. Supp. 3d 1, 6 (D.D.C. 2020) (collecting cases).  More recently, however, courts have confronted the argument that temporary release under § 3142(i) is necessary due to the conditions in detention facilities caused by the COVID-19 pandemic. *See, e.g., id.; Riggins*, 456 F. Supp. 3d at 149; *United States v. Otunyo*, No. 18-CR-251, 2020 WL 2065041, at *9 (D.D.C. Apr. 28, 2020); *United States v. Thomas*, 456 F. Supp. 3d 69, 72 (D.D.C. 2020); *United States v. Dhavale*, No. 19-MJ-92, 2020 WL 1935544, at *5–6 (D.D.C. Apr. 21, 2020).  And while some courts have granted temporary release under § 3142(i) when the defendant has serious underlying health conditions that exacerbate the risk of severe illness or death from COVID-19, *see, e.g., Thomas*, 456 F. Supp. 3d at 78–79, courts recognize that the existence of COVID-19 alone does not present a "compelling reason" necessitating temporary release, *see, e.g., Dhavale*, 2020 WL 1935544, at *5–6; *Otunyo*, 2020 WL 2065041, at *9.

### D.  Other Bases For Reconsideration

Defendant cites Federal Rule of Civil Procedure (F.R.C.P.) 59(e), which is not applicable in criminal cases.  But, as he correctly points out, "[a]lthough not expressly authorized by the

Federal Rules of Criminal Procedure, motions for reconsideration are allowed in criminal cases." *United States v. Jones*, 916 F. Supp. 2d 83, 86 (D.D.C. 2013). "This is because courts should have the opportunity 'to correct their own alleged errors.'" *Id.* (quoting *United States v. Dieter*, 429 U.S. 6, 8 (1976)). For interlocutory pretrial-detention orders, courts in this district apply the "as justice requires" standard ordinarily applied to motions under F.R.C.P. 54(b). *See, e.g., United States v. Hong Vo*, 978 F. Supp. 2d 41, 47 (D.D.C. 2013).

Reconsideration may be warranted under this standard when, within the court's discretion, the court has "patently misunderstood the parties, made a decision beyond the adversarial issues presented, or made an error in failing to consider controlling decisions or data, or where a controlling or significant change in the law has occurred." *Id.* at 48 (quoting *Arias v. DynCorp*, 856 F. Supp. 2d 46, 52 (D.D.C. 2012)) (internal quotation marks and alterations in original omitted). Beyond these circumstances, a motion for reconsideration should not be used as a vehicle for relitigating issues on which the court already ruled because the party disagrees. *Id.* (quoting *Arias*, 856 F. Supp. 2d at 52)

### E. Due Process Clause

A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fifth Amendment, rather than Cruel and Unusual Punishments Clause of the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To evaluate whether the conditions of pretrial detention violate the Fifth Amendment's Due Process Clause, the Supreme Court has stated that a court must determine whether the challenged condition amounts to "punishment." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see United States v. Salerno*, 481 U.S. 739, 746 (1987) (pretrial detention must be "regulatory, not penal"). Government actions taken with an "expressed intent to punish" clearly constitute punishment.

18

*Bell*, 441 U.S. at 538. When there is no "expressed intent to punish," the Court engages in a two-step inquiry.

First, the detainee must show an objective deprivation of his constitutional rights. To do so he must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Darnell*, 849 F.3d at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)). Second, the defendant must show that the official either "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.[7] "A pretrial detainee thus can prevail if she either introduces evidence of a subjective intent to punish or demonstrates that a restriction is objectively unreasonable or excessive relative to the Government's proffered justification." *United States v. Moore*, No. 18-CR-198, 2019 WL 2569659, at *2 (D.D.C. June 21, 2019) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)).

## III.   ANALYSIS

Defendant argues that reconsideration is warranted under two broad theories: (1) that he is not receiving adequate treatment for his non-Hodgkin's lymphoma, and (2) that his underlying conditions make him especially vulnerable to COVID-19. ECF No. 47-1 at 5. Invoking § 3142(f)(2) of the Bail Reform Act, and F.R.C.P. 59(e), defendant argues that both theories involve changed circumstances that minimize the nature and seriousness of the danger posed by his release. Elsewhere, defendant suggests that these theories may provide a "compelling reason"

---

[7] The Second Circuit also refers to this as a claim for "deliberate indifference." *Darnell*, 849 F.3d at 35.

for release, ECF No. 47-1 at 12–13, *see* § 3142(i); or amount to a violation of his due process rights, ECF No. 64 at 5.  Under any of these legal frameworks, however, defendant is wrong.[8]

## A. The Court Will Not Reopen The Detention Hearing Under Section 3142(f) of the Bail Reform Act

Section 3142(f)(2) of the Bail Reform Act permits the Court to reopen a hearing for information that "was not known to the movant at the time of the [detention] hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure . . . the safety of any other person and the community."  Here, defendant invokes the fourth factor found in § 3142(g)(4) and argues that his "severe and deteriorating medical condition continues to develop such that his compliance with any release conditions is assured."  ECF No. 47-1 at 16 (citing § 3142(g)(4)).  Yet defendant does not explain how his non-Hodgkin's lymphoma or recent developments pertaining to his condition and treatment have a "material bearing" on the "nature and seriousness of the danger to any person or the community" that would be posed if he were released.[9]  § 3142(g)(4).  That is not surprising, because defendant's non-

---

[8] Two notes are warranted here.  First, defendant invokes the Bail Reform Act's provision for release for a compelling reason *only* as to the argument concerning his susceptibility to COVID-19.  *See* ECF No. 47-1 at 9.  Second, in his reply to the government's supplemental brief, defendant for the first time argues that, under the Fifth and Eighth Amendments to the U.S. Constitution, he should be released because the government has been deliberately indifferent to his medical needs.  ECF No. 64 at 11–13.  The Court need not consider these arguments.  *See Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015) ("[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief.") (quoting *Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 140 n.4 (D.D.C. 2011)); *United States v. Hunter*, 786 F.3d 1006, 1011 (D.C. Cir. 2015) ("It is generally understood that arguments first raised in a reply brief are untimely.").  But as the analysis that follows demonstrates, whether these arguments were adequately presented to the Court makes no difference to the Court's conclusion today.

[9] Throughout his filings, defendant argues that he does not pose a flight risk.  *See, e.g.*, ECF No. 47-1 at 18.  The initial detention order never stated that defendant was a flight risk.  Instead, Chief Judge Howell concluded by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of others and the community.  ECF No. 13 at 2.

Hodgkin's lymphoma is neither essential to nor would significantly affect the inquiry under the Bail Reform Act.

Defendant's vulnerability to COVID-19 is also not information unknown "to the movant at the time of the [detention] hearing" or having "a material bearing" on the Bail Reform Act's analysis. Neither the presence of the pandemic nor defendant's awareness of his vulnerability to COVID-19 are developments arising after the detention hearing or his previous motion for reconsideration. And to the extent that defendant argues his previous COVID-19 infection and fear of reinfection are new information, the Court disagrees that that these have a "material bearing" on the Bail Reform Act analysis.

The factors on which Chief Judge Howell relied when she issued an order to detain defendant, and when she rejected his first emergency motion for reconsideration, remain the same. Defendant is charged with serious felonies. He is alleged to have threatened and assaulted police officers with a strong pepper-spray gel. The government has strong evidence in this case, including photos and video clips of defendant and his actions at the Capitol. Defendant's actions demonstrate his prior planning and coordination with the Proud Boys, some of whose members have been indicted for conspiring to attack Congress. Defendant has a criminal history. And he made several statements at the time of his arrest that the FBI would have to come for him again if he found out who exposed his identity online. Faced with these findings, defendant does not explain how his COVID-19 concerns make him less dangerous. Even accepting that the defendant may have new reasons to fear COVID-19 or to avoid detention at the D.C. Jail after his COVID-19 diagnosis, these concerns are surely diminished when his risk of reinfection is low, he has access to COVID-19 treatments and the vaccine, and the D.C. Jail has low rates of transmission. *See infra* III.B.ii.

Thus, defendant's COVID-19 concerns are neither essential to nor would significantly affect the detention decision.

Defendant also argues that "[t]he four factors [in the Bail Reform Act] together with considerations of COVID-19 justify pretrial release." ECF No. 47-1 at 15. But he concedes that "the weight of the four factors has already been expressed" in his first emergency motion for reconsideration. Chief Judge Howell considered and rejected the arguments he previously raised, ECF No. 29 at 43, finding that the four factors "weigh[ed] heavily in favor of pretrial detention," *id.* at 70. The Circuit affirmed Judge Howell's determination. *See Worrell*, No. 21-3020 (D.C. Cir. May 5, 2021). This Court sees no reason to reconsider defendant's previously-rejected arguments and defendant has provided none. *See United States v. Dermen*, 779 F. App'x 497, 502 (10th Cir. 2019) (holding that where the defendant "did not present new information to warrant reopening the detention hearing, we find no error in the district court's conclusion that he was not entitled to a detention review under § 3142(f)(2)"). The Court will not reopen defendant's detention hearing under § 3142(f)(2).

### B. Defendant Has Not Identified Compelling Circumstances For Release Under Section 3142(i) of the Bail Reform Act

#### 1. Defendant's Challenges To His Medical Care Are Without Merit

Defendant has characterized his medical treatment as, among other things, "inadequate, dangerous, and life-threatening" and "tantamount to punishment." ECF No. 57 at 8. At one point, counsel for defendant even endorsed a statement that defendant is being "subject to a form of torture." ECF No. 58 at 8–9. These representations have no basis in reality.

Contrary to defendant's characterizations, the record reflects that he *has* received attentive medical care for his non-Hodgkin's lymphoma, COVID-19, and other ailments while in custody. Within six days of his arrival at the D.C. Jail—while defendant was under quarantine after testing

positive for COVID-19—he was scheduled for a referral with an outside oncologist at Howard University Hospital for his lymphoma.[10] ECF No. 60-3 at 4. When defendant was diagnosed with COVID-19, he received approximately two temperature checks daily, and he was sent to the emergency room upon his reporting chest congestion and pain. ECF No. 60-3 at 105–06. Imaging showed no pneumonia, and from the next day through the remainder of his treatment, defendant denied having problems, concerns, or symptoms of COVID-19.[11] *See, e.g., id.* at 101. Days after defendant completed his quarantine, ECF No. 60-3 at 48, 66, defendant met with doctors at the Jail's chronic-care facility regarding his lymphoma. Additionally, on May 19, 2021, he met with the outside oncologist. ECF No. 60-4 at 2–5. He has a follow-up appointment scheduled with the chronic-care clinic at the Jail, and the Jail's medical staff have written him referrals for the procedures recommend by the outside oncologist. ECF No. 60-3 at 4. Defendant's medical

---

[10] These medical records refute the argument that his oncologist appointment was made only in response to the motion under consideration here. *See* ECF No. 60-3 at 4, 58.

[11] Defendant and the government paint dramatically different pictures of defendant's COVID-19 infection. *Compare* ECF No. 47-1 at 3 (describing "severe" body aches, weakness, muscle fatigue, and chest congestion, as well as fever, cough, headache, sweats, and chills), *with* ECF No. 60-3 at 83 (staff description describing his case as "mild"), *and* 108–14 (defendant denying symptoms of, and not having any signs of, COVID-19). The Court is skeptical of defendant's characterization in his motion in light of the medical records showing minor symptoms and his statements denying having any problems related to COVID-19.

Nevertheless, this factual dispute is hardly relevant to the outcome here. Despite his characterization of his experience, defendant nowhere argues that he received inadequate medical care for COVID-19. Defendant notes that continued medical monitoring may be required for immunocompromised individuals diagnosed with COVID-19 because of the possibility that they may suffer from other medical symptoms that endure long after the individual is testing positive. ECF No. 47-1 at 4. Again, nowhere does defendant argue that he is not receiving continued medical care from the D.C. Jail (besides his complaints about his prescriptions and oncologist access). Instead, the undisputed facts show that defendant has continued to be seen by the healthcare providers for his conditions as part of his treatment plan and when he affirmatively requests medical care.

Defendant *does* dispute the Court's earlier statements about the chances of contracting COVID-19 and that he may recontract COVID-19 and suffer serious symptoms. *Id.* at 3–4. The Court addresses those specific contentions in the next section. But notably, defendant did not contract COVID-19 at the D.C. Jail—he tested positive when he arrived. *Id.* at 2 (acknowledging that he contracted COVID-19 prior to arriving at the D.C. Jail). To the extent that defendant's argument suggests that his contracting COVID-19 is indicative of the healthcare he has received at the Jail, the Court rejects that suggestion.

records also show that he has received treatment for a cyst on his back and after he broke his hand. *Id.* at 3–4, 21. Defendant has been seen by the D.C. Jail medical staff dozens of times and his medical records reflect an average of several updates *per day. See* ECF No. 60-3.

At bottom, the government has not denied defendant medical treatment for his lymphoma or any other medical need arising during detention. And considered within this context, defendant's specific arguments about his lymphoma care fall short. Defendant first argues in his motion that he lacks access to an oncologist. ECF No. 47-1 at 9. That is incorrect. Defendant had an appointment with an oncologist on May 19 and has follow up appointments currently scheduled. *See, e.g.*, ECF No. 60-4 at 3–5. Defendant is currently under the care of an oncologist who has devised a treatment plan that includes testing and is being implemented by the D.C. Jail. *See* ECF No. 60-2 at 4.

Defendant next blames the government for the length of time before he was able to see an oncologist. *See, e.g.*, ECF No. 64 at 11 ("The failure of the Government and the DC Jail to provide Mr. Worrell with adequate medical care for his non-Hodgkin's lymphoma over a period over [sic] seventy-five days constitutes deliberate indifference."). But here too, the government provides a reasonable explanation for any delays in care after arrival at the D.C. Jail. After being diagnosed with COVID-19, defendant was kept in isolation and was unable to see an outside oncologist until May 2021. Further delays in seeing an oncologist stemmed from the difficulty faced by the government in compiling defendant's medical history from multiple previous healthcare providers. *See, e.g.*, ECF No. 29 at 43–44; ECF No. 57 at 13–14. Defendant does not seriously dispute the legitimacy of either justification. Nevertheless, the government took the initiative of scheduling an oncologist appointment while defendant was isolated. ECF No. 60-3 at 4. And within days of completing his quarantine, defendant met with doctors at the Jail's chronic-care facility to discuss

his lymphoma. ECF No. 60-3 at 48, 65. Defendant has not been deprived of medical care for his lymphoma over the entire period at issue.

Defendant's complaint that the government has failed to provide him with two prescription medications fares no better. Summarized briefly, defendant attacks (1) the length of time that will pass before the government will provide medication for his lymphoma, (2) the conclusions of the treating professionals at the Jail who declined to issue his requested prescriptions, and (3) the government's criticisms of Dr. Rucker. *See, e.g.*, ECF No. 64 at 8–14. At bottom, defendant's arguments obscure the relevant inquiry—whether defendant's medical condition or healthcare treatment affect the legal analysis for pretrial detention. They do not.

Facts first. As Chief Judge Howell found, and the Circuit affirmed, any initial delays relating to defendant's requests for medication were neither the fault of the government nor a valid basis for release. *See* ECF No. 29 at 39–40. One of defendant's prescriptions had expired, he declined to have his girlfriend bring him his remaining compound cream from home, and the government had difficulty contacting and receiving the relevant medical records for the prescriptions from Dr. Rucker. *Id.* And as explained above, the government has reasonably explained any subsequent delays in defendant's treatment plan for lymphoma while also demonstrating that defendant has had access to healthcare for his condition at the D.C. Jail. *See supra* pp. 22–24. Defendant is now under the care of the physicians at the D.C. Jail and the Howard University Oncologist, Dr. Ali. ECF No. 60-4. Prior to being treated by Dr. Rucker in February of this year, defendant had not seen an oncologist since August 2020. ECF No. 60-3 at 59. The physicians at the D.C. Jail—which include a specialist—have recommended a treatment plan involving further testing, and they have declined to prescribe the medication that Dr. Rucker chose and that defendant requests. Though defendant faults the government for failing to prescribe

something to help manage his symptoms, the government has provided reasonable explanations for the current treating plan and the physicians' disagreement with Dr. Rucker. *See id.* at 47–48 (expressing concern that "without any imaging, the patient may have more advanced disease" and explaining that defendant's requested medications are "not the standard of care," lack "any evidence," and that defendant's care would be best "managed by an oncologist"); *see also* ECF No. 60-4 (oncologist report recommending a different treatment plan).

To the extent defendant argues that his condition and healthcare treatment require release as a "compelling reason" under § 3142(i), the Court does not agree. Defendant's medical records—which include the conclusions of his treating physicians at the Jail—confirm that the government has not deprived defendant of adequate medical care for his non-Hodgkin's lymphoma. The justifications provided by the government are objectively reasonable on their face and are "rationally related" to defendant's healthcare plan. *See Kingsley*, 13 S. Ct. at 2473. This is not a case where the government wrongfully interfered with a treatment once prescribed. *See* ECF No. 64 at 8 (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). Instead, the government's doctors reached a different conclusion about what treatment was necessary for defendant's condition. Indeed, "[i]t is well established that mere disagreement over the proper treatment does not create a constitutional claim." *Banks v. York*, 515 F. Supp. 2d 89, 103 (D.D.C. 2007) (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). Nor does it create a "compelling reason" for release under the circumstances presented here. § 3142(i). Because defendant has access to adequate care, neither his disagreement with the treating physicians concerning his medication nor

his desire to have access to a different doctor provide an adequate legal basis for reconsideration of his detention.[12]

### 2. Defendant's Susceptibility To Recontracting COVID-19

Defendant next contends that "his particular vulnerability to COVID-19 not only rebuts the statutory presumption in favor of dangerousness . . . but also tilts the balance in favor of release." ECF No. 47-1 at 40. He argues that his particular vulnerability may "outweigh the traditional Section 3142(g) factors," *id.* at 16, or constitute a "compelling reason" for release, *id.* at 13. The Court is not persuaded.

Defendant has previously made—and lost—several of the arguments he presents pertaining to COVID-19. *Compare* ECF No. 16-1 at 17–18, *with* ECF No. 49 at 12–14. Notably, he attached the same affidavit from Dr. Rucker to both motions for reconsideration. *Compare* ECF No. 16-4, *with* ECF No. 47-4. And only in his reply brief does he attach a new affidavit from Dr. Rucker that states, without further explanation, that defendant is at an "increased risk of recontacting COVID-19," ECF No. 64-1 at 3.

Defendant's risk of infection now is less than when he initially contracted COVID-19 and for that matter, when Chief Judge Howell rejected his argument that his susceptibility to the disease justified release. The Centers for Disease Control and Prevention has concluded that "[c]ases of reinfection with COVID-19 have been reported, but remain rare." Centers for Disease Control and Prevention, Reinfection with COVID-19 (Updated Oct. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/your-health/reinfection.html. And as Chief Judge Howell explained, the risk of COVID-19 infection at the D.C. Jail is low. ECF No. 29 at 18–19.

---

[12] To the extent that defendant is independently requesting that the Court order the government to provide his prescriptions or provide access to his choice health care provider, the Court has not been provided any authority as to why a motion for reconsideration of a detention order is the proper vehicle for that request.

That remains true. *See* ECF No. 57 at 17; D.C. Gov't, Public Safety Agency COVID-19 Case Data, https://coronavirus.dc.gov/page/public-safety-agency-covid-19-case-data (last visited June 2, 2021). Moreover, the medical records presented by the government show that defendant not only rejected a monoclonal antibody treatment made available to him at Georgetown University Medical Center and refused to discuss his concerns with medical staff, ECF No. 60-3 at 96, he also declined to receive the COVID-19 vaccine when offered, *id.* at 46. In light of the evidence showing defendant at the Capitol without any sort of face covering, defendant's current COVID-19 arguments are even less compelling now when he refuses the Jail's medical treatments and the COVID-19 vaccine.

In conclusion, neither defendant's lymphoma nor his treatment provide a compelling reason for release under § 3142(i).

**C. Defendant's Additional Arguments For Reconsideration Are Without Merit**

For the same reasons discussed above showing that defendant has not provided a valid basis to reopen the detention hearing under § 3142(f)(2), *see supra* III.A, defendant's arguments invoking F.R.C.P. 59 also fail. The Court is not persuaded that defendant's lymphoma and COVID-19 warrant reconsideration under of the rationales where courts in this District have recognized that justice may require it. *See Hong Vo*, 978 F. Supp. 2d at 47–48. The Court will not permit defendant to use his motion to reargue theories that were previously rejected. *See id.*

Second, for the same reasons that defendant's lymphoma care and COVID-19 are not compelling reasons justifying release under § 3142(i), the Court is not persuaded that defendant's due process rights have been violated. There are no facts showing that the government has acted with an "expressed intent to punish" defendant regarding his medical care. *Bell*, 441 U.S. at 538. And because the government has provided defendant with adequate medical care, he cannot show

that the conditions "either alone or in combination, pose an unreasonable risk of serious damage to his health." *Darnell*, 849 F.3d at 30 (quoting *Walker*, 717 F.3d 125). That is sufficient to resolve the due process inquiry. Here, as discussed above, defendant has been seen by *several* doctors who have agreed on a treatment plan that is currently being implemented by the D.C. Jail. Nor has he been denied access to medical care while detained. To the extent that defendant wants a *different* doctor and *different* treatment, the Court is not persuaded that the government's rejection poses an objectively unreasonable risk of damage to defendant's health. *Cf. Banks*, 515 F. Supp. 2d at 103. Similarly, defendant cannot show an objectively unreasonable risk to his health concerning COVID-19 when cases at the D.C. Jail are low and he refuses the jail's treatments.

### D. Defendant's Eleventh-Hour Supplement To His Reply

Finally, the arguments in defendant's supplement to his reply do not warrant reopening the detention hearing under § 3142(f). *See* ECF No. 66. Nor do they justify reconsideration under Federal Rule of Civil Procedure 59(e) and its criminal analogues, amount to a "compelling reason" under § 3142(i), or rise to the level of a due process violation. *See id.* First, for the same reasons that the Court concludes that defendant's condition, treatment, and COVID-19 have no "material bearing" on the Bail Reform Act analysis, here too the Court finds that the information contained in defendant's supplement is not significant or essential to the inquiry whether "there are conditions of release that will reasonably assure . . . the safety of [others] and the community." § 3142(f)(2). For the same reason, the Court will not reconsider the § 3142(g) analysis under F.R.C.P. 59(e) and the analogous principles previously invoked by defendant. The Court also rejects defendant's argument that the information in the supplement constitutes a "compelling reason" for release under § 3142(i) or a violation of defendant's due process rights. In fact, defendant's filing undermines several of his previous arguments on these issues. In his

supplement, he admits that he was transported to the medical unit on a stretcher without requesting assistance and, once there, was asked several questions by and seen by the staff in the Jail's medical center. ECF No. 66 at 1. Even to the extent that defendant contends that he has memory issues from the incident, he does not deny that he had access to treating healthcare professionals after he fell. Instead, he (again) criticizes the treating professionals' decisions, specifically the failure to bring him to the emergency room or to give him a CT scan. *Id.* Even accepting defendant's allegations as true, the Court cannot conclude that the failure to take defendant to the emergency room or provide a CT scan resulted in an unreasonable risk of serious damage to defendant's health when neither was deemed necessary by the Jail's medical facility.

To summarize, defendant's arguments about his medical treatment, COVID-19, and his recent fall have no "material bearing" on the Bail Reform Act analysis, do not warrant reopening the detention hearing under § 3142(f)(2), do not support reconsideration under Federal Rule of Civil Procedure 59(e) and its analogues, do not constitute a "compelling reason" for release under § 3142(i), and do not implicate a violation of defendant's due process rights.

## IV.    CONCLUSION

Based on the foregoing, the Court will **DENY** defendant's emergency motion for reconsideration by separate Order.

Date:    4/9/21

Royce C. Lamberth
United States District Judge