IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No: 21-MJ-292 RCL |
| : | |
| CHRISTOPHER WORRELL, : | |
| : | |
| Defendant. : | |

OPPOSITION TO
DEFENDANT'S EMERGENCY MOTION TO REVOKE DETENTION ORDER

The government respectfully opposes defendant Christopher Worrell's emergency motion to revoke Chief Judge Howell's March 19, 2021 order detaining Mr. Worrell prior to trial.

Mr. Worrell contends that his detention order should be revoked on the ground that the D.C. Jail is currently violating his due process rights under the Fifth Amendment by being deliberately indifferent to Mr. Worrell's serious medical needs. Mr. Worrell's argument is based on a misunderstanding of the complete record of Mr. Worrell's care. This may be due, in part, to the fact that the motion appears to have been filed without Mr. Worrell's medical records.[1] After the motion was filed, the government sought and obtained Mr. Worrell's medical records pursuant to this Court's order of August 12, 2021. *See* Dkt. 83 (order granting the parties' joint request for disclosure of Mr. Worrell's medical records). Those records make clear that Mr. Worrell has received substantial and timely care, and that to the extent Mr. Worrell has not yet had particular

---

[1] Mr. Worrell asserts that his "updated medical records have not been provided to counsel or the government upon request." Dkt. 81 at 3. That has not been the government's experience. True, medical records are not provided upon request. As Mr. Worrell knows, inmates at the D.C. Jail can obtain their own medical records (or have them sent to their counsel) by filling out a HIPAA release form. But Mr. Worrell has never sent the government his D.C. Jail medical records. Instead, the government has had to twice file a motion with this Court to obtain the records. *See* Dkts. 41, 82. The D.C. Jail has always promptly provided the medical records in response to these court orders.

1

appointments, that has often been because he has declined to go to outside appointments scheduled on his behalf. Mr. Worrell's apparent reluctance to receive high-quality outside care cannot be charged to the government on a Fifth Amendment theory.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts establishing Mr. Worrell's dangerousness, and hence the appropriateness of his detention generally, are spelled out in detail in the government's prior detention-related filings: its initial memorandum in support of detention (Dkt. 9); its memorandum in opposition to Mr. Worrell's first motion for reconsideration (Dkt. 19); and the government's subsequent response to Chief Judge Howell's minute order regarding the D.C. Circuit's *Munchel* opinion (Dkt. 24). *See United States v. Munchel*, 2021 WL 1149196 (D.C. Cir. Mar. 26, 2021). This Court also detailed the facts and procedural history of this case at length in the June 9, 2021 redacted version of its previously sealed memorandum opinion denying Mr. Worrell's second motion for reconsideration of detention. *See* Dkt. 74 at 2-5.

The only new facts that Mr. Worrell alleges relate to Mr. Worrell's medical care. The history of Mr. Worrell's medical care through approximately the end of May 2021 is contained in the government's redacted Supplemental Brief in opposition to Mr. Worrell's second motion for reconsideration, *see* Dkt. 71-1 at 2-5, and in this Court's order denying Mr. Worrell's motion, *see* Dkt. 74 at 10-11.

Mr. Worrell filed an appeal of this Court's order denying Mr. Worrell's second motion for reconsideration. *See* Dkt. 75 (notice of appeal). Mr. Worrell then filed this motion, a motion for revocation of his detention order, on August 11, 2021, despite the pendency of his appeal of this Court's prior order addressing Mr. Worrell's detention. *See* Dkt. 81. On August 16, 2021, Mr. Worrell moved to dismiss his appeal, but that appeal has not yet been dismissed. *See*

Docket, *United States v. Worrell*, No. 21-3040 (D.C. Cir. 2021).

As relevant to his latest motion, Mr. Worrell's medical records from the D.C. Jail—which now span 220 pages detailing dozens of doctor's visits—show the following medical appointments have occurred since his first visit to an oncologist in May 2021. This list below does not include the many other medical visits Mr. Worrell has had, including an ophthalmologist and two dentist appointments, which are reflected in the medical records and discussed in the argument section below. The government has attached as Exhibit 1 all of Mr. Worrell's medical records since late May, when the government previously submitted Mr. Worrell's medical records to this Court.[2]

- After his initial oncology consult on May 19, 2021, Mr. Worrell's treating oncologist recommended a bone marrow biopsy, PET/CT scans, and a repeat skin biopsy. *See, e.g.*, Ex. 1 at 2 (noting recommendations from "HUH oncology").

- On June 4, Mr. Worrell underwent the PET/CT scans. *Id.* at 56; *see also id.* at 2, 44-45 (describing the results of the PET/CT scans).

- On June 7, Mr. Worrell underwent the bone marrow biopsy. *Id.* at 49-50. The biopsy showed normal bone marrow. *Id.* at 44.

- On June 10, Mr. Worrell was seen by the orthopedic surgeon Dr. Wilson at Howard University Hospital. *Id.* at 46. The surgeon recommended surgical fixation of his finger fracture. *Id.* There is no note in the records indicating that this need for surgery was caused by any purported delay in treatment. Dr. Wilson also recommended certain pre-operative laboratory tests, including an EKG test.

---

[2] The government has submitted Exhibit 1 not under seal after consultation with defense counsel, who did not oppose filing these records publicly.

*Id.*

- On June 11, 2021, Mr. Worrell was seen by Dr. Crenshaw with the Chronic Care Clinic, who noted that Mr. Worrell had had an X-ray done for what he described as left shoulder pain. *Id.* at 43. Mr. Worrell "requested that he NOT be scheduled for any outside medical appointments" the following week "so he has a chance to get the commissary order he has placed for 'healthy' foods." *Id.* at 44. The doctors "reviewed [with the patient] the risks of potentially delaying care," and Mr. Worrell "accept[ed] these and reiterate[d] his request for no outside visits next week." *Id.*

- On June 16, Dr. Ali, Mr. Worrell's outside oncologist, was consulted about these test results. *Id.* at 40. Dr. Ali recommended a referral to an Ear, Nose, and Throat specialist, who could evaluate whether to conduct an "excisional biopsy" and, if not, whether radiation therapy and chemotherapy would be appropriate. *Id.*

- On June 18, Mr. Worrell was seen by Dr. Crenshaw and insisted that "NO visits be scheduled for outside medical next week as he is awaiting a delivery of commissary and does not want to miss this." *Id.* at 35.

- On June 25, just nine days after Dr. Ali's recommendation, Mr. Worrell was seen by an Ear, Nose, and Throat specialist, who recommended an ultrasound-guided fine-needle aspiration biopsy with "interventional radiology." *Id.* at 2, 28.

- On June 29, just two weeks after Mr. Worrell's visit with Dr. Wilson, the EKG test requested by Dr. Wilson was performed. *Id.* at 27.

- In the first week of July, Mr. Worrell had a dermatology evaluation scheduled for his skin biopsy, but he "refused to go to the visit" and requested "to have th[at]

4

rescheduled." *Id.* at 15.

- Mr. Worrell was seen by Dr. Crenshaw on both June 30 and July 14. *See id.* at 23-26 (June 30 visit); 14-17 (July 14 visit). During these visits, among other things, she examined his epidermoid cyst, noted that he has a physical therapy evaluation pending for pain in his left shoulder, and noted that he is waiting for an "OR date" for surgical repair of Mr. Worrell's hand. *Id.* She also emphasized that Mr. Worrell needed to keep his medical appointments. *Id.* On July 14, Mr. Worrell "requested that he not have any outside medical visits scheduled Monday, Tuesday, and Wednesday of next week due to upcoming court/legal dates." *Id.* at 17. Once again, the risks of delaying care were reviewed with Mr. Worrell.

- On July 21, Mr. Worrell was again seen by Dr. Crenshaw, who reviewed the plan that he would have a lymph node biopsy the following week. Mr. Worrell "state[d] he is not sure he wants to go out for this procedure," "citing his concerns about the possible need to quarantine on his return back to the facility." *Id.* at 10. Dr. Crenshaw again emphasized "the importance of keeping this appointment and reviewed risks of delaying care." *Id.* Mr. Worrell "expressed understanding." *Id.*

- On July 28, Mr. Worrell nonetheless refused to attend that appointment, a "Georgetown OSM interventional radiology appointment," because of the "requirement that he be quarantined for 2 weeks after return." *Id.* at 7. "He signed a refusal form . . . ." *Id.*

- Most recently, on August 12, Mr. Worrell was again seen by Dr. Crenshaw. She noted that Mr. Worrell "has refused to go out" for the two biopsies Dr. Ali, his oncologist, had recommended. *Id.* at 3. Medical staff had a "long conversation

5

again with patient . . . about the importance of keeping these appointments as wee [sic] needed this information to determine his[ t]reatment plan." *Id.*  Mr. Worrell replied that he "will go to the visits" but only if "they do not interfere with his court dates." *Id.*  Aside from that, Mr. Worrell noted no changes other than continued persistent itching; in response, the medical staff recommended and Mr. Worrell agreed to undergo a trial treatment using hydroxyzine.  *Id.*

On August 11, Mr. Worrell filed the instant motion, claiming that he had not received the skin biopsy or lymph node biopsy that he had refused to attend just weeks before.  *See* Dkt. 81.

## ARGUMENT

**I.     This Court may deny or defer Mr. Worrell's motion, but lacks jurisdiction to grant it.**

As noted above, Mr. Worrell filed this motion while an appeal was pending at the D.C. Circuit concerning the same issue: his detention pending trial.  Generally, "[t]he filing of a notice of appeal, including an interlocutory appeal, 'confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal.'" *United States v. DeFries*, 129 F.3d 1293, 1302 (D.C. Cir. 1997) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 56, 58 (1982) (per curiam)); *see also United States v. Anderson*, 545 F.3d 1072, 1080 n.8 (D.C. Cir. 2008).  "The district court does not regain jurisdiction over those issues until the court of appeals issues its mandate." *Defries*, 129 F.3d at 1293 (citations omitted).  Here, Mr. Worrell's motion for revocation concerns the same aspect of the case involved in the appeal: his pretrial detention.  *See, e.g.*, *United States v. Murrietta*, No. CR 20-218, 2021 WL 322181, at *1 (W.D. Pa. Feb. 1, 2021) (noting that district court lacked jurisdiction to consider defendant's motion for reconsideration of detention order while an

appeal of the original detention order was pending with the Third Circuit).

In this context, Federal Rule of Criminal Procedure 37(a) provides the Court with three options. "The Court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the Court of Appeals remands for that purpose or that the motion raises a substantial issue." *Murrietta*, 2021 WL 322181, at *1; *see* Fed. R. Crim. P. 37(a), adv. committee notes (stating that a district court can "entertain the motion and deny it"); *United States v. Gonzalez*, Crim. No. 12-759 & 20-271, 2021 WL 83394, at *1 (D.N.J. Jan. 8, 2021); *United States v. Tuitele*, Crim. No. 13-00593, 2021 WL 54506, at *2 (D. Haw. Jan. 6, 2021)).

The government submits that the Court can entertain and deny Mr. Worrell's motion based on the record before the Court. Alternatively, the Court can defer ruling on the motion until after Mr. Worrell's appeal is resolved.

**II. Mr. Worrell has not shown that his medical care has been objectively unreasonable.**

Mr. Worrell raises a claim under the Due Process Clause of the Fifth Amendment. "To evaluate whether the conditions of pretrial detention violate the Fifth Amendment's Due Process Clause, the Supreme Court has stated that a court must determine whether the challenged condition amounts to 'punishment.'" Dkt. 74 at 18 (quoting *Bell v. Wolfish,* 441 U.S. 520, 535 (1979)). Absent an "expressed intent to punish" a pretrial detainee, which Mr. Worrell does not allege here, "[a] pretrial detainee . . . can prevail if she either introduces evidence of a subjective intent to punish or demonstrates that a restriction is objectively unreasonable or excessive relative to the Government's proffered justification." *Id.* at 19 (quoting *United States v. Moore,* No. 18-

CR-198, 2019 WL 2569659, at *2 (D.D.C. June 21, 2019)).[3]

Mr. Worrell has not shown that the D.C. Jail has been objectively unreasonable in attending to his medical needs. Indeed, to the contrary, it appears the D.C. Jail has consistently followed up on Mr. Worrell's medical complaints and has sent Mr. Worrell out to numerous outside specialists. The records reflect that Mr. Worrell, rather than the D.C. Jail, has served as the greatest obstacle to him receiving medical care. Most of the claims or implied claims that Mr. Worrell makes about his medical care are belied by the medical records from the D.C. Jail.

*First*, with respect to his cancer treatment, Mr. Worrell claims that over the last 150 days, "the government and jail staff have done nothing." Dkt. 81 at 8. He claims he "has still yet to receive *any* cancer treatment." *Id.* at 6. The 220 pages of Mr. Worrell's medical records belie those incredible claims. As the facts recited above show, since visiting an outside oncologist on May 19, Mr. Worrell has had a follow up PET/CT scan; has had a bone marrow biopsy; was seen by an Ear, Nose, and Throat specialist; had appointments for a skin biopsy and lymph node biopsy, and has had appointments every week or every other week with the doctors at the internal Chronic Care clinic, which focuses on Mr. Worrell's cancer care. Mr. Worrell has been seen by one specialist or another, or has gone to or at least had scheduled outside diagnostic testing appointments, almost every week since early June.

More importantly, the medical records also indicate that Mr. Worrell has twice refused to go to an outside appointment that was scheduled for him: a dermatology evaluation for his skin

---

[3] In a supplemental filing, Mr. Worrell asks this Court to review the D.C. Circuit's decision in *United States v. Tanios*, No. 21-3034 (D.C. Cir. Aug. 9, 2021), on the ground that it is "relevant authority" to his claim. Dkt. 84 at 1. Mr. Worrell does not identify in what way *Tanios*, which does not appear to have dealt with an inmate's medical care while in pretrial detention, is relevant to his Fifth Amendment argument. In any event, *Tanios* involved a defendant with "no past felony convictions, no ties to any extremist groups," and no post-January 6 violent conduct. *See* Dkt. 84-1 at 2-3. The D.C. Circuit has already denied Worrell's own appeal of his detention order, in an unpublished order focused on Mr. Worrell's dangerousness, violence on January 6, 2021, his post-January 6, 2021 threats, and his ties to larger organizations. Dkt. 46 at 2. Thus, the D.C. Circuit itself has already effectively distinguished this case from *Tanios*.

biopsy in early July, *see* Ex. 1 at 15, and a lymph node biopsy scheduled for July 28, *see* Ex. 1 at 7. Rather unbelievably, despite *refusing to attend* these appointments when they were scheduled, Mr. Worrell now claims that he has been denied those appointments: "as of August 10, 2021," Mr. Worrell claims, he "has not received appoints [sic] for (1) lymph node biopsy" or "(2) skin biopsy." Dkt. 81 at 6. Mr. Worrell cannot generate a Fifth Amendment violation by refusing to attend the treatment he has been offered and then claiming it has been denied.

*Second*, Mr. Worrell claims that on June 30, he "[d]iscovered no ophthalmologist appointment had been made for" him, implying that he was suffering a serious condition that was going untreated. Dkt. 81 at 6. But the medical records indicate that Mr. Worrell saw an ophthalmologist the next day, on July 1, and that the doctor prescribed eye drops for what the doctor described as mild "blepharitis," or inflammation. Ex. 1 at 17-18, 23. The ophthalmologist recommended a follow-up appointment in three months. *Id.* at 23. The records indicate neither that Mr. Worrell has been denied treatment for his eyes nor that his condition is an emergency. It appears to be the subject of routine care.

*Third*, Mr. Worrell claims that on June 17, he had a dental appointment scheduled for a root canal, but that his "request for procedure" was "denied," and that he is now dealing with a "cracked tooth." Dkt. 81 at 6. In fact, Mr. Worrell was seen by a dentist, Dr. Bowles, on June 17, for a dental examination. Ex. 1 at 35-36. Two weeks later, Mr. Worrell was seen by Dr. Ray for a follow-up appointment; Dr. Ray concluded, after an X-ray, that Mr. Worrell had a large lesion that would require "a root canal or extraction." *Id.* at 23. In response, Mr. Worrell said "he figured that that's what the problem was" and that "he does[ not] want the tooth taken out at this time. Would like to try and save it." *Id.* (In an earlier visit on June 5, 2021, Mr. Worrell had stated that he had a "broken tooth" but "denie[d] dental pain." *Id.* at 52.) Thus, again, Mr.

Worrell appears to have declined recommended treatment. He cannot now complain that he is not receiving the treatment he declined.

The medical records speak for themselves. Mr. Worrell has a veritable army of specialists treating his every complaint: an ophthalmologist for his eyes, two dentists for his teeth, an orthopedic surgeon for his hand, potentially a physical therapist for his back and shoulder pain, general practitioners to look at his epidermoid cyst and to routinely take his vital signs and do wellness checks, chronic care doctors who review his cancer treatment plan every two weeks (at a minimum), outside diagnostic technicians who conduct PET scans and biopsies, and an outside oncologist and Ear, Nose, and Throat specialist to consult on his cancer case. But while Mr. Worrell is receiving this barrage of medical attention, he seems utterly unconcerned, declining to attend his cancer treatment appointments for a variety of reasons (the desire to receive commissary, his belief that he will have to quarantine upon his return, or his desire not to miss his "court dates," even though there has not been a court date in this case since May 14, 2021). Indeed, Mr. Worrell has repeatedly instructed medical staff at the jail not to schedule outside medical appointments during the subsequent week or on certain days. He did so, for various stated reasons, on June 11, June 18, July 14, July 21, and August 12. *See* Ex. 1 at 3, 10, 17, 34, 44. Medical staff have had to repeatedly try to convince Mr. Worrell to attend the outside specialist appointments necessary to his cancer care. Needless to say, Mr. Worrell is the only thing standing in the way of him receiving the treatment he claims to want.

## CONCLUSION

The Court should deny Mr. Worrell's motion to revoke the detention order.


Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793


*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov