```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
      * * * * * * * * * * * * * * *    )
 3    UNITED STATES OF AMERICA,        )      Criminal Action
                                       )       No. 21-00292
 4                    Plaintiff,       )
                                       )
 5       vs.                           )
                                       )
 6    CHRISTOPHER JOHN WORRELL,        )      Washington, DC
                                       )      October 13, 2021
 7                    Defendant.       )      10:13 a.m.
                                       )
 8    * * * * * * * * * * * * * * *    )

 9

10                 TRANSCRIPT OF SHOW CAUSE HEARING
                  CONDUCTED IN PERSON/VIA ZOOM
11          BEFORE THE HONORABLE ROYCE C. LAMBERTH,
                  UNITED STATES DISTRICT JUDGE
12

13
      APPEARANCES:
14
      FOR THE GOVERNMENT:      WILLIAM K. DREHER, ESQ.
15                            UNITED STATES ATTORNEY'S OFFICE
                              700 Stewart Street
16                            Suite 5220
                              Seattle, Washington 98101
17

18    FOR THE DEFENDANT:      ALEX R. STAVROU, SR., ESQ.
                              ALEX R. STAVROU, P.A.
19                            13046 Racetrack Road
                              Suite 333
20                            Tampa, Florida 33626

21
      REPORTED BY:            LISA EDWARDS, RDR, CRR
22                            Official Court Reporter
                              United States District Court for the
23                             District of Columbia
                              333 Constitution Avenue, NW
24                            Room 6706
                              Washington, DC 20001
25                            (202) 354-3269
```

1          THE COURTROOM DEPUTY:  Your Honor, we're on the

2     record for Criminal Case 21-292, the United States of

3     America versus Christopher John Worrell.

4          Counsel, please identify yourselves for the

5     record.

6          MR. DREHER:  Good morning, your Honor.  William

7     Dreher for the United States.

8          MR. STAVROU:  Good morning, your Honor.  Alex

9     Stavrou on behalf of Mr. Worrell.

10          THE COURT:  Thank you.

11          THE COURTROOM DEPUTY:  Mr. Copeland, if you could

12     please approach the lectern and identify the individuals you

13     have with you in court today.

14          MR. COPELAND:  Good morning, your Honor.  My name

15     is Chad Copeland.  I'm Deputy Attorney General from the

16     Office of the Attorney General for the District of Columbia.

17          With me today in the courtroom is the Director of

18     the Department of Corrections, Quincy Booth; the Deputy

19     Director, Wanda Patten; the General Counsel, Eric Glover;

20     the Assistant General Counsel, Michelle Wilson; Beth Jordan,

21     who is DOC's medical director; and Eleni O'Donovan, a doctor

22     from Unity Healthcare.

23          THE COURT:  Okay.  Before we go forward, I need to

24     clear one thing with Mr. Stavrou.

25          As we talked about yesterday, Mr. Stavrou, the

 1     Court's ability to go forward like this has been hampered by

 2     the unbelievably harmful, to the Court, lack of cooperation

 3     by the D.C. Department of Corrections in suddenly on

 4     September 13th deciding it would no longer make available to

 5     the Court the four rooms that had been made available in the

 6     past after the pandemic occurred for video hearings.  And

 7     they cut it to two for the District Court on September 30th,

 8     effective immediately.

 9            And I had to already cancel hearings that I had

10     set in advance after September 13th and could not have

11     statuses by video, could not set this by video yesterday or

12     today, because there has to be more advance notice and

13     there's such limited availability of the rooms to conduct

14     videos because the Department of Corrections has refused to

15     cooperate with this Court in making more rooms available.

16     And so it makes it virtually impossible to set anything like

17     this on short notice.

18            The last time I tried to do it, I brought the two

19     Defendants here for a live hearing.  One of the two was

20     transported here and had been tested, but the results of the

21     test were not known as to whether he was COVID positive or

22     not.  So once he got here, the marshals simply sent him back

23     because they were worried about exposure to other defendants

24     and marshals here in the courthouse.  And so I was not able

25     to conduct the hearing here anyway then, because I couldn't

1    even do a live hearing because of the incompetence of the

2    jail officials in not telling the marshals what the result

3    of the test was.  It turned out it was negative, so

4    everything was all just a complete screw-up.

5          So that's how I start this hearing.  I have to see

6    if your client is willing to consent to going forward

7    without his presence today.  When I discussed that with you

8    yesterday, you said because of problems with the jail it was

9    virtually unlikely that you would be able to contact your

10   client since you had to make arrangements in advance and

11   very unlikely you'd be able to actually discuss this with

12   your client before today, but you were willing to go forward

13   and waive his presence for the purposes of today.

14         Do you want to discuss our discussion about this

15   or say anything else about that today?

16         MR. STAVROU:  No, sir.  I was fortunate enough

17   this morning that Mr. Worrell was able to make an

18   attorney-client-privileged call to me.  It was very early

19   this morning, somewhat unexpected.  He did not expect to

20   appear at this hearing based on the short notice.  So I

21   believe, sir, that based on my discussions with him this

22   morning, that we can consent to a waiver of his appearance

23   for purposes of this hearing.

24         THE COURT:  Thank you very much.

25         So I'll show Defendant waives.

1              Mr. Copeland, in response to the order to show

2      cause, I received an email last night with things that you

3      were seeking to file at 7:00.  So I did receive that last

4      night.

5              MR. COPELAND:  Thank you.

6              THE COURT:  If you want to go ahead, then, I'll

7      hear what you have to say.

8              MR. COPELAND:  Sure.  I'll just briefly summarize

9      what we put in our papers.

10             We ask the Court not to enter civil contempt

11     against the Director or against the Deputy Director.  Civil

12     contempt is a remedial sanction designed to coerce

13     compliance with a court order.

14             We provided Dr. Wilson's narrative notes --

15     narrative specialty notes to the Marshals Service yesterday

16     afternoon.  There is no noncompliance to remedy at this

17     point.

18             And then additionally, we will -- I would like the

19     Court to know that in terms of complying, the administrative

20     staff in the Medical Department do not work on the weekends

21     or holidays.  So this was turned around within one business

22     day.  We recognize that the Court wished that it had

23     happened faster, and this is a lesson that the Department of

24     Corrections will learn moving forward.

25             We also realize that in communicating with the

1    Marshals Office that the explanation that the Defendant here

2    would be going for an additional trip to see Dr. Wilson on

3    Thursday may have appeared to the Marshals Service that we

4    were saying we would not respond until after that visit.

5    And that was not the Department --

6              THE COURT:  That was the way I read Ms. Wilson's

7    letter as well.

8              MR. COPELAND:  I recognize why that was read that

9    way, your Honor.  And so there's a communication lesson for

10   the Department as well.

11             We always intended to produce what we had

12   immediately and then supplement with the results of the

13   visit on the 14th.

14             THE COURT:  Let me ask this, because I have been

15   pressing the U.S. Attorney for this record of his treatment

16   of his hand since September 18th.  I became concerned.  I

17   was trying to write an opinion by September 18th dealing

18   with his outstanding medical issues.  And I was pretty

19   satisfied on September 18th that D.C. was on top of the

20   issues regarding his cancer treatment.

21             I was dumbfounded when I realized that there was

22   no explanation for what was then in his medical records

23   about why he had not been properly treated for the wrist.

24   And I contacted Mr. Dreher.  I'd attempted to contact

25   Mr. Pierce, who was then the Defendant's attorney.  That was

1    during this period when Mr. Pierce was unavailable to be

2    contacted.  I understand from other sources -- he's now

3    withdrawn in this case.  But I understand from other sources

4    he was having a COVID problem himself at that point and was

5    unable to respond.

6            But I did talk to Mr. Dreher at that time, and I

7    asked him to supplement the record with what he could find

8    out because I could not rule on the outstanding motion that

9    then existed because there was not adequate information in

10   the record about the hand and why he had not received the

11   operation that had been recommended by the doctor for the

12   hand.

13           And I saw in the record that he had broken his

14   hand on May 16th, that he had been taken to the hospital

15   emergency room that day or the next day, that he had gone

16   back and then seen this expert, orthopedic expert, which is

17   all proper.  And I saw in the record that had been filed

18   with me then -- I've forgotten the date that I first saw it,

19   but in any event I knew in September from the record that

20   the expert had recommended in June that he have an operation

21   on the hand.

22           And I did not understand why there was still no

23   operation.  I asked Mr. Dreher what he could do about

24   supplementing the record, and he filed a supplement to the

25   record shortly thereafter and said he had filed everything

1    he could get, which did not answer the question.

2          So on September 18th, I called up the acting

3    United States Marshal for this district, Lamont Ruffin, and

4    told him that I was not satisfied with the treatment that he

5    was getting and that the marshals should look into that,

6    since the Marshal is ultimately responsible.  If the D.C.

7    Jail was not going to provide the proper treatment, I wanted

8    him moved.  And I thought other prisoners might need to be

9    moved from the D.C. Jail if they weren't going to get proper

10   treatment at the jail.  I don't know the reason for not

11   getting the proper treatment.  But in any event, I asked the

12   Marshal to look into it.

13         And an exchange of correspondence then went out

14   between the Marshal and the jail.  And as a followup to my

15   conversation with the Marshal, he sent a September 22nd --

16   his staff sent a September 22nd very specific request to the

17   jail to give him Dr. Wilson's notes.  So that has been

18   pending since September 22nd.  So this is from a May break

19   of the hand, a June 10th recommendation by Dr. Wilson to do

20   surgery on the hand, a September 22nd request that these

21   notes be produced.

22         So you can imagine my surprise, then, Thursday

23   last week when the U.S. Attorney and Mr. Stavrou filed with

24   me a status report saying this couldn't be done because the

25   Marshal had not approved the operation.  It was news to the

1  Marshal when I called him up and said:  Marshal Ruffin, why

2  are you holding this up?  It was news to him as well, since

3  they were still awaiting these notes.  And they could not

4  approve it without the notes.  They had never been given the

5  notes.

6          So I issued that order on Friday, asking for the

7  notes forthwith.  And I don't know from what you provided

8  last night -- how did the notes magically appear and why

9  were they never given to Mr. Dreher?  Mr. Dreher had been

10 asking for them and was never able to get them.  I had been

11 asking for them and never got them.  The Marshal asked for

12 them in writing September 22nd and never got them.  Where

13 did they suddenly come from?

14          MR. COPELAND:  The notes --

15          THE COURT:  How did they suddenly come in late?

16 After I set this trial of the D.C. Department of Corrections

17 Director and the Warden, then suddenly they appear.  Where

18 have they been?

19          MR. COPELAND:  Your Honor, they were part of the

20 information in the possession of the Department of

21 Corrections.  They were not part of the electronic medical

22 record.  And so in terms of producing --

23          THE COURT:  Well, where were they?

24          MR. COPELAND:  They were in the possession -- in a

25 file for the Defendant.

1        THE COURT:  Why were they not given to the

2    marshals in September, if not before?

3        MR. COPELAND:  Your Honor, I don't know.  And I

4    don't understand what happened.  I think there was an

5    understanding that we were providing his entire medical

6    record in terms of the electronic medical record.  And then

7    thus, we thought that we were complying.

8        The notes issue is a Howard University Hospital

9    record that we had a copy of after his visits, and so those

10   were added to the electronic medical record now.

11       I think -- all I can say is it stems from DOC

12   producing its records versus the records from Howard

13   University Hospital.  But now they are -- they are now and

14   going forward will be part of the electronic medical record.

15   So this will never happen again.

16       THE COURT:  When I ordered them on Friday, they

17   were in the Department of Corrections' possession.  They

18   were not forthwith produced.  Why?

19       MR. COPELAND:  Respectfully, your Honor, we

20   believe that they were produced forthwith.  They were turned

21   around the next business day.  It was a matter of

22   scanning --

23       THE COURT:  Only after I set the contempt trial.

24       MR. COPELAND:  No, your Honor.  As Mr. Glover's

25   declaration sets out, he spoke with Medical the afternoon --

1  on Friday afternoon when he received your order.  And then

2  on Tuesday morning, a member of Ms. Wilson from the

3  Department of Corrections General Counsel's Office followed

4  up with Medical to make sure that those notes were coming.

5  They were being scanned and then added to the electronic

6  medical record as of Tuesday morning.

7        And so though your Honor's order came out before

8  we made the production, it was not the impetus for the

9  production.  We intended to comply as soon as we received it

10  on Friday.

11        THE COURT:  Well, no one knew you intended to

12  comply, because Ms. Wilson's letter indicated you weren't

13  going to do anything until this additional interview by

14  Dr. Wilson.

15        Now, tell me about this letter of this Doctor --

16  whoever it is here -- O'Donovan.  Tell me how that came

17  about.  That's very suspicious to me.

18        MR. COPELAND:  Specifically, your Honor, which

19  letter?  We do have Dr. O'Donovan here, if the Court has

20  questions for her.

21        THE COURT:  10-7-21.  The statement from

22  Dr. O'Donovan.

23        MR. COPELAND:  I'm sorry, your Honor.  I'm not in

24  possession of what you're talking about.  But I'm happy to

25  speak with my client to figure out --

1          THE COURT:  I'll hand it down to you.

2          (Tenders document to counsel.)

3          She was talking about how to talk Dr. Wilson into

4  changing his mind about the surgery.

5          MR. COPELAND:  My understanding, your Honor, on

6  this issue is that DOC's medical staff felt that they got

7  some mixed signals from Dr. Wilson in terms of the necessity

8  for the surgery.  He was there in June at Howard.  He was

9  there in July at Howard.  And that their interpretation of

10  what information they were receiving from Dr. Wilson was not

11  clear anymore and that they wanted --

12          THE COURT:  Well, the medical records after each

13  time he was there continued to say:  Waiting for OR.  So

14  there's no ambiguity in the medical records.  All throughout

15  that, every time he went to Howard, they said they're just

16  waiting on the operating room.

17          MR. COPELAND:  I understand, your Honor.

18          I'm relaying what I understand to have been the

19  concern, that there was some ambiguity that was communicated

20  from Howard to our staff at DOC as to the necessity of the

21  medical, notwithstanding what's in the records.

22          THE COURT:  I really can't accept that

23  explanation.

24          MR. COPELAND:  You know, I understand the Court's

25  position.  That is our understanding.  Again, I have

1    Dr. O'Donovan here, if the Court would like some

2    clarification in terms of the document you just handed me

3    from the EMR.

4            THE COURT:  Do you have any evidence you want to

5    put on other than what we've already talked about?

6            I need that back.  It's my only copy.

7            MR. COPELAND:  (Tendering document to the Court)

8    Sure.

9            In terms of evidence, your Honor, no.  I think we

10   would stand on the declaration in terms of responding to the

11   Court's order and again urge that because the noncompliance

12   has now been remedied that there's no need to issue a

13   finding of civil contempt.

14           I'd also stress just again for the Court that the

15   communication issues on Friday in terms of our compliance

16   are lessons that we learned.  We also -- you know, the

17   General Counsel of the Department of Corrections and my

18   Office of the Attorney General are committed to making sure

19   that the Court feels that the District is responsive to its

20   concerns.  And so we remain available anytime that the Court

21   has questions or concerns.

22           THE COURT:  What happens when something like this

23   occurs, where surgery is recommended in June and it's still

24   not happened?  Does no one care?  Does no one follow up?

25   Does no one do anything?  It just goes into Never Never

1  Land, like this one?

2  　　　　　MR. COPELAND:  No, your Honor.

3  　　　　　THE COURT:  Well, what's happened since then?

4  　　　　　MR. COPELAND:  In terms of that specific issue, I

5  can't speak specifically beyond what's in the medical

6  records, which the Court has already reviewed.

7  　　　　　But residents at the D.C. Jail, particularly those

8  with chronic conditions or ongoing medical issues, they

9  receive ongoing care and treatment and check to make sure

10  that their medical needs are met.

11  　　　　　THE COURT:  Well, his medical need hasn't been met

12  since June.  He's needed an operation.  He hasn't gotten it.

13  The Marshals Service has been asking for this documentation

14  about the need for it so they could approve it.  They

15  haven't been able to get it.  It took a court order from me

16  and a threat of contempt to finally get the record needed to

17  get it approved.

18  　　　　　Why did that occur?

19  　　　　　MR. COPELAND:  It's a --

20  　　　　　THE COURT:  And no one noticed at the jail that

21  he's sitting there in pain all this time?

22  　　　　　MR. COPELAND:  I believe that he has been seen,

23  your Honor, since July, so he is receiving ongoing

24  treatment.  And as part of that treatment, there's a regular

25  examination to make sure that people are healthy, that their

1    needs are being met, that there are questions asked about

2    how they're doing.  So he is receiving ongoing care.

3    There's no question about that.

4          This issue on the surgery is, as I've explained,

5    one where Medical's understanding was that there was some

6    ambiguity as to whether it was needed.  The visit tomorrow

7    should clarify that beyond any doubt, and this will no

8    longer be a question.

9          THE COURT:  You can sit down, Mr. Copeland.

10          Let me hear from the Defendant's lawyer next.

11   Mr. Stavrou?

12          MR. STAVROU:  (No audible response.)

13          THE COURT:  You're muted.

14          THE COURTROOM DEPUTY:  Mr. Stavrou, you're muted.

15          MR. STAVROU:  My apologies.  Thank you.

16          I would like to express some concerns, your Honor.

17   First, as the Court is aware and the Court pointed out, this

18   injury occurred on May 16th of 2021.  There is some line of

19   reasoning that, had there been proper and immediate medical

20   intervention with orthopedic-type services, that the surgery

21   may not have been required.

22          So that takes us to June 11th, where I would

23   concur with the Court that the surgery at that point was

24   recommended.  I do not believe that there is any ambiguity

25   in the medical records in regards to whether or not that

1    surgical procedure was not recommended or that there was

2    some gray area where it could be determined, that that's not

3    the case.

4           The bigger concern for my client, your Honor, is

5    that we're talking about a broken wrist.  And my client, as

6    the Court is aware, has been recommended for chemotherapy,

7    more specifically a six-month-type chemotherapy program, and

8    has also been recommended for radiation.

9           And there are grave concerns that if they're going

10   to treat something that requires surgery, albeit minor

11   compared to chemotherapy, in the same manner, that this is

12   going to be what amounts to cruel and unusual punishment for

13   my client, especially if, for example, the jail can't keep

14   up with doctor visits, prior doctor visits on a schedule

15   pursuant to a chemotherapy regimen, anticipating any of his

16   needs such as nausea, pain or any of the other side effects

17   of chemotherapy.

18          And so my client and I have grave concerns that

19   going forward that they're not going to be paying attention

20   to his needs.  And if they slide some papers into a file or

21   don't pay attention to him for months at a time, the end

22   result is either going to be the complete detriment to his

23   health and possibly the worst-case scenario, which could be,

24   you know, major illness or death.

25          And so my client has grave concerns going forward

1    about the care that he was expecting to receive and the care

2    that he will need in regards to not only the wrist, but the

3    chemotherapy.

4            THE COURT:  Mr. Dreher?

5            MR. DREHER:  Thank you, your Honor.

6            I think that the Court accurately set forth the

7    timeline in this matter.  Obviously, when the Government has

8    received medical records from the D.C. Jail, we have

9    provided those to the Court on an ongoing basis in an

10   attempt to ensure that the Court was aware of these

11   developments as they occurred.

12           When the medical records indicated that

13   Mr. Worrell was awaiting an OR date which, as the Court

14   noted, was the note that was in the medical records for

15   several months following the visit with Dr. Wilson back in

16   June of 2021, the Government's understanding at the time

17   based on those records is that it was a nonemergency issue

18   that just needed -- essentially, he needed a surgery date

19   for that to take place.

20           As the Court noted, in late September or actually

21   more accurately from the Government, from the U.S.

22   Attorney's Office's perspective, it was early October when

23   we learned that there was this issue of the notes from that

24   original visit not having been provided and that that was

25   the reason that the U.S. Marshal's medical team was unable

1       to approve the request to leave.

2               And then, as the Court again accurately relayed,

3       that is when we started inquiring with the marshals about

4       whether they had been able to receive those notes.  And as

5       of last Thursday, they had not.

6               The only other thing I would say here is -- so the

7       Government does understand and appreciate the Court's

8       concern about that delay.  It is a delay of a different

9       nature than what the Office understood over the last few

10      months.

11              The only other thing I would say is -- and I think

12      the record bears this out, as has been litigated over the

13      last few months in these several motions for

14      reconsideration -- the Government does believe that

15      Mr. Worrell is receiving treatment on a timely basis for his

16      cancer, which is obviously a serious condition, and that he

17      just recently obviously received the results of several

18      biopsies.  They've come up with a management and treatment

19      plan for that.

20              So I did just want in response to some of the

21      concerns noted by Mr. Stavrou -- I did just want to note

22      that the record at least indicates that over the last

23      several months Mr. Worrell has been seen a half dozen to a

24      dozen times by either specialists or those at the D.C. Jail

25      that are on his care team to address specifically those

1    concerns.  And he's had a number of diagnostic procedures

2    that were aimed at figuring out the appropriate course of

3    treatment for him and what stage his cancer was at.

4         Aside from those updates, your Honor, the

5    Government has no further argument with respect to the issue

6    of the show cause hearing.

7         THE COURT:  It seems it would be simpler to do

8    this now rather than later.

9         Mr. Copeland, you might not know, so maybe you

10   want to consult with one of the medical people here.  But

11   can you outline for me what happens during this cancer

12   treatment?  Does he go on a medical ward for the period of

13   convalescence?  Or how is that handled at the jail when he's

14   in chemo and radiation?  Is he going to be in a medical ward

15   or how does that work?  You might fill me in a little more

16   so I'm a little bit more comfortable with how this is going

17   to happen.

18        MR. COPELAND:  Your Honor, this is Dr. Eleni

19   O'Donovan.  She's a doctor with Unity Healthcare who can

20   provide an answer to the Court's question.

21        THE COURT:  Okay.

22        DR. O'DONOVAN:  Good morning, your Honor.

23        It actually depends.  We have an infirmary at the

24   jail.  Depending on what the course of treatment is and what

25   we expect the effects to be on the patient, if there's going

1    to be a lot of side effects, this is probably a more intense

2    chemotherapy regimen.  So I would anticipate some of those.

3    We generally admit people to the infirmary.  There is a

4    24-hour provider there.  There is 24-hour nursing.  We can

5    give frequently dosed medications for pain and for nausea,

6    for vomiting, additional nutritional support, things like

7    that.

8              So occasionally, patients do not want to be there

9    because it is more of a medical unit.  It's a little bit

10   more restrictive.  But it would depend on the medical need.

11   And we follow the recommendations of the treating

12   oncologist.

13             THE COURT:  And the oncologist is going to be from

14   Howard?

15             DR. O'DONOVAN:  Correct.

16             THE COURT:  Okay.  And the oncologist is

17   administering that at Howard or how does that work?

18             DR. O'DONOVAN:  It depends on whether it's an

19   infusion therapy or a pill.  Sometimes we administer it on

20   the schedule given by the oncologist.  If it's an infusion,

21   then the Department of Corrections transfers the patient.

22   The same for radiation, if it's indicated.

23             THE COURT:  But the radiation would be there at

24   the jail?

25             DR. O'DONOVAN:  Obviously, no.  At Howard.

1          THE COURT:  Oh, at Howard?

2          DR. O'DONOVAN:  Yes.  DOC would transport.

3          THE COURT:  Now, if he has the hand surgery, how

4     is that going to work in connection with this chemo?

5          DR. O'DONOVAN:  So it's a good question.  I don't

6     know that I completely have the answer.  I think we'll know

7     more tomorrow after he meets with Dr. Wilson, if Dr. Wilson

8     is going to proceed with surgery, which was a question when

9     I spoke to him last week.  If he proceeds, then it depends.

10    Sometimes patients are admitted for one or two nights;

11    sometimes a day surgery and we transport in the morning and

12    then receive them again at the infirmary for pain control,

13    wound care and postoperative observation.

14         THE COURT:  Thank you.

15         MR. COPELAND:  Anything further from me, your

16    Honor?

17         THE COURT:  No.  Do you have anything else you

18    want to say?

19         MR. COPELAND:  No, your Honor.  Thank you.

20         THE COURT:  Based on the record before me, I find

21    that the Warden and the Director of the D.C. Department of

22    Corrections are both in contempt of this Court's order by

23    their failure to forthwith produce the record that they

24    finally produced of the notes of Dr. Wilson.

25         I find it inexcusable that they were not earlier

1    produced.  But that was not contempt.  It was contempt when

2    they didn't produce them forthwith when I ordered it on

3    Friday.

4          And the communication back to the Court on Monday

5    that led the Court to conclude that they weren't going to

6    produce anything further until after Dr. Wilson interviewed

7    the Defendant again, it was clear to the Court that they had

8    given the back of the hand to the Court, that they had no

9    intention of doing anything further.  They did not

10   communicate to the Court.  They intended not to do anything

11   further except have Dr. Wilson make a further interview of

12   the Defendant.

13         And then that last little note from this Dr. Eleni

14   O'Donovan made clear that they were then going to try to

15   persuade Dr. Wilson to change his recommendation and not

16   recommend the surgery.

17         It's clear to the Court what was up with these

18   Defendants, and they were clearly in contempt of this

19   Court's order.

20         They are found in contempt of Court.  There is no

21   further sanction available in civil contempt at this time.

22         At this time, because I conclude that there is no

23   explanation provided for the failure of the D.C. Department

24   of Corrections, it's more than just inept and bureaucratic

25   shuffling of papers.  I find that the civil rights of the

1    Defendant have been abridged.  I don't know if it's because

2    he's a January 6th Defendant or not.  But I find that this

3    matter should be referred to the Attorney General of the

4    United States.  I will do so by order for a civil rights

5    investigation of whether the D.C. Department of Corrections

6    is violating the civil rights of January 6th Defendants by

7    engaging in the conduct in this and maybe other cases as

8    well.

9         It's clear to me that the rights of this Defendant

10   were violated by the D.C. Department of Corrections in this

11   case.  And it is apparent that there is more going on here

12   than just laying aside these papers.

13        The Court will be in recess.

14        (Proceedings concluded.)

15

16

17

18

19

20

21

22

23

24

25

24

1       **<u>CERTIFICATE</u>**

2

3                   I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8                   Please note:  This hearing occurred

9       during the COVID-19 pandemic and is therefore subject to the

10      technological limitations of reporting remotely.

11

12                  Dated this 13th day of October, 2021.

13

14                  <u>/s/ Lisa Edwards, RDR, CRR</u>
                    Official Court Reporter
15                  United States District Court for the
                      District of Columbia
16                  333 Constitution Avenue, NW, Room 6706
                    Washington, DC 20001
17                  (202) 354-3269

18

19

20

21

22

23

24

25