**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No: 21-CR-292 RCL** |
| | **:** | |
| **CHRISTOPHER WORRELL,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

<u>**UPDATE ON DEFENDANT'S MEDICAL STATUS**</u>

The government respectfully submits this update on Mr. Worrell's medical status, including specifically his pinky finger fracture and his cancer treatment.  The government has obtained the following new information.  *First*, the government has learned that the surgery Mr. Worrell sought on his pinky finger fracture is, in the opinion of the orthopedic specialist who treated Mr. Worrell, not medically necessary and not urgent, but instead an elective procedure.  *Second*, the government has learned that Mr. Worrell's fracture had, likely some time before October 14, 2021, already healed in a way typical for that injury.  *Third*, the government has learned that Mr. Worrell has denied experiencing pain at rest (or any significant pain at all) from the pinky fracture, and that Mr. Worrell experiences no impairment of function from the injury.  *Fourth*, the government has learned that the fracture was treated immediately with a "closed reduction" and splint, which Mr. Worrell subsequently removed.  Finally, the government has learned that on October 20, 2021, Mr. Worrell canceled his upcoming pinky fracture surgery— which had been scheduled quickly at Mr. Worrell's insistence—to seek a second opinion.  This information significantly changes the information previously available to the Court regarding Mr. Worrell's injury.

With respect to his cancer treatment, Mr. Worrell's providers recently recommended

chemotherapy and an additional biopsy.  Mr. Worrell requested that the biopsy be completed before starting chemotherapy.

To be clear, the government takes Mr. Worrell's medical situation seriously.  His cancer is a dangerous underlying condition, and as such he was at significant risk when he first contracted COVID-19.  And he has suffered several other issues while in custody, including injuries from his accidental fall in the spring.  But the government has repeatedly been unable to sort fact from fiction in reviewing Mr. Worrell's many claims of medical mistreatment, because those claims have often been refuted, or at best unsubstantiated, by the medical notes and records that the government later obtains.  The government finds itself in the same position now, given the new information it has obtained indicating that Mr. Worrell's pinky finger fracture is not an emergency medical issue.

A.      **Mr. Worrell's History of Misrepresentations.**

In his various prior filings, Mr. Worrell has made numerous allegations of mistreatment or lack of treatment while in custody.  The government summarizes several of them here as context for Mr. Worrell's current claims regarding his pinky fracture.

Worrell first raised such allegations while in custody in Charlotte County Jail.  While there, Mr. Worrell (through counsel) asserted that his "requests for the necessary cancer medication have been denied by jail staff" and that his condition was "rapidly deteriorating," and Mr. Worrell implied that he had "been receiving" and was then "undergoing chemotherapy and radiation." Dkt. 16-1 at 3-4.  In fact, as subsequent affidavits showed, these statements were untrue or misleading or were, at best, exaggerations.  As to the prescriptions, Charlotte County Jail medical staff (who, like medical staff at the D.C. Jail, are employed by a medical contractor, not the jail) had made numerous attempts to contact his alternative provider who had prescribed

the medicine, Dr. Rucker, without success, because Dr. Rucker had no staff and had not returned the staff's calls. *See* Dkt. 19-1 at 3-4. Jail staff even told Mr. Worrell his girlfriend could simply drive the prescriptions to the Jail for the Jail's pharmacist to evaluate, but Mr. Worrell declined the offer. *See* Dkt. 49 at 4-5; *id.* Ex. 1 at 15 (transcript of April 6, 2021 hearing before Chief Judge Howell). Two different jails' staff later determined neither medication was indicated for treating Mr. Worrell's cancer; his oncologist did not prescribe them either. Dkt. 49 at 6; Dkt. 71-1 at 2-3 (providing further detail). With respect to his condition, Charlotte County Jail staff informed the government that Mr. Worrell's condition was stable, not "rapidly deteriorating." *Id.* at 5-6. Finally, Mr. Worrell's medical records revealed that he had been advised to undergo chemotherapy and radiation in August 2020, but had declined, and had apparently instead sought no treatment for six months until February 2021, when he had one visit with Dr. Rucker. Dkt. 71-1 at 2. He was apparently not undergoing chemotherapy or radiation. *Id.*

While at the D.C. Jail ("DOC"), several other of Mr. Worrell's health-related claims were similarly unsubstantiated by the medical records of DOC and outside providers. As but one example, Mr. Worrell claimed in his filings that he had had a severe case of COVID-19 during mid-April that left him with "a fever, cough, headache, severe chest congestion, body aches, weakness, and muscle fatigue, sweats, and chills," and barely able to get out of bed for three days. Dkt. 47-1 at 7. As the government noted at the time, it understands that a COVID-19 infection can be a traumatic experience for any patient. But the medical records showed that Worrell never had a temperature above 99 degrees despite twice-daily temperature checks; that he never had low oxygen levels (below 96 percent); that his COVID-19 case was described as "mild"; and that he was largely asymptomatic. Dkt. 71-1 at 4-5; *see also* Dkt. 74 at 22 (this Court noting that Mr. Worrell's claim that he was being "subject to a form of torture" had "no

basis in reality"); *id.* at 23 (this Court noting that it was "skeptical" of Mr. Worrell's claims regarding the severity of his COVID infection).

In his August 11, 2021 Motion to Revoke Detention Order, Mr. Worrell claimed that he had been denied appointments for two biopsies that had been requested by his outside oncologist at Howard University Hospital. *See* Dkt. 81 at 6. In fact, Mr. Worrell had twice refused to attend these very biopsies for a variety of reasons unrelated to his medical care. *See* Dkt. 85 at 4-6. Mr. Worrell also complained that he had a cracked tooth that was untreated. Dkt. 81 at 6. In fact, he had already been seen by a dentist, who concluded that the tooth required a root canal or extraction—but again, Mr. Worrell refused the treatment, stating he "[w]ould like to try to save it" and did not want it "taken out at this time." Dkt. 85 at 9. Mr. Worrell made several other unsubstantiated claims (or implied claims) of medical mistreatment that his medical records indicated were exaggerated or untrue. *See, e.g.*, Dkt. 85 at 8-9 (refuting Mr. Worrell's claim that the D.C. Jail had done "nothing" to address his cancer and Mr. Worrell's implied claim that he had an eye condition that was going untreated).

## B.    Mr. Worrell's pinky fracture.

In his August motion, Mr. Worrell noted that he suffered a broken pinky finger after he fell while in custody on May 16, 2021, and that he had not yet had the surgery he had requested from Dr. Robert Wilson at Howard University Hospital on June 10, 2021. Mr. Worrell claimed that fracture was "untreated" and "quite painful" as of August 11, 2021. Dkt. 81 at 9, 10. In its October 13, 2021 hearing, this Court expressed serious concern about the fact that Mr. Worrell's surgery had not been scheduled by early October, four months after the June 10, 2021 appointment.

In the last two days, the government has learned significant new information about Mr.

Worrell's injury that casts Mr. Worrell's motion in a new light.  An overview of Mr. Worrell's

injury is important given Mr. Worrell's claims regarding that injury.

On May 16, 2021, Mr. Worrell fell while in his cell.  As a result of that fall, he fractured

his pinky finger (fifth metacarpal).  *See* Ex. 6 at 2.  He was seen shortly thereafter, reported a

high level of pain, and was brought to the emergency room, where x-rays were taken and Mr.

Worrell's injury was treated with a closed reduction and a splint.  *Id.* at 2-4, *id.* at 5 ("the patient

was treated with closed reduction and application of a protective splint").  The doctors also noted

that Mr. Worrell had a previous significant injury to the same fingers.  *Id.* at 2.  Upon his return

from the hospital, just hours after the fracture, Mr. Worrell reported that he was not in pain.  *Id.*

at 1.

Mr. Worrell was then seen by Dr. Wilson, an orthopedic surgeon, at Howard University

Hospital on June 10, 2021.  Dr. Wilson concluded that Mr. Worrell had a pinky finger fracture.

*Id.* at 5.  He noted, however, that Mr. Worrell had "no significant pain" as of that date.  *Id.*

Moreover, Mr. Worrell had "removed the splint" given to him just over three weeks earlier.  *Id.*

The notes reflect an original recommendation of a cast with follow-up, but in a July 2021

addendum to his notes, Dr. Wilson stated that "[a]ctually, the patient has requested surgery for

this injury," that "[s]urgery is indicated," and that Dr. Wilson's office would "begin the

scheduling for this patient as soon as possible."  *Id.* at 8.

On October 7, 2021, Dr. Eleni O'Donovan of DOC spoke to Dr. Wilson, who clarified

that Mr. Worrell's surgery was not necessary, but that Mr. Worrell had insisted on surgery.  Dr.

Wilson and Dr. O'Donovan agreed that Dr. Wilson should review Mr. Worrell's fracture again,

and so scheduled an October 14, 2021 follow-up visit.  An x-ray of Mr. Worrell's pinky finger

taken at DOC on October 13, 2021 indicated the fracture was "old" and "healing."  *Id.* at 9.

In one set of handwritten notes from that October 14, 2021 visit, Dr. Wilson notes that he had a "[l]ong, contentious discussion" with Mr. Worrell; that "surgery indications are weak," but that Mr. Worrell was "insistent" on surgery and was "UNWAVERING." *Id.* at 10.[1]  The more comprehensive notes state that on October 14—the day after this Court's hearing—Mr. Worrell told his providers he had "no significant pain" other than "intermittent discomfort with making a fist," but was "adamant that he needs surgery" because he was not "pleased that his bone is not straight." Ex. 1 at 14-15.  The fracture is described in the notes as "healed." *Id.* at 15.  Dr. Wilson states:

> Previously, I had agreed to treat surgically, although I was a bit hesitant due to the lack of indication at that time. I did decide to not proceed after careful consideration. Now, the patient presents with a persistent interest in surgery. . . . He has an emotional interest in having surgery.  Despite the weak indications for surgery, . . . [w]e will proceed due to the patient's insistence . . . He was informed that surgery has risks that may outweigh the benefits of a surgery.  Although, we discussed the risks of infection, poor function, pain, etc. . . the patient's beyond reason at this time.  . . . We will proceed with extreme caution, since it is apparent that ulterior motives are at play.  He will be booked for surgery ASAP.

*Id*.  These notes—and the recommendation in Mr. Worrell's case—appear to have been reviewed by two providers: Dr. Sean Williams and Dr. Wilson.  *See id*.

In an interview with U.S. Marshals Service medical staff and the government on October 21, 2021, Dr. Wilson reiterated that he did not believe surgery was "necessary" after his initial examination in June 2021.  Indeed, Dr. Wilson stated that treatment with a "closed reduction" and splint to allow healing of the fracture is a common treatment path, and that while surgery for this type of fracture is sometimes indicated, the circumstances in which such surgery would be appropriate were weakly present (if present at all) in Mr. Worrell's case.  Instead, Dr. Wilson

---

[1] During separate interviews with Dr. Wilson and Dr. O'Donovan at DOC last week, the government has confirmed that the handwritten notes at the bottom of this one-page "consultation request" form were created by Dr. Wilson. *See* Ex. 1 at 10.  Any confusion over that issue may have arisen because those notes were also separately transcribed by DOC into Worrell's electronic medical record. *See id.* at 11.

stated that Mr. Worrell had requested surgery, which Dr. Wilson described as "elective."[2]  When asked about the timing of that surgery, Dr. Wilson stated that there was "no urgency" in conducting the surgery and that it could occur now or in the future.

Dr. Wilson also confirmed that the fracture healed on its own (as fractures typically do), in a way that is "typical" for injuries of the type suffered by Mr. Worrell.  He stated that Mr. Worrell had no loss of function, aside from mild restriction of motion in his pinky finger—but Dr. Wilson was clear that it would not interfere with any daily tasks like writing, holding a knife, or playing the piano.  Dr. Wilson stated that Mr. Worrell had no pain while at rest, but described mild discomfort when moving the finger in question.  But Dr. Wilson was clear that the fracture had already healed.

These notes, and Dr. Wilson's evaluation of Mr. Worrell's lack of pain and retention of ordinary function in the finger, are confirmed by other medical notes.  On October 20, 2021, Mr. Worrell was seen by Dr. Crenshaw at DOC.  The notes state: "[Mr. Worrell] reports that he has no functional limitations and has no difficulty writing, eating, or gripping things," and only "occasional intermittent pain with certain movements," but that he is "unhappy with the appearance of the deformity over the dorsal side of his hand," that his hand "is '85% normal' and hopes it can be 'back to normal' with surgery."  Ex. 1 at 18.

Dr. Wilson also confirmed that Mr. Worrell simply invented what he asserted in August 2021: that "Dr. Wilson informed Mr. Worrell" in June "that due to the jail's delay the hand [would] require surgery rather than being reset in Dr. Wilson's office."  Dkt. 81 at 6.  Dr. Wilson

---

[2] Dr. Wilson's June 2021 notes do not include his view that surgery was not necessary.  But Dr. Wilson's notes did state that the injury could be treated conservatively, and that Mr. Worrell had requested surgery.  While Dr. Wilson stated at that time that surgery was "indicated," he later made clear the indications were "weak" and "poor." Ex. 1 at 47, 60.  Given that Dr. Wilson was amenable to proceeding with the elective surgery at Mr. Worrell's request, it is unsurprising that Dr. Wilson did not include in the notes a statement that surgery was not medically necessary.  Certainly, the government has no reason to believe that Dr. Wilson is retroactively revising his medical assessment of Mr. Worrell's pinky fracture.

stated in his interview that he never said anything of the sort, and that the comment Mr. Worrell attributes to him also "makes no sense."

It is thus not true that Mr. Worrell's injury was "untreated" as of August 2021.  In fact, Mr. Worrell was given a "closed reduction" and splint cast for his fracture on May 17, 2021, when he visited the emergency room; he himself had removed the splint.  His injury had likely healed over the summer, in a way that is typical for that type of injury.  Certainly, it had healed by the time of this Court's hearing on October 13, 2021.  It is also untrue that Worrell was experiencing significant pain from this injury, at least according to both the evaluations of Dr. Wilson and Mr. Worrell's statements to his providers.  According to those records, Mr. Worrell was not experiencing significant pain at his first visit with Dr. Wilson in June 2021; and experienced only mild discomfort with certain movements of the pinky finger (but not at rest) by October 2021.  And Mr. Worrell's statements on October 20, 2021 indicate that he primarily was dissatisfied with the appearance of his pinky finger.

After all of this, and after the pinky fracture surgery was scheduled on a rush basis for October 25, 2021, Mr. Worrell then *declined* the surgery on October 20, 2021, stating that he wanted a second opinion.  *See* Ex. 1 at 16.  Mr. Worrell refused to sign the declination form that was offered to him, but there were two witnesses to the refusal.  *Id.*  (Another doctor was also told by Mr. Worrell that Mr. Worrell wanted "a second opinion before proceeding with surgery." *Id.* at 19.)  The government has asked for confirmation from Mr. Worrell that he is declining the surgery.

In the meantime, given that his fracture has healed, is not causing him ongoing significant pain or any functional limitations, and can be operated on in the future, Mr. Worrell's pinky fracture is not an emergency medical condition.  Indeed, the record suggests it had been treated

and may have healed by August 11, 2021, when Mr. Worrell filed his most recent motion seeking reconsideration of detention.

**C.     Mr. Worrell's cancer treatment.**

With respect to his ongoing cancer treatment, Mr. Worrell had a follow-up visit with Dr. Ali, his outside oncologist, on September 29, 2021.  At that visit, Dr. Ali recommended a six-month course of chemotherapy, and also recommended a lymph node biopsy after the needle aspiration biopsy that Mr. Worrell had in September showed no evidence of cancer.  Dr. Ali also recommended follow-up with radiation oncology to determine whether radiation therapy was appropriate.

On October 19, 2021, Mr. Worrell told the government (through counsel) that he had had an appointment with radiology and that they told him "the cancer was too widespread throughout his body for radiation as part of the treatment plan."  But the medical records—from an outside provider (Dr. Nguyen at Howard University Hospital)—do not support Mr. Worrell's stark claim.  The radiology report states: "As B-cell lymphoma is very sensitive to chemotherapy, I will recommend chemotherapy instead of radiation.  The radiation therapy may leave lasting skin changes over the face which may affect the patient [sic] cosmesis.  In addition, he had radiation therapy in the past.  There may be increased toxicity if there is any overlap with the previously irradiated area." Ex. 1 at 22-23.  Thus, radiation appears to have been rejected as the preferred treatment not because Mr. Worrell's cancer was too widespread, but because chemotherapy is effective; the radiation might have cosmetic effects; and Mr. Worrell had had prior rounds of radiation.

According to the medical notes at DOC, Mr. Worrell then declined to pursue chemotherapy until an additional excisional lymph node biopsy, recommended by Dr. Ali, had

occurred.  Ex. 1 at 21.  Again, the government has asked for confirmation from Mr. Worrell that he is declining chemotherapy at this time.  DOC has reported that the biopsy has been scheduled for November 1, 2021.

## CONCLUSION

Mr. Worrell's reports of his medical treatment have repeatedly been contradicted or unsubstantiated by the medical records of the providers who have seen him: the Charlotte County Jail's medical contractor staff, the D.C. Jail's medical contractor staff, and multiple outside specialists at Howard University Hospital.  The government cannot assist in ensuring that Mr. Worrell is receiving proper treatment, nor make an informed decision regarding the impact of that medical status on his pretrial detention, if Mr. Worrell does not accurately relay the status of his medical conditions and his medical treatment.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov