IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No: 21-CR-292 RCL |
| : | |
| CHRISTOPHER WORRELL, : | |
| : | |
| Defendant. : | |

**RESPONSE TO DEFENDANT'S SUPPLEMENT TO DEFENDANT'S REQUEST TO REVOKE THE ORDER OF DETENTION**

The government respectfully submits this response to the defendant Christopher Worrell's Supplement, filed yesterday, to his Request to Revoke the Order of Detention, which was filed on August 11, 2021.

As an initial matter, and to clarify for the Court, because Mr. Worrell's recent filing merely supplements Mr. Worrell's prior filing through prior counsel, most of the supplement is copied nearly verbatim from that prior filing. *See* Dkt. 81 (prior filing); Dkt. 119 at 8 n.6 ("The undersigned would advise that substantial portions of the facts and legal arguments were from John Pierce, Esquire [sic], prior submissions."). Thus, much of the filing restates claims to which the government has already responded or that the government has already debunked. For example, the filing repeats the claim that Dr. Wilson told Mr. Worrell in June "that due to the jail's delay the hand will require surgery rather than being reset in Dr. Wilson's office." Dkt. 119 at 39. That assertion, the government has previously explained, was specifically denied by Dr. Wilson, who explained that it "makes no sense"; it is also not reflected in any notes. Dkt. 118 at 7-8. As another example, the alleged medical history on pages 4-5 of the supplement appears to be the same as that listed in the August 11, 2021 filing, to which the government already responded. *See* Dkt. 81 at 3-6.

1

In this filing, the government responds only to those issues raised for the first time in the supplement. The government begins this response with the same caveats it has previously expressed. First, the government is not present for Mr. Worrell's care and can only relay the professional opinions of those doctors and medical staff who are treating Mr. Worrell, and tender what appear to the government to be reasonable conclusions that one could draw from those records and opinions. Second, the government takes both Mr. Worrell's significant ailments and the medical care afforded to pretrial detainees generally extremely seriously. Mr. Worrell has a serious condition; the government does not dispute as much. The problem is that the medical records and interviews the government has conducted have produced a picture quite different than that articulated by Mr. Worrell. As explained below, the most reasonable interpretation of the records in the possession of the government and defense counsel is that Mr. Worrell is receiving or has already received medical treatment and care for the ailments he lists, and that Mr. Worrell himself has been the cause of significant delay in receiving cancer diagnostic care in particular.

Finally, because Mr. Worrell's supplement submits conditions of release that Mr. Worrell believes are appropriate to reasonably ensure that Mr. Worrell will not represent a danger to the community, the government includes below new evidence of Mr. Worrell's offense and of his disingenuousness, the latter of which the government believes is relevant to Mr. Worrell's willingness to comply with conditions of release set by this Court. The government submits that Mr. Worrell remains a danger to the community and should remain in custody.

**A.     Mr. Worrell's medical issues.**

The government limits its discussion of Mr. Worrell's medical issues to updates since its last filing (Dkt. 118) and responses to the claims made by Mr. Worrell in his supplement (Dkt. 119).

***Fifth metacarpal fracture.*** The government need not spend much more time on Mr. Worrell's hand injury. As previously explained, Dr. Wilson and DOC medical staff report that his injury has healed with no functional limitations and mild, intermittent discomfort, that it did not need surgery and that it was treated, according to those same doctors, in a typical way. *See* Dkt. 118 at 5-9. The government is unable to discern whether the photographs submitted by Mr. Worrell showing his hands actually show any kind of deformity—Dr. Wilson noted an "angulation" on the right hand that he referred to as a typical outcome for this type of injury—but the photographs also depict Mr. Worrell closing his previously injured hand into a fist without difficulty.

After Dr. Wilson reluctantly agreed to pursue surgery at Mr. Worrell's request and it was scheduled for October 25, 2021, Mr. Worrell then declined the surgery and asked for a second opinion. *See* Dkt. 118 at 8. But the U.S. Marshals medical staff, who also interviewed Dr. Wilson (with undersigned counsel), came to the conclusion that a second opinion on Mr. Worrell's hand fracture was not necessary because "[s]econd opinions are generally only authorized . . . if there are serious questions about a prisoner's current medical or surgical management, for example, if the management is not consistent with current accepted standards of medical or surgical practice," and based on the "reviewed medical documentation and verbal communication with the treating orthopedic surgeon," there was no need for a second opinion here. *See* Ex. 7 at 1. The government has no reason to dispute this finding.

***Cancer treatment.*** Mr. Worrell's doctors have recommended chemotherapy. The government has been informed that Mr. Worrell can start his chemotherapy imminently, as it has been authorized by DOC and the U.S. Marshals' medical team. Mr. Worrell raises two issues relating to diagnostic biopsies, but on further examination, neither indicates any deficiencies in

3

treatment.

Second, the government previously explained at length, with ample supporting documentation, that Mr. Worrell refused to attend *two* crucial diagnostic biopsies in July 2021, claiming he did not want to go because of, *inter alia*, "court dates," even though this Court held no hearings on this case that month. Dkt. 85 at 8-9; Ex. 7 at 5. Those biopsies were then rescheduled for the first week of September 2021, and both occurred. Dkt. 95 at 1. Now, Mr. Worrell complains that the lymph node biopsy he received was a needle aspiration biopsy, when he believes an excisional biopsy was recommended by Dr. Ali, the oncologist, in May 2019. Dkt. 119 at 10 n.9. Mr. Worrell states in his filing that his Exhibit E states: "Report signed by Dr. Crenshaw on June 16, 2021, indicating Dr. Ali request ENT (ear, nose, throat) for an excisional biopsy." *Id*. Mr. Worrell goes so far as to claim that DOC officials should be held in "contempt for misrepresentations to this Court about who is really causing" the delay in Mr. Worrell receiving certain biopsies. *Id*.

Upon reviewing that assertion, undersigned counsel contacted defense counsel, concerned that there had been a misunderstanding on Mr. Worrell's part. Specifically, Exhibit E, attached to Mr. Worrell's motion, actually states: "spoke with Dr. Ali . . . he recommends referral to ENT *for eval for* excisional biopsy." Dkt. 119 at 17 (emphasis added). In other words, Exhibit E does *not* state that Dr. Ali recommended an excisional biopsy. It (and other references in the medical notes, *see* Dkt. 85-1 at 33, 39, 41) state that Dr. Ali referred Mr. Worrell to another specialist (Ear, Nose, and Throat specialist) for an *evaluation* of that procedure. When the ENT specialist at Georgetown University Hospital then evaluated Mr. Worrell, the specialist recommended the needle aspiration biopsy that Mr. Worrell then received, *id.* at 27 ("referred to IR for . . . ultrasound guided FNA" biopsy), and *not* an excisional biopsy, *id.* ("hold on excisional biopsy for now"); *see also* Ex. 7 at

7 (the ENT specialist's original handwritten notes stating the same). The ENT specialist's records were introduced into the public record by the government back in August. *See id.*

Defense counsel confirmed, and the government agrees, that Mr. Worrell's misstatement on this issue was the result of an oversight: counsel had simply not seen the ENT specialist's recommendations during his review of the medical records. The government thus believes this alleged issue is resolved and thus not a dispute before the Court. The excisional biopsy was recommended by Mr. Worrell's oncologist at the end of September, not in May.

Second, last week, the government stated in a public filing that Mr. Worrell was scheduled for the excisional lymph node biopsy on November 1, 2021. Dkt. 118 at 10. But in his supplemental filing yesterday, Mr. Worrell expressed uncertainty about what this appointment was for, Dkt. 119 at 6 ("It is unclear what the nature of the appointment is for . . . ."), and asserted its timing was "convenient," even though it has been discussed in the notes for weeks, *id.* Perhaps unsurprisingly at this point, Mr. Worrell then declined to go to the biopsy on November 1, 2021, the *third time* he has declined to attend a necessary diagnostic biopsy. Again, the government submits that a defendant cannot fairly accuse DOC of declining to timely provide him care when he is repeatedly declining necessary diagnostic services that are, in some instances, prerequisites to determining the appropriate type of treatment. The defendant cannot leverage his own delay into a due process violation.

**Other issues.** Mr. Worrell refers to a litany of medical issues he has had while in custody, but those have all been treated, as noted below. None of these are new issues since August, and many have not even been the subject of discussion in the medical records in months:

1. Mild blepharitis (inflammation of the eyelids): This was treated. Mr. Worrell has seen an ophthalmologist three times in the last four months, and has seen medical

staff for eyedrops and his prescription glasses on several other occasions. *See* Ex. 7 at 8-9, 10-11, 12-14 (detailing ophthalmology appointments).

2. Pain left shoulder: Mr. Worrell attended three physical therapy sessions for this injury before deciding to cease treatment. *See* Dkt. 95 at 2; Dkt. 101-1 at 2.

3. Epidermoid cyst: The recurrent cyst was drained and treated in May 2021, *see* Dkt. 71-1 at 5, and the last apparent reference to it in the medical records was in July 2021.

4. Urinary hesitancy, lower back pain, prediabetes: The medical records show these to be pre-existing conditions for Mr. Worrell that the jail has continued to manage. *See, e.g.*, Ex. 7 at 16-17, 19, 20, 21-22. The government has not found any unaddressed complaints relating to these.

5. Squamous cell carcinoma of the head, neck and base of tongue: The medical records note there is no recurrence of this carcinoma. Ex. 7 at 7, 23 ("no [evidence of] recurrence in recent scans").

6. History (Hx) of COVID symptoms: Mr. Worrell did have COVID-19. He has since repeatedly declined a COVID vaccine.

7. Hypertension: This is another pre-existing condition for Mr. Worrell, *see* Ex. 7 at 24, and his "[blood pressure] and [heart rate] continue to be well controlled off of medication." Ex. 7 at 25.

8. Dental—cracked molar: Mr. Worrell asserts in his supplement that he "maintains a cracked tooth." Dkt. 119 at 5. But Mr. Worrell has a cracked tooth because he has consistently declined treatment for it, as the government has previously explained. Dkt. 85 at 9-10 (quoting medical records from dentist indicating he refused

extraction of tooth); Ex. 7 at 26-27 (the records).  Indeed, just a few days ago, after specifically requesting another evaluation because the tooth was painful, *see* Ex. 7 at 28, Mr. Worrell *again* refused to have the tooth treated in any way, *see* Ex. 7 at 29-30 (noting that referral was for "increased pain in tooth #19" but that "Patient states that although he can feel the fx. tooth with his tongue he does not want to have anything done on that tooth. . . . Only wants to get his teeth cleaned.").

Although the government recognizes that Mr. Worrell's cancer is quite serious, and that he has a litany of other medical complaints, it is difficult to discern—on this record—exactly what errors medical staff are alleged to have made with respect to these other medical issues. Rather, the overall picture is that of an individual who is being appropriately treated by medical professionals.

**B.     Mr. Worrell's Dangerousness and Disingenuousness.**

The government previously catalogued some of the many instances in which claims of mistreatment were made by Mr. Worrell that were not substantiated by later medical records.  Mr. Worrell's supplement includes new potential conditions of release, raising the question whether Mr. Worrell would comply with those conditions in the first place.  The government thus supplements the record with other instances in which Mr. Worrell either misrepresented the truth or insisted that FBI agents had lied about what he said.  The updates below are also relevant to the strength of the government's evidence under 18 U.S.C. § 3142(g)(2), one of the factors this Court must consider in evaluating pretrial release.

*First*, when Mr. Worrell was originally interviewed by the FBI in this case on January 18, 2021, he stated that "he did nothing illegal," that he "did not go onto Capit[o]l grounds," and that he "didn't witness any crimes or violence towards Law Enforcement."  Ex. 7 at 31.  These claims

were false, as Mr. Worrell knew then.  Mr. Worrell is captured on many videos and photographs on Capitol grounds.  Indeed, Mr. Worrell himself took approximately a dozen videos using his phone while on Capitol grounds.  And even according to Mr. Worrell's account, he engaged in at least two further illegal acts: carrying pepper spray gel onto Capitol grounds, and pepper spraying at least *some* individual on Capitol grounds.  Immediately after this initial interview, Mr. Worrell posted threatening messages on Facebook toward the person he believed had "ratted" him out to the FBI.  *See* Dkt. 71-1 at 11-12.

  *Second*, when Mr. Worrell was arrested two months later, the FBI agent who spoke with him stated that he refused to turn himself in at the closest FBI resident agency and instead insisted on driving all the way back to his house, a lengthy period of time during which he had uninhibited access to his phone.  *See* Dkt. 13 at 7.  When he arrived, the FBI agent also overheard Mr. Worrell make two statements that could easily be construed as threats to potential witnesses.  *Id.*  Yet Mr. Worrell, through counsel, remarkably claimed that the FBI agent was not telling the truth—that Worrell had not made the threats toward other witnesses, *see* Dkt. 51-1 at 47-48 ("THE COURT: You just deny that those words were said?  MR. PIERCE: As of right now I'm denying that those words were said.").  On Mr. Worrell's phone, however, the government recently found text message exchanges in which Mr. Worrell, during the time he was driving to meet the FBI to turn himself in, appears to agree to delete evidence from his phone[1]:

---

[1] The messages in green are from the user of Mr. Worrell's phone.



**Source Extraction:**
Advanced Logical
**Source Info:**
CHRIS's iPhone/mobile/Library/SMS/sms.db : 0x59D93A
(Table: message, handle, chat, Size: 8335360 bytes)







From another individual:



*Third*, Mr. Worrell previously told Chief Judge Howell, through counsel, that he "did not

10

encourage the 'taking' of the Capitol or interference with Capitol Police as they attempted to control the crowd," and "did not confront the Capitol Police, threaten them, or make any attempt to interfere with their carrying out their duties." Dkt. 16-1 at 13-14.  In support, Mr. Worrell submitted a short clip of a several videos spliced together. *See id.* Ex. D.  Mr. Worrell's prior counsel stated at the ensuing detention hearing that he did not know the origin of the video, but that it was not edited, because "[t]here is no reason to edit or redact or withhold anything[] that would be inculpatory to him because he didn't do anything wrong." Dkt. 49, Ex. 1 at 34-35.

All of these claims have been shown to be false by videos the defendant himself recorded, making Mr. Worrell's duplicity all the more confusing.  In the last few weeks, the government has reviewed videos from Mr. Worrell's phone and Facebook account, including the videos from which clips were apparently taken and submitted to the Court in March.  These videos have all been turned over to Mr. Worrell through discovery.  Those videos show:

- Later that day, Mr. Worrell films himself telling U.S. Capitol officers who are putting on riot gear just outside the U.S. Capitol: "Honor your oaths!  On your knees!  . . . We are on your side, don't make us go against you!  These are our streets!"

- Later, Mr. Worrell films himself at roughly the location of his later assault on the lower west terrace.  He zooms in on the U.S. Capitol Police officers in front of the crowd and states: "Look at the commies with the guns."

- In another video, Mr. Worrell raises his hand in the "okay" symbol used by the Proud Boys to encircle a group of U.S. Capitol officers arresting a rioter.  Mr. Worrell yells: "He didn't do nothing!"  Earlier in this video, Mr. Worrell states: "We are here in peace!"  That is the only edited portion of this video that Mr.

Worrell submitted to the Court in March in what his then-counsel represented was an unedited video. A screenshot of his hand symbol is below:



- Another three videos taken shortly thereafter capture Mr. Worrell repeatedly yelling "Fuck you" around a dozen times while filming the U.S. Capitol Police. In one video, he says "Fuck you n*****!" He then holds up his middle finger while filming the U.S. Capitol Police; a cropped screenshot is below:



- In a later video, from which Mr. Worrell also clipped a small portion and submitted

only that edited portion to Chief Judge Howell, Mr. Worrell moves U.S. Capitol Police barriers at the very point in the police line shortly thereafter breached by Daniel Scott, another Proud Boy member.[2]  In a portion of the video Mr. Worrell edited out of his submission to Chief Judge Howell, he yells at the officers behind the barriers: "You're a fucking piece of shit!  Yeah, you can't look at me, huh? . . . You're a piece of shit!  Triple C P!"  The latter is apparently a reference to the Soviet Union ("CCCP").

- In a later video, Mr. Worrell films the crowd breaching the stairs under the scaffolding of the northwest corner of the lower west terrace.  A companion of Mr. Worrell's (who appears in multiple prior videos taken by Mr. Worrell that day) says to Mr. Worrell, as the crowd is surging up the stairs: "You film it?  We did it man!"  Daniel Scott, having just initiated the breach, yells to Mr. Worrell while facing the camera: "Proud of your fucking boy!"  Mr. Worrell then yells: "Yeah!"  He then turns the camera on himself and says: "Yeah! Taking the Capitol!"

---

[2] This breach, under the scaffolding on the northern end of the lower west terrace, occurred just minutes after Mr. Worrell's and Mr. Scott's interaction.  Mr. Scott appears in many, if not most, of the videos taken by Mr. Worrell on January 6, 2021, and poses with Mr. Worrell on several occasions.  The breach referenced here is what ultimately led to the collapse of the police line on the entire west front, and to rioters entering the U.S. Capitol through the Senate Wing Door.



During these videos, the crowd or individuals near Mr. Worrell are yelling things like "Stand down! Stand down!" and "You want a war?!" and, at one point prior to the breach, "Take the stairs!"

Thus, Mr. Worrell *filmed himself* doing the very things he previously denied in filings in this case: encouraging others to "take the Capitol" using those exact words, and confronting and threatening the Capitol Police officers.

*Fourth,* on August 26, 2021, after the government's opposition to Mr. Worrell's August 11, 2021 Motion was filed, Mr. Worrell called in to the show "Greg Kelly Reports" on Newsmax TV.[3]  During that interview, Mr. Worrell was asked whether he "regret[ted]" any of his conduct from January 6, 2021.  He responded: "Nobody I knew, talking to during or after, had any idea that anything like that was gonna occur on that day.  None of us had any tendencies for anything

---

[3] The interview is publicly available here: https://www.youtube.com/watch?v=Y7-e6OI_w4U.

other than to preach our First Amendment rights and protest . . . of our tyrannical government, it seems like. They're just worried about their own political agenda." He later states that the charge that he assaulted a line of police officers with pepper spray gel is "completely false and fabricated" and is a "crime that they have no evidence of."

That bold claim is contradicted by the evidence. The government has previously provided a clear photograph of Mr. Worrell on U.S. Capitol grounds, within feet of the line of law enforcement officers, discharging a can of pepper spray gel. *See* Dkt. 24 at 4. That much appears to be undisputed at this point. The Complaint also includes photographs of the police line and screenshots from video taken from other angles of that time. *See id.* at 4-5. In a video another rioter took that is publicly available, Mr. Worrell walks up to Daniel Scott and states, while laughing: "I just deployed a whole can."[4] While saying this, his hand moves to the location on his body armor where he previously had a canister of pepper spray gel. And in another video that Mr. Worrell himself filmed, he is standing some 50 yards or so from the ongoing melee on the lower west terrace, well after his assault. Upon hearing sound and seeing smoke rising from the area, Mr. Worrell states to someone off-screen: "That's flash bangs and tear gas, bro. . . . We were fucking handing it to them. I had two cans of fucking . . . ." Mr. Worrell abruptly ends the recording at that moment.

In sum, it is not just Mr. Worrell's conduct on January 6, 2021, or his criminal history, or his association with the Proud Boys, or his threats against witnesses after January 6, 2021, that should concern this Court. It is his willingness to repeatedly make or induce his prior counsel to make claims he presumably knew were untrue, misleading, or unsubstantiated: to the FBI agents who interviewed him, to Chief Judge Howell, to the Newsmax anchor who interviewed him on

---

[4] This video is accessible here: https://jan6attack.com/videos/7/7K705Sx4NEy7/.

August 26, 2021, and (as the government has previously outlined), apparently to this Court regarding his ongoing, and well documented, medical care.

This Court can only release a defendant if there exist a combination of conditions that will reasonably assure the safety of the community. The government submits that no such conditions exist.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793


*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov