UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Action |
| | ) No. 21-CR-292 |
| vs. | ) |
| | ) November 3, 2021 |
| CHRISTOPHER JOHN WORRELL, | ) 11:16 a.m. |
| Defendant. | ) Washington, D.C. |

* * * * * * * * * * * * * * *

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE ROYCE C. LAMBERTH,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**
*(Parties appearing via videoconference and/or telephonically.)*

**APPEARANCES:**

FOR THE UNITED STATES: WILLIAM DREHER
U.S. Attorney's Office
700 Stewart Street
Seattle, WA 98101
(202) 553-4579
Email: william.dreher@usdoj.gov

FOR THE DEFENDANT:   ALEX REED STAVROU, SR.
13046 Racetrack Road
Tampa, FL 33626
(813) 251-1289
Email: alex@alexstavrou.com

INTERESTED PARTY:   CHAD COPELAND
KATRINA SEEMAN
Office of the Attorney General
for the District of Columbia
441 4th Street, NW
Washington, DC 20001
(202) 724-6623
Email: chad.copeland@dc.gov

ALSO PRESENT:   ERIC GLOVER, General Counsel, D.C. DOC
CHRISTINE SCHUCK, Pretrial Services Officer

Court Reporter:   Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

*This hearing was held via videoconference and*
*telephonically and is, therefore, subject to the limitations*
*associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

**P R O C E E D I N G S**

1

2          THE COURTROOM DEPUTY:  All right.  This Honorable

3     Court is now in session.  The Honorable Judge Royce C.

4     Lamberth is presiding.

5          Good morning, Your Honor.

6          THE COURT:  Good morning.

7          THE COURTROOM DEPUTY:  Good morning, everyone.

8          We're here for a criminal status conference in

9     case 21-292, the United States of America versus Christopher

10    John Worrell.

11         Your Honor, for counsel for the government we have

12    William Dreher; and we have Christine Schuck for pretrial.

13         If defense could identify yourself for the record,

14    please.

15         MR. STAVROU:  Your Honor, Alex Stavrou on behalf

16    of Christopher Worrell who is present by video.

17         THE COURT:  Okay.

18         THE COURTROOM DEPUTY:  And, Your Honor, I did have

19    one unidentified source.  I had another, but I found out

20    that was pretrial; one unidentified source that attempted to

21    come into the Zoom hearing.

22         I removed them from the hearing.  I am not sure

23    who it was, but they refused to identify themselves.  Just

24    so you know.

25         THE COURT:  All right.

```
 1                    And for the United States?

 2            MR. DREHER:  Good morning, Your Honor.

 3            William Dreher for the United States.

 4            THE COURT:  All right.  And for the D.C. parties?

 5   Mr. Copeland.

 6            MR. COPELAND:  Yes, Your Honor.  Good morning.

 7   Chad Copeland from the Office of the Attorney General.  I am

 8   here with Katrina Seeman who is an Assistant Attorney

 9   General from our office; and Eric Glover, who is the General

10   Counsel for the Department of Corrections.

11            THE COURT:  Okay.

12            All right.  I have read all of the papers that all

13   of you have filed, including the United States' memo filed

14   at 1:20 this morning.  I am prepared to go through a summary

15   of where I think we are.

16            I did have one thing I wanted to raise first; and

17   then I will hear anything y'all want to add to any of the

18   papers you have.

19            I had a status conference off the record with

20   counsel for the gov- -- counsel for the United States and

21   counsel for the defendant one day last week in which I had

22   the government confirm that -- and I wanted to put that on

23   the record, that they had no evidence -- their recollection

24   of the evidence was the same as mine; that there was no

25   evidence of any record that Dr. Wilson had -- prior to my
```

1    contempt -- my first entry of an order requesting --

2    requiring the government to produce the -- his notes of

3    the -- that had been required by the Marshal to approve the

4    surgery, that there had not been any written record of

5    Dr. Wilson saying anything other than that a surgery was

6    required, and the efforts to get Dr. Wilson to say something

7    different were all subsequent to my order; and the

8    government confirmed that they had no written record of

9    anything prior to my order.

10            And I just wanted to confirm that's still your

11    understanding, Mr. Dreher.

12            MR. DREHER:  Well, Your Honor, just with one

13    caveat, which is I believe your -- the forthwith order was

14    issued on Friday, October 8.

15            THE COURT:  Right.

16            MR. DREHER:  And the records -- the medical

17    records indicate a conversation between -- there is a note

18    of a conversation between Dr. O'Donovan at DOC and

19    Dr. Wilson; and that occurred -- my understanding is that

20    that occurred on Thursday, October 7; so prior to this

21    Court's order, so one day prior.  I think it was after the

22    Marshal had requested the notes, which occurred in

23    September, but just prior to this Court's --

24            THE COURT:  That note was allegedly created on

25    the 7th.  Is there any indication it was, in fact, created

1    on the 7th?

2              MR. DREHER:  I think just --

3              THE COURT:  See, part of the problem is they

4    didn't put these notes in the record, right?

5              MR. DREHER:  Well, when we received the electronic

6    medical record, that note of that conversation is in there.

7    And I think it's -- I can pull it up right now, but I

8    believe it is dated October 7th.  So that I don't believe

9    was one of the notes that had -- that had not been present

10   in the electronic medical record; that one was in there the

11   entire time.  That's my understanding, Your Honor.

12             THE COURT:  All right.  In any event --

13             THE COURTROOM DEPUTY:  One moment, Judge.

14             Mr. Worrell, if you could mute your mic, please?

15             Mr. Worrell, if you could mute your mic when you

16   are not speaking.  Thank you.

17             THE COURT:  In any event, explain for the record a

18   little bit more about why there were so many notes that

19   weren't in the record and were in the record, and how that

20   was -- I mean, you, for weeks, had tried to get records that

21   you were never able to obtain; that's part of the whole

22   problem there.  Right?

23             MR. DREHER:  Well, Your Honor -- so the

24   United States has -- as the Court knows, on a number of

25   occasions pursuant to this Court's orders that we sought --

1       asked for the electronic medical record or, rather, asked

2       for medical records of Mr. Worrell.

3               What we got back was the -- sort of the electronic

4       medical record that we understood to be the complete file of

5       those medical records.

6               There was this issue that arose in late

7       September -- we first became aware of it in late September,

8       either the end of September or the very beginning of

9       October -- that the marshals were requesting the provider

10      notes from Dr. Wilson.  I had not seen those in the

11      electronic medical record; and my understanding is they

12      weren't, obviously, in the electronic medical record until

13      they were scanned in on October 12.

14              In a later conversation with DOC, it became

15      apparent to myself that there were attachments that were

16      being -- that were part of the record in some fashion, but

17      that were not being transmitted when they were sending the

18      electronic medical record to us; and Mr. Glover was on that

19      phone call.  And my understanding was that Mr. Glover also

20      was not aware -- because he was requesting the electronic

21      medical record, was not aware that these pages of

22      attachments were not being included in the transmission.  So

23      once we discovered that, we asked for, obviously, the full

24      record including those attachments; and that's what we

25      obtained, I believe, in the subsequent --

1          THE COURT:  The attachments were in the custody of

2     the Department of Corrections?

3          MR. DREHER:  Yes.  There were -- yes, like

4     Dr. Wilson's notes, for example.

5          THE COURT:  They weren't at Howard University;

6     they were in the Department of Corrections --

7          MR. DREHER:  I believe --

8          (Overlapping speakers.)

9          THE COURT:  -- subsequently provided.

10          MR. DREHER:  I believe that that is correct, Your

11     Honor.

12          THE COURT:  So when the marshals were asking for

13     copies, the Department of Corrections had them and didn't

14     provide them to the marshals.

15          MR. DREHER:  That is my understanding from the

16     record.  I just don't know whether there was a

17     miscommunication somewhere along the way, in terms of how

18     they got transferred.

19          THE COURT:  And when you were asking for them, the

20     Department of Corrections didn't provide them to you either?

21          MR. DREHER:  Well, just to clarify, what I

22     asked -- I would ask DOC for the medical records of

23     Mr. Worrell; I would then get back some electronic medical

24     record.

25          Again, I was not aware until late September, early

1   October, that the marshals wanted these separate handwritten

2   notes.  And so I don't recall --

3             THE COURT:  When you were asking for them it was

4   because I was asking for them because I wanted this all

5   cleared up before September 18th; and you knew that's what I

6   was trying to do.

7             MR. DREHER:  That's correct.

8             THE COURT:  And I wanted the medical records from

9   the Department of Corrections which they repeatedly did not

10  give me --

11            MR. DREHER:  Yes.  I understood --

12            THE COURT:  -- which is in their custody; and now

13  they want to weasel out and say they gave me everything.

14            Okay.  Go ahead.

15            MR. DREHER:  Yes.  Thank you, Your Honor.

16            I understand, yes --

17            THE COURT:  When we asked for the --

18            (Overlapping speakers.)

19            MR. DREHER:  -- that is what I understood the

20  Court to want.

21            THE COURT:  -- they didn't give me the documents.

22            MR. DREHER:  And I was merely saying that in that

23  period in September, rather than in early October, what I

24  had requested was, sort of, a generic request for all of the

25  medical records.  And obviously those did not include the

1    notes that were not scanned in at that time period and that

2    were later scanned in on October 12th; that's all I was

3    clarifying.

4              THE COURT:  All right.

5              All right.  In any event, let me go through what

6    my notes show as an update since the last hearing; and then

7    I will let y'all add in what you want to add.

8              The orthopedic specialist who treated the

9    defendant Worrell, Dr. Wilson, after the last hearing, saw

10   the defendant again and has now concluded that surgery is

11   not medically necessary and not urgent but, instead, an

12   elective procedure, after that was suggested by the

13   Department of Corrections' physician to him.

14             There is a factual dispute as to how that came

15   about.  I am not going to try to resolve that now; and there

16   is a factual dispute as to whether he ever, in any way, made

17   that suggestion himself and what was in his original report.

18             The wording about it being "elective" was not, in

19   any way, in his written report that he provided at the time;

20   and there was no suggestion that it was, in any way,

21   elective surgery that he was providing.  But the marshals

22   had been requesting a copy of his written report for some

23   extended period of time there, and had even put it in

24   writing.

25             In September they wanted the written report and

1    they were unable to obtain it; that's what I had been trying

2    to get myself and had asked you to try to get, after talking

3    to you about trying to get something so I could rule before

4    September 18th on his overall medical problems.

5          In any event, we also know an update on his

6    chemotherapy, that there was a need for an additional biopsy

7    with that.  I don't actually know that that's now been

8    completed, and I don't know the exact current status; but,

9    in any event, we know he's going to need chemotherapy at

10   some point.  And whether he also needs radiation, I guess,

11   still remains to be decided.

12         But as a result of my contempt finding, in my

13   referral to the Attorney General, I was told the same

14   afternoon of my referral to the Attorney General for the

15   civil rights investigation that the Attorney General --

16   well, the civil rights division instigated that

17   investigation promptly; that was on Wednesday, I guess, the

18   13th of October.

19         On Monday, the 18th of October, a number of U.S.

20   Marshals inspectors went to the D.C. Jail to conduct an

21   inspection of the D.C. Jail.  The acting United States

22   Marshal for the District of Columbia briefed me that

23   afternoon on the first day's events.

24         I will make public the letter that he sent on

25   November 1st to the D.C. Department of Corrections.  I sent

1    a copy of that letter to the Chief Judge of this court

2    yesterday, and I will make that public in part of the record

3    here.  And I will also make public the press release that

4    the Marshals Service issued yesterday.

5            But in those public documents that I will make

6    part of the record, the Marshals Service concluded that the

7    conditions at the D.C. Jail were so egregious that all

8    federal prisoners should immediately be removed from the

9    D.C. Jail.  And contrary to some news accounts of the report

10    of the Marshal's actions, the Marshal did not say conditions

11    were not egregious at the correctional treatment facility;

12    he simply said that they were not as egregious as at the

13    jail.

14            They are continuing to review the conditions at

15    the correctional treatment facility.  The actual wording of

16    the Marshal -- I guess, I will leave it to the Marshal.

17            But when the marshals arrived at the jail and

18    finally gained entrance, they -- I guess the most disturbing

19    thing for me about Mr. Worrell is they -- they witnessed

20    jail staff members antagonizing detainees, directing

21    detainees not to cooperate with the review, and warning

22    detainees that they had better not snitch to the marshals.

23            The marshals actually overheard themselves

24    detainees being warned that they had better not tell

25    anything to other marshals.  The marshals overheard these

1    warnings themselves, that there were threats being made to

2    inmates to not warn -- to tell what was really going on to

3    the marshals.

4           When this was brought to the attention of

5    supervisors in the jail, they were uninterested or unaware

6    that these threats were being made.

7           On the first day the Marshal informed me that

8    afternoon about one federal detainee who had been sprayed by

9    jail guards with a pepper spray irritant, and then left for

10   days without an opportunity to shower and, therefore,

11   reinfected in his skin because, when pepper spray is applied

12   and you are not allowed to wash it off, it continues to

13   reinfect you.  And he continued to experience the burning

14   effects of pepper spray for days, which is a clear civil

15   rights violation, and probably a clear criminal violation of

16   those guards who participated in that.

17          I think, on the first day, he also advised me of

18   an inmate who was a federal prisoner who had sought access

19   to the sick call system for weeks who was not allowed to go

20   on sick call because he failed to complete the form

21   requesting sick call.  He wasn't able to complete the form

22   because his fingers were so hurt that he couldn't move his

23   fingers; and two of his fingers had turned black, and he was

24   unable to write to complete the form.  So the marshals

25   actually took him up to sick call because he could not

1    complete the form, and that's why he had not been taken on

2    to sick call.

3            In another instance the Marshal told me -- I think

4    this is only the first or the second day -- that, in

5    retaliation for prisoners' actions, the D.C. staff had cut

6    off the water to the entire pod of the cell block.  The

7    prisoners and detainees were wrongly deprived of water for

8    daily activities, like showering.  But the marshals also

9    then witnessed unsanitary conditions because the resulting

10   clogging backed up toilets and resulted in large amounts of

11   standing human sewage throughout that cell block.

12           In the Marshal's letter to D.C., he notes that the

13   water in many of the cells within South 1 and North 1 had

14   been shut off for days, prohibiting detainees from drinking

15   water, washing hands, or flushing toilets; and that

16   inspectors observed large amounts of standing human sewage

17   and human feces in the toilets of multiple occupied cells.

18   The smell of urine and feces was overpowering in many

19   locations.  D.C. staff confirmed to inspectors that water to

20   the cells was routinely shut off for punitive reasons.

21           The marshals also noted that food delivery and

22   storage is inconsistent with industry standards; hot meals

23   were observed served cold and congealed; evidence of drug

24   use was pervasive.  Marijuana smoke and odor were

25   widespread; they had a stream of smoke and odor of

1    marijuana.  Detainees had observable injuries with no

2    corresponding medical or incident reports available to

3    inspectors.  And, as already noted, DOC staff were observed

4    antagonizing detainees, and observed -- directing detainees

5    to not cooperate with inspectors.

6            And with all of those findings, the Marshal

7    determined to remove all federal prisoners from the D.C.

8    Jail.  They did tell me that they had removed 335 prisoners.

9            They returned to the jail -- an inspection of a

10   jail of that size would normally be completed in two to

11   three days; they stayed five days.  They did go back on

12   Sunday.

13           And for the first time in the history of our

14   particular Marshal here, our Acting Marshal, they were

15   ordered to leave the jail, and they were barred entry.  In

16   his entire career, he has never seen any local jail that

17   ever barred the Marshal from entering the jail, but they

18   were barred entry to the jail.  They did not get into a

19   shootout, but they did not enter the jail on Sunday.

20           It is beyond belief some of the reports of the

21   Marshal here to the Court yesterday.  We had an executive

22   session of the full court yesterday.  And he said the

23   conditions at the D.C. Jail were deplorable; the conditions

24   in CTF were not as deplorable.  And the immediate action

25   taken by the Department of Justice was to move all federal

1   inmates out of the D.C. Jail; that does not mean that the

2   conditions in CTF were meeting any standards.  According to

3   him, they were not as deplorable as the conditions in the

4   D.C. Jail.

5           So that's my background on which I act today.

6           Now, in terms of the record here, in *U.S. v*

7   *Salerno,* the Supreme Court affirmed the constitutionality of

8   the Bail Reform Act, concluding that pretrial detention

9   contemplated by the Bail Reform Act is regulatory in nature,

10  and does not constitute punishment before trial in violation

11  of the Due Process Clause, 481 U.S., at 748.

12          The parties had focused their attention on the Due

13  Process Clause and need not -- I need not reach the more

14  difficult question of whether due process provides the basis

15  for release under these circumstances because I find the

16  Bail Reform Act provides a sufficient legal framework.

17          The Bail Reform Act, at 18 U.S.C. 3142(i), states

18  that a judicial officer may, by subsequent order, permit the

19  temporary release of a person in custody of a U.S. Marshal

20  or another appropriate person, to the extent that the

21  judicial officer determines such release to be necessary for

22  the preparation of the person's defense or other compelling

23  reason.  There are two primary elements of this provision;

24  one, release must be necessary for a compelling reason; and,

25  two, release must be made to an appropriate person.

1        So, first, the Court should conclude that the

2   defendant's medical condition -- specifically, in this case,

3   his cancer -- provides a compelling reason for release; but

4   not for the reasons argued by the defendant in his filings

5   and disputed by the government.  The parties focused on the

6   quality of care or lack thereof at the D.C. Jail.

7        I wrote an original opinion rejecting the

8   defendant's condition, that his medical care was inadequate,

9   relying, in large part, on the records of the D.C. Jail; I

10  won't revisit that determination today, although I certainly

11  could.

12       But the defendant will soon be undergoing

13  chemotherapy for his cancer.  He will require intensive and

14  structured treatment by his medical provider.  In light of

15  the Department of Corrections' actions in this case,

16  evidenced -- as evinced by the findings of the U.S. Marshals

17  in their investigation, this Court has zero confidence that

18  the D.C. Jail will provide the treatment required by the

19  defendant's condition and that the D.C. Jail staff will not

20  retaliate against Worrell as they recently have against

21  other prisoners and detainees.

22       While the government disputes the seriousness of

23  the defendant's hand injury, the Court is not persuaded that

24  it can rely on the eleventh-hour statements of doctors and

25  DOC staff that are inconsistent with months of medical

1   records stating that the defendant needs surgery, and

2   came -- and are dated after the Court's contempt

3   proceedings.

4          The DOC's inability to provide records to the

5   Marshals Service in a timely matter, even after a court

6   order, only furthers the Court's concerns.

7          Courts in this district ask whether the compelling

8   reasons identified by a defendant effectively override or at

9   least sufficiently counterbalance the findings that

10  originally justified the pretrial detention order; that's in

11  *Boatwright*, at 2020 Westlaw 1639855, at 5.

12         So despite the serious charges that Worrell faces,

13  and this Court's prior dangerousness determination, the

14  compelling reasons for Worrell's release to home

15  incarceration counterbalance the findings that originally

16  justified his pretrial detention.

17         His physical condition while he undergoes

18  chemotherapy militates against the danger he would otherwise

19  impose.  The Court will impose stringent conditions of

20  release to mitigate the identifiable threat that he would

21  otherwise pose to the public, and his need for medical

22  treatment is a compelling reason for his release from

23  custody at this time.

24         There must be an appropriate person as his

25  third-party custodian.  Several decisions in this district,

1    including my own decision in *U.S. v Chansley*, treat the

2    "appropriate person" as a necessary and mandatory

3    requirement for temporary release under Section 3142(i).

4            An additional issue in the Middle District of

5    Florida is it does not have electronic monitoring devices,

6    so the third-party custodian will now serve the role of

7    enforcement of the person in custody.

8            I don't know anything about the custodian that we

9    would have as a third-party custodian here, so the custodial

10   issues will need to get worked out with Worrell's attorney.

11           I am going to order the Marshal to move

12   Mr. Worrell today to the Alexandria jail so that he is safe;

13   I do not want him harmed in D.C.'s custody while he

14   remains -- while I get this third-party custodian worked

15   out.  So he will be moved forthwith to the Alexandria jail

16   until I have the third-party custodian selected and picked,

17   and the third-party custodian worked out.  And Mr. Worrell

18   will be placed in third-party custody for his chemotherapy

19   with stringent conditions to ensure that he is -- does not

20   continue any kind of internet access and broadcasting, and

21   things like that, as has been done in other of these kinds

22   of cases.

23           Anyone want to make any additional comments on the

24   record?

25           The motion to reconsider last night filed by the

1    Attorney General, on behalf of the Department of Corrections

2    and their leaders, I will rule separately in writing; and I

3    don't propose to take that up, not having had any response

4    to it yet.

5              Anything else anyone else wants to say on the

6    record today, they may.

7              Mr. Dreher.

8              MR. DREHER:  Your Honor, I think I heard the Court

9    talk about electronic monitoring.  And as long as the --

10   that was our one -- the one thing that we wanted to make

11   sure of, is that while he was under the supervision program,

12   he be on electronic monitoring; and, as proposed by

13   Mr. Stavrou, that his -- that he be restricted to the Middle

14   District of Florida specifically; that's important to the

15   government for security reasons.  Thank you.

16             THE COURT:  Mr. Stavrou.

17             MR. STAVROU:  Your Honor, I can propose --

18   Trish Priller is his significant other, it's been a

19   long-term relationship; and I certainly can propose her as a

20   person of supervision so-to-speak.

21             THE COURT:  Okay.  Talk to pretrial there.  And

22   they have to do their interview, and -- they're in Florida,

23   and give them the information about her.

24             MR. STAVROU:  Judge, she may very well be in the

25   Washington, D.C. area.  So if those arrangements can be

1    made, I might be able to get that done.

2              THE COURT:  Pretrial here can talk to her, yes.

3              MR. STAVROU:  Very good, sir.

4              THE COURT:  If it can be done right away -- I want

5    him moved to Alexandria right away.  I told the marshals

6    this morning, I don't want him --

7              MR. STAVROU:  Understood, sir.

8              And it was corrected in Mr. Dreher's filing; but

9    the parties consulted about a statement that I had made in

10   records to something said by Dr. Ali; it was indicated in a

11   sentence in another portion of the medical records that my

12   statement was in error.  The parties discussed that.  And

13   that correction that was made by Assistant United States

14   Attorney Dreher was done after we consulted.

15             THE COURT:  Okay.  All right.

16             Mr. Copeland.

17             MR. COPELAND:  Thank you, Your Honor.

18             I first want to let the Court know that the

19   District takes the issues in the Marshal's letter very

20   seriously, and has attracted the -- and has the attention of

21   the highest levels of this government.

22             We are investigating.  We have already reached out

23   to the U.S. Marshals Service.  We're working on next steps.

24   We expect to keep the courts informed as to what's going on.

25             The only other thing that I would ask -- just to

1     clarify for the record, is that the District -- the

2     department takes no position in terms of the Court's

3     decision here.

4            I just did want to note that Mr. Worrell had been

5     housed for the entirety of his time at the CTF, and that the

6     Marshal's letter did say that -- this is quoting from it;

7     that the conditions at the CTF were observed to be largely

8     appropriate and consistent with federal prisoner detention

9     standards, and that the U.S. Marshals have not moved their

10    pretrial detainees from CTF; they have only removed them

11    from CDF, in light of the findings that the Court detailed

12    earlier.

13           Beyond that, Your Honor, I have nothing to add.

14           THE COURT:  Okay.  The Court will be in recess.

15           Thank you very much, Counsel.

16           Good luck, Mr. Worrell.

17           MR. STAVROU:  Your Honor, can I be provided the

18    information for pretrial services so I can make the

19    arrangements?

20           THE COURTROOM DEPUTY:  Counsel, she's on the line.

21           PRETRIAL SERVICES OFFICER:  Good morning, Your

22    Honor.

23           MR. STAVROU:  Okay.

24           PRETRIAL SERVICES OFFICER:  I will reach out to

25    defense counsel.  This is pretrial services for the District

1    of Columbia.  We are the ones who will do the screening

2    because we have to request safety provisions from the Middle

3    District of Florida.

4                 I will reach out to defense counsel now via email

5    with my contact information so that we can correspond.

6                 MR. STAVROU:  Very good.  Thank you, ma'am.

7                 THE COURT:  And then I need a copy to the Court so

8    I can review it.

9                 PRETRIAL SERVICES OFFICER:  And I will reach out

10   to your law clerk who I have been working with.

11                THE COURT:  Thank you very much, Counsel.

12                THE COURTROOM DEPUTY:  This Honorable Court is

13   adjourned.
                    (Whereupon, the proceedings conclude, 11:54 a.m.)
14                              **CERTIFICATE**

15                I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
16   transcript of my stenographic notes, and is a full, true,
     and complete transcript of the proceedings to the best of my
17   ability.
                    PLEASE NOTE:  This hearing was held via
18   videoconference and telephonically in compliance with the
     COVID-19 pandemic stay-safer-at-home recommendations and is
19   therefore subject to the limitations associated with the use
     of technology, including but not limited to telephone signal
20   interference, static, signal interruptions, and other
     restrictions and limitations associated with remote court
21   reporting via telephone, speakerphone, and/or
     videoconferencing capabilities.
22                This certificate shall be considered null and void
     if the transcript is disassembled and/or photocopied in any
23   manner by any party without authorization of the signatory
     below.
24
                 Dated this 5th day of November, 2021.
25               /s/ Elizabeth Saint-Loth, RPR, FCRR
                 Official Court Reporter