IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | Case No: 21-CR-292 RCL |
| : | |
| CHRISTOPHER WORRELL, : | |
| : | |
| Defendant. : | |

### RESPONSE TO DEFENDANT'S SUPPLEMENT TO HIS MOTION TO CONTINUE TRIAL

#### INTRODUCTION

In his supplemental filing, Mr. Worrell's only developed contention is that his recent medical issues mean that he is not "medically able to proceed to trial" on December 12, 2022, Dkt. 175 at 4, but that purportedly that situation will be different by March 2023, when he would prefer the trial occur.

Mr. Worrell's supplement fails to support his claim that he is physically incompetent to stand trial—a claim that typically requires a robust showing, as explained below. No doctor has offered their opinion, based on their evaluation of Mr. Worrell, that he cannot sit through trial— or indeed offered any opinions about that key question. His filing includes only an affidavit from a non-treating, non-independent, physician assistant that he hired to review his own medical records and prepare this affidavit for litigation. Even that affidavit does not explain why he cannot stand trial. His treating doctors apparently declined to opine as much. And Mr. Worrell's alleged medical issues are not so obviously debilitating that the need for a continuance is self-evident without expert affidavits. He underwent jaw surgery in mid-September, three months prior to trial; he has not alleged that it has led to any complications. He has had cancer for over a decade, and his oncologist concluded a week ago that there was "no clear evidence of active skin disease" and

1

required no treatment or follow up until 2023. Ex. C at 3-4. Aside from that, Mr. Worrell points to two episodes of fainting that have not recurred in the last month.

The government has never, of course, disputed that Mr. Worrell has faced significant medical issues since before his arrest in this case, largely due to his cancer, and it does not seek to downplay them now. But Mr. Worrell has provided no evidence from his treating physicians that he cannot stand trial on December 12, 2022, and that is the only relevant question here.

The medical records the government recently obtained from Mr. Worrell also include a revelation about his post-jaw surgery condition. On September 19, 2022, Mr. Worrell asserted that his surgery "has rendered [him] unable to verbally communicate," and that the "length of time until [he] is able to speak is uncertain." Dkt. 161 at 3. (To be clear, the government does not doubt that defense counsel was acting in good faith and relying on information from his client in this filing.) Mr. Worrell asked to set out his trial date—then almost three months away—based in large part on his inability to verbally communicate. *Id.* Based on that representation, the government filed a motion on September 25, granted by this Court the next day, to relax his pretrial conditions to permit him to communicate electronically. Dkt. 164. But in fact, his medical records show, Mr. Worrell already had no difficulty talking well before the government filed its motion. On September 22, he spoke to the emergency room staff during admission and continued to talk throughout his stay. Ex. A at 17 (Mr. Worrell "explain[ing]" and "stat[ing]" what happened to him, and "describ[ing]" where he feels pain, on September 22). To be clear, he was not communicating non-verbally. On September 24, 2022, a nurse reported that Mr. Worrell was "yelling" at her repeatedly and calling her "incompetent." Ex. A at 27. She included direct quotes from Mr. Worrell. *Id.* That Mr. Worrell was yelling at a nurse just days after seeking a continuance due to his inability to speak illustrates, if nothing else, that the Court cannot rely on Mr. Worrell's

self-reports about his condition without supporting affidavits from independent doctors.

As the government previously explained, Mr. Worrell's other previously asserted bases for a continuance—the introduction of additional counsel to his trial team, discovery review, and his difficulty talking for a period of time after his surgery—do not merit a continuance.  Mr. Worrell does not return to those issues in his supplement, aside from a passing general reference to discovery produced in a different January 6 trial.  Therefore, because he has not demonstrated a medical inability to stand trial, Mr. Worrell's continuance request should be denied.

## DISCUSSION

It is worth first clarifying the only question at issue.  The question is not whether Mr. Worrell has in the past faced medical issues (many defendants his age do), nor whether he is receiving treatment for those medical issues now.  Nor is the question whether he may need treatment after trial.  The only question relevant to his continuance request is whether Mr. Worrell is physically competent to stand trial—capable of sitting and listening to testimony during a 5-7 day trial, while assisting in his defense or testifying.

The cases discussing defendants' requests for a continuance due to alleged physical incompetence to stand trial establish a high threshold that the defendant must meet in his motion.  In this district, Judge Boasberg summarized the standard thusly:

> In weighing whether a severance or continuance is proper, the Court's goal is to "assess the degree to which a defendant's health might impair his participation in his defense," and to determine whether "the proceeding is likely to worsen the defendant's condition" or may result in risk to his health, and to balance that against "the public interest in bringing those accused of criminal misconduct promptly to account."  "The mere possibility of an adverse effect on [Defendant's] wellbeing is not enough to warrant a postponement."  Rather, "'the medical repercussions must be serious and out of the ordinary; the impending trial must pose a substantial danger to a defendant's life or health.'"

*United States v. Saltzman*, 153 F. Supp. 3d 245, 250 (D.D.C. 2016) (internal citations omitted).

To analyze whether an impending trial poses a substantial danger to a defendant's health, courts have examined multiple factors, including: "1. medical evidence; 2. Defendant's activities outside the courthouse; 3. measures to minimize the risks to defendant's health; 4. usefulness of delay; and 5. seriousness of the case," with that last factor meaning "the degree of loss or injury to the public interest deemed to result from delay or total preclusion of a trial." *United States v. Jones*, 876 F. Supp. 395, 397 (N.D.N.Y. 1995) (citing *United States v. Doran*, 328 F. Supp. 1261, 1263 (S.D.N.Y. 1971); *Saltzman*, 153 F. Supp. 3d at 250 (listing similar factors); *United States v. Zannino*, 895 F.2d 1, 14 (1st Cir. 1990) (listing similar factors, quoted by *Saltzman*); *United States v. Brown*, 821 F.2d 986, 988 (4th Cir. 1987); *United States v. Gunter*, No. CRIM.A. 12-394-4, 2013 WL 5942341, at *1 (E.D. Pa. Nov. 5, 2013) (citing *Doran*).

Applying that standard, some courts have rejected continuance requests that were better substantiated and based on graver medical concerns than those put forward by Mr. Worrell. In *Jones*, the defendant was "an obese 76 year old male who suffer[ed] from coronary artery disease and diabetes," including episodes of syncope (fainting) like Mr. Worrell. 876 F. Supp. at 398. The defendant's board-certified, treating internist provided the kind of opinion missing here: an affidavit stating the defendant was "at substantial risk of developing a heart attack" due to the "exertion associated with a trial projected to last two weeks." *Id.* But the Court appointed an impartial cardiologist, who agreed with the defendant's treating doctor's assessment that his medical condition was serious, while disagreeing that "sitting and listening to testimony" would "greatly increase his risk of myocardial infarction." *Id.* The Court concluded that the defendant was physically competent to stand trial and denied the defendant's request for a continuance. *Id.* at 400.

In *Brown*, the defendant had, again unlike in this case, "submitted material from other

4

[treating] physicians who stated that he should not stand trial [because] the stress of a trial would aggravate [his] hypertension, diabetes, and heart disease to a dangerous extent . . . and [the defendant] lacked the ability to concentrate on trial proceedings sufficiently to comprehend them." 821 F.2d at 989.  But the Fourth Circuit upheld the denial of a continuance after the district court heard from other doctors who had reviewed the defendant's records or evaluated him and who concluded that he was competent to stand trial.

With those cases in mind, the government reviews the factors identified in *Saltzman* and *Jones* below.

**1. Medical evidence.**  Perhaps most importantly, the medical evidence does not support a conclusion that Mr. Worrell is physically incompetent to stand trial.

Recall what *Saltzman* requires—a showing that "the impending trial . . . pose[s] a substantial danger to a defendant's life or health," or that health issues will interfere with trial preparation or assistance with the defense. *Saltzman*, 153 F. Supp. 3d at 250.  As to those issues, Mr. Worrell has made virtually no showing at all.  Mr. Worrell's submission does not include a single medical opinion or affidavit from any treating doctors, much less affidavits from treating physicians specifically concluding that Mr. Worrell cannot sit through trial in December.  This Court has no update from Mr. Worrell's oral surgeon, and so must assume that Mr. Worrell's recovery from that surgery is proceeding apace.  This Court has no affidavit from Mr. Worrell's oncologist, or cardiologist, or primary care physician.  By his own admission, this is because his "providers—quite frankly—would either not render an opinion or did not wish to do so." Dkt. 175 at 2-3.  The government can only guess as to why.  It may be because they are busy.  Or it may be because they are not willing to state under oath that Mr. Worrell cannot physically sit through roughly a week of testimony five weeks from now.

Indeed, even the non-independent physician assistant who was hired to review Mr. Worrell's medical records was only willing to assert, in a single sentence, that Mr. Worrell's medical issues "would impair his ability to go to trial." Garrido Aff. ¶ 18.  That is a more conservative and ambiguous claim than that Mr. Worrell's health would be jeopardized by proceeding to trial, or that he could not assist in his defense.  The physician assistant, who has never treated Mr. Worrell, Dkt. 175 at 2-3, also provided no opinion or evidence as to *how* or *why* sitting through testimony would increase any health risks for Mr. Worrell, given his underlying medical conditions.  Certainly there is no evidence that Mr. Worrell cannot sit in a chair during testimony.  He is not (to the government's knowledge) on bed rest, or unable to sit up, or undergoing chemotherapy or similar treatment.  Indeed, Mr. Worrell has presumably (though again, the government does not know) been standing up, sitting down, and talking with counsel about his case for the last month without incident.

Mr. Worrell's filing seems to suggest that a defendant facing medical issues is entitled to continue his trial until such time as he has received "multiple clearances" from any and all medical providers he is seeing or will soon see, regardless of whether he substantiates his claim that trial poses a health risk.  Not so.  Courts have been clear that if the medical records or affidavits a defendant provides (or fails to provide) do not at least make an initial showing that a defendant is physically incompetent to stand trial, a continuance request should generally be denied.  *See, e.g.*, *United States v. Donovan*, No. 04 CRIM. 1346 (MHD), 2005 WL 1473928, at *2 (S.D.N.Y. June 21, 2005) (denying continuance request by pro se defendant who failed "to submit medical documentation," such that there was "no evidence that defendant is currently unable to stand trial").  It is not the Court's burden to solicit clearances from a defendant's medical providers before setting a criminal trial date.

Below, the government reviews each of Mr. Worrell's alleged health issues in greater detail.  The government caveats this discussion with the fact that government counsel does not possess medical expertise, and so can only use common sense and what the medical records state to draw reasonable conclusions.  The government does not seek to downplay Mr. Worrell's medical concerns, only to highlight that he needed to substantiate them.  The only medical records provided to the government are from Mr. Worrell's recent oncology visit and his two emergency room visits; none from any other specialist.  The government also has no power to interview Mr. Worrell's providers without his consent about his treatment, nor to force him to be evaluated by an independent physician.  That is why affidavits from an out-of-custody defendant's treating, independent physicians are crucial to this Court's evaluation.  Given the defendant's preference to continue the trial, the absence of the affidavits sought by this Court weeks ago speaks volumes.

*Dental treatment*.  In September, Mr. Worrell was concerned that his jaw surgery might impede his ability to communicate with counsel or might lead to complications in recovery.  But as noted above, Mr. Worrell was talking and yelling within days of that filing.  He can also communicate with his counsel or review discovery using the internet.  There are no new facts put forth by Mr. Worrell in his supplement about his recovery from jaw surgery—just the conspicuous absence of an affidavit from his oral surgeon.  Certainly, Mr. Worrell has not attempted to show, through the opinion of a qualified, treating doctor, that his recovery from jaw surgery three months before trial would render him unable to sit through testimony or assist his counsel.

*Hyper/hypotension and fainting.*  The second concern cited by Mr. Worrell is two episodes of syncope (fainting) in mid-September and early October.  Mr. Worrell's records indicate that the fainting was perhaps due to changes in blood pressure.  There have apparently been no further incidents in the month since his release.  An "extensive cardiac and neurological work-up" at his

first emergency room visit "was negative," other than high blood pressure. Ex. B at 1, 6; Ex. A at 23-27 (reviewing results). Cardiology cleared him for discharge from the hospital and recommended outpatient follow up. Ex. A at 17. During his second visit, a chest x-ray, CT scan, EKG, and echocardiogram, along with other workups, appear to have resulted in negative findings. *E.g.*, Ex. B at 12-13; *id.* at 16; *id.* at 8 ("logic exam and cardiac exam unremarkable laboratory work is unremarkable"); *id.* at 9 ("everything came back negative including CT head negative, bilateral carotid artery negative, 2D echo showed no abnormality. . . .Lab work-up showed no acute findings including negative troponin. Chest x-ray shows no active disease. CT head shows no acute intracranial abnormality. Vital signs in ED within normal limits."); *id.* at 18-20. His "blood pressure [was] within normal limits" during his two days at the hospital. *Id.* at 9. The discharge recommendation was merely for him to follow up with his primary care physician to discuss reducing his cholesterol levels and monitoring his blood pressure at home. *Id.* at 1, 3 (under "Key items to be followed up by outpatient providers", the records list "Patient to follow-up with PCP" and "Blood pressure monitoring at home and with PCP.").

These episodes may or may not be concerning; the government and Court do not know. Mr. Worrell has provided no documentation of any follow-up visits with his primary care physician or cardiologist. (His third-party custodian, Ms. Priller, stated on her fundraising website on October 7, 2022 that "The doctors have run many tests and have ruled out a cardiac event.") Mr. Worrell's hired physician assistant, Mr. Garrido, states only that Mr. Worrell will have a follow-up appointment with cardiology at some unspecified time "after November 10." Garrido Aff. ¶ 20. It appears he is also "awaiting appointments" with his "General Practitioner, oral surgeon, a cardiologist, and oncology," and perhaps with neurology, again, with no details. Dkt. 175 at 4. Absent an explanation provided by Mr. Worrell, that some of those appointments may not have

even been scheduled a month after his discharge indicates that either Mr. Worrell or his doctors may not view the issue as a medical emergency.

The only specific issue noted by Mr. Worrell is that he cannot bring a cell phone within six inches of his Holter monitor (which is typically worn around the chest) for about another week. But he can use his cell phone as one normally does, while holding it more than six inches from his chest, or using speakerphone. He can also use a computer. So that will not impair his ability to prepare for or go to trial.

Importantly, there is no opinion from any treating doctor that these episodes of fainting (or any underlying disease causing them) would prevent Mr. Worrell from going to trial, prevent him from engaging in ordinary tasks like sitting and listening, communicating, or concentrating, or that trial would increase the likelihood of their occurrence.

*Cancer.* Mr. Worrell's cancer records show a disparity between his oncologist's assessment and Mr. Worrell's representations as to his condition. Mr. Worrell has consistently stated or implied that his cancer is active or worsening, both in his online fundraising and in his filings in this Court.

Though the government again emphasizes its lack of expertise, Mr. Worrell's oncologist's report indicates that Mr. Worrell's May 2022 chemotherapy was relatively successful. Mr. Worrell apparently told the treating physician at the emergency room in September 2022 that he did not need further chemotherapy because he was "currently cancer free." Ex. A at 17. On October 5, 2022, his emergency room records indicate that he was "[n]ot currently under any cancer treatment." Ex. B at 1; *id.* at 10 (same). And on October 27, 2022, his oncologist concluded that Mr. Worrell had "no clear evidence of active skin disease at this visit," that his itchy skin "seems to be present with or without active disease," and that the only follow-up was: "follow up next

year," i.e., 2023.  Ex. C at 3-4.  His oncologist characterized the results of the testing done during Mr. Worrell's emergency room visits, including kidney testing, as "unremarkable."  *Id.* at 2.  These records seemingly indicate his oncologist does not view his cancer as an urgent threat requiring immediate treatment.  And no chemotherapy is currently scheduled.

It is also worth noting that Mr. Worrell apparently waited two months after his release from custody to see an oncologist, and a full six months to start chemotherapy, despite being advised to start chemotherapy by his doctors in October 2021.  Indeed, he was supposed to start receiving chemotherapy in custody shortly after his ultimate release in November 2021.  Whether the six-month delay was his choice,[1] his treating oncologist's preferred timeline, or something else, it would seem to undercut his repeated claim that his cancer was rapidly, dangerously progressing.

In sum, while there is evidence that Mr. Worrell underwent jaw surgery, has fainted twice, and has cancer, Mr. Worrell has not provided evidence that his medical issues would be exacerbated by his participation in trial, or that they would render him physically incompetent to stand trial.  The government does not know the seriousness of his conditions, because his doctors have not described them.

Rather than provide any affidavits from a treating physician, Mr. Worrell has instead filed an affidavit from a physician assistant that the defense hired to review Mr. Worrell's medical records.  This physician assistant has apparently never treated or evaluated Mr. Worrell, and the government has no information as to whether he is qualified to render such wide-ranging opinions about Mr. Worrell's cancer, syncope (fainting), high blood pressure, cardiological issues, and

---

[1] This is not the first time Mr. Worrell apparently delayed treatment.  This Court previously found, based on Mr. Worrell's personal (i.e., non-D.C. Jail) medical records, that in August 2020 an oncologist advised him to engage in chemotherapy to treat a recurrence of his lymphoma.  Dkt. 68 at 10.  Worrell apparently sought little or no treatment for six months, before seeing Dr. Rucker to receive topical medications in February 2021.  *Id.*

neurological issues.

For example, the physician assistant describes Mr. Worrell's lymphoma as "active," which at a minimum glosses over the expert oncologist's evaluation from just days prior that there was "no clear evidence of active skin disease." Garrido Aff. ¶ 15. He says the cancer will "require additional oncologic treatment pending his follow up visit," seemingly implying imminent, active intervention. *Id.* In fact, it appears that Mr. Worrell is only supposed to follow up with his oncologist next year, and may possibly have to undergo some unspecified treatment at some uncertain future time. That his oncologist deemed it unnecessary to see him in the next few months, but may plan some future treatment, is if anything a reason to proceed to trial in the next few months, not to wait.

The physician assistant also opines about the causes of Mr. Worrell's hospitalization and potential diagnoses, but it is hard to discern from where those conclusions are drawn. *Id.* at ¶¶ 11-16. For example, he raises a "renal carcinoid tumor" as "one possible differential diagnosis." *Id.* ¶ 13. Mr. Worrell's filing calls it a "possibility of malignant tumor related and/or spread from his current lymphoma." Dkt. 175 at 4. That could be concerning, but the government—concededly lacking medical expertise—could not find supporting evidence for either claim in the records. The October 27, 2022 records from Mr. Worrell's own oncologist do not seem to raise this concern, with the oncologist calling the results of his prior kidney exams at the hospital "unremarkable." Ex. C. The government could find no reference to a tumor nor any apparent concern with the kidneys in the hundreds of pages of emergency room medical records. Instead, the opinions of his treating doctors at those hospitals were that an "abdominal ultrasound and evaluation of renal arteries . . . showed no abnormalities," Ex. B at 1, that the "kidneys function normally without focal solid masses," and that "[s]ubcentimeter probable cysts" on "both kidneys" were "too small

11

to characterize but likely benign," Ex. A at 31. It is thus hard to square Mr. Garrido's opinion with those of Mr. Worrell's treating doctors. If there is nonetheless a possibility of a renal tumor, there would still be the question of how, when, or whether it would require treatment or interfere with proceeding to trial in December (but would permit a trial in March, as Mr. Worrell requests).

Finally, the physician assistant's conclusion that Mr. Worrell must receive "clearance" by multiple specialists to participate in trial is also untethered to any specific discussion of the risks that trial poses to Mr. Worrell's health. Garrido Aff. ¶ 19. It appears that Mr. Worrell has not yet seen some of those doctors. There is no explanation at all of what about trial poses a risk to Mr. Worrell, or what about his health would prevent him from assisting in his defense.

**2. Defendant's activities outside the courthouse.** Courts have been clear that the district court can rely on a defendant's out-of-court activity, or the court's personal observations of the defendant during hearings, in making this evaluation. *E.g.*, *Brown*, 821 F.2d at 989; *Jones*, 876 F. Supp. at 397. Mr. Worrell has been active while on pretrial release, attending a local city council meeting in April and a Proud Boys rally in July, in violation of his bond conditions. Mr. Worrell's explanations as to why he believed he could attend the rally—that it was the only place he could meet with his civil attorney—were found by this Court to be transparently implausible. Mr. Worrell has thus demonstrated that at least prior to September of this year, he was engaging in activities outside of his house, even without permission from pretrial services. This factor cuts against a continuance more so than in *Jones*, where the defendant was effectively homebound and the only evidence of him traveling was from almost a year prior. 876 F. Supp. at 398. There is otherwise no allegation that Mr. Worrell does not understand the proceedings, and he has been able to sit through all of this Court's pretrial hearings to date.

**3. Measure to minimize the risks to defendant's health.** As other courts have found,

courts have the ability to modify the trial schedule, "such as reducing the length of the court day or week, and tailoring recesses in length and frequency," to accommodate a defendant with medical issues. *See Jones*, 876 F. Supp. at 399 (quoting *United States v. Sweig*, 316 F. Supp. 1148, 1167-68 (S.D.N.Y. 1970)). If Mr. Worrell were to substantiate his claim that he cannot sit and listen to testimony for long stretches, these accommodations would appear to be a more than adequate response, and would be more appropriate than an outright continuance.

**4. Seriousness of the case.** The government and public would also suffer from a postponement of the trial or total preclusion of the ability to try the case. This is not an ordinary case in which the public has little or no interest. It involves a riot that interrupted the peaceful of transfer of power at the United States Capitol building, an unprecedented event that remains in the public eye. Mr. Worrell's case is among the most serious of those that have proceeded to trial, involving an alleged assault against an officer and implicating the role of the Proud Boys in the January 6 attack. It has been pending since March 12, 2021.

Mr. Worrell, meanwhile, has undertaken efforts to increase the public's attention on his case. As the Court may recall, Mr. Worrell called into a cable news program from jail on August 26, 2021 to assert that at least the government's assault charge was "completely false and fabricated."[2] He has fundraised online, through a website run by his third-party custodian, Tricia Priller; on that website, she has claimed that Mr. Worrell was present on January 6, 2021 only "to exercise his First Amendment Right" and that he "was there standing up for my rights. He was even there standing up for your rights." *See* https://www.givesendgo.com/flotilla (March 25, 2022 update). She has called his case "blatant political and Christian persecution." *Id.* (June 8, 2022). And as this Court is also aware, Mr. Worrell showed up to a local city council meeting in April,

---

[2] The interview is publicly available here: https://www.youtube.com/watch?v=Y7-e6OI_w4U.

without permission from pretrial services, to assert that he is a "political prisoner."

It is, of course, Mr. Worrell's absolute right to assert his innocence. But the government has a different view of this case than Mr. Worrell does. And the government and public are entitled to have a jury accept or reject the government's evidence and Mr. Worrell's assertions of innocence. Continuing to postpone trial may threaten to prevent the government and public's right to a trial in this case.

**5. Usefulness of postponement.** Finally, it is not clear a postponement would serve any purpose. Mr. Worrell's supplement fails to substantiate his original claims about needing more time to recover from jaw surgery (a surgery that the Court already set the current trial schedule to accommodate). Mr. Worrell's oncologist has concluded that there will be no cancer-related follow-up until 2023, so a continued trial may just conflict with future cancer treatment. And with respect to his two episodes of fainting, Mr. Worrell does not know if his condition will improve with a continuance. Mr. Worrell has previously noted, and notes in his filing, Dkt. 175 at 4 n.3, that he has suffered from fainting in the past, including in June 2021 while in custody. Mr. Worrell posits that further testing might uncover its cause and lead to treatment, Dkt. 175 at 4, but no records or affidavits from his treating doctors state as much, describe what further diagnostic testing would occur, when any appointments are scheduled, or how serious his condition is.

Mr. Worrell asserts that his "condition is deteriorating." *Id.* If true, that is unfortunate. But on the narrow question here, a "defendant's deteriorating condition actually weighs against postponing the trial," *Jones*, 876 F. Supp. at 399-400, because it could "effectively deny the Government a trial of [this] defendant[,] who may never be more capable of standing trial" than he is now, *United States v. DePalma*, 466 F. Supp. 920, 926 (S.D.N.Y. 1979). There is thus little evidence of the utility of a postponement.

\*   \*   \*

A review of the five factors assessed above indicates that Mr. Worrell has provided little to no evidence that he cannot sit through testimony while assisting in his defense or testifying on his behalf. Indeed, his out-of-court extracurricular activities and recent medical records indicate that he is able to engage in ordinary activities like sitting down, standing up, and talking with defense counsel. No qualified opinion from a treating physician has been rendered to the contrary. And Mr. Worrell's medical issues (a past jaw surgery, a cancer he has managed for a decade and with no evidence of active disease, and two episodes of fainting) are not of the type that obviously would interfere with Mr. Worrell's ability to prepare for or go to trial. Mr. Worrell has not substantiated his claim that he is physically incompetent to stand trial.

## CONCLUSION

Mr. Worrell's motion to continue his trial should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov

*/s/ Alexis Loeb*
ALEXIS LOEB
CA Bar No. 269895
Assistant United States Attorney (Detailed)
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7168

alexis.loeb@usdoj.gov