**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No: 21-CR-292 RCL** |
| | **:** | |
| **CHRISTOPHER WORRELL,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

<u>**RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE**</u>

The government files this response in opposition to Defendant Christopher Worrell's motions *in limine*. Dkt. 180. Worrell moves to preclude the government from using certain terms at trial, on the ground that such terms will be hearsay or improper opinion testimony. Worrell then moves to preclude a variety of categories of evidence that Worrell asserts are substantially more prejudicial than probative, and so inadmissible under Federal Rule of Evidence 403.

Worrell is wrong as to both contentions, for the reasons outlined below. In its response to each of Worrell's motions *in limine*, the government outlines any factual proffer related to that motion.

**ARGUMENT**

**I.    The Government and Its Witnesses May Use Terms that Appropriately and Accurately Describe the Events of January 6, 2021.**

Worrell first moves *in limine* to prevent the government from using the following terms: "rioters," "breach," "confrontation," "police line," "insurrectionists," and "mob," (the "subject terms") a list that includes several terms that many an objective observer would agree fairly describe the events of January 6. *See, e.g., United States v. Munchel*, 991 F.3d 1273, 1276, 1279, 1284 (D.C. Cir. 2021) (using "mob," "riot," "insurrection," and "breach"). Other judges in this district have denied motions to preclude the use of similar terms in January 6 cases. *See United*

*States v. Rahm*, 21-cr-150 (TFH), ECF No. 47 (D.D.C. Aug. 16, 2022); *United States v. Alford*, 21-cr-263 (TSC), ECF No. 83 (D.D.C. Sept. 9, 2022); *United States v. Nassif*, 21-cr-421 (JDB).[1] This Court should do the same.

In support of his motion, Worrell makes two arguments: (1) the subject terms raise hearsay and Confrontation Clause issues when included in the captions of videos or photographs, and (2) witnesses using the subject terms would be providing improper opinion testimony. Dkt. 180 at 2. Neither argument supports his requested relief. The government addresses these arguments in reverse order.

First, the use of the subject terms is not impermissible opinion testimony. Under Federal Rule of Evidence 701, courts have wide latitude to permit testimony in the form of an opinion so long as it is "(a) rationally based on a witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Courts thus liberally permit lay witnesses to testify to everyday inferences from their observations, so long as they do not stray into expert testimony. "The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." *United States v. Fulton*, 837 F.3d 281, 301 (3d Cir. 2016) (citation omitted). For example, "testimony that a person was 'excited' or 'angry' is more evocative and understandable than a long physical description of the person's outward manifestations." *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995) (quoting

---

[1] Judge Bates denied a similar motion at a pretrial conference in *United States v. Nassif* on November 7, 2022.

Stephen A. Saltzburg et al., Federal Rules of Evidence Manual 1032 (6th ed. 1994)).

As a threshold matter, several of the subject terms are likely not even "opinion testimony." Here, an officer's testimony that police formed a "police line," or that a rioter "breached" a barrier, is not opinion testimony. Both are a literal description of the witness's actual observations, not a characterization or inference. *See, e.g.*, *United States v. Robinson*, No. CR 16-98 (CKK), 2017 WL 11496730, at *1 (D.D.C. June 30, 2017) (observing that "it is not clear that" testimony that patients were "nodding off" "presents an opinion at all"). Indeed, it is not clear how else Worrell would like witnesses to describe either concept without using synonyms of the terms.

But even if those terms were "opinions," they and three of the other four mentioned by Worrell ("mob," "rioters," and "confrontation") would qualify as permissible Rule 701 lay-opinion testimony.[2]   Much like a lay witness can call a witness "angry" or "excited," a Capitol Police officer can describe what he perceives to be a "confrontation" without laboriously explaining each physical observation that led to that inference. Officers who battled the crowd for hours and watched it repeatedly disregard direct commands from law enforcement, assault officers, and destroy property could rationally perceive the events of January 6 as a "riot," and could fairly view the thousands of unauthorized individuals who descended upon the Capitol to be a "mob."[3]

The subject terms will also be relevant to understanding both the witnesses' experiences relating to January 6 and various facts that may be at issue, as permitted by Rule 701(b). For example, the government must prove that there was a "civil disorder," an element of the Section 231(a)(3) charges, on January 6. Worrell is also charged with obstructing an official proceeding and aiding and abetting. It is thus relevant whether the group of people who invaded Capitol

---

[2] The government does not anticipate referring to the events of January 6 as an "insurrection," labeling Worrell an "insurrectionist," or asking witnesses whether they viewed him as such.
[3] Similarly, witnesses who were present on January 6 could point out such features in a video, informed by their experience on January 6.

grounds acted, according to the percipient witnesses, like a "mob" engaged in a "riot," or instead as a group of peaceful protestors.

Finally, the subject terms do not reflect expert knowledge, satisfying Rule 701(c). If a witness can testify that a defendant appeared drunk, *Robinson*, 2017 WL 11496730, at *1 (D.D.C. June 30, 2017), or depressed, *Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006), a witness can testify that a group of individuals appeared to be a "mob" or engaged in a "confrontation." *See also Harris v. J.B. Robinson Jewelers,* 627 F.3d 235, 240–241 (6th Cir. 2010) (including "the appearance of persons or things, identity, the manner of conduct," as among "prototypical examples" of lay opinion) (citation omitted).

Worrell's concerns find no support in the cases he cites. First, use of the subject terms would not constitute an opinion that the jury is in an equal position to render. Dkt. 180 at 2. Courts have disapproved of opinion testimony where the witness has no greater familiarity with a subject than the jury, such as a courtroom identification based on a photograph. *See United States v. Garcia-Ortiz,* 528 F.3d 74, 79-80 (1st Cir. 2008). But the government's witnesses will base their testimony on their firsthand experience on January 6 with the crowd's conduct and law enforcement's response, which cannot be gleaned from a video or photograph in a courtroom. Second, witnesses' use of the subject terms will also not usurp the role of the jury. There is little risk of a witness opining on "the application of the exact statutory elements involved in the case," *United States v. Locke*, 643 F.3d 235, 241 (7th Cir. 2011); *see also United States v. Wantuch,* 525 F.3d 505, 514 (7th Cir. 2008) (witness asked to offer legal conclusions and to speculate as to defendant's frame of mind) (cited by Worrell). The subject terms here will not be offered as legal conclusions parroting statutory elements; Worrell is not charged with rioting or insurrection, and the legal question is not whether he "breached" a "police line" or had a "confrontation."

4

Instead of usurping any jury function, the subject terms allow the government to present its case clearly and concisely. "Allowing witnesses to state their opinions instead of describing all of their observations has the further benefit of leaving witnesses free to speak in ordinary language." *Gov't of Virgin Islands v. Knight*, 989 F.2d 619, 630 (3d Cir. 1993). "If circumstances can be presented with greater clarity by stating an opinion, then that opinion is helpful to the trier of fact." *Id.* Lay opinion terms are often easier for the jury to understand than a compilation of every single fact that is a building block of that lay opinion, to say nothing of the waste of time if the witness is forced to do so repeatedly, rather than being allowed to use a shorthand term. *See, e.g., Knight*, 989 F.2d 619 at 630 (permitting opinion that gunshot was "accidental"); *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1179 (10th Cir. 2001). Were the court to preclude the use of "mob," for example, an officer may have to testify that "thousands of agitated people stood at short distances from one another in a relatively small area in the same location, and many members of them appeared to share a common purpose." Instead of "police line," an officer might have to testify that "police officers stood in a straight, horizontal formation in front of the crowd." Such oblique descriptions would only serve to confuse the jury, waste time, and sanitize the government's case.

But the rules of evidence do not "generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (rejecting a Rule 403 challenge). Witnesses need to be able to use appropriate language to explain the nature and gravity of the defendant's conduct. And events that took place at the Capitol on January 6, 2021, are accurately described by the terms "riot," "mob," "confrontation," and "breach," as the D.C. Circuit's use of several of those terms reflects. Many hundreds of people forced their way past lines of law enforcement officers building during

the constitutionally mandated process of certifying the Electoral College votes, injured more than one hundred law enforcement officers, and caused more than two million dollars in damage and loss. It was a dramatic, violent, intense day. The government is entitled to present a fair depiction of the day's events to the jury.

Worrell's second objection is to using the subject terms in the captions of videos or photographs, on hearsay or confrontation grounds. Dkt. 180 at 2. He does not specify particular captions to which he objects. The government assumes he refers to titles of videos or photographs affixed by third parties around the time of January 6, 2021 (for example, a hypothetical video entitled "Rioters Storm the Capitol"). Such captions are obviously not testimonial, so Worrell's Confrontation Clause objection is misplaced. *See Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Nor is a caption on a video or photograph necessarily impermissible hearsay; it may be non-hearsay (for example, if it was created by Worrell), or it may not be offered for its truth. Prior to trial, however, the government will review its exhibits, and will redact any captions raising hearsay or Rule 403 concerns.

In summary, the subject terms fit comfortably within Rule 701, and precluding their use would hamstring the government's ability to present a concise, accurate narrative of Worrell's conduct, properly situated in the context of the events of January 6. The government does agree, however, not to refer to Worrell as an "insurrectionist" (unless he somehow opens the door, or unless the term appears in documentary evidence, such as Worrell's Facebook records) and will redact the subject terms from captions from videos or photographs if those terms would constitute inadmissible hearsay. The Court should deny the remaining relief requested in Worrell's motion.

## II. The Government May Introduce Evidence of Worrell's Affiliation with the Proud Boys and Pre- and Post-January 6, 2021 Conduct.

Worrell also raises objections under Federal Rules of Evidence 403 and 404 regarding the

admission of evidence about several related subject matters. Worrell's arguments are taken up in turn below.

### A. Legal Framework.

Federal Rule of Evidence 404(b) provides that evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character, but is admissible for any non-propensity purpose, including motive, intent, plan, knowledge, and absence of mistake. *See United States v. Bowie*, 232 F.3d 923, 926, 930 (D.C. Cir. 2000). As the D.C. Circuit has instructed, Rule 404(b) is a rule of "inclusion rather than exclusion." *Id.* at 929. Specifically, "[a]lthough the first sentence of Rule 404(b) is 'framed restrictively,' the rule itself 'is quite permissive,' prohibiting the admission of 'other crimes' evidence 'in but one circumstance'—for the purpose of proving that a person's actions conformed to his character." *Id.* at 929-30 (quoting *United States v. Crowder,* 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*) ("*Crowder II*")); *accord United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) ("[A]ny purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character" (quoting *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990)) (emphasis in original)).

There is a two-pronged test for determining whether evidence of prior crimes is admissible under Rule 404(b). First, the evidence must be "probative of a material issue other than character." *Miller*, 895 F.2d at 1435 (citation omitted). Second, the evidence is subject to the balancing test of Rule 403, which renders it inadmissible only if its prejudicial effect "substantially outweighs" its "unfair: probative value. *Id.*; *Cassell*, 292 F.3d at 796; *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008).[4]  "Rule 403 establishes a high barrier to justify the exclusion of evidence."

---

[4] Admission of Rule 404(b) evidence is permitted in the government's case-in-chief. Specifically, the government is entitled to anticipate the defendant's denial of intent and knowledge and to introduce similar act evidence as part of its case-in-chief. *See United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) ("[Rule 404(b) other crimes evidence] is admissible during the government's

*United States v. Lieu,* 963 F.3d 122, 128 (D.C. Cir. 2020).

Some evidence that is "intrinsic" to the government's case is not Rule 404(b) evidence at all. "In other words, Rule 404(b) only applies to truly 'other' crimes and bad acts; it does not apply to 'evidence . . . of an act that is part of the charged offense' or of 'uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime." *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (quoting *Bowie,* 232 F.3d at 929). "Notably, 'intrinsic' evidence of a charged offense will always satisfy the requirements of Rule 404(b), thus the distinction [between intrinsic and 'other' acts evidence] serves only to 'relieve the prosecution of Rule 404(b)'s notice requirement and the Court of its obligation to given an appropriate limiting instruction upon defense counsel's request.'" *United States v. Edwards*, 889 F. Supp. 2d 47, 49 (D.D.C. 2012) (quoting *Bowie*, 232 F.3d at 927).

### B. The Government May Admit Evidence of Worrell's Affiliation with the Proud Boys, Conduct as a Proud Boy, and Relationship with other Proud Boys.

#### 1. This evidence is admissible under Rule 404(b).

Worrell first asserts that "the character of the defendant from the standpoint of being a proud boy is wholly irrelevant to any of the listed charges and is therefore not 'pertinent.'" Dkt. 180 at 3. The evidence relevant to Worrell's affiliation with the Proud Boys is described throughout the government's response below, but generally includes: 1) evidence that he is a member of that organization, 2) evidence that it is a fraternal organization whose members attend political rallies or protests in coordinated fashion; 3) evidence that the organization is divided into "chapters" or "zones" and has a hierarchical organization; 4) evidence that Worrell traveled with, spoke to, and heard from members of his "zone" on January 6, 2021; 5) evidence that he and other Proud Boys

---

case-in-chief if it is apparent that the defendant will dispute that issue"); *United States v. Lewis*, 759 F.2d 1316, 1349 n.14 (8th Cir. 1985).

members communicated with each other leading up to, on, and after January 6, 2021 about that date, their travel, and what would or did occur on that day; 6) evidence of the particular lingo, code words, phrases, and hand symbols Proud Boys use to communicate.

As an initial matter, the government does not seek to prove anything about Worrell's *character*—that is, that he is a bad person, untrustworthy, violent, or any similar character traits.[5] The government will therefore not prove anything about Worrell's character through either "reputation" or "opinion" testimony or "specific instances of conduct," because Worrell's character is not an element to be proven in the case. Fed. R. Evid. 405(a), (b). Similarly, the government will not seek to admit "[e]vidence of [Worrell's] character or character trait . . . to prove that on a particular occasion"—on January 6—Worrell "acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Because the government does not seek to introduce either type of evidence of Worrell's *character*, Worrell's citations to Rules 404(a) and 405, which deal with attempts to prove a defendant's character, are inapposite. Dkt 180 at 3 (citing Fed. R. Evid. 404(a)(2)(A) and 405).

By contrast, what the Government does intend to do, and may permissibly do under Rule 404(b)(2), is introduce evidence of Worrell's "other crime[s], wrong[s], or act[s]" for any *non-character* (i.e., non-propensity) purpose. As long as the evidence is being used not to prove a defendant's character trait, but anything else—including "motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake"—it is admissible under Rule 404(b)(2). Fed. R. Evid. 404(b)(2). All of the evidence offered by the government at trial will serve non-propensity

---

[5] One exception is Worrell's character for truthfulness. If Worrell testifies, then on cross-examination the government may inquire into specific instances of conduct in order to attack his character for truthfulness. Fed. R. Evid. 608(b). And separate and apart from *character* evidence, the government may of course impeach Worrell's statements with prior inconsistent statements or extrinsic evidence that contradicts Worrell's statements. *See* Fed. R. Evid. 607, 806.

purposes. Below, the government just a few such purposes for this type of evidence.

In addition, much of this evidence is inextricably intertwined. It includes, for example, things Worrell said on January 6 and identifies others who were at the Capitol with him and with whom he communicated. As set forth below, however, to the extent this evidence does fall under Rule 404(b), it is admissible all the same.

### a.   Proof of Worrell's relationship with others present on January 6, 2021.

First, evidence of Worrell's Proud-Boys affiliation will help prove Worrell's relationship with those with whom he traveled to the U.S. Capitol on January 6, 2021. As Judge Kelly previously found with respect to two other Proud Boy defendants charged together, the defendants' membership in the Proud Boys group "was relevant to the nature and circumstances of the offense insofar as they show that the defendants were leaders and shared a pre-existing common bond which provides context to explain how these individuals, from disparate parts of the country, are at least alleged to have wound up together in Washington, D.C." *United States v. Nordean et al.*, 21-CR-175-TJK, Dkt. 71 (transcript of April 19, 2021 detention ruling). And even in the context of highly prejudicial evidence of a defendant's gang affiliation, that has been routinely deemed "particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue[,]' such as in a conspiracy case." *United States v. Suggs*, 374 F.3d 508, 516 (7th Cir. 2004) (quoting *United States v. Thomas,* 86 F.3d 647, 652 (7th Cir. 1996)); *United States v. Shelledy*, 961 F.3d 1014, 1020-21 (8th Cir. 2020) ("The government may elicit testimony about the defendant's social or gang membership if it is relevant to a disputed issue in the case"); *United States v. Ford*, 761 F.3d 641, 649 (6th Cir. 2014).

Here, evidence of Worrell's membership and relationship with the Proud Boys will be significantly probative. With Worrell at the Capitol on January 6, 2021 was his co-defendant,

Daniel Scott, a group of at least three other individuals from or associated with his Proud Boys "zone," and a much larger group of Proud Boys from other "zones" across the country. The photograph below, recovered from Worrell's phone, shows the individuals from or affiliated with his "zone" in Florida.



Worrell's Proud Boys "zone" traveled with him, communicated and celebrated with him, and was present with him for most key parts of the day. Evidence of their pre-existing relationship will make sense of this coordinated movement.

For example, they march together from the Washington Monument to the U.S. Capitol building. During that march, individual #4 (Worrell's co-defendant Daniel Scott) yells "Let's take the fucking Capitol!"  They later enter Capitol grounds together, in a video that Worrell recorded. On this recording, Worrell's zone-mates say things like: "Oh god, we're going in the Capitol, guys," and "Kicking the doors in," and "I've never been to the Capitol before."  Worrell joins them, making the statement "Trump is coming to the Capitol."  There is an enormous difference in the probative value of these statements for inferring Worrell's state of mind, intent, and knowledge that day if they are the statements of Worrell's fraternal zone members rather than

anonymous individuals near him with whom he had no prior association.

In addition, just prior to Worrell's act of pepper spraying, he appears to speak to individual #1 and/or #3 above, who are present when Worrell sprays. Shortly after his assault, Worrell approaches his co-defendant Daniel Scott (individual #4) and states: "I just deployed a whole can." This friendly interaction is significant in part because it circumstantially indicates that Worrell and Scott shared a common intent. Just minutes later, Scott assaulted two law enforcement officers.

Most of these six individuals also appear in the direct vicinity of Worrell and Scott just prior to Scott's recorded assaults, which the breached the line of officers. After those assaults, Worrell recorded himself celebrating with individuals # 1-4:



Evidence of these individuals' association explains why they celebrate a fellow Proud Boy's assault on an officer together. And their celebration circumstantially undercuts Worrell's

theory that he was incapable of having assaulted an officer mere minutes earlier.

Background contextual evidence about this smaller "zone"-specific group, including that Worrell and these other individuals are members of Florida's "Zone 5" Proud Boy chapter, will also be important for the jury to even understand certain communications. For example, in Worrell's video of this smaller group entering Capitol grounds, a member of the group says: "Zone 5 stay tight!" Worrell also sends electronic communications referring to when "Z5" arrived in D.C. on January 5 and returned to Florida on January 7. These statements are meaningless absent context about Worrell's Proud Boy membership and chapter.

Relevant evidence of Worrell's relationships with other Proud Boys will extend beyond this small group. Worrell also marched with a larger group of Proud Boys from the Washington Monument to the west side of the U.S. Capitol on the morning of January 6, 2021. This occurred even before former President Trump spoke to the crowd and indicated the crowd would march to the Capitol. In a video from his cell phone, Worrell films the march and narrates it as follows: "Proud Boy march to the Capitol. 1-6-21."

Worrell's participation in this Proud Boys march is relevant for several reasons, all unrelated to propensity. That Worrell traveled to the U.S. Capitol even before the President's speech is highly indicative of his intent to obstruct the congressional proceedings that day—he was not, as some defendants have claimed, merely present to attend a rally and then directed by others to the U.S. Capitol. That Worrell traveled with an organized group is evidence of his and the other Proud Boys' pre-planning and highly organized travel to the U.S. Capitol. And his movement with a much larger group also indicates the seriousness of his intent; had he traveled to the Capitol alone, Worrell could claim that he did not intend to disrupt congressional proceedings because he could not have thought he could do so alone. That he traveled with a large group of

individuals geared for hand-to-hand combat helps dispel that defense.

On a basic level, the repeated Proud Boys references and associations help the jury identify Worrell throughout January 6, both during the march and at the Capitol. Thus, for example, that the narrator of his videos uses Proud Boy catchphrases, slogans, or hand symbols—along with evidence Worrell has used those before—helps identify the user of the phone recording those videos as Worrell. That Worrell appears in photographs and videos with multiple individuals from Florida with whom he associated on his phone similarly makes it more likely that he (rather than some unknown individual who looks like him) is in the individual in those photographs and videos.

  **b.**    **Proof of the meaning of coded hand symbols, statements, and chants.**

Evidence of Worrell's Proud Boys membership is also necessary for the jury to understand the meaning of coded language used by Worrell or other Proud Boys around January 6, 2021.

As one example, during Worrell and Scott's celebration of Scott's assaults, Scott says "Proud of your fucking boy!" This is a common greeting or expression of solidarity among Proud Boys; the group's name itself is derived from the phrase. In the same video, other Proud Boys and Worrell then yell "Uhuru!"—another common Proud Boy chant or greeting. Evidence of the use of that phrase in prior communications and videos will thus be crucial for the jury to understand those otherwise bizarre phrases. Finally, as the photograph on page 11 shows, several Proud Boy members (including Worrell) display the common Proud Boy "OK" hand symbol to each other. This symbol is meaningless absent context from other communications, photographs, and videos showing that it, too, is a sign of solidarity amongst Proud Boys, as seen below:



As a final example, in various videos others refer to Worrell as "Loach," and Worrell refers to his co-defendant as "Milkshake" or "shake."  These references will make little sense to the jury absent the evidence, including in his own communications with other Proud Boys, that Worrell's Proud Boy moniker was "Loach Gan Eagla" and Scott's was "Milkshake."

### c.      Proud Boys communications proving Worrell's knowledge and intent

Other evidence of Worrell's intent to obstruct the certification and his knowledge of the proceeding may come from chats among the Proud Boys in which Worrell participated. These chats also use Proud Boys slogans, such as "POYB" ("Proud of Your Boy"), to express support. As explained above, evidence of Worrell's Proud Boys affiliation is necessary to give meaning to these terms. Moreover, without evidence of Worrell's Proud Boys membership, the chats will seem like a text chain among random collection of individuals. Worrell was not reading a public comment board online; he was listening to the views expressed privately by his comrades. The shared identity of individuals in a fraternal group explains why they are communicating and coordinating and evidences their common goals, including disrupting the certification on January 6. That is particularly so because members of those chats indeed moved in a coordinated group with Worrell onto and within Capitol grounds on January 6, 2021—demonstrating that the chats were not idle chatter.

15

## 2.     This evidence is admissible under Rule 403.

Nor is any of this evidence inadmissible under Rule 403. For all the reasons above, Worrell's Proud Boys affiliation is highly probative of many issues in this case. He fails to show "compelling or unique" evidence of unfair prejudice outweighing this probative value, as would be required to exclude this evidence under Rule 403. *United States v. Mitchell*, 49 F.3d 769, 777 (D.C. Cir. 1995). Finally, it "is a sound rule that the balance" of admissibility under Rule 403 "should generally be struck in favor of admission when the evidence" has "a close relationship," temporally and substantively, "to the event charged.'" *United States v. Cooper*, 229 F. Supp. 3d 75, 76 (D.D.C. 2017) (quoting *Cassell*, 292 F.3d at 795). Here, much of the evidence implicating Worrell's Proud Boys affiliation is from January 6 or shortly before January 6 and relates to events occurring during and in reaction to the criminal conduct charged.

Contrary to Worrell's concerns, the government does not seek to admit any of this information to "establish the proud boys are a racist . . . organization," and will not characterize the group as such. Dkt. 180 at 3.[6]  And none of the evidence outlined above overtly invokes the specter of racism.

Worrell also asserts that the government will admit Proud Boys-related evidence to "establish the proud boys are…anti-government [or] anti-law enforcement."  As detailed above, those are not the primary reasons the government intends to introduce Proud Boys-related evidence; that evidence is probative for many other reasons. And the government does not intend to introduce evidence of the Proud Boys' organizational views (to the extent they exist), or of any anti-government or anti-law enforcement sentiments expressed by Proud Boys in communications

---

[6] There may be some communications by or to Worrell that are substantively relevant and not politically correct.  The government will endeavor to redact such communications unless doing so would meaningfully change the substance of the communication.

there is no evidence Worrell saw or heard. Thus, the government will not seek to have the jury infer Worrell's state of mind by mere evidence of his membership in a group, nor by the evidence of the views of individuals he never could have heard.

But the government will of course introduce evidence that *Worrell* and the Proud Boys with whom he specifically marched on January 6, or with whom he participated in chats, held "anti-government" or "anti-law enforcement" views—meaning strong views about and against the incoming Biden administration, the then-existing Congress, and law enforcement officers in Washington, D.C. It is not clear if such statements are the type included in Worrell's motion *in limine*. But if so, that evidence is plainly relevant, and not unfairly prejudicial. Anti-government views are direct evidence of Worrell's intent to obstruct Congress in certifying the transfer of power to the incoming presidential administration. Anti-law enforcement views are direct evidence of Worrell's intent to pepper spray police officers on January 6. Similar statements by other Proud Boys *to* Worrell or in his presence are also admissible to show Worrell's knowledge of what would occur on January 6, including the congressional proceeding. For example, one message stated: "You know, if congress is blocked from the joint session on the 6th, they don't certify and trump stays. Would be shame if protest kept them from doing that."  Others circumstantially show his intent or motive, because the jury can infer that he agreed with the sentiment stated to him if he did not object to it, expressed similar sentiments, or acted on January 6 in accordance with it.

More fundamentally, that strong anti-government or anti-law enforcement views were expressed by Worrell's close comrades in his fraternal organization, including on January 6, 2021, undercuts Worrell's purported defense. His claim has been that he sprayed another member of the crowd to protect law enforcement. That all of his comrades, including those he traveled with on January 6, 2021, held anti-government and anti-law enforcement views and had expressed those

to Worrell without objection from Worrell; that he then traveled with them on January 6 and remained close to them on Capitol grounds; and that they celebrated an assault on an officer (with his participation) makes it less plausible that, in the midst of all that, he broke from his group and sprayed other rioters to *protect* the police. In short, it should be no surprise that evidence of Worrell's anti-government and anti-law enforcement views, and those sentiments expressed to him leading up to January 6, are relevant and admissible in a case alleging obstruction of the government and an assault on law enforcement.

This is perhaps easiest seen with a hypothetical—a prosecution for bank robbery in which the defendant assaulted a police officer. Without question, the government could introduce as evidence of motive or intent, the defendant's expressed "anti-bank' views—idolizing Robin Hood, or expressing anger at the interest rates banks charge—and "anti-law enforcement" views— statements indicating officers are the enemy for protecting the bank. The government could similarly introduce evidence of the same types of statements made in the defendant's presence prior to the robbery, for their potential effect on the defendant's state of mind (or direct reflection of that state of mind, insofar as he appeared to agree with them). And it could introduce, as evidence of knowledge, motive, and intent, that the defendant was told by other members of his gang something like: "You know, if [the armored car that arrived January 6th] is blocked from [getting out of traffic] on the 6th, they don't [get away] and [the money would not make it to the bank's vault]. Would be shame if [another car] kept them from doing that."  Particularly if the defendant is alleged to have used a car to block an armored car as part of a robbery on that day.

The government recognizes that, given the notoriety of the Proud Boys, evidence of Worrell's affiliation could in theory be prejudicial. But the solution to that possibility is *voir dire*, where the Court can examine whether any jurors have such strong feelings about the Proud Boys

that they cannot impartially judge this case. The solution is not to require the government to surgically remove all references to the Proud Boys from this case, where Worrell's association with the group is so bound up with what he said, thought, and did on January 6, and where many pieces of evidence would not make sense divorced from the Proud Boys context. Worrell's Proud Boys affiliation serves several non-propensity purposes, and Worrell has not identified unfair prejudice that would substantially outweigh the evidence's probative value. The Court should allow the evidence.

### C.     Evidence of Worrell's presence at a Roger Stone rally on January 3, 2021.

Worrell lives in Naples, Florida. He and other Proud Boys from his "zone" attended a January 3, 2021 public rally in Naples, Florida where Roger Stone stated, "[w]e were here today to respectfully urge Senator Rick Scott and Senator Marco Rubio to vote with the president," "[t]o vote for an honest, transparent vote count and to reject voters . . . electors who are sent to the electoral college with fraudulent votes."  Other video of Mr. Stone has him stating:  "Rick Scott has a fundamental choice. He will either stand up for the Constitution, . . . "—at which point Worrell's co-defendant Daniel Scott interjected: "Or give him the rope!"  Scott, Worrell, and their zone-mates joked about this exchange in later communications. At another point, Scott leads the crowd in a chant of "stop the steal!"  Worrell took selfie-style videos of himself posing with Roger Stone.  He also posed with Stone and other Proud Boys from South Florida, including at least two (numbers 4 and 5 in the photograph on page 11) who were with him on Capitol grounds on January 6, 2021:





Worrell asserts that the government cannot introduce any evidence of his presence at this rally, nor of his interactions with Roger Stone and other Proud Boys at that rally. He contends this evidence "establishes no motive, and does not aid the government in proving a single element of any crime charged."  Dkt. 180 at 4.

Worrell is incorrect. The fact that *any* speaker at a rally that Worrell attended just three days before January 6, 2021 specifically referred to objecting to the certification of the electoral

college vote is plainly relevant evidence of Worrell's knowledge of that congressional proceeding, relevant to proving Count 1, his violation of 18 U.S.C. § 1512(c)(2). That Worrell chose to attend a rally in which the speaker called for objection to that certification, and then posed with that speaker, is relevant evidence of Worrell's intent and motive in acting to influence the proceeding on January 6, 2021. That Worrell and his fellow Proud Boys discussed responding with violence to members of Congress who failed to object to the certification is also relevant to his intent when he descended on the Capitol as that certification was taking place.

All of that would be relevant regardless of who the rally speaker was. But it is also true that Roger Stone was among a group of high-profile individuals calling for Congress to refuse to certify the 2020 Electoral College vote. That is relevant context, because it makes it far less likely that Worrell attended the rally, and took a video posing with Stone, without knowing of Stone's views on the certification of the vote (as Worrell might claim if the speaker were not a public figure).[7]

If a defendant were charged with intimidating a witness by demonstrating outside their house, presumably the government could admit evidence that the defendant attended a meeting three days earlier where a third party told the defendant where the witness lived, when they would be home, and that the witness needed to change his or her mind. The third party's reputation for disliking that witness would also be probative if the defendant posed for pictures with the third party. So too, in a case where Worrell is charged with seeking to influence or obstruct Congress by demonstrating violently outside the U.S. Capitol, the government may admit evidence that

---

[7] The government does not seek to introduce evidence relating to Roger Stone aside from his pre-January 3, publicly stated views as to the 2020 election and January 6 certification, as well as his conduct and statements at the January 3, 2021 rally. The government expects this evidence to be brief.

Roger Stone told Worrell three days earlier that Congress would vote to certify on January 6 and that Florida's senators needed to vote to object to the certification.

> **D.      Evidence of Worrell's conduct during his arrest on March 12, 2021.**

The government may introduce at trial evidence that on March 12, 2021, Worrell was called by the FBI and informed he was under arrest. He had previously been interviewed by the FBI about his presence at the Capitol on January 6, 2021. Worrell did not turn himself in when first requested to do so by the FBI over the phone; instead, Worrell insisted that he would meet the FBI where they were at his home in Naples, Florida. That gave Worrell several hours after being notified of his arrest before he was actually in custody. The government may also introduce evidence that Worrell, during that time, appears to have agreed to delete evidence from his phone, as illustrated in the following text messages. First, one individual texted Worrell at 6:49 AM to "Make sure to clear the phone". A second individual then texted Worrell around 7:15 AM:  "Turn your location off on your phone". Worrell replied to the second user: "Done Gonna zap it". Worrell also communicated via phone call with the second user. There are several videos from January 6, 2021 that were not present on Worrell's phone when he was arrested on March 12, 2021, but that were present in a backed-up older copy of his phone on his computer.

Referring to this evidence, Worrell contends that "[a]ny reference to Worrell avoiding arrest, that returning home rather to an FBI field office to be arrested, and obstructing justice fails 403 Analysis and is more prejudicial than probative."  Dkt. 180 at 4-5. Worrell does not cite any case law holding such evidence inadmissible.

The probative value of such evidence is clear. "It is universally conceded today that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus

of guilt itself." *United States v. Martinez*, 681 F.2d 1248, 1256 (10th Cir. 1982) (quoting Vol. II, J. Wigmore on Evidence § 276 (Chadbourne Rev.)). Moreover, "[n]umerous Courts of Appeals have concluded that, although rule 404(b) does not list spoliation, spoliation evidence," such as evidence that a defendant deleted electronic records, "is admissible to show consciousness of guilt." *United States v. Shirley*, 214 F. Supp. 3d 1124, 1160 (D.N.M. 2016); *United States v. Katakis*, 252 F. Supp. 3d 988, 995 (E.D. Cal. 2017) (defendant's "attempts to delete emails after learning about the government investigation was highly probative in showing [his] consciousness of guilt, which outweighs any dangers of unfair prejudice"), *aff'd,* 796 F. App'x 400 (9th Cir. 2020); *United States v. Kuehne*, 547 F.3d 667, 691 (6th Cir. 2008); *United States v. Castillo*, 615 F.2d 878, 885 (9th Cir. 1980); *United States v. Carpenter*, 372 F. Supp. 3d 74, 80 (E.D.N.Y. 2019) (admitting evidence that defendant instructed others to remotely wipe electronic device and delete inculpatory video).

Worrell's refusal to turn himself in was a direct response to being called by the same FBI agent who had previously interviewed him about January 6, 2021 and being informed that there was an arrest warrant for him. Rather than turn himself in as directed, Worrell stalled, gaining several hours alone with his phone. As the Seventh Circuit has observed, "[u]nder Rule 404(b), evidence of flight certainly would be admissible to show consciousness of guilt of a defendant who knew he was in possession of evidence demonstrating his involvement in [a crime] if that defendant fled from or struggled with police . . . ." *United States v. Robinson*, 161 F.3d 463, 469 (7th Cir. 1998). Evidence that a defendant refused to quickly turn himself in, potentially because he knew of incriminating evidence on his phone, is logically indistinguishable from evidence that a defendant resisted arrest or sought to flee because he knew of such evidence: in both cases, the defendant is attempting to gain time to destroy or consider destroying the evidence.

As to prejudice, Worrell does not explain why the evidence would be unfairly prejudicial. The evidence contains no derogatory or inflammatory language or other unfairly prejudicial information. At trial, the government intends only to neutrally describe the facts of his arrest and argue the consciousness of guilt inferences noted above. The government does not intend to refer to Worrell "obstructing justice."  Dkt. 180 at 4. Thus, Worrell's complaint that doing so would "call[] for a legal conclusion" is moot. Dkt. 180 at 5. The government will propose a limiting instruction with respect to this evidence of flight and potential deletion of evidence, to further minimize any prejudice.

Finally, Worrell asserts that "[a]ny communications with the two referenced individuals . . . alluded to inadmissible hearsay, and violates Worrell's right of confrontation . . . ." Dkt. 180 at 5. But Worrell's own text message is a non-hearsay party opponent admission, and as such is not subject to the Confrontation Clause. The other two statements are non-testimonial for confrontation purposes. In terms of hearsay, the text messages sent by the other users to Worrell are not hearsay; as commands or requests (for Worrell to delete evidence), they are not being offered for the truth of any statement. *See, e.g.*, *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006) ("Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay." (collecting cases)); *United States v. Rodriguez-Lopez*, 565 F.3d 312, 314 (6th Cir. 2009) ("questions or commands" would "not be assertive speech at all"); *United States v. Rutland*, 705 F.3d 1238, 1253 (10th Cir. 2013) (affirming as non-hearsay statements that "were instructions and were not offered for their truth"). Here, those statements are offered not as an independent assertion but for the effect on the listener, or to inform the meaning of Worrell's response: "Done Gonna zap it."

### E.        Witness intimidation.

Finally, the government may seek to admit evidence that Worrell, after being interviewed by the FBI with respect to January 6, went onto Facebook in an attempt to find the "rat."  On January 18, 2021, the day Worrell was first interviewed by the FBI, he told one Facebook user:

> Worrell: Got a visit from FBI an hour ago
> …
> Worrell: I just put a troll post out Believe I know who ratted
> User: Feds have been going over every vid with a fine tooth comb though. They may have just ID'd you from public vids
> Worrell: I think it was someone from my last job. . . . We shall see Got a plan
> User: Forget him for now, he's irrelevant.
> …
> Worrell: I am 99.9 I know who called

In a public post on January 18, Worrell stated: "SO WHOMEVER CALLED THE 'FEDS' ON ME REST ASSURED I KNOW WHO YOU ARE AND WE WILL BE DISCUSSING THIS SOON!! The best part is you have NOTHING accept [sic] empty accusations!! You are the piece of shit I knew you were!!"

He then replied to various comments on his post:

- One user replied: ". . . I hope ya find who did it n make their life Miserable." Worrell replied: "yup!!  People seem to think they are 'anonymous' even in 2021!! Information is easy to get these days  Joke is on them!!"
- To another, Worrell said: "it was a close personal friend of ours that made the baseless phone call. The rat thinks it got away with the cheese!!"
- To another: "It's a simple case of a butt hurt pussy ass bitch that thought they could Fuck with someone with some dumb bullshit!! They are about to get educated in 'real life'"
- To another: "I KNOW EXACTLY who did it!! I hope they are reading this post!!"

On January 22, 2021, Worrell posted: "Funny how people run & hide after you call them out for being a rat . . . then when you back em in a corner because their narrative got blown apart they block you."

Worrell argues generally that introduction of this evidence would "inflame the jury, appeal to their emotions," and would "cause[] undue prejudice to the defendant."  Dkt 180 at 5.

But this type of evidence (an online threat or attempt to ferret out a witness who identified him to the FBI with respect to the conduct at issue in this case) is relevant to show consciousness of guilt. Concern about a witness having identified him to the FBI indicates concern over being identified at the Capitol on January 6—concern grounded in his actual presence and conduct at the Capitol. The threats that follow—for example, that Worrell wanted to learn their identity, and that he wanted to "educate[ them] in 'real life'"—are admissible evidence of consciousness of guilt. As courts have held, "[t]hough not listed in Rule 404(b), spoliation evidence, including evidence that defendant attempted to bribe and threatened a witness, is admissible to show consciousness of guilt." *United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986); *see also United States v. Cordero*, 973 F.3d 603, 619 (6th Cir. 2020) ("Because spoliation evidence tends to establish consciousness of guilt without any inference as to the character of the spoliator, its admission does not violate Rule 404(b)."). It is now a "widely recognized principle that a defendant's attempts to intimidate potential witnesses are probative of his consciousness of guilt." *United States v. Mokol*, 646 F.3d 479, 483 (7th Cir. 2011).

Indeed, this Court similarly has held that testimony "that defendant . . . had threatened a witness' grandmother was also properly admitted. Such statements may be admissible as probative of defendant's consciousness of guilt." *United States v. Simmons*, 431 F. Supp. 2d 38, 64 (D.D.C. 2006) (Lamberth, J.), *aff'd sub nom. United States v. McGill*, 815 F.3d 846 (D.C. Cir. 2016); *see United States v. Turner*, 485 F.2d 976, 985 (D.C. Cir. 1973) ("it seems to be generally accepted doctrine that a party's 'misconduct constituting obstruction of justice' prior to trial is 'commonly regarded as an admission by conduct. By resorting to wrongful devices he is said to give ground for believing that he thinks his case is weak and not to be won by fair means'" (quoting McCormick on Evidence § 273, at 660 (2d ed., 1972))). Or as the Ninth Circuit once put it, evidence that a

defendant "threatened his father-in-law and uncle to intimidate them into withholding information from the FBI" was admissible because such evidence "shows consciousness of guilt—second only to a confession in terms of probative value." *United States v. Meling*, 47 F.3d 1546, 1557 (9th Cir. 1995); *United States v. Brazel,* 102 F.3d 1120, 1153-54 (11th Cir. 1997) (threats made by defendant to cooperating co-conspirator in holding cell was properly admissible under Rule 404(b) as evidence showing "consciousness of guilt"); *United States v. Perez*, 387 F.3d 201, 209 (2d Cir. 2004) ("we have upheld the admission of evidence of attempted witness . . . tampering as probative of a defendant's consciousness of guilt"); *United States v. Van Metre*, 150 F.3d 339, 352 (4th Cir. 1998) (collecting further cases).

Thus, this evidence is highly probative of Worrell's consciousness of guilt. Worrell has not identified any unfair prejudice that he would suffer.

## CONCLUSION

Worrell's motions *in limine* should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov

*/s/ Alexis Loeb*
ALEXIS LOEB
CA Bar No. 269895
Assistant United States Attorney (Detailed)
450 Golden Gate Ave., 11th Floor

San Francisco, CA 94102
(415) 436-7168
alexis.loeb@usdoj.gov