# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 21-CR-292-1 (RCL)** |
| | : | |
| **CHRISTOPHER WORRELL,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' TRIAL BRIEF

The United States of America respectfully submits this trial brief in advance of the March 13, 2023 trial scheduled before this Court in this case. The brief is divided below into a summary of the charges and elements; a list of the outstanding motions to be resolved at the pretrial conference; a summary of the anticipated government witnesses' testimony; and a discussion of certain evidentiary or other legal issues anticipated to arise.

## OUTSTANDING MOTIONS

The motions that have not yet been ruled on by this Court are: 1) the defendant's pretrial motions, *see* Dkts. 44, 45, and 162; 2) the parties' motions in limine, *see* Dkts. 179-181; and 3) two motions to continue and exclude time that have been rendered moot, *see* Dkts. 25, 113. The defendant has also filed a jury trial waiver, which was styled as a motion; the government would ask that the Court confirm in open court the defendant's intent to proceed without a jury.

### I. Pretrial motions

The defendant, through prior counsel John Pierce, filed a motion to transfer venue in this case on May 4, 2021. *See* Dkt. 44. The defendant filed a motion to dismiss the Indictment the same day. *See* Dkt. 45. The government filed its oppositions to these motions on May 18, 2021, Dkts. 51-52, and the defendant replied in support of both motions on May 26, 2021, Dkts. 62-63.

At the pretrial status conference on June 17, 2022, after the defendant had changed counsel, the government raised these two motions and inquired whether the defense was still seeking a ruling on them.  Defense counsel requested a short period of time to determine whether he sought a ruling on those two motions or would instead withdraw those motions.  Thereafter, on September 19, 2022, defense counsel re-filed the motion to dismiss with slight amendments, *see* Dkt. 162, and did not re-file the motion to transfer venue.

Even assuming the defendant has not withdrawn the motion to transfer venue, that motion was almost entirely premised on the claim that the defendant could not receive a fair trial in the District of Columbia because of alleged biases of the potential jury venire.  The motion was made under Federal Rule of Criminal Procedure 21(a), which permits transfer "if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."  Fed. R. Crim. P. 21(a); Dkt. 44-1 at 1.  The defendant's motion also cited the "defendant's right to a fair trial by an impartial jury," and asserted that the "venire must be presumed as tainted."  Dkt. 44-1 at 1; *id.* at 5-7 (citing standard for determination of whether pretrial publicity has tainted jury pool).  The defendant has now elected to have a bench trial rather than a jury trial.  Dkt. 213.  The defendant's motion to transfer should be denied as moot for that reason (or could be denied on the merits for the reasons provided in the government's opposition).  *See United States v. Miller*, 54 F.4th 219, 226 (4th Cir. 2022) (noting that "Rule 21(a) addresses juror, rather than judicial, prejudice").

Thus, of the pretrial motions, only the motion to dismiss (Dkt. 162) remains outstanding for this Court's consideration at the motions hearing on March 6, 2023.

**II.     Motions in Limine (MIL)**

    **A.          Government motions in limine**

      The government's motions in limine in this case are listed below.  The defendant did not respond to any of the government's motions in limine by the deadline (November 14, 2022) or thereafter.  One of the government's motions (#4) is now moot in light of the defendant's request for a bench trial.

       **1.          MIL To Limit Unnecessary Discussion of Security-Related Topics**

      This motion sought to preclude the defendant from inquiring as to U.S. Secret Service protocols or the exact location of U.S. Capitol Police security cameras.  Dkt. 179 at 1-7.  The defendant did not file a response to this motion in limine.

       **2.          MIL To Preclude Defendants from Arguing Entrapment by Estoppel, Public Authority, or Entrapment**

      This motion sought to preclude the defendant from raising the affirmative defenses of entrapment by estoppel, public authority, or estoppel, as there is no evidence supporting such a defense.  Dkt. 179 at 7-14.  The defendant did not file a response to this motion in limine.

       **3.          MIL To Preclude Defendants from Suggesting That Their Speech or Conduct was Protected by the First Amendment**

      This motion sought to preclude the defendant from claiming that the government cannot introduce his statements as evidence (of, e.g., intent) because his speech is protected by the First Amendment; that theory is baseless.  Dkt. 179 at 14-16.  This motion also sought to preclude the defendant from contending his entry on U.S. Capitol Grounds was somehow authorized by the First Amendment, or was constitutionally protected conduct.  It was not.  *Id.* at 17-18.  The defendant did not file a response to this motion in limine.

**4.      MIL To Preclude Defendants from Arguing or Commenting in a Manner That Encourages Jury Nullification, Whether During Voir Dire or During Trial**

Because the defendant has requested a bench trial, this motion relating to jury nullification is moot.

**5.      MIL To Admit Defendants' Out-of-Court Statements as Statements by a Party Opponent Under Federal Rule of Evidence 801(d)(2)(A)**

This motion sought to admit the defendant's party-opponent statements under Rule 801(d)(2)(A).  Dkt. 179 at 21-22.  The defendant did not file a response to this motion in limine.

**6.      MIL To Preclude Defendants' Use of Their Own Out-of-Court Statements as Inadmissible Hearsay**

This motion sought to preclude the defendant from admitting his own statements, which are hearsay.  Dkt. 179 at 22-24.  If the defendant would like to tell his story to the Court, he can testify.  *Id.*  The defendant did not file a response to this motion in limine.

**7.      MIL To Admit Certain Statutes and Records**

This motion requested that the Court take judicial notice of, and enter into evidence, copies of Article II, Section 1 of the Constitution of the Unites States, the Twelfth Amendment, 3 U.S.C. §§ 15-18, and the Congressional Record from January 6, 2021.  Dkt. 179 at 23-24.  The defendant did not file a response to this motion in limine.

**8.      MIL Regarding Authentication of Photo and Video Evidence. Dkt. 181.**

This motion sought this Court's permission to use certain authentication techniques at trial to authenticate U.S. Capitol Police video footage, officers' body-worn camera footage, video of the Electoral College certification process within the U.S. Capitol, the defendant's own videos from his Facebook account and digital devices, and photographs and videos from others present at the Capitol. Dkt. 181 at 1-29.  The defendant did not file a response to this motion in limine.

B.        **Defendant motions in limine**

The defendant filed two motions in limine:

1.        **MIL to prevent the government from using the following terms: "Rioters," "Breach," "Confrontation," "Police Line," "insurrectionists," "mob."**

This motion sought to prevent the government from using the identified terms in videos, photos, or other items of evidence, on the ground that such characterizations would be improper opinion testimony or, if on an exhibit, testimonial hearsay.  Dkt. 180 at 1-2.  The government opposed this motion, pointing out that such terms are lay characterizations and not improper opinions, Dkt. 184 at 1-6, but agreeing that it would review its exhibits to redact potentially problematic hearsay references in them.

2.        **MIL to preclude the government from referencing "Mr. Worrell being a proud boy," or "any attempted use by the Government of Worrell's initiation and affiliation with the proud boys."**

This motion sought to prevent the government from introducing evidence of Mr. Worrell's affiliation with or status as a Proud Boy member. Dkt. 180 at 2-4. The government opposed this motion, explaining the myriad ways Mr. Worrell's status as a Proud Boy member, close connections to other Proud Boys at the U.S. Capitol on January 6, 2021, and communications with other Proud Boys about January 6 were relevant and admissible under Rules 404(b) and 403.  Dkt. 184 at 8-19.

Because this case is now a bench trial, Mr. Worrell's Rule 403 concerns with respect to this evidence fall away: "Rule 403 'has a highly limited application, if any at all' in a bench trial." *United States v. MacAndrew*, No. CR 21-730 (CKK), 2022 WL 17961247, at *3 (D.D.C. Dec. 27, 2022) (quoting *United States v. Fizsimons,* 2022 WL 1658846, at *5 n.6 (D.D.C. May 24, 2022)); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, No. 11-cv-1623, 2015 WL 13680822, at *1 (D.D.C. June 12, 2015) (same); *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir.

1994) (holding that "in the context of a bench trial, evidence should not be excluded under 403 on the ground that it is unfairly prejudicial"); *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. Unit A Jan. 1981) (holding that Rule 403 "has no logical application to bench trials" and that "excluding relevant evidence on the basis of 'unfair prejudice' [in a bench trial] is a useless procedure"). This Court is already well aware, in any event, of evidence of Mr. Worrell's affiliation with the Proud Boys. For example, this Court is aware that Mr. Worrell violated the conditions of his release to attend a rally for a detained Proud Boy last July, and because this Court just took the plea of Mr. Worrell's co-defendant, Daniel Scott, it is aware of that statement of offense detailing Mr. Scott's and Mr. Worrell's participation in the Proud Boys organization.

### 3. MIL to preclude the government from referencing Mr. Worrell's participation in a rally with Roger Stone on January 3, 2021.

This motion sought to preclude evidence of Mr. Worrell's presence at a rally with Roger Stone on January 3, 2021. Dkt. 180 at 4. The government opposed this motion, pointing out that speakers and the crowd made statements like "Stop the Steal!" and about the certification of the Electoral College vote that bore directly on Mr. Worrell's knowledge of what was occurring on January 6, 2021 and on his intent to interfere with or influence the certification that day. Dkt. 184 at 19-22. In addition, Mr. Worrell's fellow Proud Boys—including his co-defendant, Daniel Scott—were present at the rally, and evidence of their friendship was relevant to their conduct together on January 6, 2021. Finally, Mr. Worrell's motion was based on a Rule 403 objection to this evidence, and Rule 403 has limited, if any, application now that this is a bench trial.

### 4. MIL to preclude the government from referencing Mr. Worrell's conduct during his arrest and statements and conduct relating to witnesses.

This motion (the combination of the second part "C." and the part "D." of Mr. Worrell's motion in limine filing) lodged a Rule 403 objection to evidence that Mr. Worrell did not turn

himself in in a timely fashion, that Mr. Worrell may have deleted evidence from his phone, or that Mr. Worrell made threatening statements toward or about potential witnesses in his case.  Dkt. 180 at 4-5.  The government opposed this motion explained that courts have generally permitted such evidence, because it is evidence of consciousness of guilt and not (as a general matter) overly prejudicial.  Dkt. 184 at 22-27.  But in any event, with Rule 403 of limited or no application now that this is a bench trial, this evidence is all the more plainly admissible.

## CHARGES AND ELEMENTS

Below, the government outlines the charges and elements for each charge, along with any statements of law relevant to that count.

## I.      Count One

### A.       Elements

Count One of the Second Superseding Indictment charges the defendant with obstruction of an official proceedings and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c) and 2. In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. First, the defendant attempted to or did obstruct or impede an official proceeding;

2. Second, the defendant intended to obstruct or impede the official proceeding;

3. Third, the defendant acted knowingly;

4. Fourth, the defendant acted corruptly.

If the Court finds that the government has proved beyond a reasonable doubt all of the elements of this charge, the defendant's motive in acting is not relevant.

To "obstruct" or "impede" means to block, interfere with, or slow the progress of an official proceeding.

The term "official proceeding" includes a proceeding before the United States Congress. As used in Count One of the Second Superseding Indictment, the term "official proceeding" means Congress's Joint Session to certify the Electoral College vote.  *See United States v. Grider*, No. CR 21-022 (CKK), 2022 WL 17829149, at *10 (D.D.C. Dec. 21, 2022) ("like every other court of this jurisdiction to have addressed the issue, [the Court concludes that] the quadrennial certification of the electoral vote was an 'official proceeding.'").

The official proceeding need not be pending or about to be instituted at the time of the offense. If the official proceeding was not pending or about to be instituted, the government must prove beyond a reasonable doubt that the official proceeding was reasonably foreseeable to the defendant.

To act "corruptly," the defendant must use unlawful means or have a wrongful or unlawful purpose, or both.  The defendant must also act with "consciousness of wrongdoing." "Consciousness of wrongdoing" means an understanding or awareness that what the person is doing is wrong or unlawful.

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what he did or said.

## B.      Aiding and Abetting

The government further alleges that the defendant aided and abetted others in committing obstruction of an official proceeding.  To satisfy its burden of proof in proving that the defendant aided and abetted others in committing this offense, the government must prove the following beyond a reasonable doubt:

1.      First, that others committed obstruction of an official proceeding by committing each of the elements of the offense charged;

2.      Second, that the defendant knew that obstruction of an official proceeding was going to be committed or was being committed by others;

3.      Third, that the defendant performed an act or acts in furtherance of the offense;

4.      Fourth, that the defendant knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of obstruction of an official proceeding; and

5.      Fifth, the defendant did that act or acts with the intent that others commit the offense of an obstruction of an official proceeding.

To show that the defendant performed an act or acts in furtherance of the offense charged, the government needs to show some affirmative participation by the defendant which at least encouraged others to commit the offense. That is, you must find that the defendant's act or acts did, in some way, aid, assist, facilitate, or encourage others to commit the offense. the defendant's act or acts need not further aid, assist, facilitate, or encourage every part or phase of the offense charged; it is enough if the defendant's act or acts further aid, assist, facilitate, or encourage only one or some parts or phases of the offense. Also, the defendant's acts need not themselves be against the law.  The government must prove beyond a reasonable doubt that the defendant in some way participated in the offense committed by others as something the defendant wished to bring about and to make succeed.

C.      **Attempt**

In Count One, the defendant is also charged with attempt to commit the crime of obstructing an official proceeding.  The elements of the crime of attempted obstruction of an official proceeding, each of which the government must prove beyond a reasonable doubt, are:

1.      First, that the defendant intended to commit the crime of obstruction of an official proceeding, as defined above; and

2.      Second, that the defendant engaged in conduct that constituted a substantial step toward committing obstruction of an official proceeding, as defined above.

9

You may not find the defendant guilty of attempt to commit obstruction of an official proceeding merely because he made some plans to or some preparation for committing that crime. Instead, you must find that the defendant took some firm, clear, undeniable action to accomplish his intent to commit obstruction of an official proceeding. However, the substantial step element does not require the government to prove that the defendant did everything except the last act necessary to complete the actual commission of the crime.

## II.    Count Two

Count Two of the Second Superseding Indictment charges the defendant with entering or remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.    First, that the defendant entered or remained in a restricted building or grounds without lawful authority to do so;

2.    Second, that the defendant did so knowingly;

3.    Third, that the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.

An object can be a "deadly or dangerous weapon" in two ways. First, an object is a deadly or dangerous weapon if it is inherently or obviously dangerous or deadly. Second, an object is a deadly or dangerous weapon if the object is "capable of causing serious bodily injury or death to another person" when used in the "manner" in which the defendant used it. *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002) (citation omitted). In determining whether the object is a "deadly or dangerous weapon," the Court may consider both the object's physical capabilities and the manner in which the object was used.

"Serious bodily injury" means "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 n.1(M); Dkt. 162 at 11 (Worrell agreeing in this case that this is the appropriate definition).

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting. The term "person protected by the Secret Service" includes the Vice President, and the immediate family of the Vice President.

## III.   Count Four

Count Four of the Second Superseding Indictment charges the defendant with disorderly or disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.   First, that the defendant engaged in disorderly or disruptive conduct in any restricted building or grounds;

2.   Second, that the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions;

3.   Third, that the defendant's conduct in fact impeded or disrupted the orderly conduct of Government business or official functions;

4.   Fourth, that the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.

"Disorderly conduct" occurs when a person is unreasonably loud and disruptive under the circumstances or interferes with another person by jostling against or unnecessarily crowding that person. "Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal

11

course of a process. *See, e.g.,* Final Jury Instructions, *United States v. Bacon,* 21-cr-488 (CRC), ECF No. 70, at 10 (D.D.C. Mar. 2, 2023).

Judge Kollar-Kotelly has found, "'disorderly' conduct is that which 'tends to disturb the public peace, offend public morals, or undermine public safety.' 'Disorderly,' Black's Law Dictionary (9th ed. 2009); *see also* 'Disorderly,' Oxford English Dictionary (2nd ed. 1989) ("Not according to order or rule; in a lawless or unruly way; tumultuously, riotously.")." *United States v. Rivera*, No. CR 21-060 (CKK), 2022 WL 2187851, at *5 (D.D.C. June 17, 2022). "Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process. *See, e.g.*, *id.* at *5.

"Even mere presence in an unlawful mob or riot is both (1) 'disorderly' in the sense that it furthers the mob's 'disturb[ing] the public peace' and (2) 'disruptive' insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants. Were it not, it must be said that continued presence in a mob that is being tear gassed and pepper sprayed is disorderly insofar as a person's continued presence clearly impedes law enforcement's efforts to regain control of a particular area." *Rivera*, 2022 WL 2187851, at *5.

## IV.    Count Six

Count Six of the Second Superseding Indictment charges the defendant with engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

>    1.    First, that the defendant engaged in any act of physical violence against any person in any restricted building or grounds;

2.  Second, that the defendant did so knowingly; and

3.  Third, that the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.

The term "act of physical violence" means, as relevant here, any act involving an assault or other infliction or threat of infliction of death or bodily harm on an individual.

## V.  Count Eight

Count Eight of the Second Superseding Indictment charges the defendant with an act of physical violence in the United States Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.  First, that the defendant engaged in an act of physical violence in the Grounds or any of the Capitol Buildings; and

2.  Second, that the defendant did so willfully and knowingly.

The term "United States Capitol Grounds" is defined as the area designated on a map entitled "Map showing areas comprising United States Capitol Grounds," dated June 25, 1946, approved by the Architect of the Capitol, and recorded in the Office of the Surveyor of the District of Columbia in book 127, page 8.  That map is attached as Exhibit 1.

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law.  "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating.

## VI.  Count Ten

Count Ten of the Second Superseding Indictment charges the defendant with civil disorder, in violation of 18 U.S.C. § 231(a)(3). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.    First, the defendant knowingly committed an act or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

2.    Second, at the time of the defendant's actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

3.    Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

"[F]or the purposes of this statute, the Court need not find that the defendant's actions *in fact* obstructed law officer officers. Rather, the Court need only find that the defendant committed or attempted to commit an act with the specific intent to obstruct law enforcement officers." *Grider*, 2022 WL 17829149, at *8 (citing *United States v. McHugh*, 583 F. Supp. 3d 1, 24-25 (D.D.C. 2022) (JDB) (collecting cases)).

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property. 18 U.S.C. § 232(1).

The term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia. It also means commerce wholly within the District of Columbia. *Id.* § 232(2).

The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof. *Id.* § 232(3).

The term "law enforcement officer" means any officer or employee of the United States or the District of Columbia while engaged in the enforcement or prosecution of any criminal laws of the United States or the District of Columbia.  *Id.* § 232(7).

For the U.S. Capitol Police and Metropolitan Police Department on January 6, 2021, the term "official duties," means policing the U.S. Capitol Building and Grounds, and enforcing federal law and D.C. law in those areas.

## VII.   Count Thirteen

Count Thirteen of the Second Superseding Indictment charges the defendant with assaulting, resisting, or impeding certain officers using a dangerous weapon, in violation of 18 U.S.C. § 111(a)(1) and (b). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.  First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer of the Metropolitan Police Department or the U.S. Capitol Police;

2.  Second, the defendant did such act forcibly;

3.  Third, the defendant did such act intentionally;

4.  Fourth, the person assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer or an employee of the United States who was then engaged in the performance of his official duties, or any person assisting such an officer or employee in the performance of that officer's duties;

5.  Fifth, in doing such acts, the defendant used a deadly or dangerous weapon.

The defendant acts "forcibly" if he uses force, attempts to use force, or threatens to use force against the officer.  A threat to use force at some unspecified time in the future is not sufficient to establish that the defendant acted forcibly.

The term "intentionally" means that the defendant acted knowingly, consciously, and voluntarily.

The term "assault" means any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so.  A finding that one used force (or attempted or threatened to use it) isn't the same as a finding that he attempted or threatened to inflict injury.  In order to find that the defendant committed an "assault," the Court must find that the defendant acted forcibly and that he intended to inflict or threaten injury.

The phrase "deadly or dangerous weapon" has the same meaning as described in Count Two above.

The terms "resist," "oppose," "impede," "intimidate," and "interfere with" carry their everyday, ordinary meanings.

It is not necessary to show that the defendant knew the person being forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with was, at that time, assisting federal officers in carrying out an official duty so long as it is established beyond a reasonable doubt that the victim was, in fact, assisting a federal officer acting in the course of his duty and that the defendant intentionally forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with that officer.

For a deadly and dangerous weapon to have been "used," the government must prove that the defendant not only possessed the weapon, but that he intentionally displayed it in some manner while forcibly assaulting, resisting, opposing, impeding, intimidating or interfering with the federal officer.

Count Thirteen of the Second Superseding Indictment also charges the defendant with assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

16

1. First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer of the Metropolitan Police Department or the U.S. Capitol Police;

2. Second, the defendant did such act forcibly;

3. Third, the defendant did such act intentionally;

4. Fourth, the person assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer or an employee of the United States who was then engaged in the performance of his official duties, or any person assisting such an officer or employee in the performance of that officer's duties;

5. Fifth, in doing such acts, the defendant acted with intent to commit another felony—in this case, Civil Disorder, as charged in Count Ten, or Obstruction of an Official Proceeding and Aiding and Abetting, as defined in Count One.

## UNITED STATES' EVIDENCE

### I.      The Government's Witnesses

The government currently intends to call the following witnesses in either its case-in-chief or in rebuttal to the defendant's evidence.  The government has asked the defense whether it will stipulate to the authenticity of basic pieces of evidence like CCTV footage or the defendant's own videos from his cell phone.  If such stipulations are entered into, some of the following witnesses may not be necessary.  We have not yet received confirmation as to any stipulations.

**United States Capitol Police ("USCP") Captain Sean Patton** will provide overview testimony regarding the riot that took place at the Capitol on January 6, 2021.  **Captain Patton** will identify relevant locations at the Capitol, and he will describe how the area was restricted by a perimeter of bicycle racks and snow fencing, closed to the public because of the certification and because of COVID-19.  He will describe how rioters broke through those barriers at the Peace Circle and advanced to the Lower West Terrace, where an hours-long battle between

17

police and rioters, in which he participated, began.  **Captain Patton** will also describe how rioters eventually broke through police lines at the Lower West Terrace, an event which led directly to the first breach of the Capitol itself – an event which caused the Joint Session to go into recess as Congress and the Vice President evacuated and sheltered for hours until it was safe to return.  He will also show the numerous other breaches that followed as the Capitol was besieged from all sides, engulfed in a civil disorder. **USCP Sergeant Tim Lively**, and **USCP Officers Stephen Lowe, Nathan Cole, and Joshua Weber** (or a subset of these witnesses) will testify about their participation in the conflict on the west front of the U.S. Capitol on January 6, 2021, where they fought against rioters to establish a police line on the West Plaza to keep rioters from breaching the U.S. Capitol building.  Along with **Captain Patton**, they will recount their struggle and the attacks they endured on the Capitol's west front, particularly on the northern end of the police line near the Northwest Staircase at the time that Worrell was in the area and assaulted police. **Officer Cole** will also authenticate videos in which he appears, including video showing Worrell's co-defendant, Daniel Scott, assaulting him—an assault that Worrell witnessed.

  **Journalist Lev Radin** will testify to his eyewitness account of Worrell's assault.

  **Dr. Vanessa Fitsanakis, a toxicologist and neuroscientist**, will explain the scientific composition and design of OC spray and the pain, injury, and incapacitation it is designed to cause. Dr. Fitsanakis will also testify to the medical complications that pepper spray can cause in its ordinary application, including asthma attacks, corneal damage, or heart-related issues.

**USCP Sergeant Kevin Jiannotti** will testify in his capacity with the USCP's training bureau as to the extreme reactions and physical harm he has witnessed firsthand when a person is exposed to Sabre Red pepper spray.

Other law enforcement officers will testify as to how the surge of rioters on Capitol grounds affected the Congressional proceedings inside the Capitol where the 2020 electoral college vote was being certified. **USCP Officer Mark Gazelle** will testify as to his role helping to secure the Senate Chamber as the certification proceedings began and were eventually driven to a halt after rioters overran the west front and breached the building through the Senate Wing Door. As part of Vice President Mike Pence's U.S. Secret Service ("USSS") detail, **Special Agent Elizabeth Glavey** will testify about her security preparations in anticipation of these proceedings and how the breach of the Capitol came to pose a severe threat to the safety of Vice President Pence and his wife and daughter, who were also Secret Service protectees that day.

**Special Agent Alexander Grandy** of the Federal Bureau of Investigations ("FBI") will testify about his investigation of the defendant, including his first interview of the defendant, and the defendant's statements and conduct during his arrest.  **Agent Grandy** will also walk the Court through the video and photographic exhibits seized from the defendant's phone, laptop, and Facebook profile. **FBI Special Agent Emma Jamison** and **FBI forensic examiner Mary Horvath** will walk through the search of Worrell's home, truck, cell phone, and Facebook account. These agents will also detail the recovery of a canister of Sabre Red Pepper Gel from the defendant's home. **FBI forensic analyst Joseph Stephens** will explain how he tested the contents of this canister, which contains both capsaicin and dihydrocapsaicin, confirming it is OC spray. **Collier County Sheriff's Office Detective Brian Clervoix** and **FBI Special Agents Aldrit Konda** and **Kathryn Camiliere** will testify to their role in additional investigative steps, such as interviews of the defendant and his partner, Tricia Priller. **FBI CART Examiner Kate Cain** will testify to the method used to obtain Telegram messages in which Mr. Worrell participates.

If necessary, further witnesses will also testify to the authenticity and relevance of video evidence taken at or around the time of the assault on the West Plaza or other digital evidence. **USCP Sergeant Kevin Gallagher** will testify about the photographs he took at a vantage point on the Lower West Terrace and inauguration scaffolding that overlooked the West Plaza. **USCP Special Agent Jaclyn O'Neill** will authenticate and articulate the relevance of USCP's closed-caption video ("CCTV") system that captured overhead footage of the police line and crowd on the west front. **Randall Newingham** will attest to the authenticity of footage from his time on the West Plaza. Additional law enforcement witnesses—**FBI Special Agents Sam Maxwell, Wyatt Tackett** and **Sean Thomas** and **Metropolitan Police Department Detective Joshua Koble**—will authenticate certain videos or chats extracted from other defendants' (or witnesses') phones. **Charlotte County Sherriff's Office Detective Nathan Edwards** and **Antoinette Walker** from the **Department of Corrections** will authenticate Worrell's jail calls and e-mails.

Finally, **Edgar Tippett**, a District Manager with Safeway, will testify that the riot culminating in the Capitol breach disrupted Safeway stores in the District of Columbia that day and forced their early closure.

## LEGAL AND EVIDENTIARY ISSUES

### I.     Evidentiary Issues

#### A.       Evidence identified in Mr. Worrell's motions in limine

As explained in its opposition to Mr. Worrell's motions in limine, *see* Dkt. 184 at 8-19, the government intends to introduce evidence of Mr. Worrell's affiliation with the Proud Boys. This evidence will go to establish Mr. Worrell's close ties to other individuals present on Capitol grounds that day, including his co-defendant, Daniel Scott. This evidence is material and relevant in numerous ways. Mr. Worrell met up with the Proud Boys in his "Zone" near the

Washington Monument that day; they marched to the Capitol together and breached Capitol Grounds together.  One of Mr. Worrell's fraternal Proud Boy "brothers" was pepper sprayed by law enforcement officers on the same police line at which, the government alleges, Mr. Worrell sprayed—and just 35-40 seconds prior to Mr. Worrell spraying.  His connection to that Proud Boy is highly relevant as a potential immediate motive or impetus for Mr. Worrell spraying the police line with pepper gel.  As a second example, another of Mr. Worrell's zone "brothers," his co-defendant Daniel Scott, assaulted officers within approximately fifteen minutes of Mr. Worrell's pepper gel assault.  Mr. Worrell, Mr. Scott, and others in their Proud Boys group celebrated Mr. Scotts' assault after, yelling Proud Boys slogans and using Proud Boys hand gestures.  The fact that Mr. Worrell was close to Mr. Scott is relevant to his celebration of Mr. Scott's assault afterward, and indeed is necessary context for the Court to understand Mr. Worrell's and Mr. Scott's communications on January 6 and thereafter.

Mr. Worrell's Proud Boys connections are also necessary context for many of Mr. Worrell's communications—many of which were with or to other Proud Boy members—and for communications sent to Mr. Worrell.  *Id.* at 15.  For example, Mr. Worrell was in Telegram chats with individuals who made statements about obstructing the certification of the vote:

From: 736823241 Based Russian
January 6th is when congressmen can object to the electors. The last chance to stop the steal. If millions of Trump supporters show up, congress might do the right thing. Maybe...

From: 1313557586 "Biz" n†ne
You know, if congress is blocked from the joint session on the 6th, they dont certify and trump stays

From: 1313557586 "Biz" n†ne
Would be shame if protest kept them from doing that

That those individuals made those statements in a private chat amongst "brothers" in the Proud Boys, a fraternal organization of which Mr. Worrell was a part, is very different than if those statements were on an anonymous message board on the internet. The fact that these statements were made in private by Mr. Worrell's fraternal brothers makes it far more likely that he heeded those statements and was influenced by them. Finally, the messages between Mr. Worrell and others will establish the meaning of various hand symbols, terms, and chants used by the Proud Boys on January 6, 2021, such as the slogans they yelled after Mr. Scott's assault. *See id.* at 14-15.

### B.        Hearsay Issues

### 1.        Defendant's statements under Rule 801(d)(2)

The government intends to introduce a number of Worrell's statements under Federal Rule of Evidence 801(d)(2), which defines an "Opposing Party's Statement" as non-hearsay. Fed. R. Evid. 801(d)(2). These statements will come in two forms: statements that Worrell made himself, and statements made by other speakers, but which Worrell "manifested that [he] adopted or believed to be true." Fed. R. Evid 801(d)(2)(B). As Judge Kollar-Kotelly explained in a recent January 6 bench trial:

> To be an adoptive statement, the defendant must "'have understood and unambiguously assented to [the other's] statement.'" [*United States v. Beckham*, 968 F.2d 47, 51 (D.C. Cir. 1992)] (quoting *Naples v. United States*, 344 F.2d 508, 512 (D.C. Cir. 1964)). This "understanding and assent may be established through conduct as well as words." *Id.*; *see also Landis v. Tailwind Sports Corp.*, 292 F. Supp. 3d 211, 221 (D.D.C. 2017) (mere possession of document insufficient). . . . In addition to overt action, silence can also manifest adoption depending on the circumstances. 6 Handbook of Fed. Evid. § 801:21 (9th ed. 2021) (collecting cases); *see also* [*Naples*, 344 F.2d at 512, *overruled on other grounds by Fuller v. United States*, 407 F.2d 1199 (D.C. Cir. 1967) (en banc)]. The Court's inquiry in this regard is objective and focused on the totality of the circumstances. *See Naples*, 344 F.2d at 512. The primary question "is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the

[factfinder] could infer that the defendant heard, understood, and acquiesced in the statement." *United States v. Williams*, 445 F.3d 724, 735 (4th Cir. 2006).

*United States v. Rivera*, No. CR 21-060 (CKK), 2022 WL 2239800, at *1–2 (D.D.C. June 17, 2022).

The government will introduce several such statements.  For example, on one jail call, an unidentified friend of Mr. Worrell states: "Number two, you were spraying an Antifa guy who was attacking the cops."  Mr. Worrell then interrupts: "Well, somebody that was throwing the rods at them.  Whether they're Antifa, that doesn't matter."  Mr. Worrell's limited correction of the speaker's statement is an implicit adoption, in that context, of the remainder of that statement.

### 2.     Present sense impressions or excited utterances under Rules 803(1) or (2)

At least two statements made by others around Mr. Worrell, particularly on January 6, 2021, will be offered as present sense impressions under Rule 803(1).  First, in a video that is taken roughly 30-45 seconds prior to Mr. Worrell's spraying incident, a member of the crowd near Mr. Worrell says, at the time the crowd pushes forward against a line of officers: "Oh, there they go!"  Second, in a video taken later that day, Mr. Worrell and another person watch, from a distance, the crowd at the west plaza.  At one point, the other person says: "Oh, someone threw a smoke grenade."  Both statements are present sense impressions describing an event and made while or immediately after the declarant perceived it.  They are offered for their truth under Rule 803(1).

Two statements by Mr. Worrell's fraternal Proud Boy brothers will be offered as present sense impressions, excited utterances, or adoptive admissions by Mr. Worrell.  An excited utterance is a "statement relating to a startling event," "made while . . . under the stress of excitement that it caused."  Fed. R. Evid. 803(2).

In a video from around 1:50 PM, within seconds of Mr. Scott assaulting two police officers and collapsing the police line, an individual turns to Mr. Worrell, refers to him by Worrell's Proud Boy nickname "Loach," and says: "You film it? We did it, man."  The evidence will show that this individual and Mr. Worrell had a pre-existing relationship.  Mr. Scott, Mr. Worrell's co-defendant, then looks at Mr. Worrell and yells "Proud of your fucking boy!" while flashing a Proud Boys hand symbol.  Mr. Worrell says "Yeah!" to Mr. Scott, and makes a matching hand symbol back at him.  Mr. Worrell shortly thereafter turns the camera on himself and says: "Yeah! Taking the Capitol!"  All of these statements occur as the crowd streams up the Capitol's steps; as Captain Patton will describe, that crowd would later breach the Capitol's interior for the first time at the Senate Wing Door.

These two statements ("We did it, man" and "Proud of your fucking boy!") are offered as circumstantial proof that Mr. Worrell and these individuals had previously discussed seeking to help the crowd breach the police line, and that that was one of Mr. Worrell's goals at that time. The statement "We did it, man" makes little sense if the declarant and Mr. Worrell had not previously spoken about wanting to work together to accomplish what had just occurred.  The statement "Proud of your fucking boy!" is an obvious (in context) boast about Mr. Scott's assault, and again implies it was known to Mr. Worrell in advance.  Both statements explain an event immediately after the declarant perceives it, and so is a present sense impression under Rule 803(1).  Alternatively, both statements relate to the startling event of Mr. Scott's assaults and the police line collapsing, and were made while the declarants were under the stress of that event.  Finally, both statements can also be viewed as adoptive admissions by Mr. Worrell, who did not deny what was said by either person, expressly agreed with Mr. Scott's sentiments, and went on to say "Yeah! Taking the Capitol!"

### 3. Business records under Rule 803(6)

The government intends to introduce at least four sets of business records at trial: 1) records, photographs, audio files, and video files from Mr. Worrell's Facebook account; 2) toll records from Mr. Worrell's cell phone company; 3) toll records and text message content from the cell phone company of Mr. Worrell's co-defendant, Daniel Scott (which includes messages to and from Mr. Worrell); and 4) if necessary, the business records of Albertson Companies, the ultimate parent company of Safeway, to prove the January 6, 2021 riot's effect on interstate commerce.

All four sets of business records were accompanied by certifications compliant with Rules 902(11) and 803(6) establishing their authenticity and admissibility under Rule 803(6). The government produced those certifications to the defense in discovery, and noticed its intent to offer these records via letter and email on October 26, 2022. Defense counsel has not provided notice of any objection to the authenticity of these records nor to their admission under Rule 803(6).

### 4. Statements offered not for their truth, but for their effect on the listener (Mr. Worrell)

The government will seek to introduce numerous statements made by other individuals either 1) in electronic chats or communications in which Mr. Worrell was present; or 2) in person, when Mr. Worrell was present or nearby. The government will lay foundation that Mr. Worrell was present during these statements; most will be introduced from videos taken by Mr. Worrell's phone, held by Mr. Worrell—itself sufficient evidence that Mr. Worrell likely or may have heard the statement, if his phone's microphone did.

These statements will be offered not for their truth, but for their effect on the listener (Mr. Worrell) or to prove Mr. Worrell's knowledge. For example, the government will offer

Telegram statements, such as those identified above, about the certification of the vote or what was going to occur on January 6, 2021. Those will be offered to show that Mr. Worrell was aware of the certification occurring at the Capitol on January 6, 2021—because someone else said something about that certification in a chat with Mr. Worrell—and as circumstantial evidence of Mr. Worrell's intent and motive on January 6, 2021. The latter point follows from common sense. Evidence that an individual heard numerous anti-government or anti-Congress statements from others in his fraternal organization, in chats in which he lodged no objection to those statements despite being a frequent participant in such conversations, makes it circumstantially more likely he held the same views leading up to January 6. At the very least, that evidence makes it *marginally* more likely that Mr. Worrell held those views than if he had not been in those chats at all—and such a marginal difference is all it takes to establish the relevancy of this evidence. As explained by the government in its opposition to Mr. Worrell's motion in limine, evidence of the statements made by others about the certification at the January 3 Roger Stone rally are similarly admissible as evidence of Worrell's knowledge and intent. Dkt. 184 at 19-22.

In the same vein, anti-police statements made by Mr. Worrell's fraternal brothers in private chats leading up to January 6, 2021 would be introduced to show their effect on Mr. Worrell. They would not be offered for their truth (i.e., that the police are actually bad). Instead, such statements by Mr. Worrell's fraternal brothers make it more likely that Mr. Worrell would hold similar views (especially if he lodged no objection to those statements at any time). Additionally, such statements also make it more likely that he would feel comfortable assaulting the police, because the anti-police statements would have given him comfort that his fraternal

brothers would not chastise or ostracize him for such an assault.  For each of those reasons, statements by others in chats with Mr. Worrell about the police are admissible.

Similarly, statements on January 6 by others in Mr. Worrell's group or in his vicinity while on Capitol grounds that express sentiments consistent with interfering with the certification of the vote (e.g., "Take the Capitol!") or assaulting the police ("Attack 'em!" or "You didn't do this shit to Antifa!" or "Please stop gassing us.") are relevant and admissible.  Those statements, likewise, are not hearsay because they are not offered for their truth, but instead because hearing those statements may have influenced Mr. Worrell's state of mind.  As but one example, it stands to reason that an individual would feel more comfortable assaulting the police in the midst of a crowd yelling "Attack 'em!" and other anti-police chants, compared to a crowd chanting "Back the Blue" and vigorously defending law enforcement.  That inference renders the crowd's statements admissible, circumstantial evidence.

### 5.    Statements offered not for their truth, but as context

The government will introduce certain statements by declarants other than the defendant, in videos relevant for other reasons, not for their truth, but as context or irrelevant background. For example, in one video exhibit, there is a thirty-second conversation between the cameraman and a woman who states she was hit with a pepper ball by the police.  That conversation is irrelevant to Worrell's case.  But without it, the cameraman's subsequent shout in Worrell's direction could be confused as a statement aimed at Worrell (rather than the police): "Hey so you shot an old lady in the face, you feel good about that?"  Thus, those portions of the conversation are simply limited helpful context to help the Court understand the video, which also contains admissions and statements by Mr. Worrell.

### C.      Marital communications privilege

The marital communications privilege can only be asserted to protect communications between spouses if "there [was] a valid marriage at the time of the communication" and "the communication [was] made in confidence." *S.E.C. v. Lavin*, 111 F.3d 921, 925 (D.C. Cir. 1997). Mr. Worrell and his girlfriend, Tricia Priller, are not married, and were not married at all relevant times in this case.  In addition, all statements between Mr. Worrell and Ms. Priller that the government will introduce were made on recorded jail calls—with a warning at the start of each call that the calls were recorded—or on calls in which law enforcement participated.  Those communications are thus non-confidential.  Therefore, there is no marital communications privilege issue in introducing statements made between Mr. Worrell and Ms. Priller in this case.

### D.      Racial slur

The government seeks permission to introduce into evidence a video in which, the context makes clear, Mr. Worrell directs a racial slur at the U.S. Capitol Police.  The video was taken approximately nine minutes before Worrell discharged pepper gel in the direction of the police line.  Mr. Worrell's willingness to direct a racial slur at the U.S. Capitol Police at that time is thus strong evidence of Mr. Worrell's antagonism toward the U.S. Capitol Police.  Given that Rule 403 concerns are largely absent in a bench trial, the government seeks permission to introduce an unredacted version of this video.

### E.      General evidence of the Capitol riot

The government will introduce evidence of the events at the U.S. Capitol on January 6, 2021, even beyond those in the immediate vicinity of the defendant.  This evidence will include:

1.  An overview U.S. Capitol Police witness, Captain Sean Patton, who will testify regarding the crowd's initial breaches of the barriers surrounding the U.S. Capitol's restricted area and the crowd's progress in pushing through police lines before ultimately entering the

U.S. Capitol itself, as well as law enforcement's hours-long struggle to clear the U.S. Capitol grounds of rioters;

2. An overview, 15-minute montage of U.S. Capitol Police CCTV footage of the riot, showing the same events;

3. A U.S. Secret Service witness, Liz Glavey, who will testify to the presence and movements of the Vice President, Michael Pence, at the U.S. Capitol on January 6, 2021.

Mr. Worrell's pepper-gel assault occurred at approximately 1:31 p.m., and he left the west plaza at approximately 2:00 p.m.  He remained on Capitol grounds until sometime after 3 p.m.  However, evidence of the overall riot and its progression that day, even after Mr. Worrell's pepper spray assault, is relevant to at least three counts.

First, to prove Count One, the government may prove that Mr. Worrell (or others he aided and abetted) in fact impeded or obstructed an official proceeding—here, the congressional certification of the 2020 Electoral College vote.  Similarly, to prove Count Four, the government must prove that Mr. Worrell's disorderly or disruptive conduct "in fact impeded or disrupted the orderly conduct of Government business or official functions."  Thus, to prove those two elements, the government can offer proof that other rioters whom Mr. Worrell may have aided and abetted ultimately entered into the Capitol building and interfered with or stopped the certification.

Second, to prove Count Ten, the government must prove both that the officers whom Mr. Worrell interfered with were "engaged in the lawful performance of their official duties incident to and during a civil disorder," and that the civil disorder "obstructed, delayed, or adversely affected" either interstate commerce or "any federally protected function."  Thus, the government can introduce evidence that the crowd had become a riot as of 1:31 p.m., including

evidence of that riot from locations other than where Mr. Worrell was located.  It can also

introduce evidence that the riot grew to such a size, and entered such sensitive areas in the

Capitol, that it impacted local commerce and affected the protection of the Vice President, which

is a federally protected function.  *See, e.g.*, *United States v. Nordean*, 579 F. Supp. 3d 28, 55

(D.D.C. 2021) (protecting Vice President and Vice President-elect were federally protected

functions); *Grider*, 2022 WL 17829149, at *9 (same).

### F.        Inadmissibility of Witness Convictions under Rule 609

Two government witnesses in this case have criminal history, but neither's prior

convictions are relevant or admissible under Rule 609.  Under Federal Rule of Evidence 609(a),

evidence of a witness's prior conviction is admissible only if it is a felony or if the "court can

readily determine that establishing the elements of the crime required proving—or the witness's

admitting—a dishonest act or false statement." Fed. R. Evid. 609(a)(2).

In addition, if more than 10 years have passed since the conviction or release from

confinement, whichever is later, evidence of the conviction is admissible only if its probative

value, supported by specific facts and circumstances, substantially outweighs its prejudicial

effect. Fed. R. Evid. 609(b)(1). The party offering the conviction must also provide sufficient

notice to allow the opposing party "a fair opportunity to contest its use." Fed. R. Evid. 609(b)(2).

Evidence of a conviction more than ten years old "is presumptively inadmissible as too remote."

*United States v. Bay*, 762 F.2d 1314, 1317 (9th Cir. 1985). The Advisory Committee Notes to

Rule 609(b) provide: "It is intended that convictions over 10 years old will be admitted very

rarely and only in exceptional circumstances." Fed. R. Evid. 609(b)(1), advisory committee's

notes.

In this case, one government witness, an FBI agent, has a recent misdemeanor conviction

in the state of Florida for driving under the influence.  A first-time DUI offense in Florida "is not

punished as a felony," and "establishing the elements of a driving under the influence offense does not require proving a dishonest act or false statement." *Ogilvie v. Swank*, No. 2:14-CV-354-SPC, 2016 WL 1554407, at *1 (M.D. Fla. Apr. 18, 2016) (citing Fla. Stat. §§ 316.193(1)-(2)); *Hester v. Speedway, LLC*, No. CV 20-2350, 2023 WL 1863166, at *1 (E.D. Pa. Feb. 9, 2023) (a DUI conviction "is not a crime of dishonesty"); *United States v. Avery*, No. CR 11-00405 MMM, 2011 WL 13136810, at *5 (C.D. Cal. Dec. 15, 2011) (collecting cases). As such, evidence of this witness's DUI arrest or conviction "cannot be introduced into evidence under Rule 609." *Id.*

A civilian witness, who will, if called, be asked only to authenticate three videos he took on January 6, 2021, has at least 12 misdemeanor convictions.[1] From the government's review of these state-law offenses, none appears to require, as an element, a defendant's "dishonest act or false statement."[2] In addition, all of the convictions older than ten years old—particularly the juvenile convictions—are not probative, given that this witness is merely an authentication

---

[1] They are:
2000, *Juvenile conviction for disorderly conduct*, in violation of 720 ILCS 5.0/26-1(a)(1);
2003, *Possession of liquor by minor*, in violation of 235 ILCS 5.0/6-20;
2003, *Knowingly damage property*, in violation of 235 ILCS 5.0/6-20;
2003, *Possession of liquor by minor*, in violation of 235 ILCS 5.0/6-20;
2003, *Possession of liquor by minor*, in violation of 235 ILCS 5.0/6-20;
2008, *Resisting officer*, in violation of 720 ILCS 5.0/31-1(a);
2009, *Disorderly conduct*, in violation of 720 ILCS 5.0/26-1(a)(1);
2013, *Resisting officer*, in violation of 720 ILCS 5.0/31-1(a);
2013, *Driving under influence of alcohol*, in violation of 625 ILCS 5.0/11-501(a)(2);
2014, *Domestic violence*, in violation of MCL 750.81(2);
2019, *Dangerous weapons – Using self-defense spray device*, in violation of MCL 750.224d(2);
2020, *Driving on revoked license*, in violation of 625 ILCS 5.0/6-303(a).
[2] The only offense that would even plausibly involve dishonesty, driving with a suspended license, has been deemed inadmissible under Rule 609 by numerous federal courts across multiple states. *See Avery*, 2011 WL 13136810, at *5 (precluding misdemeanor conviction for driving with a suspended license); *Yudenko v. Guarini*, No. CIV.A. 06-4161, 2009 WL 2152085, at *2 (E.D. Pa. July 16, 2009) ("it is not a crime of falsehood to drive without a license"); *United States v. Wilson*, No. 09-20138, 2009 WL 3818192, at *4 (E.D. Mich. Nov. 13, 2009) (same).

witness for videos that will independently match in several respects other video exhibits submitted by the government in this case.  Thus, the Court should preclude cross-examination as to any of the above-listed misdemeanor convictions.

## II.   Legal Issues

### A.   The government's evidence will be sufficient to show that pepper gel is a "deadly or dangerous weapon."

Counts Two, Four, Six, and Thirteen, charging violations of Sections 1752(a) and 111(b) of Title 18, have as one element that Worrell used or carried a "deadly and dangerous weapon." A "deadly or dangerous weapon" under Section 111 is "an object capable of causing serious bodily injury or death to another person," where the defendant uses the object "in that manner."  *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002) (citation omitted); U.S.S.G. § 1B1.1 n.1(E). "Serious bodily injury" is defined by the U.S. Sentencing Guidelines to mean "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  *Id.* § 1B1.1 n.1(M).  Worrell has previously agreed that these are the correct definitions of "dangerous weapon" under Sections 1752 and 111.  Dkt. 162 at 11.

To be clear, as explained elsewhere, *see* Dkt. 51 at 8, the government need not show that a particular victim was struck or suffered serious bodily injury in this case.  A weapon is dangerous if it is merely "*capable*" of inflicting "serious bodily injury" in the way it was used, even if it did not inflict such injury in that particular instance.  U.S.S.G. § 1B1.1 n.1(E) (emphasis added); *Arrington*, 309 F.3d at 45.

As explained above, the government's witnesses will testify that pepper gel containing capsaicin—like the pepper gel used by Worrell on January 6, 2021—is capable of causing extreme pain, especially to the eyes; can cause breathing difficulties, especially for those with underlying

conditions such as asthma; can cause sudden changes in blood pressure or heart rate that can require medical attention; can require medical attention in the form of steroidal eye drops; and can cause long-term damage, in particular to the cornea.  As outlined at length in the government's response to the defendant's motion to dismiss, Dkt. 51 at 6-8, numerous cases have held that similar or even less compelling evidence is sufficient to prove that pepper spray, mace, or similar products are at least *capable* of causing "serious bodily injury" when used in their ordinary application, and so are "deadly and dangerous weapons."[3]

---

[3] Chief Judge Howell came to that conclusion with respect to the pepper gel in this case at the detention stage, based on a proffer of evidence similar to that which will be provided at trial. Many other courts have also so found based on similar evidence either proffered or admitted at trial.  *See also United States v. Gieswein*, 2021 WL 3168148, at \*14 (D.D.C. July 27, 2021), *aff'd*, 2021 WL 5263635 (D.C. Cir. Oct. 19, 2021) (such spray "is generally understood to be capable of causing 'extreme physical pain' and 'protracted' impairment of a bodily organ, such as coughing, choking, burning sensations of the eyes and nose, and exacerbation of pre-existing conditions such as asthma.")); *United States v. Neill*, 166 F.3d 943, 949-50 (9th Cir. 1999) (exacerbation of asthma and pain of initial spray qualified pepper spray as dangerous weapon); *United States v. Bartolotta*, 153 F.3d 875 (8th Cir. 1998) (chemical pneumonia resulted from mace attack; mace was dangerous weapon); *United States v. Melton*, 233 F. App'x 545, 547 (6th Cir. 2007) (pepper spray dangerous weapon because it "burns the face, nostrils, restricts breathing passages, and causes blindness. . . .  persons with medical problems such as asthma have experienced damage to lungs when exposed to pepper spray"); *United States v. Douglas*, 957 F.3d 602, 607 (5th Cir. 2020) (finding that pepper spray is a "dangerous weapon" and noting that "[t]wo victims were treated in a hospital after initial treatment in the prison infirmary, and one victim suffered protracted impairment in his right eye"); *Headwaters Forest Def. v. Cty. of Humboldt*, 240 F.3d 1185, 1199-1200 (9th Cir. 2000) ("pepper spray is designed to cause intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx"), *cert. granted, judgment vacated*, 534 U.S. 801 (2001); *cf. United States v. Dukovich*, 11 F.3d 140, 142 (11th Cir. 1994) (tear gas was "dangerous weapon" under Sentencing Guidelines because it can cause "eye pain and a severe headache," and can cause vomiting, a rash, the loss of breath, or temporary damage to the eyes); *see United States v. Krueger*, No. 13-20242, 2013 WL 8584873, at \*2 (E.D. Mich. July 10, 2013) (concluding that pepper spray was dangerous weapon under Sentencing Guidelines); *Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1261 (E.D. Wash. 2005).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:     <u>/s/ *William Dreher*</u>
WILLIAM DREHER
Assistant United States Attorney (Detailed)
D.C. Bar No. 1033828
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov

ALEXIS J. LOEB
Assistant United States Attorney (Detailed)
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7168
alexis.loeb@usdoj.gov

J. HUTTON MARSHALL
Assistant United States Attorney
DC Bar No. 1721890
601 D Street, N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov