**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-292 (RCL)** |
| **CHRISTOPHER WORRELL,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in this case. For the reasons given below, the government requests that this Court sentence Christopher Worrell to 168 months of imprisonment, 3 years of supervised release, $2,000 in restitution, a fine of up to $181,000 (depending on Worrell's accounting of his fundraising), and $610 in mandatory special assessments. The government's recommendation is at the low end of the applicable guidelines range, as calculated by the government, of 168-210 months.

### I.       INTRODUCTION

Christopher Worrell was found guilty, after a bench trial in which he perjured himself, of assaulting a group of police officers with a deadly and dangerous weapon in order to thwart Congress's certification of the 2020 electoral vote and the peaceful transition of power.

Worrell plotted his trip to D.C. with other Proud Boys from his "zone" for weeks leading up to January 6, participating in conversations in which the police were called traitors and Proud Boys brainstormed ways to disrupt the certification. Consistent with this planning, Worrell arrived in D.C. ready for battle, wearing body armor, and carrying pepper gel spray and a large radio to

1

coordinate with his zone-mates. Intent on obstructing the certification, he did not wait for President Trump to call his supporters to the Capitol. Instead, Worrell marched with a larger group of Proud Boys around and then onto Capitol grounds, threatening U.S. Capitol Police ("USCP") officers along the way to "honor their oaths" or face the Proud Boys' wrath.  Once on Capitol grounds, Worrell spewed vitriol for half an hour at the overwhelmed officers restraining the mob. And when he saw an opportunity to pepper spray the police line from deep within the crowd, Worrell took it. It was exactly the kind of criminal assault on officers that one of Worrell's Proud Boys brothers had called for in earlier Telegram conversations. Worrell immediately retreated to safety and gloated about his assault to his co-defendant Daniel Scott.

As the Court knows from the sentencing materials in Daniel Scott's case, Worrell, Scott, and their Proud Boy zone-mates together played a pivotal role in collapsing the police line on the west front, leading to the first breach of the Capitol Building. Worrell reacted to that collapse with glee: He yelled his congratulations to Scott, flashed a Proud Boys hand signal in triumph, and then, turning the camera on himself, said: "Yeah! Taking the Capitol!"

When confronted with this conduct at trial, Worrell showed no remorse. Instead, though under oath, he spun falsehood after incredible falsehood in an effort to deflect responsibility and cast himself as a hero intervening to protect the police. He told these lies without shame. As detailed below, Worrell's dishonesty on the stand was only one of many instances where he has apparently lied to benefit himself or to escape responsibility for his own misconduct.

The government recommends that the Court sentence Worrell to a total of 168 months of incarceration. Worrell willingly participated in a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power,

injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1] But Worrell stands apart from the average rioter that day. Unlike most January 6 rioters, Worrell multiplied the threat of his conduct by advancing on the Capitol with a large group of like-minded individuals clad in tactical gear and weaponry and intent on disrupting the certification. Unlike many January 6 rioters, Worrell coordinated with these Proud Boys before January 6, during their collective march to the Capitol, and while on Capitol grounds. Unlike most January 6 rioters, Worrell assaulted officers with a deadly and dangerous weapon. Unlike many January 6 rioters, Worrell lied to the FBI repeatedly, made vague threats toward witnesses, and refused to turn himself in. Unlike many January 6 rioters, Worrell has profited from his participation in the riot to the tune of over $181,000, peddling the lie that he is a falsely charged political prisoner. Due to his efforts, that false narrative has made its way from his local county commissioners' meeting to two major cable news networks. And unlike many January 6 rioters, Worrell refused to take responsibility, has shown no remorse, and lied numerous times under oath to the Court. Worrell should be punished accordingly. The government seeks a low-end sentence only because of Worrell's ongoing medical conditions.

## II.    FACTUAL BACKGROUND

This Court is well aware of the general background of the January 6, 2021 attack on the Capitol, and the government will not repeat that general background here. *See* Dkt. 1-1 at 1-2.

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol were $2,923,080.50. That amount reflects, among other things, damage to the U.S. Capitol building and grounds and certain costs borne by the U.S. Capitol Police.

**A.      Worrell's Role in the January 6, 2021 Attack on the Capitol**

**1.      Conduct and statements leading up to January 6.**

Worrell and his co-defendant Scott are members of the Proud Boys' "Hurricane Coast" zone. Prior to January 6, Worrell, Scott, and other Proud Boys from his zone talked on Telegram about their expectations for that day. Those messages included expressions of hope that Trump would "install himself as a Fascist dictator," and that Congress or Vice President Pence would "cave" if there were massive, disruptive protests in D.C. Trial Ex. 180 at 23, 25, 28. In one exchange, Worrell's zone-mate "J-Bird," who accompanied Worrell on January 6, discussed physically blocking members of Congress from being able to vote. PSR ¶ 34. In another, the Proud Boys discussed with approval the "storming" by "patriots" of the Oregon state capital on December 20, 2020, stating: "Zero will change until the shootin' starts." *Id.* at 32-33. In another, Worrell encouraged violence on January 6: "Remember George Washington attacked and saved the Union on Christmas Eve." Trial Ex. 185 at 8. On Facebook, Worrell continued the theme, making statements like "Resist Like It's 1776" with respect to the election. Trial Ex. 200 at 7.

Worrell's conversations also included numerous references to violence against the police. On December 29, 2020, in response to other Proud Boys stating: "FUCK COPTIFA," and "The enemy is DC Metro [police]," Worrell replied with a Proud Boys "OK" hand-symbol. Trial Ex. 180 at 7. On January 2, after a Proud Boy shared a video of Proud Boys facing off against the police, his zone-mate "J-Bird" (who was with Worrell on January 6) stated: "TYRANNY ALWAYS COMES IN A UNIFORM." Other Proud Boys referred to officers as "traitors" and expressed their hopes that "'someone' may drop a smoke grenade on the police line" or that "the cops" would "get fucking pepper sprayed." Tr. Exs. 180 at 40, 181. On January 4, a Proud Boy

shared a video of Proud Boys stepping on a Thin Blue Line flag and calling the police traitors. Another Proud Boy responded by calling the police "scumbags." Worrell replied "Agreed!" a few minutes later, and then stated: "FUCK EM F THEY DON'T STAND WITH US!! 'AGAINST ALL ENEMIES FOREIGN OR DOMESTIC!!" Tr. Exs. 180 at 51, 182.

On January 3, 2021, Worrell, Scott, and other local Proud Boys went to a "Stop the Steal" rally featuring Roger Stone in Naples, Florida. *See, e.g.*, Trial Exs. 135, 208. During the rally, after stating that the 2020 presidential election was rigged due to voting fraud, Stone said: "Rick Scott has a fundamental choice. He will either stand up for the Constitution ..." In response, Daniel Scott, standing next to Worrell, yelled "Or give him the rope!"

### 2.    Conduct and statements on January 6.

From January 4 to 5, 2021, Worrell traveled with a group of 8-10 others, including 5-6 other Proud Boys from his zone, from southwest Florida to D.C. 5/11 Trial Transcript ("5/11 Tr.") 63. On the morning of January 6, Worrell walked with this group to the Washington Monument. Worrell wore a "plate carrier that had stab plates in it," 5/11 Tr. 61, a large radio (and antenna), ear headphones for the radio, and a GoPro-style camera. *See* 5/11 Tr. 62; 4/27 Trial Transcript ("4/11 Tr.") 156. Worrell also carried two canisters of Sabre Red Maximum Strength Pepper Gel. *Id.* Worrell's regional group is depicted in Trial Ex. 134A below:



Image 1—Trial Ex. 134A

The five numbered individuals in Trial Ex. 134A all entered Capitol grounds with

Worrell (circled in red) and Scott (kneeling). They are two individuals from southwest Florida

(#1 and #2), and Proud Boys with aliases "J-Bird" (#3), "El Greco" (#4), and "Leo Riddler" (#5).

Worrell had joined and was an active participant in the Proud Boys' "Boots on the Ground"

Telegram chat, in which Proud Boys members present in D.C. for January 6 coordinated their

plans. Per instructions in the chat, Worrell and Scott met a larger group of 100 or more Proud

Boys, led by Ethan Nordean, Joseph Biggs, and Zachary Rehl, at the Washington Monument.[2]

Nordean issued orders through a megaphone, including "slow and steady pace to the Capitol" and

---

[2] Nordean, Biggs, and Rehl have been convicted of seditious conspiracy and other offenses in connection with their role in the breach of the Capitol. *United States v. Nordean,* No. 21-cr-175.

"develop that front line, get a move on." Trial Ex. 565 at 3:42-4:45. Before President Trump's speech, Worrell and this larger group marched to and around the Capitol. At 11:28 a.m., Worrell yelled threats at a group of USCP officers donning protective gear: "Honor your oaths! On your knees! Honor your oaths! We are on your side, don't make us go against you! These are our streets!" Trial Ex. 246A. Fifteen minutes later, Scott yelled "Let's take the fucking Capitol!" to Worrell and the rest of the assembled Proud Boys. As this Court found, Worrell's "statements and actions during January 6, at the very least, establish that he developed [the] purpose [of disrupting the certification] by the morning of January 6," before entering Capitol grounds. Dkt. 245 at 1.

Shortly after USCP perimeters were first breached, Worrell, Scott, and their zone-mates marched in a coordinated stack formation past downed barricades and trampled fencing onto Capitol grounds. They discussed their excitement about invading the building itself:

- Scott: "Oh god, we're going in the Capitol, guys."
- Another Proud Boys member of Worrell's zone: "Kicking the doors in."
- Worrell: "Trump is coming to the Capitol."
- Another Proud Boys member of Worrell's zone: "Taking that motherfucking Capitol back."
- Scott: "I've never been in the Capitol before."
- Another Proud Boys member of Worrell's zone: "Zone 5, stay tight."

Trial Ex. 211. Clearly, Worrell "entered Capitol grounds . . . with the purpose of disrupting the Electoral College Certification" and with knowledge the area was closed to him. Dkt. 245 at 1.

Worrell, Scott, and the three other Proud Boys from their zone moved to the front of the crowd, facing a line of law enforcement officers on the lower west plaza, where they stayed between approximately 1 p.m. and 1:48 p.m. During this time, Worrell filmed himself chanting or screaming derogatory messages toward the USCP. For example:

- At 1:01 p.m., Worrell called the USCP "commies with the guns." Trial Ex. 141A.

7

- At 1:22 p.m., Worrell repeatedly screamed "Fuck you!" at the USCP. He then used a racial slur to describe them, while holding up his middle finger at them. Trial Ex. 142A.
- At 1:34 p.m., Worrell screamed at USCP officer Nathan Cole, calling Cole "scum" and a "piece of shit" for defending the Capitol building. Trial Ex. 113A.

At around 1:30 p.m., Worrell's zone-mate "Leo Riddler" pushed against a line of officers in front of Worrell. *See* Trial Ex. 254. One minute later, Worrell sprayed pepper gel at the same group of officers. Dkt. 245 at 2-3. "Worrell's pepper gel affected at least three law enforcement officers." Dkt. 245 at 3. After spraying USCP officers, Worrell rushed back to Scott and, smiling, stated: "I just deployed a whole can." Trial Ex. 247A.

The group then moved a few yards north, in front of a smaller group of USCP officers guarding the northwest stairs of the Capitol. This area is depicted in Image 4 below, in which, from left to right, "Leo Riddler," Worrell, Scott, "J-Bird," and "El Greco," are circled.



*Image 2*

Worrell took up position behind Scott, who squared up directly in front of the officers. Worrell's zone-mates and Proud Boys leaders like Nordean and Biggs also positioned themselves behind Scott. At about 1:48 p.m., Scott suddenly pushed the two officers backward and up the

stairs. The police line there collapsed, and the crowd surged up the stairs and ultimately was the first group to enter the U.S. Capitol building. Immediately after Scott's assault broke the police line, Scott and Worrell celebrated with each other, with Scott donning a cowboy hat and yelling "Proud of your fucking boy!" to Worrell. *See* Trial Ex. 112A. Worrell then said: "Yeah! Taking the Capitol!" while filming the crowd surging up the steps. *Id.* "As [Worrell] said, he wanted the mob to take the Capitol, even though he did not himself go inside." Dkt. 245 at 2. Worrell remained on Capitol grounds for more than another hour, walking to within feet of the Capitol on its Upper West Terrace and appearing in a music video, flashing a Proud Boys hand symbol. Trial Ex. 162.

On January 7, 2021, Scott texted Worrell, apparently in reference to a dispute they were having with their local zone leadership, "Siege the chapter." Trial Ex. 267-1. Worrell replied: "Much easier than the Capitol." *Id.* Worrell later obtained from Scott a Proud Boys "challenge coin" to celebrate the Proud Boys' breach of the building, featuring a noose, guillotine, and flames:



*Image 3 - Trial Ex. 564.*

### B.      Worrell's Post-January 6, 2021 Statements

Shortly after January 6, Worrell posted lies about the riot on Facebook. In one, Worrell stated: "The violence was perpetrated on civil protestors. Not one person was causing harm or inciting violence on those steps!! The Capitol COMMIE Police fired tear gas and flash bangs into a PEACEFUL CROWD!!" Trial Ex. 200 at 38. Worrell admitted at trial that this was a lie. 5/11 Tr. at 171-172. He also claimed, falsely, that the Capitol Police "opened" the Capitol's east side "with intention of letting others in," Trial Ex. 200 at 29, and that the "Capitol Police literally opened the gates for" rioters. *Id.* at 32. Other posts showed Worrell's unrepentance, like his comment that the "protesters took the protest to the exact place they should have." *Id.*

### C.      Worrell's FBI Interview and Arrest

Worrell was interviewed by the FBI on January 18, 2021, at his home. In that interview, Worrell made three knowingly false statements. He claimed he did not "witness any crimes or violence toward law enforcement on January 6th," 5/11 Tr. 138, which he admitted at trial was false, *id.* at 138-139. He claimed that "Patriots didn't storm the Capitol, that it was BLM, Antifa and paid actors," *id.* at 140, but admitted at trial that when he made the statement, he already knew that two of his fellow Proud Boys members had entered the Capitol, *id.* at 141-42, as had others who were not "BLM, Antifa and paid actors," *id.* at 142-43. Worrell also told the FBI he "did not enter Capitol grounds," *id.* at 144, but admitted at trial that he knew he had been on Capitol grounds on January 6th, *id.* at 145-46.

Shortly after that interview, believing that someone had reported him to the FBI, Worrell logged onto Facebook to announce he had "a plan" to deal with the "rat." Trial Ex. 200 at 46-47. Worrell stated: "SO WHOMEVER CALLED THE 'FEDS' ON ME REST ASSURED I KNOW

WHO YOU ARE AND WE WILL BE DISCUSSING THIS SOON!! . . . You are the piece of shit I knew you were!!" *Id.* at 40. He then replied to various comments on his post with additional implied threats of potential violence:

- One user posted: ". . . I hope ya find who did it n make their life Miserable." Worrell replied: "yup!! People seem to think they are 'anonymous' even in 2021!! Information is easy to get these days Joke is on them!!"
- To another, Worrell said: "it was a close personal friend of ours that made the baseless phone call. The rat thinks it got away with the cheese!!"
- To another: "It's a simple case of a butt hurt pu**y ass bitch that thought they could F**k with someone with some dumb bullshit!! They are about to get educated in 'real life'"
- To another: "I KNOW EXACTLY who did it!! I hope they are reading this post!!"

*Id.* at 42-44.

Worrell was arrested on March 12, 2021. At trial, FBI Task Force Officer Grandy testified that the FBI twice directed Worrell to turn himself in immediately when he was not located at home. Worrell twice refused, instead insisting on driving all the way back to his house. 4/27 Tr. at 159-60. This bought him an additional "two, two and a half hours" alone with his phone. 4/27 Tr. at 163. On Worrell's phone were the following messages:

- At 7:08 AM, minutes after Worrell was first called by the FBI, another Proud Boy texted him: "Turn your location off on your phone." Worrell replied: "Done Gonna zap it." Trial Ex. 120 at 22-23.
- At roughly the same time, another individual texted Worrell: "Make sure to clear the phone." Trial Ex. 120 at 20.

Certain videos that were present on a backup of Mr. Worrell's phone dated January 10, 2021, were not present on his phone when seized on March 12, 2021. 4/28 Trial Transcript ("4/28 Tr.") at 9. No messages from Worrell's encrypted Telegram application, which Worrell used to communicate with other Proud Boys before, on, and after January 6, were reviewed by the FBI after extraction of his phone. *Id.* at 203. The Telegram messages this Court saw at trial came from

11

other Proud Boys' phones.

When Worrell finally arrived and was arrested, he stated that he "knew who tipped [the FBI off]," then said that "if he ever finds [the person who identified him online], that the FBI will be coming after him again." *Id.* at 164. Agents searching his house and vehicle never found Worrell's GoPro-style camera or body armor from January 6, 2021. 4/27 Tr. 165-66.

### D.    Worrell's Proffer Interviews

After his arrest, Worrell requested the opportunity to proffer with the government about his misconduct. He sat for two proffer interviews in July and August 2021, and minimized or outright lied about his conduct repeatedly. For example, Worrell stated:

- That he left the "Boots on the Ground" chat "before Christmas," when he in fact participated in the chat until January 7, 2021, at which point he told the entire chat to delete it: "[n]uke this shit." Trial Ex. 175 at 20.
- That "there was no plan to meet up at the Washington Monument," and that the Proud Boys "went there" only "because there was a good view," when in fact Worrell received several chats stating that the group needed to "meet at the Washington Monument at 10am," where, lo and behold, Worrell arrived at the designated time. *Id.* at 11, 15.
- That his group "did not have the national [Proud Boy radio] frequencies," when in fact Worrell himself *sent* the group frequency to the group. *Id.* at 13.
- That when Daniel Scott "bulldoze[d]" officers on the steps, Scott "had gone up the steps and then disappeared," when in fact, Worrell celebrated Scott's assault with Scott immediately after it occurred. Trial Ex. 112A.

During a second proffer to discuss his own misconduct, Worrell told an elaborate, false story about intervening to protect the police from a group of individuals clad in black assaulting officers using iron rods. He identified at least three people as having been the target of his pepper spray on January 6, with the identity of that target changing even during the proffer.

Around that time, Worrell called from jail into a Newsmax TV cable television show for

an interview about his case.[3]  During that interview, Worrell stated that the charge that he assaulted

a line of police officers with pepper spray gel was "completely false and fabricated" and a "crime

that they have no evidence of."

## III.    THE TRIAL

After a bench trial, Worrell was convicted on May 12, 2023 of all seven counts in the

Second Superseding Indictment:

- Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18
  U.S.C. §§ 1512(c)(2) and 2 (Count One);
- Entering and Remaining in a Restricted Building or Grounds with a Deadly or
  Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Two);
- Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly
  or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count
  Four);
- Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or
  Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Six);
- Act of Physical Violence in the Capitol Grounds or Building, in violation of 40 U.S.C.
  § 5104(e)(2)(F) (Count Eight);
- Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count Ten); and
- Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in
  violation of 18 U.S.C. § 111(a)(1) and (b) (Count Thirteen).

Mr. Worrell's testimony, which was replete with false statements, is covered in detail in

the discussion of the obstruction enhancement under U.S.S.G. § 3C1.1, below. *See infra* at 25-29.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As explained below, the government calculates Worrell's total offense level as 35, and his

guidelines range as 168-210 months. The government's calculations are set forth below.

### A.    Count One

The final PSR does not include a Guidelines analysis for Count One because that count

---

[3] The interview is publicly available here: https://www.youtube.com/watch?v=Y7-e6OI_w4U.

groups with Count Thirteen, which the PSR appears to conclude has a higher offense level. *See* PSR ¶ 97. The government submits that Count One has a higher offense level (35) than Count Thirteen (30). The correct guidelines calculation for Count One is as follows:

Count One: 18 U.S.C. § 1512(c)(2):

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(1)(B) | Injury/threatened injury to obstruct | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Substantial interference | +3 |
| U.S.S.G. § 2J1.2(b)(3) | Extensive in scope, planning, or preparation | +2 |
| U.S.S.G. § 3A1.2(c) | Substantial risk to officers | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of justice | +2 |
| | **Total:** | **35** |

Worrell objects to every one of the enhancements above the base offense level of 14, *see* Dkt. 278 at 4-5, so the government addresses each in turn below. The draft PSR included every enhancement except for the 6-level enhancement under Section 3A1.2(c).[4] Dkt. 267 at ¶¶ 99-104.

## 1.    Section 2J1.2(b)(1)(B) and (b)(2).

The 8-level increase under Section 2J1.2(b)(1)(B) applies here because the offense involved causing or threatening injury "to obstruct the administration of justice." The 3-level increase under Section 2J1.2(b)(2) applies here because "the offense resulted in substantial interference with the administration of justice." Worrell contends that neither enhancement applies because "an 'official proceeding', when it is a proceeding before Congress, is not a matter involving the 'administration of justice.'" Dkt. 271 at 3. Worrell is wrong; Congress's Joint

---

[4] As explained below, *see infra* at 29-30, if the Court declines to apply this six-level enhancement, the government respectfully seeks a discretionary upward departure under U.S.S.G. § 3A1.4 n.4.

Session on January 6 involved the "administration of justice," as most courts in this district have recognized.

Section 2J1.2's text, purpose, and commentary all support the conclusion that obstructing Congress's certification of the electoral vote interferes with the "administration of justice." Administration of justice, in its broadest sense, refers to the proper administration of law by all three branches of government. Black's Law Dictionary defines "justice" to include "[t]he fair and proper administration of laws," and it defines "obstruction of justice" as "[i]nterference with the orderly administration of law and justice." Black's Law Dictionary (11th ed. 2019); *see* Ballentine's Law Dictionary 696 (3d ed. 1969) (defining justice to include "exact conformity to some obligatory law"). When defining "contempt" to include "[c]onduct that defies the authority or dignity of a court *or legislature*," Black's Law Dictionary observes that "such conduct interferes with the administration of justice." Black's Law Dictionary (11th ed. 2019) (emphasis added). And courts have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977).

To be sure, the term "administration of justice" is most commonly used in a narrower sense to refer to "interference with the pendency of some sort of judicial proceedings." *In re Kendall*, 712 F.3d 814, 828 (3d Cir. 2013); *see United States v. Aguilar*, 515 U.S. 593, 599 (1995) (stating that the "omnibus clause" of 18 U.S.C. § 1503, which criminalizes obstruction of the "due administration of justice," requires proof of "an intent to influence judicial or grand jury

proceedings"). But there are compelling reasons to conclude that "administration of justice" bears its broader (albeit less common) meaning in Section 2J1.2.

*First*, Section 2J1.2's context and purpose support the broader reading of "administration of justice" in both subsections (b)(2) and (b)(1)(B). Section 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense (i.e., relating to judicial or quasi-judicial proceedings). *See* U.S.S.G. § 2J1.2, cmt. (listing covered statutes); U.S.S.G. Appx. A (same). Those offenses include concealing or destroying invoices or papers relating to imported merchandise, 18 U.S.C. § 551; obstructing an investigation under the Workforce Innovation and Opportunity Act, 18 U.S.C. § 665(c); obstruction of proceedings before departments, agencies, and committees, 18 U.S.C. § 1505; obstruction of enforcement of state gambling laws, 18 U.S.C. § 1511; obstruction of official proceedings, 18 U.S.C. § 1512; obstruction of a federal audit, 18 U.S.C. § 1516; destruction of documents in agency investigations, 18 U.S.C. § 1519; and interfering with the administration of the Internal Revenue Code, 26 U.S.C. § 7212. Yet under a narrow interpretation of the guideline, the enhancements under subsection (b) could not apply to those offenses. That is good reason to reject such a reading, as multiple judges have recognized. *See United States v. Rubenacker,* No. 21-cr-193 (May 26, 2022), Sent. Tr. at 69 ("There is simply no indication in guideline Section 2J1.2 that the [specific offense characteristics] containing the phrase 'administration of justice' were meant to apply to only some of the statutes referenced to this guideline and not to apply to all of the cases involving obstruction of proceedings taking place outside of courts or grand juries; that simply doesn't make sense."); *United States v. Wright*, No. 21-cr-341 (CKK), 2023 WL 2387816, at *5 (D.D.C. Mar. 4, 2023) ("To suggest . . . that the specific offense characteristics of § 2J1.2 only apply to some of the statutes referenced—

would be counterintuitive and an unreasonable interpretation."). Moreover, as Judge Mehta observed, "[i]t would seem very odd" for the guidelines "to carve out" Section 1512 official proceedings in particular—"a type of proceeding that Congress expressly held would be subject to and the object of obstructive conduct before it"—without the guidelines "expressly saying so." Sentencing Ex. K (*United States v. Rhodes et al.,* 22-cr-15 (APM), 5/24/23 Sent. Tr.) at 7.

Similarly, Section 2J1.2's background reaffirms that Section 2J1.2 broadly covers crimes such as intercepting grand jury deliberations, interfering with an illegal gambling investigation, or obstructing "a civil or administrative proceeding." U.S.S.G. § 2J1.2, cmt. bkgd. The background then states that the "specific offense characteristics" at issue here "reflect the more serious forms of obstruction," *id.*, again indicating that those enhancements apply to the many obstruction offenses covered by Section 2J1.2 that do not involve interference with judicial proceedings.

*Second*, Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines "[s]ubstantial interference with the administration of justice" to "include" the following: "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." U.S.S.G. § 2J1.2, cmt. N.1 (emphasis added). This definition includes interference not only with "court" resources, but also with any "governmental" resources, a term that would ordinarily include congressional resources.

Reading the commentary's use of the term "governmental . . . resources'" to include congressional resources would not, as Worrell argues, render the phrase "or court" superfluous. The purported superfluity could be avoided by reading "governmental . . . resources" to refer to

the resources of both the executive and legislative branches, but not the judicial. Besides, even if a broad definition of "governmental" could include "court" resources, using both terms to clearly sweep in all three branches of government is hardly an obvious superfluity. Moreover, Worrell's interpretation of the commentary runs into its own interpretive problem. If the term "administration of justice" in § 2J1.2 refers only to a judicial or related proceeding, then the word "governmental" is itself overbroad, as the ordinary reading of that term extends beyond judicial proceedings.

Worrell's argument also relies on the idea that if the legislature is not included in "governmental" in Section 2J1.2's definition, then a congressional proceeding cannot involve the administration of justice—that is, that Section 2J1.2's definition provides an *exhaustive* list of what constitutes the "administration of justice." But that's not true. "The term 'includes' clearly indicates that the subsequent listing of acts warranting this enhancement is not exclusive, and that other acts—if similarly or even more disruptive of the administration of justice—could serve as bases for the section 2J1.2(b)(2) enhancement." *United States v. Amer*, 110 F.3d 873, 885 (2d Cir. 1997); *Wright*, 2023 WL 2387816, at *6. As Judge Mehta observed: "the definition begins with the word 'includes,' and the Guidelines specifically define and state the word 'includes'—look at 1B1.1, Note 2—that 'includes' means that the list is not exhaustive. It is 'merely illustrative.'" Sentencing Ex. K at 10. Meanwhile, "[t]he canon of *expressio unius est exclusion alterius*— 'mention of one thing implies exclusion of another thing,'—does not apply when context does not indicate that the list is meant to be exclusive." *Wright*, 2023 WL 2387816, at *6 (citations omitted). Thus, Section 2J1.2's commentary's list of illustrative examples does not narrow the meaning of "administration of justice," which as noted above must be broad enough to encompass the statutes the Commission determined were subject to Section 2J1.2.

18

This Court and at least twelve other judges in this District have applied at least one of Section 2J1.2's "administration of justice" enhancements in cases arising from the Capitol breach on January 6: then-Chief Judge Howell (*United States v. Rubenacker*, No. 21-cr-193); Judge Mehta (*United States v. Rhodes et al.,* 22-cr-15), Judge Contreras (*United States v. Andries*, No. 21-cr-93); Judge Cooper (*United States v. Robertson*, No. 21-cr-34); Judge Chutkan (*United States v. Priola*, No. 22-cr-242); Judge Moss (*United States v. Miller*, No. 21-cr-75); Judge Kelly (*United States v. Pruitt*, No. 21-cr-23); Judge Friedrich (*United States v. Reffitt*, No. 21-cr-32); Judge Hogan (*United States v. Tenney*, No. 21-cr-640); Judge Friedman (*United States v. Puma*, No. 21-cr-454); Judge Bates (*United States v. Brock*, No. 21-cr-140); and Judge Kollar-Kotelly (*Wright*, 2023 WL 2387816, at \*4-\*13).[5] This Court has applied these enhancements in several cases, including that of Worrell's co-defendant, Daniel Scott. *See also, e.g.*, *United States v. Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Chansley*, No. 21-cr-003 (Lamberth, J.).

Outside of the January 6 context, other courts have also applied the "administration of justice" enhancements in Section 2J1.2(b)(2) to efforts to obstruct a wide range of proceedings that were not limited to judicial or grand jury proceedings. *See United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (defendant obstructed proceeding by kidnapping children and transporting them internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (defendant interfered with OSHA investigations into a workplace accident);

---

[5] The only judge who has consistently found that the enhancements do not apply to Section 1512(c)(2) offenses is Judge McFadden, as in *United States v. Hale-Cusanelli*, No. 21-cr-37.

*United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (defendant withheld subpoenaed documents from a congressional subcommittee).

The Electoral College certification vote on January 6 falls comfortably within the meaning of "administration of justice" as used in Section 2J1.2 because it involved Congress's performance of duties required by law. As stipulated by Worrell, Congress's certification of the Electoral College vote was an "official proceeding" required by both the Constitution and federal statutes. *See* Trial Ex. 401 ¶ 7. Application of both Sections 2J1.2(b)(1)(B) and (b)(2) is therefore appropriate here.[6]

### 2. Section 2J1.2(b)(3): Extensive in scope, planning, or preparation.

This Court already found that Section 2J1.2(b)(3)(C)'s enhancement applied to the Section 1512(c) offense of Worrell's co-defendant, Daniel Scott, and the evidence supporting the enhancement for Worrell is just as strong.[7] Like Scott, Worrell was involved in numerous discussions over encrypted media with other Proud Boys leading up to January 6, 2021, regarding the need to protest the election results, what could disrupt the certification on January 6, 2021, and how to organize that group to prepare for, or inflict, potential street violence. Like Scott, Worrell participated in the January 3, 2021 "Stop the Steal" rally featuring Roger Stone, where Scott threatened violence if senators voted to certify the 2020 election. Dkt. 209 at 4-5. Worrell traveled

---

[6] Those enhancements also apply as a matter of fact, which Worrell does not dispute. Worrell's obstructive conduct included an assault, so there is no question that the offense threatened to cause injury (U.S.S.G. § 2J1.2(b)(1)(B)), and he played a role in the riot that substantially interfered with the certification (U.S.S.G. § 2J1.2(b)(2)), as this Court found after trial. Dkt. 275 at 4.

[7] A recitation of cases applying the enhancement appears in the government's sentencing memorandum for Daniel Scott (Dkt. 255, at 19-22), but in short, "the length and scope of the criminal activity as well as the number of persons involved" are relevant considerations. *United States v. Holland*, 22 F.3d 1040, 1046 (11th Cir. 1994).

from Florida to D.C. to commit his offense, bringing with him a large radio with an antenna, a stab vest with stab plates, two canisters of pepper gel, and other tactical clothing, plainly anticipating potential violence and crowd-control munitions. Worrell helped another zone-mate select his radio and agreed to "rig" it "en[ ]route" to D.C., *see* Trial Ex. 100 at 8-19, 22-23, and then provided the radio frequency to the larger group of Proud Boys in D.C. on January 6, *see* Trial Ex. 175 at 13. Proud Boys leaders planned what to wear and bring on January 6, 2021: not to wear Proud Boys colors (yellow and black); to wear tactical gear; to bring communication equipment; and to arrive at the Washington Monument at 10 am on the morning of January 6, 2021.[8]  As a member of the "Boots on the Ground" chat, Worrell saw those planning instructions, and then followed them.

Worrell's offense was also extensive in scope, like Scott's. Worrell marched with more than 100 Proud Boys members to the Capitol, and continued to coordinate with his zone-mates once inside the restricted area. *See supra* at 5-9. And Worrell's intent was hardly modest in scope: he sought to disrupt the transfer of power.

Worrell contends that his meeting up with Daniel Scott on January 6 was "coincidental," Dkt. 271 at 2, and that he put on gear on January 6 solely to confront Antifa, Dkt. 278 at 9-10. But given his statements prior to January 6 about going to the Capitol to object to the certification, and the many messages sent to him by other Proud Boys about the plan for January 6, it beggars belief that Worrell set out to fight Antifa that day and just coincidentally ended up marching to the Capitol with a coordinated group of Proud Boys members, assaulting USCP officers, and

---

[8] *See, e.g.*, Trial Ex. 175 at 11 (Proud Boy stating: "Everyone needs to meet at the Washington Monument at 10am tomorrow morning!! Do not be late! Do not wear colors! . . ."); *id.* at 13 (Proud Boy referring to Worrell's Baofeng radio frequency and stating "Everyone get on this channel until further notice").

celebrating the crowd's breach of the Capitol. Worrell knew what he was preparing for on the morning of January 6 when he put on his stab-proof vest and brought his pepper spray.

In sum, the evidence that Worrell's offense was "extensive in planning, preparation, and scope" is sufficient for the same reasons found by this Court in the Scott sentencing.

### 3.   Section 3A1.2(c): Official victim enhancement.

Section 3A1.2(c) provides for a six-point enhancement where an assault "creating a substantial risk of bodily injury" against an officer occurs "during the course of the offense . . . ."[9] Here, in the course of committing obstruction, Worrell pepper sprayed officers on the West Plaza police line in the midst of the riot, creating "a substantial risk of serious bodily injury." U.S.S.G. §3A1.2(c). The government argued in favor of applying this enhancement in its obligation and response, *see* Dkt. 270 at 3-5, but the final PSR does not discuss the enhancement.

 "[E]valuating the risk of serious injury may depend on many factual details of the confrontation," including the environment of the assault and risks of further injury from that environment that may not have materialized. *United States v. Alexander*, 712 F.3d 977, 978 (7th Cir. 2013); *see also, e.g., United States v. Curtis*, 799 Fed. App'x 639, 642 (10th Cir. 2020) (affirming application of enhancement where scuffle with prison guards occurred in a "confined" environment); *United States v. Irving,* 413 Fed. App'x 513, 516 (7th Cir. 2011) (affirming application of enhancement where defendant shoved officer down "icy" stoop; officer, who

---

[9] This is distinct from the official victim enhancement under 3A1.2(a). For Section 3A1.2(a) to apply, "*the*" primary "victim" (emphasis supplied) must be "a government officer or employee"; Congress was the primary victim of the obstruction here. The text of Section 3A1.2(c) contains no such limitation; and the commentary explains that it "may apply in connection with a variety of offenses that are not by nature targeted against official victims." U.S.S.G. § 3A1.2, cmt n.4.

suffered skinned knees, "could have struck his head, torso, back, or limbs on the steel pipe banister, on the concrete stairs, on the retaining wall, or on the pavement below"). No serious bodily injury need have actually occurred; what matters is the risk. *See United States v. Bowie,* 198 F.3d 905, 913 (D.C. Cir. 1999) (affirming application of enhancement where defendant tried to pull a pistol during altercation with officer).

Here, Worrell sprayed "a whole can" of maximum-strength pepper gel at a line of officers who were vastly outnumbered as they sought to defend the U.S. Capitol from an inflamed mob. On January 6, rioters threw blunt objects, like "two by fours" through the air, and swung makeshift weapons, like "flag poles." *See, e.g.,* Apr. 26, 2023 Trial Tr. at 88. Pepper gel spray commonly forces a victim to reflexively shut his or her eyes "very tightly and very—in some respects, violently." *See* 4/28 Tr. at 110 (testimony of Dr. Fitsanakis). Officers who are sprayed are thus unable to see the threats around them during a riot, leaving them vulnerable to being attacked by rioters, hit with flying objects, dragged into the crowd, or disarmed. *See, e.g.*, 4/26 Trial Transcript ("4/26 Tr.") at 41 (testimony of Sgt. Lively that, when his eyes closed in response to being sprayed, "now I have to worry about someone attempting to take my firearm or any other weapon that I carry on myself"). Deputy Stephen Lowe witnessed just that occur. After being sprayed, two other officers could not open their eyes and grasped at a nearby bicycle rack. Lowe viewed it as an "involuntary reaction. They were just holding on as tight as they could." 4/27 Tr. at 77. *Id.* But rioters were also pulling on the bicycle rack—and Lowe had to deploy his pepper spray against them to keep the officers from getting pulled into the crowd. *Id.*

Other January 6 cases have illustrated that the danger Deputy Lowe experienced was very real: officers pulled into the crowd on January 6 could be savagely beaten. *See, e.g.*, Gov. Sent.

Mem., *United States v. Stager*, No. 21-cr-35 (RC), Dkt. 333, at 6-9 (describing how two MPD officers were pulled into the crowd; one was beaten with a flagpole and a police baton; another had his helmet knocked off and was struck with poles and stomped on); Gov. Sent. Mem., *United States v. Rodriguez*, No. 21-cr-246 (ABJ), Dkt. 189 at 21-27 (describing how MPD Officer was dragged into the crowd, where a rioter repeatedly used an electroshock device on his neck). "Serious bodily injury," involving either extreme physical pain, lasting physical impairment, or requiring hospitalization or other medical intervention, could obviously result. *See, e.g., Alexander*, 712 F.3d at 979 ("Even one blow to the head, and even by an unarmed person, can pose a substantial risk of serious injury within the meaning of the Guidelines").

Judge Mehta has recognized this precise risk—that temporarily blinding or incapacitating police officers with pepper spray during the January 6 riot could lead to serious officer injury—as a basis for the 3A1.2(c) enhancement. *United States v. Schwartz,* No. 21-cr-178 (APM), Dkt. 213 (May 5, 2023 Sent. Tr.) at 13. In *Schwartz*, one victim officer had described how "the OC spray temporarily blinded him for a period of time." *Id.* Judge Mehta observed, "[g]iven the circumstances of that day, for any officer to have been blinded even momentarily created an additional substantial risk of injury, given that there were multiple—not multiple—there were hundreds and thousands of other people intending to and doing harm to police officers that day." *Id.* at 13-14. He concluded, "and so the use of the OC spray in a way that incapacitated officers and made them more vulnerable to injury, and serious bodily injury at that, given the amount and the number of people out there who were using makeshift weapons really did create a circumstance that I do think fits the definition under [3]A1.2(c)(1)." *Id.* at 14. As further support, Judge Mehta cited *United States v. Richburg,* 109 F. App'x 558 (4th Cir. 2008), where the court found that

pepper spraying an officer in the face during an altercation (the defendant had also punched the officer) warranted the adjustment. *Id.* at 14.

### 4.    Section 3C1.1: Obstruction of justice.

Application Notes 4(B) and 4(F) to Section 3C1.1 state that "committing . . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies, as is "providing materially false information to a judge." *United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993). Whether Worrell committed either type of conduct must be shown by preponderance of the evidence.[10]  *See United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). The Court should make specific findings at sentencing as to each element of perjury: that Worrell gave "false testimony concerning a material matter with the willful intent to provide false testimony." *Dunnigan*, 507 U.S. at 94.

Worrell took the stand at trial and committed perjury. This Court has already characterized Worrell's testimony as "unbelievable," noted several material claims by Worrell that the Court found incredible, Dkt. 245 at 3, and found that Worrell "attempt[ed] to downplay his prior actions and create a false narrative about them." Dkt. 245 at 5. Worrell testified to the following specific materially false statements, among others:

---

[10] "At one time," the D.C. Circuit required proof of perjury for 3C1.1 purposes by clear-and-convincing evidence. *United States v. Makki*, 47 F. Supp. 2d 25, 29 n.3 (D.D.C. 1999) (citing *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994)). But the D.C. Circuit subsequently interpreted a 1997 amendment to the sentencing guidelines to mean that "such allegations could now be proven by a preponderance of the evidence." *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). While *Montague* has not, to the government's knowledge, been expressly overruled, the government is not aware of it having been cited favorably in a perjury 3C1.1 case that involved the post-1997 guidelines. Of course, Worrell committed perjury under either standard of proof.

1.    Most prominently, this Court found that Worrell's testimony that he "sprayed the pepper gel at Antifa, or some other members of the crowd," instead of law enforcement officers, was "preposterous," "completely incredible," and false beyond a reasonable doubt. Dkt. 245 at 2; *see* 5/11 Tr. 163-64 (Worrell's testimony). This false testimony was plainly material to the Section 111(b) assault charge.

2.    Worrell testified that he did not know that Congress was certifying the 2020 electoral college vote on January 6, 2021 "until that day, later on that day" after he left, and that he had no knowledge of the certification while on Capitol grounds. 5/11 Tr. at 122. This Court found that testimony "incredible," because "[h]is actions and statements on January 6 and shortly before, demonstrate that he had the intent to obstruct or impede the certification." Dkt. 245 at 5. This Court also necessarily rejected Worrell's testimony when it concluded that by January 3, 2021, "he knew his actions were directed at the official proceeding he wished to disrupt and those representatives he believed were going to certify the election for President Biden," and that his "purpose for traveling to Washington D.C. was to help 'Stop the Steal' at the Electoral College Certification." Dkt. 245 at 5. Among the evidence supporting the Court's conclusion were Worrell's own Facebook posts describing the certification and his intent to be there. This false testimony was material to Worrell's intent to obstruct.

3.    Worrell testified that he was not planning to go to the U.S. Capitol on January 6, 2021 until the Proud Boys started to march in that direction. 5/11 Tr. 65 (Worrell testifying that going to the Capitol was "a spur of the moment" decision). Worrell also testified they marched to the Capitol solely because "we were freezing standing" near the Monument. 5/11 Tr. 70. This Court found directly the opposite: that "[o]n January 2, [Worrell] was posting on Facebook about

going to the Capitol on January 6 for Trump," and that before and on the morning of January 6, Worrell had the "purpose of disrupting the Electoral College Certification" at the Capitol. Dkt. 245 at 1. The trial evidence also showed that the Proud Boys assembled at the Washington Monument for the express purpose of marching to the U.S. Capitol. Worrell's false testimony was material because it related to his intent to disrupt the certification.

4.      Worrell testified that there was "nothing blocking the walkway" he used to advance onto Capitol grounds. 5/11 Tr. 84. After his testimony concluded, the Court asked Worrell: "There's one problem with your testimony that's most troubling to me… you're saying up until that point, when they were throwing tear gas, you had no idea that was unlawful to be there?" 5/12 Trial Transcript at 23. Facing the Court, Worrell responded directly, "I did not, sir." *Id.* The Court then found to the contrary, concluding that the walkways had "bike racks and snow fencing that clearly show that the area is restricted," that Worrell had admitted he "saw the barriers were up with law enforcement manning the barricades," and that Worrell later "went past those same barricades after they were overrun," and so Worrell "knew the area was cordoned off, he knew it was restricted, yet he entered and remained anyway." Dkt. 245 at 7; Trial Ex. 561. Worrell's false testimony was material to whether Worrell knew the area was restricted.

5.      Worrell testified that he did not see Scott physically assault two officers on the stairs, and claimed he thought Scott was assaulting some "bad actor" or had even "bent over to help somebody that was down on the ground." 5/11 Tr. 103-04, 108-109. This testimony was absurd, because (1) video evidence showed Worrell watching his co-defendant assault uniformed officers, *see* Trial Ex. 248; (2) Worrell was later captured on a jail call admitting that he was an "eyewitness" to Scott "bodyslam[ming] a cop," *see* Trial Ex. 315; (3) Worrell also stated in a

proffer with the government that he had "watched Mr. Scott bulldoze two officers," 5/11 Tr. at 187; and (4) immediately after Scott's assault, Worrell celebrated Scott's assault with Scott and then yelled: "Yeah! Taking the Capitol!" *See* Trial Ex. 112A. This Court unsurprisingly found that Worrell's testimony on this point was "incredible." Dkt. 245 at 3. This false testimony was material because Worrell's celebration of Scott's assault both showed his intent to obstruct and was circumstantial proof he, too, had earlier assaulted officers (and not Antifa members).

6.      Worrell first testified that "in both conversations and online" communications with other Proud Boys, "there was never any conversations saying, you know, there should be violence against the cops." 5/11 Tr. at 59-60. On cross-examination, Worrell was confronted with his own Telegram conversations in which, he had to admit, violence against the cops was discussed. *See supra* at 4-5; 5/11 Tr. 133 (Worrell agreeing that comment "put the guys with gas masks up front and roll through those traitors" suggested "some violence towards the police"); *id.* (admitting another comment "suggest[ed] violence against the police"); *id.* (same for a third comment); *id.* (same for a fourth comment advocating pepper spraying the police). Worrell's false testimony was material because it related to his intent to attack the police on January 6, 2021.

Worrell's only response to this litany of false statements is to claim that his elaborate lies while under oath about whom he intended to assault were the result of a "confusing scene" and his "misperceptions" of what was occurring on January 6. Dkt. 278 at 12. But this Court found that Worrell intended to assault officers for the purpose of disrupting the certification, Dkt. 245 at 2-3, and so has already rejected the idea that Worrell was confused about whom he was spraying. Dkt. 245 at 2-3.  Regardless, Worrell also made false statements (described above) about his conduct before and after his assault, which would independently require application of Section 3C1.1.

5.      **Section 3A1.4 n.4: Terrorism enhancement departure.**

Should the Court decline to apply any of the above enhancements, the government respectfully requests that it depart upward under Note 4 to Section 3A1.4 instead. Note 4 to Section 3A1.4 states that an "upward departure" is "warranted" for an offense that is not a federal crime of terrorism (as defined by 18 U.S.C. § 2332(g)(5)(B)) if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion . . . ."

As the Court found, Worrell's clear intent was to "ensur[e] that the Electoral College Certification of President Biden failed"—that is, to "influence or affect the conduct of government." Dkt. 245 at 2. And Worrell sought to do so through intimidation or coercion, as seen in the tone of his threats to the police on January 6, his use of actual force against officers after they refused to relent, and his coordinated attack on the Capitol with other Proud Boys.

The government has sought a departure under that provision with respect to a number of defendants who, like Worrell, were members of and acted in coordinated fashion with militant, violent groups present on January 6—the Proud Boys and Oath Keepers. For example, Judge Mehta imposed departures of between 3 and 6 levels for each defendant in *United States v. Rhodes et. al.*, No. 22-cr-15 (APM). In so doing, Judge Mehta emphasized not only the defendants' agreement to use force, which involved in that case the stockpiling of weapons in Virginia, but also "the actual use of force by others who went into the building and applied that force against police officers who were doing their duty that day." *Rhodes*, No. 22-cr-15 (APM), May 25, 2023, Hr'g Tr. at 78-79. The enhancement was also recently applied in an obstruction and assault case

not involving those groups.[11]  *See United States v. Southard-Rumsey*, No. 21-cr-387 (APM). Worrell's conduct fits comfortably within this class of cases.

**B.    Count Thirteen.**

The government, like the PSR, calculates the offense level for Count Thirteen as follows:

Count Thirteen: 18 U.S.C. § 111(a)(1):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[12] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(1) | More than minimal planning | +2 |
| U.S.S.G. § 2A2.2(b)(7) | Section 111(b) conviction | +2 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon | +4 |
| U.S.S.G. § 3A1.2(a)-(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of justice | +2 |
| | **Total** | **30** |

*See* PSR ¶ 98-108. In addition to the obstruction enhancement discussed earlier, Worrell also disputes the two-level planning enhancement under Section 2A2.2(b)(1). *See* Dkt. 278 at 5. The government thus addresses that enhancement below.

**1.    Section 2A2.2(b)(1): More than minimal planning.**

Worrell's planning was plainly more than *minimal.* Worrell traveled from southwest Florida to Washington, D.C. with two canisters of pepper gel, thus bringing the weapon he used against USCP officer across state lines. He brought that pepper spray on January 6 knowing that he was going to the Capitol. Hours before his assault, he warned USCP officers: "Don't make us

---

[11] Several judges have declined to apply this departure. *See United States v. Reffitt,* No. 21-cr-32 (DLF), *United States v. Wright*, No. 21-cr-341 (CKK), *United States v. Judd,* 21-cr-40 (TNM); *United States v. Rodriguez*, 21-cr-246 (ABJ), *United States v. Fitzsimons*, No. 21-cr-158 (RC).

[12] By cross-reference from U.S.S.G. § 2A2.4(c)(1), which directs that Section § 2A2.2 be applied if the conduct constituted aggravated assault (as, here, when it involved a dangerous weapon and intent to commit another felony).

go against you!"[13] Later, Worrell sought those officers out by walking past barricades into an area he knew was closed to the public and moving near the front of the mob. And he then spent half an hour haranguing, insulting, and confronting USCP officers before finally assaulting them. His assault was therefore not a rash response to a surprising or sudden external stimulus; he did not encounter USCP officers by accident, but by design. Worrell also participated in a Telegram chat on January 2 in which his Proud Boy brothers requested exactly the kind of assault Worrell carried out two days later: pepper spraying a line of officers holding back a crowd of Proud Boys. *See* PSR ¶ 33(v). In short, Worrell apparently anticipated a clash with the police and took steps (bringing his weapon of choice and defensive body armor) days in advance. His assault was a far cry from a spontaneous assault using, for example, a weapon found at the scene. His planning was more than minimal.

### C.      Grouping Analysis.

The government agrees with the PSR that Counts One, Two, Four, Six, Eight, Ten, and Thirteen group for the reasons stated in the PSR. *See* PSR ¶¶ 95-97.

### D.      Guidelines Range.

The adjusted offense level for the grouped counts is 35. The defendant's criminal history is category I. PSR ¶ 114. Worrell's guidelines range is thus 168 to 210 months' imprisonment.

## V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The Section 3553(a) factors favor the government's recommended sentence of 168 months, which is at the low end of the guidelines to account for Worrell's serious medical conditions.

---

[13] Worrell's odd claim that this comment was somehow just a religious reference, Dkt. 278 at 10, is difficult to understand.

### A.   Nature and Circumstances of the Offense

The government focuses only on a few salient facts with respect to Worrell's offenses.

First, of the crimes committed on January 6, assaults on law enforcement officers stand apart. And among the assaults, Worrell's use of pepper spray gel stands apart from those who shoved or pushed officers without using a dangerous weapon. The Court credited the testimony of an expert toxicologist about the serious health effects that could have resulted from Worrell's pepper gel attack. Officers also testified about the intense pain pepper spray causes. USCP's training officer compared it to "hot melted metal in your eyes, right into your eye sockets." 4/27 Tr. at 125. One officer was so desperate to decontaminate he flushed his eyes with urinal water; another was unable to eat for a day because he felt like he was "chewing and swallowing glass" and feeling like his "entire body was on fire." 4/26 Tr. at 42, 44. Worrell obviously intended at least to injure and incapacitate officers on the line, if not cause them serious injury, because otherwise there would have been no point to his targeted assault. Though his attack appears not to have led to serious health consequences for the officers, it could have.

Second, unlike some other rioters', Worrell's assault was not a spontaneous reaction to a sudden event, or a "momentary lapse in judgment," as he claims (Dkt. 278 at 14). It was the climax of his planning and verbal taunting and the very point of his presence on Capitol grounds.

Third, like his co-defendant Scott, Worrell's conduct is further aggravated because of his coordination with other Proud Boys leading up to and on January 6. As Judge McFadden recently found, "the violence, the planning, and the extremist intentions of the group" make a defendant's association with the Proud Boys on January 6 an aggravating factor. *United States v. Speed,* 22-cr-244 (TNM), Dkt. 67 (May 8, 2023 Sent. Tr.) at 37. Worrell's choice to march to and invade

Capitol Grounds with other Proud Boys intent on obstruction and violence made his conduct all the more dangerous and his objective—obstructing the certification—all the more likely to succeed. As the Supreme Court has recognized, "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961); *see also United States v. Rhodes et al.*, 22-cr-15, 5/25/23 Sent. Tr. 111-12 (quoting *Callanan*, 364 U.S. at 593).[14] And indeed, Worrell's tight-knit group of Proud Boy zone-mates illustrates the point: together, they prodded and assaulted the police line until they broke it, unleashing their fellow Proud Boys into the building.

### B.  The History and Characteristics of the Defendant

*Criminal history.* Unlike many January 6 rioters, Worrell had several prior criminal convictions and arrests. Worrell was convicted of two property crimes in 1991, of Disorderly Conduct in 1996, and of Malicious Injury to Property in 2000. PSR ¶¶ 110-12. Years later, at age 37, Worrell pled no contest to a disturbing charge of attempting to impersonate a police officer— in which he flashed a badge and tried to pull over a woman who was alone, with handcuffs and weapons in his vehicle. *See* PSR ¶ 113. These prior encounters with law enforcement over decades may not score, but they still set him apart from January 6 defendants who have spotless records.

---

[14] Worrell asks the Court to "set aside and disregard" all evidence about what other Proud Boys said, "the Proud Boys organization, and Mr. Worrell's membership in that organization." Dkt. 278 at 2. But he cites no basis for doing so, and courts in this district have routinely considered such evidence of coordination, planning, and concerted action as an important aggravating factor at sentencing.

***History of misrepresentations.*** Worrell has a history of making prolific and opportunistic false statements, especially when confronted with his own misconduct. For example:[15]

1.      Worrell enlisted with the Air Force in July 1990 and was discharged with an entry-level separation by mid-December 1990. When asked by the Probation Office about his military service, Worrell claimed "there was no specific incident that led to his discharge." PSR ¶ 166. That is untrue; Air Force records show he was discharged because he failed to show up for work on four separate days and left base against orders on two others. PSR ¶ 168. The same records indicate that Worrell, when caught, misrepresented to his superiors that he had permission to not attend work. *See* Dkt. 270, Ex. A at 13-15, 16-19.

Worrell has consistently misrepresented his service to others, even in just the conversations to which the government has been privy. While being interviewed by a Turkish news program about the Proud Boys in late 2020, Worrell asserted he had "fought in a Muslim war."[16] In a jail email in 2021 he asserted that "during Desert Shield/Storm" he had "been to Saudi" and "had scuds dropping around us." Sentencing Ex. A at 1-2. On another jail call interview, Worrell claimed he was in the equivalent of the Air Force "Security Forces" (military police). Sentencing Ex. B at 0:24-1:57. None of those claims are substantiated by the Air Force's records.

2.      In 2009, when caught by police after attempting to impersonate a law enforcement officer and to arrest a woman, Worrell lied and denied displaying a badge to her; officers searched

---

[15] The government does not include in this list Worrell's various misrepresentations about his medical condition while at the Charlotte County and D.C. jails, some of which are discussed *infra.*

[16]      The      interview      is      available      here: https://www.youtube.com/watch?time_continue=704&v=PhcKXQ97_Tc&embeds_referring_eur i=https%3A%2F%2Flawandcrime.com%2F&source_ve_path=MzY4NDIsMjM4NTE&feature= emb_title

his car and found a badge matching the description provided by the victim. PSR ¶ 113.

3.      After January 6, 2021, Worrell lied on Facebook multiple times about what occurred that day, claiming the crowd was entirely peaceful. *See supra* at 10.

4.      In January 2021, when first interviewed by the FBI, Worrell lied three times about January 6—about whether he was on Capitol grounds at all, about whether he witnessed violence, and about whom he saw enter the Capitol building. *Supra* at 10.

5.      In a filing with this Court, Worrell claimed on August 11, 2021 that he had not received appointments for two biopsies. Dkt. 81 at 6. But in a subsequent proffer with the government, Worrell admitted that he had refused to go to those biopsy appointments after they had been made in July.

6.      As noted above, Worrell lied repeatedly in his proffers with the government in July and August 2021.  *Supra* at 12.

7.      In December 2021, after just one month of supervising Worrell on pretrial release, his local, experienced pretrial services officer suggested that Worrell was misrepresenting to the Court that his bond conditions precluded him from attending medical appointments: "Mr. Worrell has provided very little to virtually no verification as to his medi[cal] issues, diagnosis or treatment plans. He has only provided me doctor's and dentist appointment confirmations. He has not requested any adjustments to the schedule after his submission." The officer added: "[I]n my opinion, Mr. Worrell is confrontational, manipulative and passive aggressive with the conditions of his release order and his overall supervision. He questions every aspect of supervision and is attempting to manipulate the home detention portion of the bond to suit his desires."

8.      In April 2022, Worrell told pretrial services he was going to the local county

government center "for his son." Dkt. 152 at 2. Instead, he went to make false statements about his arrest and case at a public Collier County commissioners meeting. *Id.* at 2-3.

9.      In July 2022, Worrell went to a rally for another detained January 6 defendant in a jail parking lot. He had contact with another Proud Boy there. Both his attendance and the contact were violations of his conditions of release. Dkt. 151 at 3 (alleging violations). Worrell claimed that he went to the rally because it was the only time and place he could meet with his civil attorney. Dkt. 153 at 2-3. This Court heard that excuse and concluded it was "the most ridiculous explanation I've ever heard in my life." Sentencing Ex. C at 3. In a filing, Worrell also asserted he was "not a member of the Proud Boys" and did "not wear 'Proud Boy' clothing," Dkt. 153 at 3, another false claim that was easily refuted, including by Worrell's testimony at trial. Dkt. 157 at 6-8.

10.      In September 2022, Worrell claimed in a filing that he was unable to speak following jaw surgery, and the Court relaxed his conditions because of that statement. But it was apparently false; the government later obtained medical records showing that, at approximately the same time, he was screaming at a nurse at the hospital. Dkt. 176 at 2-3.

11.      Worrell told the Probation Office that he had not smoked marijuana after his first drug test in 2022; but USPO records showed he had been told he tested positive for marijuana at least once in 2023, and that there were multiple positive tests for it in 2023. PSR ¶ 154-55.

12.      At trial, Worrell made multiple false statements while under oath. *See supra* at 25-28.

In sum, Worrell has lied to the military, to the local police, to the FBI, to his pretrial services officers, to the U.S. Attorney's Office, and to this Court. He has impersonated a police officer and lied about his military service, about his medical conditions, and about his drug use. This track

record should color how this Court receives any statements by Worrell at or before sentencing.

*Medical history.* The government has never and does not now dispute that Worrell has certain serious medical conditions, including cancer. That is why the government is requesting a low-end sentence. Those conditions and Worrell's medical status also warrant placement in a Bureau of Prisons facility that is designed to care for inmates with such conditions. *See* PSR ¶ 148.

The government has disputed many of Worrell's specific claims of mistreatment or medical emergency, but only when the medical records undercut, refuted, or failed to support Worrell's claims. Medical records, affidavits, or information from healthcare providers that undercut Worrell's claims have come from the D.C. Jail's healthcare contractor, *compare, e.g.*, Dkt. 81 at 6 (Worrell claiming in August 2021 that he was being denied two biopsies), *with* Dkt. 85 at 4-6, 8-9 (medical records showing he had declined to attend both biopsies in July 2021, which was later corroborated by Worrell during proffer); *see also* Dkt. 74 at 22-23 & n.11 (order noting Court's skepticism of Worrell's claim that his COVID-19 symptoms were severe in light of medical records, including twice-daily temperature checks); from the Charlotte County Jail, *see* Dkt. 19 at 4-5, Dkt. 19-1, and Dkt. 29 at 39-40 (government opposition and Chief Judge Howell explaining that the Charlotte County Jail was not denying Worrell access to prescription medication as he claimed); from various departments at Howard University Hospital, *e.g.*, Dkt. 79 at 4-5 (HUH emergency room records undercutting Worrell's claimed COVID-19 symptoms); from local hospitals to which Worrell was taken in the fall of 2022, *see* Dkt. 176 at 2-3 (Worrell "yelling" at nurse at time when he claimed he could not speak), and from his own providers, *see id.* at 9-10 (oncologist's records undercut claim that his cancer was progressing). The examples cited above are but a few of the representations made by Worrell in his various filings that the government has

been unable to substantiate with subsequent medical records. Presumably these different physicians at different facilities have not all misrepresented Worrell's health in their records. The government submits that the more likely explanation is that Worrell has at times mischaracterized his medical treatment or condition in his filings.

That does not, of course, undercut the findings of the U.S. Marshals Service during its inspection of the D.C. Jail in October 2021. And Worrell will not be going back to the D.C. Jail regardless. Finally, it is appropriate to account for Worrell's ongoing medical conditions at sentencing.  But Worrell's history of intentional false statements, including certain of his dubious claims about his treatment, does at least cast doubt on his claims of past medical mistreatment, including his implicit claim—which the government does not view as substantiated—that he suffered additional punishment during his pretrial incarceration.[17]

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Worrell's assaults and obstruction of the certification of the vote were the epitome of disrespect for the law. Yet from his Facebook posts after January 6—in which he defended the rioters' conduct and pretended it was peaceful—to his FBI interviews and posts on his fundraising websites—in which he claims he did nothing more than exercise his First Amendment rights—to

---

[17] Worrell has repeatedly faulted the Bureau of Prisons for denying him cancer treatment in custody. But that is not true. Prior to his arrest, Worrell apparently did not undergo the chemotherapy or radiation recommended by his oncologist in August 2020. Once in custody, by contrast, Worrell requested immediate conventional treatment for his cancer. But when his Howard University Hospital oncologist and Ear, Nose, and Throat specialist concurred in the need for diagnostic biopsies, Worrell twice refused to attend them (by his own admission) delaying his treatment by weeks or months. Only after this second oncologist then recommended chemotherapy did Worrell undergo that treatment after his release that he had not pursued prior to his arrest.

his testimony at trial—in which he claimed there was no indication the mob was unwelcome and tried to falsely blame shadowy anti-protester factions for what occurred—Worrell has consistently downplayed the seriousness of his offense or of the threat that day.

Indeed, even today, Worrell cannot bring himself to admit that he has done anything wrong. Worrell continues to press the idea that officers being hit by his pepper spray was accidental: that it "could have been the result of 'overspray' or dispersal of the pepper spray by the wind." Dkt. 278 at 12. And Worrell asserts that his false testimony about whom he sprayed was the product of his "confus[ion]" due to the "chaotic scene" of January 6. Dkt. 278 at 11-12. Even after being found guilty, that is, Worrell continues to claim he is somehow innocent.

Worse, Worrell has gone out of his way to disseminate misinformation about January 6. Indeed, in several jail calls, Worrell painted himself and others as the victim of a government "setup" (supposedly involving several "congressmen") to entrap conservatives into breaching the Capitol so they could be rounded up. Sentencing Ex. E; *see* Sentencing Ex. F at 0:00-1:15, 3:00-3:56 (Worrell describing another conspiracy theory about the CARES Act including appropriations to prepare to jail conservatives before January 6). In another, he dictated the following "statement" (as edited by Worrell during the call): "Jan 6 was about the Constitution. The people's state of mind that day was about protecting and preserving our democracy and the Constitution. The violence that day was perpetrated against the people while exercising their constitutional First Amendment rights, and the people's reaction was a result of the violence against them in an attempt to save innocent lives." *See* Sentencing Ex. G.

More than that: Worrell has aggressively promoted the ideas that the January 6 prosecutions are invalid; that he is a factually innocent political prisoner; that January 6 was a set

up; that his arrest was unconscionable; or that the Capitol Police were not the victims but the instigators on that day. On top of his Facebook posts, he called into NewsMax in August 2021, called his charges "totally false and fabricated" and when asked whether he "regret[ted]" any of his conduct from January 6, responded: "Nobody I knew, talking to during or after, had any idea that anything like that was gonna occur on that day. None of us had any tendencies for anything other than to preach our First Amendment rights and protest . . . of our tyrannical government, it seems like. They're just worried about their own political agenda."[18] He later violated his conditions to attend a county commissioners' meeting to falsely claim his third-party custodian, Tricia Priller, was held "at gunpoint for hours" on the date of his arrest.[19] Ms. Priller, for her part, spoke to the Naples Daily News in January 2022, appearing to call this Court's bond restrictions "truly disgusting" and "a gross denial of civil rights and due process";[20] to the Epoch Times in June 2022, making false statements about the FBI's search of her home, perhaps at Worrell's behest, *see* Sentencing Ex. I;[21] and to Tucker Carlson on Fox News in November 2022, claiming,

---

[18] *See* https://www.youtube.com/watch?v=Y7-e6OI_w4U.

[19] *See* Sentencing Ex. H.

[20] *See* https://www.naplesnews.com/story/news/2022/01/03/christopher-worrell-keeper-outraged-judges-orders-capitol-riot/9066487002/.

[21] For example, Priller claimed the FBI held her in her home "for seven and a half hours," "held [her] at gunpoint," and only called Worrell "[f]ive hours into the ordeal," Sentencing Ex. I at 5, none of which is true, based on the FBI's reports and agent's and Worrell's own testimony. Priller also claimed the FBI SWAT team "had all of the lasers on me." *Id.* Yet in a jail call many months prior to the interview, Priller told Worrell she did *not* recall "lasers" being pointed at her—but Worrell (who had not been present) suggested she had:

WORRELL: Every little thing that happened, the whole time they were there. That you can recall. You need to document it, please listen to me on that.

…

WORRELL: … All the way down to what happened when you opened the door, what you saw,

among other things, that in-custody January 6 defendants' food was being "poisoned."[22]  Worrell has raised nearly $200,000 off of online fundraising appeals in which he claims he is an innocent "political prisoner." PSR ¶¶ 130. He then lied repeatedly under oath in an attempt to escape punishment. In light of Worrell's criminal conduct and post-January 6 representations to the public and to this Court, a significant sentence is required to promote respect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was. *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism"). The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. And more specifically, when a defendant like Worrell refuses to accept responsibility, then takes the stand and repeatedly tells baldfaced lies to the Court in service of his defense, the sentence he receives will be more closely watched— and a more prominent lodestar for others considering similar conduct in the future—than that of others who have taken responsibility for their conduct and disavowed their illegal conduct.

---

did you have a bunch of red dots all over you, I'm sure you did.

PRILLER: I don't know, I didn't see the red dots.

WORRELL: You didn't see the lasers coming at you?

PRILLER: No.

WORRELL: You don't remember red lights coming at you?

PRILLER: No. There was too big of a light, like a floodlight blast blinding me.

*See* Sentencing Ex. J at 0:20-1:10.

[22] The interview is available here: https://www.foxnews.com/video/6315989806112.

The Court should also impose a significant sentence to deter the use of pepper spray against law enforcement. Pepper spray was deployed hundreds of times on January 6 against law enforcement, and it incapacitated dozens of officers up and down the line. But unlike close combat, firing pepper spray at officers is easy for rioters to do—they need only depress a button and then retreat, like Worrell did. The Court's sentence must thus also deter the use against law enforcement of this widely available, easily used, dangerous weapon and to counter any narrative that its use is unserious because of its commercial availability and "less lethal" classification.

### *Specific Deterrence*

The evidence also indicates that a lengthy sentence of incarceration is necessary to deter Worrell specifically. Indeed, this may be the most significant sentencing factor. Worrell appears unable to accept responsibility for his own misconduct. Instead, at every turn, Worrell deflects blame, seeks scapegoats, or lies in order to escape consequences, including in his trial in this case. Only severe consequences for this shameless approach can deter him from again using violence in pursuit of his political goals and from continuing to lie and disrespect the rule of law.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). Accordingly, courts should give "respectful consideration to the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The government has recommended a guidelines sentence at the bottom of the guidelines.

**F.      Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is, however, "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The D.C. Circuit has recognized that "different district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008).

In addition, "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). Consequently, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).[23]

The most relevant comparator to Worrell is his co-defendant, Daniel Scott. Scott was sentenced to 60 months' imprisonment. But there are crucial differences between Scott and Worrell that are reflected in their guidelines ranges. First, Scott pled guilty and received credit for

---

[23] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."

acceptance of responsibility; not only did Worrell not accept responsibility, but he took the stand and perjured himself, falsely denying his own culpability. And Worrell's denial of culpability involved advancing fantastical claims (such as the weather motivating the Proud Boys' march to the Capitol, or him not seeing Scott's assaults) that exhibited disrespect for the Court—the same factfinder before whom the defendant has appeared for two years, and that has carefully considered the defendant's every claim related to his pretrial detention and release. Worrell still has made no statement accepting responsibility or acknowledging that he is guilty. This alone indicates that Worrell is far more likely to commit another offense and far more in need of deterrence than Scott.

Second, Scott engaged in no obstructive conduct after January 6: he did not lie under oath; did not discuss deleting evidence; and did not seek out or try to intimidate witnesses. Worrell did all of those things. Third, Worrell told repeated lies in his proffers without offering any information of meaningful value. Fourth, Worrell's assault involved a deadly and dangerous weapon, unlike Scott's. Fifth, Worrell displayed a level of vitriol and hatred toward the U.S. Capitol Police on January 6 that Scott did not. Sixth, unlike Scott, Worrell has loudly and falsely claimed to several media outlets that he is a persecuted innocent man.

These differences are more than sufficient to justify a substantially different sentence for Scott and Worrell. Indeed, they require a significantly higher sentence for Worrell.

Looking specifically to this Court's prior sentences, this Court has had four post-plea cases other than that of Daniel Scott involving both an assault conviction under 18 U.S.C. § 111 and an obstruction conviction under 18 U.S.C. § 1512. The guidelines ranges for these defendants were lower than Worrell's, because those defendants accepted responsibility, did not obstruct justice, did not use a deadly or dangerous weapon, and avoided other guidelines enhancements.  In each

case (and Scott's), this Court appropriately imposed a guidelines sentence due to the nature of the defendants' assaults and the gravity of the January 6 riot, even when the defendants pointed to strong mitigating facts in their favor. Those four cases are:

- *U.S. v. Scott Fairlamb*, No. 21-cr-120 (RCL). Fairlamb's guidelines range was 41-51 months, and he received a sentence of 41 months' imprisonment. Unlike Scott, Fairlamb pled guilty quite early after January 6, 2021, and expressed remorse early in the investigation.

- *U.S. v. Duke Wilson*, No. 21-cr-345 (RCL). Wilson's guidelines range was 41-51 months. Wilson pled guilty early, was 68 years old, and had "been an upstanding citizen all [his] life." Mar. 18, 2022 Sent. Tr., Dkt. 38, at 35. He received a sentence of 51 months, at the top of the guidelines range, for his violence in the Lower West Terrace's tunnel.

- *U.S. v. Marshall Neefe and Charles Smith*, No. 21-cr-567 (RCL). Neefe and Smith participated, with a large group, in thrusting a large metal sign into the police line. Both of these defendants' guidelines ranges were 41 to 51 months. At the hearing, the Court noted their youth and family support, but sentenced both to 41 months due to their assaultive conduct and preplanning. Sept. 23, 2022 Sent. Tr. at 49-50.

Aside from his current medical conditions, there is nothing exceptional about the facts of Worrell's conduct that would warrant a downward variance or departure.[24] And there are

---

[24] 168 months would be in the vicinity of the sentences imposed on some other defendants who have been convicted of Section 111(b). For example, Daniel Rodriguez (21-CR-246 (ABJ)) received a sentence of 170 months, even though he pled guilty and did not take the stand and lie. Thomas Webster (21-cr-208 (APM)) received a sentence of 120 months despite his 25-year history

countervailing aggravating factors, not all of which are accounted for (such as Worrell's coordination with the Proud Boys), or fully accounted for (such as Worrell's pattern of deception) under the guidelines. A low-end guidelines sentence is both presumptively reasonable and appropriate on the facts of this case: Worrell attacking a group of police using a dangerous weapon; assaulting the police with the specific intent of undermining the peaceful transfer of power; planning and acting in concert with a larger group before and during the attack; displaying zero remorse; and, finally, lying to the Court, the government, and the public throughout this case. A 168-month sentence is appropriate.

## VI.   RESTITUTION

With respect to Counts One, Two, Four, and Ten, restitution is discretionary under the Victim and Witness Protection Act of 1982 ("VWPA") (codified at 18 U.S.C. § 3663). *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A). Restitution is mandatory with respect to Counts Six and Thirteen, however, because each is a crime of violence under the Mandatory Victims Restitution Act, (codified at 18 U.S.C. § 3663A). 18 U.S.C. § 3663A(c)(1). Under these statutes, the use of a "reasonable estimate" or reasonable approximation of restitution is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019).

Here, the government recently estimated that the overall losses suffered by the five victims in this case—the Architect of the Capitol, the House Chief Administrative Officer, the Secretary

---

of public service as a Marine Corps veteran and New York City police officer. He also was not convicted of obstructing Congress, as Worrell was. Neither defendant entered the Capitol.

of the Senate, the Senate Sargent at Arms, and the U.S. Capitol Police Department—were, in total, $2,923,080.50. *See* 18 U.S.C.§ 3664(i) (authorizing restitution to federal agencies). Restitution in the amount of $2,000 is appropriate for Mr. Worrell. That is the amount his co-defendant, Daniel Scott, agreed to pay, and the amount that virtually all felony defendants who have either pled guilty to or been convicted after trial of similar charges have agreed to pay.[25]  And $2,000 is a reasonable estimation of any individual rioter's contribution to the overall damages incurred by the riot, given that each rioter played a role in contributing to the collapse of the police perimeter and the mob's ability to inflict property damage and injury. Indeed, even if every charged rioter pays $2,000 in restitution, it will not exceed the total losses of $2,923,080.50.

## VII.    FINE

Worrell's felony convictions subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, Worrell has raised over $181,000 in two online fundraising campaigns that are expressly based on lies regarding his conduct on January 6. *See* PSR ¶ 130. For example, his first site stated that he was wrongly imprisoned "after using non-lethal means to defend himself and others from violent anti-protesters" and that he was "being

---

[25]  Worrell will pay restitution to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

held as a political prisoner," with an image of Worrell from January 6 on the site.[26]  His second website states: "He was not there to overthrow the government or to riot. Chris was there to exercise his First Amendment Right. He was present to have his voice heard and to seek a redress to his grievances from his government. … Chris was in D.C. standing up for his God-given inalienable rights. He was there standing up for my rights. He was even there standing up for your rights. Because Chris took a stand he is in a battle for his life, literally."[27]  Worrell should not be able to use his crimes (or his false denials of them) as a revenue-generating opportunity.

His websites indicate the funds are to be used for "medical bills and cost of living expenses" in addition to legal fees. It appears that Worrell has not paid fees to his first or third attorney of record.[28] If Worrell shows that some portion of the funds were used to pay for his second attorney of record, or for medical care, that amount can be deducted from a fine. Otherwise, however, a fine of the remaining amount (up to $181,000) would be appropriate. Worrell should not be able to "capitalize" on his assault on police officers and participation in the Capitol breach. *Seale*, 20 F.3d at 1284-86.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 168 months' imprisonment, 3 years of supervised release, $2,000 in restitution, a fine of up to $181,000, and $610 in mandatory special assessments.

---

[26] *See* https://web.archive.org/web/20211123164817/www.givesendgo.com/G26PQ.

[27] *See* https://www.givesendgo.com/flotilla (March 25, 2022 update).

[28]   *See,   e.g.*,   https://web.archive.org/web/20211123164817/www.givesendgo.com/G26PQ (September 15, 2021 update) ("John Pierce had taken on all these cases pro-bono so we had no out of pocket expenses …").

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    */s/ William Dreher*
WILLIAM DREHER
Assistant United States Attorney (Detailed)
D.C. Bar No. 1033828
700 Stewart Street, Suite 5220
Seattle, WA 98101
(206) 553-4579
william.dreher@usdoj.gov

ALEXIS J. LOEB
Assistant United States Attorney (Detailed)
CA Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7168
alexis.loeb@usdoj.gov