# EXHIBIT I

# THE EPOCH TIMES

PREMIUM    CONSTITUTIONAL RIGHTS

# Jan. 6 Prisoner Who Was Denied Cancer Treatment Now 'In Dire Straits'

'Not only were these conditions sub-human in the Jan. 6 pods but they were equally and even more so in other parts of the jail.'



After a federal judge ordered his release and held jail staff in contempt of court, Jan. 6 defendant Chris Worrell receives the medical treatment that was denied to him while incarcerated for over eight months. (Courtesy of Trish Priller)



By Patricia Tolson
June 13, 2022   Updated: June 14, 2022



Print

A Jan. 6 prisoner who was released by a federal judge after being denied cancer treatment for eight months is now "in dire straights," according to his girlfriend.

On March 10, 2021, Chris Worrell was arrested and charged with alleged offenses related to his presence at the U.S. Capitol on Jan. 6, 2021.

According to the March 10, 2021, criminal complaint, Worrell is charged with knowingly entering or remaining in a restricted building or grounds, engaging in disorderly or disruptive conduct in a restricted building, and violent entry and disorderly conduct on Capitol grounds.

According to the statement of facts (pdf), the FBI received a tip alleging that Worrell had participated in the breach at the Capitol, but there is no evidence that Worrell entered the Capitol building.

The statement includes photos of Worrell spraying pepper gel while standing in a crowd outside the Capitol, with police nearby.

An arrest warrant (pdf) was issued for Worrell on March 10, 2021, charging him with the aforementioned alleged offenses, as well as charges for allegedly engaging in acts of physical violence in a restricted building or grounds and obstruction of Congress.

## Priller's Story

Worrell's girlfriend, Trish Priller, was also in Washington that day. In an exclusive interview with The Epoch Times, Priller shared her story of what happened on Jan. 6, 2021, and the disturbing events that have transpired over the subsequent 17 months.

"We were just there," Priller insisted. "We were there with family members and friends. We had some ladies in their 70s that were with us. The ladies wanted to go down and hear President Trump speak at the ellipse and I had never been to anything like that so I went with them."

As Priller explained, there was a large crowd there that day and once you were in a spot at the ellipse, you could not move out of it–even to go to the restroom– because you would never find your people again or be allowed back in through the crowd. They stood there for several hours, waiting to hear President Donald Trump speak.

"I was at the ellipse with Chris and we were separated for seven and a half hours because the crowd was so enormous we couldn't meet up with each other," Priller recalled, adding that while the cell towers weren't working and they couldn't communicate by phone, they could get the occasional text "here and there."



Chris Worrell, a Jan. 6 defendant who was released from pretrial detention to undergo cancer treatment, is with his girlfriend Trish Priller. (Courtesy of Trish Priller)

"I don't know what he did during that time because we weren't in the same area," she said.

Two months later, on March 11, Worrell and some of his friends headed off for a weekend canoeing trip in northern Florida. It was a Friday, and Priller was home alone when the FBI raided the house.

"They flash banged me and held me at gunpoint," Priller recalled. "When I went outside I had all of the lasers on me. They held me in my home for seven and a half hours. During that time they were rifling through everything in the house and I had to sit in a chair and watch them. I couldn't go anywhere. If I wanted something to drink, they would bring it to me. When I had to go to the restroom I had to go with two agents with me into the bathroom. I was held prisoner in my home for all that time."

Five hours into the ordeal, Priller said she was allowed to call Worrell and give the phone to the FBI. The agents agreed that Worrell could come home. During the 3-hour drive back home, Worrell checked in about every 30 minutes to let the FBI know where he was, Priller said. When Worrell arrived, he was immediately handcuffed, searched, and brought into the house. Documents (pdf) show Worrell was taken to Fort Meyers, Florida.

He was originally granted pretrial release on bond, but a second judge ordered a stay on Worrell's release, and Worrell was instead transferred to Charlotte County, Florida, where he was held for three weeks.

Worrell has a rare form of non-Hodgkin lymphoma, a type of blood cancer, and had been managing the illness since he was diagnosed in 2007. He remained at stage one of the illness for several years.

But Priller said that when Worrell was being held in Charlotte County, he didn't have access to his medications during that time.

"They wouldn't allow the doctor to bring them in," Priller asserted. "They said I should go get them, but you can't do that. You can't bring medicines into a prison. They won't let you do that. So our doctor wrote a prescription and sent it to them and they didn't process it. It took almost the whole three weeks. At that point he was transferred to Oklahoma by Con-Air, I guess, where he stayed for another couple of days, still with no meds."

As Priller explained, Worrell was then transferred to Northern Neck, Virginia, where he stayed for another couple of days. It was there that Worrell contracted the Chinese Communist Party (CCP) virus, commonly known as the novel coronavirus. At the time, it was already known the facility had many COVID cases.

Then he was transported to the Correctional Treatment Facility in Washington (pdf), referred to by Priller and many Jan. 6 prisoners as "the gulag." At that point, Worrell had gone 75 days without his medications.

"They basically said his physician wasn't qualified, even though he had been in the practice and treated cancer patients," Priller charged. "They didn't feel like he was qualified so he continued on with no meds. They would send him to doctors for visits but they falsified that."

As Priller explained, Worrell would be taken from the prison and taken to the university hospital where he would see a doctor. The guards who went with him had paperwork they needed to have filled out, so the doctor would fill out the paperwork and hand it to the guards to return it to the prison where it was given to their medical team, she said.

"The notes from the doctor were then transcribed by jail personnel, who fabricated things, changed notes switched it up and then gave it to the medical facility in the jail," Priller asserted. "They kept using the word 'treatment.' But the word 'treatment' means you're actually receiving some sort of medicine. He didn't have any 'treatment.' He had a *consultation*, not a 'treatment' for his cancer."

Priller said Worrell filed hundreds of grievances through the jail, not just for the lack of medical care for his cancer and broken hand but for the deplorable conditions he and other Jan. 6 prisoners were forced to live under.

"They told him if he keeps putting in grievances they were going to put him in the hole," Priller said. "and they did. They kept him there for 16 days."

As described by Liberty Nation, "the hole"–solitary confinement–is where detainees are allegedly sent to be punished for daring to talk to the media about what is really going on inside the prison. Lawyers John Pierce and Steven Metcalf II, who represent several of the defendants, told EpochTV's "The Nation Speaks" that among the nearly people 500 arrested so far in connection with Jan. 6, more than 50 are being held in solitary confinement for 23 hours a day, in conditions that are "unconstitutional" and violate "every single basic human right."

"Anything that they do, or if anybody speaks up on their behalf, all of a sudden, they get targeted even further and then get put into a dangerous, unsanitary condition," Metcalf said.

The Epoch Times has reached out to corrections officials in Charlotte County, Florida, and in Washington, requesting comment about these allegations.

## The Legal Fight

On May 26, 2021, Worrell's attorney filed a reply to the government's supplemental brief pursuant to the district court's order (pdf), stating that "the essential undisputed fact of this case is that Mr. Worrell has cutaneous follicular b-cell non-Hodgkin's lymphoma, and has been held by the Government without treatment for his white blood cell cancer for seventy-five days." It further asserted that the government was intentionally refusing "to issue the prescription authorized by Dr. Rucker, a licensed medical doctor in the state of Florida" and has "failed to issue an alternative medication."

On Sept. 24, 2021, Worrell's attorney John Pierce was replaced by Alex Stavrou.

As the second attorney, Stavrou noted the numerous prior steps taken to seek conditions of release for Worrell.

"Of course, from a legal perspective," Stavrou told The Epoch Times in an exclusive interview, "the government and the courts were extremely reluctant to grant any of those conditions and I think that's pretty evident by the fact you can see the number of individuals who are still incarcerated in various jails across the country waiting to be sent to the Northern Neck Regional Jail in Virginia or the Washington D.C. jail. Mr. Worrell, of course, received what could be argued as horrendous medical care while at the jail, and there were numerous attempts to thwart that medical care or to thwart the physicians of Mr. Worrell in regards to what treatment was needed."

Aside from the cancer, one of the biggest issues Stavrou cited in Worrell's case was the fact that his hand was broken while in jail and there was a surgical recommendation in writing. While jail officials tried to argue that they never recommended surgery, it had been in writing and the doctor changed his original position, saying he never recommended surgery.

"Of course, there was no follow-up care for several months," Stavrou said (pdf). "And at the end of the day, the judge was not overly impressed with the overall care that Mr. Worrell was not receiving and then started to force the issue, which culminated with Chris receiving conditions of release."

More importantly, Stavrou said what came out of Worrell's plight was the exposure of "borderline medical malpractice" and caused the judge to order an inspection regarding the conditions inside the jail.

"The long and short of it was, not only were these conditions subhuman in the Jan. 6 pods but they were equally and even more so in other parts of the jail," Stavrou asserted.

Stavrou described how there was rampant availability of drugs, primarily marijuana. While they knew inmates were buying drugs, they could only be coming in through staff. Jail staff would also allegedly turn off the water in the Jan. 6 pods for days at a time.

"Without water, you can't flush a toilet," Stavrou noted. "You can't have drinking water. You can't bathe. So you can imagine the beyond-subhuman conditions when in an 8-by-10 or a 6-by-6 [foot] cell. The smell of unflushed, clogged toilets and the smell of marijuana, fecal matter, urine and unbathed, unshaved gentlemen. These are completely atrocious conditions, especially in a country that supposedly prides itself on human rights."

In response to the repeated complaints and reports regarding the deplorable "subhuman" conditions at the Washington jail, the U.S. District Court for the District of Columbia "directed the Clerk of the Court to transmit the civil contempt order to the Attorney General for appropriate inquiry into potential civil rights violations of January 6 defendants, as exemplified in this case." (pdf)

The judge also held the prison warden and the director of the D.C. Department of Corrections in contempt for failure to promptly produce Worrell's medical records

On Nov. 3, a statement by the U.S. Marshals Service (pdf) said that their inspection of the Central Treatment Facility (CTF)–where some of the Jan. 6 prisoners are being held–"did not identify conditions that would necessitate the transfer of inmates from that facility." However, the U.S. Marshals did admit that "based on the results of the unannounced inspection" of the Central Detention Facility, where an additional 400 detainees were held in the custody of the United States Marshals Service (USMS), it was determined "that conditions there do not meet the minimum standards of confinement as prescribed by the Federal Performance-Based Detention Standards. Therefore, working with the Lewisburg Bureau of Prisons, the USMS agreed to transfer those detainees to United States Penitentiary in Lewisburg, Pennsylvania."

Stavrou said he would argue that the conditions and treatment of inmates was being swept under the rug and that the "same kind of nonsense" was still taking place. "While they may have cleaned up the deplorable conditions, now they will do things like claim the internet is down for two to five days so the inmates can't communicate with loved ones through email messages or there is something wrong with the phones. So now there are gentlemen in the prison who haven't received release who can't get in touch with their families."

It was further noted in the U.S. Marshals' statement that "the Lewisburg Bureau of Prisons facility provides attorney and visitor areas, medical care, and video teleconferencing capabilities."

When Worrel was released from prison, he hadn't had any medications for eight months. At that point, he had gone from stage one cancer to stage three.

## The Fight for His Life

"Chris just finished five rounds of chemotherapy and has a follow-up appointment in July for further diagnostic tests," Priller said, noting that some of his symptoms are already returning. "His medical condition has deteriorated dramatically. His teeth, his skin, so many issues that could have been prevented. Chris is in dire straights."

Trish Priller sits with her boyfriend, Jan. 6 defendant Chris Worrell, while he goes through chemotherapy for cutaneous follicular B-cell non-Hodgkin lymphoma. (Courtesy of Trish Priller)

As Priller explained, Worrell now needs multiple surgeries on his mouth and teeth due to radiation treatments "and further complications due to the fact he was using a very specific type of toothpaste that he could not get while incarcerated." The cost is estimated at about $30,000. Then there is the additional chemotherapy to treat the returning symptoms. For that, he will need at least another $50,000. There is a [GiveSendGo account](#) to raise money for Worrell's treatment.

In the meantime, Priller said their daily lives are stressed with the constant threat of another visit from the government.

"The marshals and pretrial services can just show up any time they want and do a search," Priller said, "and they do, and you have to let them in. They're looking to violate you, to see what you've done wrong. We have parameters, we have to call in every single day. There's a lot of rules we have to follow. We have to submit a weekly schedule and call in every Tuesday."

She described how there was one instance where she was on the phone with the pretrial officer trying to get their schedule filed on time. Shortly after, the pretrial service officer filed an order (pdf) claiming Worrell violated the conditions of his conditions of release "because he heard keystrokes," Priller said.

Stavrou filed a response (pdf) explaining that it was Priller typing in an effort to submit the weekly schedule on time while "on the phone simultaneously with Pre-trial services Officer Tad Parks." Judge Royce Lamberth accepted the explanation (pdf).

"I'm being watched and monitored and I wasn't even the one arrested," Priller said. "So I am basically imprisoned also."